**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No.: 17-CV-23419

**JAMES GOOSBY**,

      Plaintiff,

vs.

**BRANCH BANKING & TRUST**
**COMPANY,** a foreign corporation, and
successor by merger to BankAtlantic,

      Defendant,

_____/

**COMPLAINT**

Plaintiff, JAMES GOOSBY ("Goosby"), through undersigned counsel, sues Defendant

BRANCH BANKING & TRUST COMPANY, successor by merger to BankAtlantic ("BB&T"),

and alleges:

**SUMMARY OF ACTION**

1.      Howard Baker famously said "[i]t is almost always the cover-up rather than the

event that causes trouble."  Those words were profound when first said.  They are equally

profound here, where after it was discovered that BB&T intentionally, falsely and with nefarious

intent fabricated a story about Mr. Goosby forging a check BB&T sent him, BB&T attempted to

cover up its initial story by intentionally, falsely and with nefarious intent fabricating a second

story about Mr. Goosby, which resulted in his continued arrest and imprisonment.

2.      In April 2008, Mr. Goosby opened a credit line with BankAtlantic, pursuant to

which he could borrow no more than $106,000.00 for use in his business.  In September 2012, he

paid $50,000.00 of the credit line, which reduced the balance to $53,682.10.  In the same month,

he borrowed $50,000.00 from the credit line for another project, brining the balance to $103,682.10.

3.      BB&T informed Mr. Goosby that the outstanding balance on the line was $153,682.10 because the $50,000.00 check for his September 2012 deposit was returned for lack of funds.  Mr. Goosby disputed the balance and asked for, but was not provided proof of the check that BB&T claimed was returned for lack of funds.  BB&T was required to keep a copy of this check pursuant to banking laws.

4.      Despite being unable to provide a copy of the check it claimed was returned for lack of funds, BB&T threatened to foreclose the credit line.  On December 5, 2016, BB&T, via a letter, informed Mr. Goosby that it would reinstate the credit line and not foreclose if he paid $2,673.78 by January 9, 2017.  Mr. Goosby timely paid the $2,673.78 and continued trying to resolve the status of the check BB&T claimed was returned for lack of funds.

5.      Displeased with Mr. Goosby's continued requests for a copy of the so-called bad check, BB&T tendered Mr. Goosby, via official BB&T checks, the $2,773.78 he paid pursuant to the December 2016 letter and the two payments he made in September and December 2016.  In addition, BB&T filed a lawsuit to foreclose the credit line.

6.      Before March 3, 2017, Mr. Goosby cashed without incident the official BB&T checks returned to him.  However, on March 3, 2017, when he attempted to cash another official check BB&T returned to him, BB&T intentionally, blatantly, falsely and without confirming it issued the check, contacted and informed the police, *inter alia*:  (1) that Mr. Goosby forged the BB&T check, (2) that it had confirmed the check was not a BB&T check, and (3) that Mr. Goosby's driver's license did not appear real.

7.     As a result of BB&T's deliberate false statements to the police, Mr. Goosby was arrested, placed in a police car without air conditioning, and exhibited in front of the bank for over an hour before being hauled off to jail.  During the time Mr. Goosby was in the back of the police car, BB&T began to do what it should have done *prior* to contacting the police—*i.e.*, confirm whether the BB&T check it claimed Mr. Goosby had forged was real.

8.     BB&T eventually confirmed that the check it claimed Mr. Goosby had forged was a real BB&T check.  Remarkably, rather than admit that its initial statements to the police were blatantly false, and forgetting that its initial call to the police was memorialized, BB&T changed its story and claimed that it called the police because Mr. Goosby was disorderly and disruptive, and caused the bank's customers to leave.  Based on BB&T's new deliberate false statements, Mr. Goosby remained arrested and was imprisoned for disorderly conduct.

9.     The Miami-Dade prosecutor's office dropped all charges against Mr. Goosby after reviewing BB&T's surveillance videos, which contradicted its claim that Mr. Goosby was disorderly and disruptive.

## PARTIES, JURISDICTION AND VENUE

10.     This is a civil action for monetary damages in excess of seventy-five thousand dollars ($75,000.00), exclusive of costs, interest and attorney's fees.

11.     Plaintiff Goosby is an individual over the age of eighteen and is otherwise *sui juris*.  At all times relevant, Mr. Goosby was and still is a resident of Miami-Dade County, Florida.

12.     BB&T is incorporated in North Carolina with a principal place of business in Winston-Salem, North Carolina, and at all relevant times was authorized to and engaged in substantial and not isolated business in Florida.

13.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332 because this matter is for an amount in excess of $75,000.00, exclusive of interest, costs and attorney's fees, and is a dispute between citizens of different states.

14.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to this lawsuit arose in Miami-Dade County, Florida, and BB&T is subject to jurisdiction herein.

15.     Goosby has complied with all conditions precedent to pursuing this action or said conditions have been waived or have otherwise occurred.

## FACTUAL ALLEGATIONS

### A.     THE CREDIT LINE

16.     On or about April 28, 2008, Mr. Goosby and BankAtlantic, the predecessor in interest of BB&T, entered into a Credit Agreement and Disclosure Agreement (the "Credit Line"), pursuant to which Mr. Goosby could borrow no more than $106,000.00.

17.     On or about September 4, 2012, Mr. Goosby paid BankAtlantic via a money order and cash a total of $50,000.00 ("50K Deposit"), which reduced the balance of the Credit Line to $53,782.10.

18.     On or about September 7, 2012, Mr. Goosby borrowed $50,000.00 against the Credit Line, which increased the outstanding balance to $103,682.10 ("50K Draw").

19.     BB&T, however, informed Mr. Goosby that the balance of the Credit Line was $153,682.10 instead of $103,682.10.

20.     Specifically, BB&T claimed that Mr. Goosby's 50K Deposit was returned to BankAtlantic as "Refer to Maker" and therefore the payment was not credited to reduce the

outstanding balance of the Credit Line.  BB&T informed Mr. Goosby that the reference to "Refer to Maker" meant that the 50K Deposit was returned for lack of funds.

21.    Mr. Goosby disputed that the correct outstanding balance of the Credit Line was $153,682.10 and that the 50K was returned for lack of funds.  He also requested proof of the so-called check that was returned to BankAtlantic for lack of funds.

22.    BB&T has not provided Mr. Goosby with a copy of the so-called check it claims was returned for lack of funds, which copy it was required to retain pursuant to banking laws. Instead, BB&T claims that it returned the check to Mr. Goosby's address on file after it was not able to reach him via phone.

23.    Curiously, BB&T was able to provide proof of the 50K Draw, which was issued three (3) days after the 50K Deposit.  A copy of the 50K Draw is attached as **Exhibit A**.

24.    Mr. Goosby continued disputing the $153,682.10 outstanding balance of the Credit Line, and the related charges on such inflated outstanding balance.

**B.    BB&T THREATENS TO FORECLOSE THE CREDIT LINE AND RETURNS PAYMENTS IT REQUESTED TO REINSTATE THE CREDIT LINE SO IT COULD INITIATE FORECLOSURE PROCEEDINGS**

25.    Displeased with Mr. Goosby's repeated requests for a copy of the check that was purportedly returned for lack of funds, on December 5, 2016, BB&T sent a certified letter to Mr. Goosby informing him, *inter alia*, that (1) he was in default of the Credit Line, (2) the Credit Line would continue as though it was not late if Mr. Goosby paid $2,673.88 on or before January 11, 2017, and (2) BB&T would commence judicial foreclosure proceedings if Mr. Goosby did not timely pay the $2,673.88 amount referenced in the letter ("Default Letter").  A copy of the Default Letter is attached as **Exhibit B**.

26.     On December 7, 2016, BB&T via an official check returned to Mr. Goosby the $500.00 he paid in September 2016.   A copy of the letter retuning the check is attached as **Exhibit C**.

27.     On December 9, 2016, Mr. Goosby paid $500.00 via a cash deposit towards the balance of the Credit Line and received a receipt from BB&T.   On December 22, 2016, BB&T via an official BB&T check returned the $500.00 to Mr. Goosby and informed him that, contrary to the Default Letter, it was returning his monies because the Credit Line was in foreclosure, was not reinstated and remains in default.   Copies of the deposit receipt and BB&T's letter are attached as **Composite Exhibit D**.

28.     Mr. Goosby visited a BB&T and cashed without incident the two $500.00 checks BB&T sent him.  He, however, continued disputing the inflated outstanding balance of the Credit Line and requesting proof of the 50K Deposit that BB&T claimed was returned for lack of funds.

29.     On January 9, 2017, two (2) days before the deadline referenced in BB&T's Default Letter, Mr. Goosby paid via a cash deposit the $2,673.88 requested in the letter ("Default Payment").  The payment was 10 cents more than the amount requested in the Default Letter.

30.     Again, contrary to the Default Letter, on January 26, 2017 BB&T, via an official bank check, returned to Mr. Goosby the Default Payment.  Again, contrary to the Default Letter, BB&T informed Mr. Goosby that it was returning the Default Payment because the Credit Line was in foreclosure, was not reinstated and remains in default.  Copies of the Default Payment and the letter returning it are attached as Composite **Exhibit E**.

31.     Mr. Goosby visited a BB&T and cashed without incident the $2,673.88 check BB&T sent him.  But, he continued disputing the inflated outstanding balance of the Credit line and requesting proof of the 50K deposit that was allegedly returned to him for lack of funds.

32.     On February 3, 2017, and despite timely receiving the Default Payment, BB&T filed in state court an action to foreclose the Credit Line.

33.     Amazingly, in its foreclosure action, BB&T falsely allege that Mr. Goosby failed to pay the Default Payment requested in the Default Letter.

34.     BB&T, however, fails to mention that, contrary to its allegation, Mr. Goosby timely paid the Default Payment, but that BB&T returned his monies so that it could justify foreclosing the inflated Credit Line because he continued disputing the inflated outstanding balance and requesting proof that the 50K Deposit was returned for lack of funds.

35.     On or before January 2017, BB&T sent Mr. Goosby another statement requesting payment of $3,676.23 towards the outstanding balance of the Credit Line, which was now the subject of the state court foreclosure action.  Mr. Goosby paid via a cash deposit $3,700.00 and received a BB&T receipt.

36.     On February 23, 2017, BB&T returned via an official check the $3,700.00 it requested Mr. Goosby pay towards the outstanding balance of the Credit Line.  A copy of the letter returning the payment and the cash deposit receipt are attached as **Composite Exhibit F**.

C.     **BB&T FALSELY REPORTS TO THE POLICE THAT MR. GOOSBY FORGED THE BB&T OFFICIAL CHECK IT SENT TO HIM**

37.     On March 3, 2017, as he had done on several occasions without incident, Mr. Goosby visited BB&T to cash the official BB&T check in the amount of $3,700.00

38.     Unfortunately, Mr. Goosby's attempt to cash the official BB&T check was met with resistance.

39.     Specifically, on March 3, 2017, Mr. Goosby drove into a BB&T drive thru teller to cash the check.  After Mr. Goosby placed the check and his identification into the drive-thru teller machine, the teller immediately accused him of forging the check.  Mr. Goosby explained

how he received the check, including that he had at his house the letter from BB&T returning the check.  The teller continued accusing Mr. Goosby of forging the check and requested he come into the bank.

40.     Because he did not forge the check, Mr. Goosby entered the bank and approached the teller window.  While at the teller window, the teller continued accusing Mr. Goosby of forging the check.  Mr. Goosby continued explaining to the teller how he received the check.

41.     However, Mr. Goosby quickly became concerned about what was occurring and informed the teller that he was going to call the police.  The teller told Mr. Goosby that it was not necessary to call the police.  Shortly thereafter, the teller left the check and Mr. Goosby's driver's license at the teller window and left the teller window to go speak with the branch manager, whose office was near the bank's entrance.

42.     Mr. Goosby remained at the teller window with the check and his driver's license because he was concerned that someone might take the check and his driver's license.

43.     Because he was still concerned that BB&T was accusing him of forging the official BB&T check sent to him, Mr. Goosby called the police to report what was happening and requested they come to the bank, prepare a police report of the incident and provide him with a copy of the police report and the BB&T check for his records, which he could use to later try to resolve the incident.

44.     In fact, Mr. Goosby called the police twice before BB&T called the police.  His first call was at 3:43 pm and his second was at 3:57:27 pm.  During both calls Mr. Goosby informed the 911 operators what transpired.  Particularly, he informed the 911 operators that he paid BB&T certain monies, that BB&T returned his monies to him via official BB&T checks,

which he cashed without incident, and that BB&T was now accusing him of forging the official BB&T check it recently sent him.

45.     Unbeknownst to Mr. Goosby, shortly after his second call to the police, at 3:57:44 pm, the branch manager, who had not seen the so-called forged BB&T check that still remained at the teller window, called the police and intentionally, blatantly, falsely and with nefarious intent stated:  (1) that Mr. Goosby presented a check that is fake, (2) BB&T already confirmed that the check is fake, (3) Mr. Goosby was asked, but refuses to step away from the teller window, (4) that the driver's license Mr. Goosby presented, which the manager had not seen, is hard to read because it is really worn our or a really bad license, and (5) that Mr. Goosby was trying to enter the manager's office ("Initial False Statements").

46.     The branch manager remained on the phone with the operator until a police officer arrived at the bank.

47.     Mr. Goosby, thinking the police officer that arrived was responding to his 911 calls, called the officer over to the teller window so he could explain what transpired, including that the teller had accused him of forging the BB&T check.  Mr. Goosby requested the police officer prepare a report of the incident and provide him with a copy of the check for his records.

48.     After speaking with the police officer, Mr. Goosby continued waiting near the teller window while the police officer spoke with the branch manager and the teller in the branch manager's office.

49.     Later, the police officer asked Mr. Goosby to come into the branch manager's office.  Mr. Goosby complied.

50.     Upon entering the branch manager's office, the branch manager continued accusing Mr. Goosby of forging the BB&T check.  Mr. Goosby, however, continued explaining

the history of the BB&T checks, including that BB&T repeatedly sent him official BB&T checks returning the payments he made towards the inflated balance of the Credit Line. He also offered to go to his home to bring a copy of the letter he received from BB&T returning the $3,700.00 check BB&T claimed he forged.

51. Unfortunately, Mr. Goosby was not given the opportunity to leave. Instead, he was arrested and placed in the rear of a police car without air conditioning in front of the bank in the shopping center. Mr. Goosby remained in the sweltering police car for nearly an hour and a half before he was transported to jail.

52. Before he was hauled off to jail and while in the back of the sweltering police car, a second police officer that had come to the bank repeatedly asked BB&T whether the check it accused Mr. Goosby of forging was an official BB&T check.

53. BB&T, contrary to its Initial False Statements, could not answer whether the check was forged or an official BB&T check. In fact, BB&T began confirming whether the check was real or forged after Mr. Goosby was arrested and during the nearly hour-and-a-half that he was exhibited in the rear of the sweltering police car in front of the bank.

**D.   BB&T ATTEMPTS TO COVER UP ITS INITIAL FALSE STATEMENTS**

54. After repeated calls to other BB&T employees, at approximately 5:12 pm (more than an hour after BB&T first called the police at 3:57 pm), the branch manager finally confirmed that the BB&T check Mr. Goosby was trying to cash was a real check issued by BB&T.

55. But, now caught in the quandary of admitting that its Initial False Statements were blatantly false, BB&T decided it was best to intentionally change its story so that Mr. Goosby would remain arrested.

56.     Specifically, the branch manager, upon hanging up the phone after speaking with BB&T's upper management, told the police officer that BB&T concluded that the check is legitimate.  The branch manager, based on his conversation with BB&T's upper management, then intentionally, deliberately and with bad faith falsely stated to the police officer that the reason BB&T called the police ***was not because the check was forged or a fake***, but because Mr. Goosby was aggressive and refused to move from the teller window, which made bank employees feel intimidated ("Cover Up False Statements").

57.     Simply, BB&T's Initial False Statements and its Cover Up False Statements were both blatantly false and made intentionally by BB&T with the utmost bad faith.  Summarily, the Initial and Cover Up False Statements were:

| Initial False Statements | Cover Up False Statements |
|---|---|
| • Mr. Goosby presented a check that is fake;<br>• BB&T already confirmed that the check is fake;<br>• Mr. Goosby was asked, but refuses to step away from the teller window;<br>• Mr. Goosby's driver's license is hard to read because it is really worn out or a really bad license; and<br>• Mr. Goosby was trying to enter the manager's office | • Mr. Goosby was aggressive;<br>• Mr. Goosby refused to move from the teller window;<br>• Mr. Goosby made bank employees feel intimidated. |

### E.   MR. GOOSBY IS IMPRISONED FOR NON-EXISTENT DISORDERLY CONDUCT AND FORCED TO CLEAR HIS NAME

58.     Because of BB&T's Initial and Cover Up False Statements, Mr. Goosby was arrested for forging a check and then imprisoned for disorderly conduct.

59.     Mr. Goosby was forced to retain and pay an attorney to help him clear his name.

60.     The Miami-Dade County State Attorney's office dropped all charges against Mr. Goosby after reviewing BB&T's surveillance video, which contradicted BB&T's Initial and Cover Up False Statements.

## COUNT 1
## MALICIOUS PROSECUTION

61.     Goosby incorporates paragraphs 1, 6 through 15, and 37 through 60 as though fully set forth herein.

62.     On March 3, 2017, Mr. Goosby was arrested at a BB&T location in Miami-Dade County, placed in the rear of a police car without air conditioning, and exhibited in front of the BB&T where strangers and people he knew saw him.  Then later, he was transported to a Miami-Dade County jail, after which he was forced to retain an attorney to successfully challenge and obtain a dismissal of the criminal charges and proceedings against him.

63.     BB&T's conduct was the legal and proximate cause of Mr. Goosby's arrest and imprisonment and of the criminal charges and proceedings commenced against him.

64.     Specifically, BB&T called and intentionally, with malice and with the utmost bad faith made the Initial False Statements to the police.  BB&T knew or should have known the Initial False Statements were blatantly false.

65.     After Mr. Goosby was arrested based on the Initial False Statements, BB&T was put in the quandary of admitting the falsity of its Initial False Statements.  Rather than do the right thing and admit that its Initial False Statements were false, BB&T decided to cover up the falsity of the Initial Statements by intentionally, with malice and with the utmost bad faith making the Cover Up False Statements, which it knew or should have know were also false, inaccurate and misleading.

66.     The criminal proceedings against Mr. Goosby were terminated in his favor in May 2017, after he provided the Miami-Dade County State Attorney's office with BB&T surveillance video, which refuted BB&T's Initial False Statements and Cover Up False Statements.

67.     The police did not have probable cause to initiate the criminal proceedings against Mr. Goosby and only proceeded with the criminal proceedings against him based on BB&T's Initial False Statements and Cover Up False Statements, which were false, misleading and inaccurate.

68.     BB&T acted maliciously and with bad intent when it made the Initial False Statements and Cover Up False Statements to the police.

69.      Mr. Goosby suffered significant damages as result of BB&T's conduct, including but not limited to economic and non-economic damages associated with his arrest and subsequent imprisonment.

**WHEREFORE**, Mr. Goosby respectfully requests the Court enter judgment in his favor and against BB&T and award Mr. Goosby economic and non-economic damages in excess of $75,000.00, punitive damages, attorney's fees and costs associated with the underlying criminal proceeding, costs in this action, pre and post-judgment interest, as applicable, and such further relief the Court deems just and proper.

## COUNT 2
## FALSE ARREST/IMPRISONMENT

70.     Goosby incorporates paragraphs 1, 6 through 15, and 37 through 60 as though fully set forth herein.

71.     On March 3, 2017, Mr. Goosby was arrested at a BB&T location in Miami-Dade County, placed in the rear of a police car without air conditioning, and exhibited in front of the

BB&T where strangers and people he knew saw him.  Then later, he was transported to a Miami-Dade County jail, after which he was forced to retain an attorney to successfully challenge and obtain a dismissal of the criminal charges against him.

72.     Mr. Goosby's arrest and detention were against his will.

73.     Also, his arrest and detention were without legal authority or color of authority. Specifically, Mr. Goosby's arrest and detention were instigated by, and were the direct and proximate result of BB&T's Initial and Cover Up False Statements, both of which were blatantly false and were made intentionally and with the utmost bad faith.

74.     More specifically, BB&T made the Initial and Cover Up False Statements with utter disregard to Mr. Goosby's rights, liberties and dignity.  Furthermore, BB&T's conduct of making the Initial and Cover Up False Statements was reckless, outrageous, unreasonable and unwarranted under the circumstances.  BB&T knew or should have known that the check it claimed was forged was a real check.  Certainly, it should not have taken it over an hour and a half to confirm the check was real, and it should not have called the police to report that the check was forged before confirming if the check was real or forged.  Also, it should not have concocted the Cover Up False Statements to cover up the falsity of its Initial False Statements.

75.     As a direct and proximate result of BB&T's conduct, Mr. Goosby suffered significant damages, including but not limited to economic and non-economic damages associated with his arrest and subsequent imprisonment.

**WHEREFORE**, Mr. Goosby respectfully requests the Court enter judgment in his favor and against BB&T and award Mr. Goosby economic and non-economic damages in excess of $75,000.00, punitive damages, attorney's fees and costs associated with the underlying criminal

proceeding, costs in this action, pre and post-judgment interest, as applicable, and such further relief the Court deems just and proper.

## COUNT 3
## GROSS NEGLIGENCE

76.     Goosby incorporates paragraphs 1, 6 through 15, and 37 through 60 as though fully set forth herein.

77.     On March 3, 2017, Mr. Goosby was arrested at a BB&T location in Miami-Dade County, placed in the rear of a police car without air conditioning, and exhibited in front of the BB&T where strangers and people he knew saw him.  Then later, he was transported to a Miami-Dade County jail, after which he was forced to retain an attorney to successfully challenge and obtain a dismissal of the criminal charges against him.

78.     Mr. Goosby's arrest and detention were the direct and proximate result of BB&T's inaccurate, false and misleading Initial and Cover Up False Statements.

79.     BB&T made the Initial and Cover Up False Statements with utter disregard to Mr. Goosby's rights, liberties and dignity.  Furthermore, BB&T's conduct of making the Initial and Cover Up False Statements was reckless, unreasonable, unwarranted under the circumstances, grossly and flagrantly negligent, outrageous, and beyond all bounds of decency. BB&T knew or should have known the check it claimed was forged was a real check.  Certainly, it should not have taken it over an hour and a half to confirm the check was real, and it should not have called the police to report that the check was forged before confirming if the check was real or forged.  Also, it should not have concocted the Cover Up False Statements to cover up the falsity of its Initial False Statements.

80.     As a direct and proximate result of BB&T's conduct, Mr. Goosby suffered and continues suffering from severe emotional distress resulting from his arrest and subsequent imprisonment in the Miami-Dade County jail.

81.     Certainly, BB&T knew that making the Initial and Cover Up False Statements would, as it did, result in Mr. Goosby's arrest and subsequent imprisonment.

**WHEREFORE**, Mr. Goosby respectfully requests the Court enter judgment in his favor and against BB&T and award Mr. Goosby economic and non-economic damages in excess of $75,000.00, punitive damages, attorney's fees and costs associated with the underlying criminal proceeding, costs in this action, pre and post-judgment interest, as applicable, and such further relief the Court deems just and proper.

### COUNT 4
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

82.     Goosby incorporates paragraphs 1, 6 through 15, and 37 through 60 as though fully set forth herein.

83.     On March 3, 2017, Mr. Goosby was arrested at a BB&T location in Miami-Dade County, placed in the rear of a police car without air conditioning, and exhibited in front of the BB&T where strangers and people he knew saw him.  Then later, he was transported to a Miami-Dade County jail, after which he was forced to retain an attorney to successfully challenge and obtain a dismissal of the criminal charges against him.

84.     Mr. Goosby's arrest and detention were the direct and proximate result of BB&T's inaccurate, false and misleading Initial and Cover Up False Statements.

85.     BB&T made the Initial and Cover Up False Statements with utter disregard to Mr. Goosby's rights, liberties and dignity.  Furthermore, BB&T's conduct of making the Initial and Cover Up False Statements was reckless, unreasonable, unwarranted under the

-16-

circumstances, and was outrageous and beyond all bounds of decency.  BB&T knew or should have known the check it claimed was forged was a real check.  Certainly, it should not have taken it over an hour and a half to confirm the check was real, and it should not have called the police to report that the check was forged before confirming if the check was real or forged.  Also, it should not have concocted the Cover Up False Statements to cover up the falsity of its Initial False Statements.

86.     As a direct and proximate result of BB&T's conduct, Mr. Goosby suffered and continues suffering from severe emotional distress resulting from his arrest and subsequent imprisonment in the Miami-Dade County jail.

87.     Certainly, BB&T knew that making the Initial and Cover Up False Statements would, as it did, result in Mr. Goosby's arrest and subsequent imprisonment.

**WHEREFORE**, Mr. Goosby respectfully requests the Court enter judgment in his favor and against BB&T and award Mr. Goosby economic and non-economic damages in excess of $75,000.00, punitive damages, attorney's fees and costs associated with the underlying criminal proceeding, costs in this action, pre and post-judgment interest, as applicable, and such further relief the Court deems just and proper.

## COUNT 5
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

88.     Goosby incorporates paragraphs 1, 6 through 15, and 37 through 60 as though fully set forth herein.

89.     On March 3, 2017, Mr. Goosby was arrested at a BB&T location in Miami-Dade County, placed in handcuffs in the rear of a police car without air conditioning, and exhibited in front of the BB&T where strangers and people he knew saw him.  Then later, he was transported

to a Miami-Dade County jail, after which he was forced to retain an attorney to successfully challenge and obtain a dismissal of the criminal charges against him.

90.    Mr. Goosby's arrest and detention were the direct and proximate result of BB&T's inaccurate, false and misleading Initial and Cover Up False Statements.

91.    BB&T made the Initial and Cover Up False Statements with utter disregard of Mr. Goosby's rights, liberties and dignity.   Furthermore, BB&T's conduct of making the Initial and Cover Up False Statements was reckless, unreasonable, unwarranted under the circumstances and was outrageous and beyond all bounds of decency.   BB&T knew or should have known the check it claimed was forged was a real check.   Certainly, it should not have taken it over an hour and a half to confirm the check was real, and it should not have called the police to report that the check was forged before confirming if the check was real or forged. Also, it should not have concocted the Cover Up False Statements to cover up the falsity of its Initial False Statements.

92.    As a direct and proximate result of BB&T's conduct, Mr. Goosby suffered and continues suffering from severe emotional distress resulting from his arrest and subsequent imprisonment in the Miami-Dade County jail.

**WHEREFORE**, Mr. Goosby respectfully requests the Court enter judgment in his favor and against BB&T and award Mr. Goosby economic and non-economic damages in excess of $75,000.00, punitive damages, attorney's fees and costs associated with the underlying criminal proceeding, costs in this action, pre and post-judgment interest, as applicable, and such further relief the Court deems just and proper.

## COUNT 6
## NEGLIGENT TRAINING

93.     Goosby incorporates paragraphs 1, 6 through 15, and 37 through 60 as though fully set forth herein.

94.     On March 3, 2017, Mr. Goosby was arrested at a BB&T location in Miami-Dade County, placed in handcuffs in the rear of a police car without air conditioning, and paraded in front of the BB&T where strangers and people he knew saw him.  Then later, he was transported to a Miami-Dade County jail, after which he was forced to retain an attorney to successfully challenge and obtain a dismissal of the criminal charges against him.

95.     Mr. Goosby's arrest and detention were the direct and proximate result of BB&T's inaccurate, false and misleading Initial and Cover Up False Statements.

96.     BB&T made the Initial and Cover Up False Statements with utter disregard of Mr. Goosby's rights, liberties and dignity.  Furthermore, BB&T's conduct of making the Initial and Cover Up False Statements was reckless, unreasonable, unwarranted under the circumstances and was outrageous and beyond all bounds of decency.  BB&T knew or should have known the check it claimed was forged was a real check.  Certainly, it should not have taken it over an hour and a half to confirm the check was real, and it should not have called the police to report that the check was forged before confirming if the check was real or forged.  Also, it should not have concocted the Cover Up False Statements to cover up the falsity of its Initial False Statements.

97.     Significantly, the BB&T branch manager and teller that accused Mr. Goosby of forging the check did so because BB&T did not have adequate procedures for employees to follow to determine if an official BB&T check was real or fake, and/or did not adequately train employees, including the branch manager and the teller, of the proper procedures to follow to determine if an official check is real or fake.

98.     For example, and because of the lack of BB&T procedures and training, the branch manager and teller tried to determine if the check they accused Mr. Goosby of forging was real or fake by simply looking at it, instead of, *inter alia*, (1) calling the persons who authorized the issuance of the official bank check and asking them to review their records to determine if the check was authorized and issued to Mr. Goosby, (3) calling the persons who maintain access to and security of the check stock used for official BB&T checks and asking them to review their records to confirm if the bank issued the check to Mr. Goosby, and (4) having a central department or persons that bank employees can contact for help in determining if official bank checks have been authorized and issued to customers identified on the checks ("Confirmation Procedure").

99.     Had BB&T implemented proper Confirmation Procedures and/or trained its employees, including the branch manager and teller at the heart of this matter, in the proper Confirmation Procedures, BB&T could have quickly confirmed that the check it claimed was forged was real, and would not have ventured to make the Initial and Cover Up False Statements.

100.    Instead, the lack of Confirmation Procedures and training resulted in BB&T making the Initial and Cover Up False Statements, which directly and proximately caused Mr. Goosby's arrest and imprisonment, and the resulting economic and non-economic damages.

**WHEREFORE**, Mr. Goosby respectfully requests the Court enter judgment in his favor and against BB&T and award Mr. Goosby economic and non-economic damages in excess of $75,000.00, punitive damages, attorney's fees and costs associated with the underlying criminal proceeding, costs in this action, pre and post-judgment interest, as applicable, and such further relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

**WALLEN HERNANDEZ LEE MARTINEZ, LLP**
306 ALCAZAR AVENUE, SUITE 301, CORAL GABLES, FL 33134 • TELEPHONE (305) 842-2100

Plaintiff James Goosby demands a jury trial on all issues so triable.

Respectfully submitted,

**WALLEN HERNANDEZ
LEE, MARTINEZ, LLP**
*Counsel for Plaintiff James Goosby*
306 Alcazar Ave, Suite 301
Coral Gables, Florida 33134
Phone: (305) 842-2100
Facsimile: (305) 842-2105

By: ____s/  Jermaine A. Lee____
**Jermaine A. Lee, Esq.**
Florida Bar. No.: 0850861
jlee@whlmlegal.com
**Eric A. Hernandez, Esq.**
Fla. Bar. No.: 340730
eric@whlmlegal.com