JAMES GOOSBY,

     Plaintiff,

v.

BRANCH BANKING & TRUST COMPANY.

     Defendant.

_____/

## ORDER ON DEFENDANT'S WORK PRODUCT CLAIM

### Introduction

In the classic novella *Animal Farm*, written by George Orwell (1903–1950) and first published in 1945, the pigs who control the Manor Farm famously amended "The Seven Commandments of Animalism" and changed the commandment that "all animals are equal" to proclaim that "all animals are equal but some animals are more equal than others."[1]

In the litigation context, and especially when evaluating a work product claim, it is sometimes important to consider an *Animal Farm*-like maxim: there are reports, and then there are **reports.** In other words, all reports may not *always* be equal.

The discovery dispute percolating here for several weeks concerns a Suspicious

---

[1]    *See* George Orwell, ANIMAL FARM 118 (1945).

Incident Report ("SIR"), not to be confused with Suspicious Activity Reports ("S<u>A</u>R"), which the Government requires banks to file under certain circumstances. The dispute requires the Undersigned to determine whether the "primary purpose" test, "dual purpose" test, or some other test or approach (concerning the motivation for a person's creation of a document subject to a work product claim) applies. Neither the United States Supreme Court nor the Eleventh Circuit Court of Appeals has answered that question. District courts in our Circuit have used both the primary purpose and dual-purpose test, while some other circuit courts and district courts in other circuits use different tests.

Moreover, the dispute also triggers the need to evaluate the *specifics* of the SIR at issue and to decide whether the nature of this particular SIR has any legal significance. Thus, the work product squabble has produced the following two additional questions for resolution (above and beyond determining which test to use): First, is the specific SIR at issue a garden variety one, prepared as a matter of mandatory and standard business routine, or is it a *special* type of SIR, prepared in a *particular* way because of a concern over threatened litigation? Second, if it is a *special* type of SIR, would that status (of being litigation-influenced and unusual) affect the work product claim assessment?

These questions arose after Plaintiff James Goosby sued his bank, Defendant Branch Banking & Trust Company (the "Bank"), for malicious prosecution, false arrest/imprisonment, and other related theories arising from a Friday, March 3, 2017

incident at a Bank branch. Bank employees incorrectly concluded that Goosby had tried to cash a forged check. Both Goosby and the Bank contacted police, and an officer ultimately arrested him (for disorderly conduct). The Bank later determined (that same day, before police drove off with Goosby in a police car to take him to jail) that the check was not in fact forged. A police officer at the scene advised the Bank that its mistake would likely yield repercussions. The Miami-Dade State Attorney's Office later dropped all charges against Goosby (but not until after he was taken to jail).

Goosby returned to the Bank the next business day, Monday, March 6, 2017. The branch manager and a branch banker jointly completed an SIR later that day, after Goosby left. Although Bank employees routinely issue SIRs as part of the Bank's standard, mandatory procedure, the Bank seeks to withhold production of the SIR under a work product claim.

At bottom, the Bank contends that it was concerned about litigation when the SIR was prepared because Goosby threated to sue the Bank. Thus, the Bank contends that this litigation concern influenced the SIR's preparation and resulted in an unusual SIR -- one containing far more detail than would otherwise be expected. According to the Bank, this partial motivation (the other motivation being the need to comply with the Bank's requirement that employees prepare an SIR) generates work product protection for this SIR. Goosby disagrees.

The parties have submitted legal memoranda. [ECF Nos. 62; 71; 89; 97]. Also, at

my direction, the Bank filed a representative sample of ten SIRs. [ECF No. 99].

For the reasons outlined below, the Undersigned **sustains** the Bank's work product claim (and confirms my earlier ruling). In short, the SIR at issue is, similar to some of the fictional *Animal Farm* animals, not equal to other Bank-prepared SIRs. Though required (like all other SIRs), this particular SIR is significantly more focused on litigation-related issues than the other samples.

## **The SIRs**

The Bank prepares SIRs in the ordinary course of its business. SIRs are distinct from SARs (Suspicious Activity Reports), which the Bank Secrecy Act protects from disclosure. At the time at issue, the Bank's standard procedures *"required"* employees who witnessed an event similar to the March 3, 2017 Goosby incident "to complete and submit a SIR [sic] within one business day of the occurrence." [ECF No. 55-2, ¶ 7 (emphasis added)]. The Bank has since renamed its SIRs to "UFOs" (for Unusual Financial Observation), perhaps to avoid confusion between SIRs and SARs.

The Bank's applicable written procedures require the submission of an SIR when there is a "suspicious incident involving a client or another associate." [ECF No. 61-3, p. 2]. They also explain that the SIR is "required by bank policy" and is "used to collect and process information for reporting suspicious activity." [ECF No. 61-4, p. 2]. In addition, the Bank's written procedures explain that "[a]ccording to governmental regulations, attempted activity that is suspicious must be reported." [ECF No. 61-4,

p. 2]. And the procedure also highlights that "[f]ailure to timely file a [sic] SIR can cause increased risk, exposure and loss" to the Bank. [ECF No. 61-4, p. 2].

The SIR is a prelude to the potential submission of an SAR required by federal law. The submission of an SIR may lead the Bank to submit an SAR. *See Wiand v. Wells Fargo Bank, N.A.*, 981 F. Supp. 2d 1214 (M.D. Fla. 2013) (discussing federal law and regulations for SARs).

**Detailed Factual Background**

The debate over the validity of the Bank's work product claim and the determination of which test to use flows from Goosby's relationship with the Bank and the events of March 3 and 6, 2017.

<u>The Bank's View of the Facts</u>

Goosby and the Bank had been involved in a multi-year dispute concerning the balance on his line of credit. The Bank viewed the line of credit as being in default. Intending to make a partial payment on the line of credit, Goosby arrived at the Bank's Cutler Bay branch on March 3, 2017, to cash a $3,700 refund check the Bank had issued him. But instead, the check created the brouhaha on the afternoon of March 3rd.

The Bank initially believed the check was fraudulent. The teller, Merly Gallego, did not recognize the form or style of the check, which was inconsistent with the official checks issued by the branch and with which Gallego was familiar. Also, the printed information (Goosby's name, amount, and date of the check) was not printed in a place

she would have expected. So Gallego forwarded the check to the Bank's operations center for verification. And another Bank employee, Lisa Zike, pulled the signature card on the account and saw that the name of the check signer, Gypsy A. McKenzie, did not appear as an authorized signer.

Zike informed Gallego that the Bank did not issue the check. Gallego then informed Goosby, who became angry. When she asked him several times to take a seat in the reception area and wait to speak with the branch manager (who was then occupied), Goosby refused to move away from the teller window. Ultimately, both Goosby and BB&T called the police. [ECF No. 37].

The first police officer, Richard Wilkinson, arrived just after 4:00 p.m. and spoke first to Goosby. He then talked to Cristhian Sanchez, the branch manager, and Gallego for about one minute each. He then asked Goosby to come into Sanchez's office so that the officer could investigate. In the office, when Officer Wilkinson told Goosby that the Bank was trying to assist him and asked him to listen to what the Bank had to say, Goosby became uncooperative and protested.

During this meeting, Sanchez indicated that the check had been verified as fraudulent. In response, Goosby asked for an affidavit from Sanchez so he could sue the Bank. Although Goosby repeatedly claimed that the Bank had accused him of forging the check, Officer Wilkinson reiterated several times that "no one was accusing you of anything" and "since I've been here, no one has accused you of anything." [ECF No. 71,

p. 3].

After a second officer, Javier Pineda, arrived at the branch, a second meeting occurred between the two officers, Goosby, Sanchez, and Gallego, during which Goosby's behavior worsened, and he became less cooperative. Goosby repeatedly told the officers just to take him to jail. When Officer Pineda asked Goosby to calm down and give him five minutes to attempt to clarify the situation and suggested it could be a clerical error, Goosby refused. Sanchez had pulled up Goosby's credit line on his computer and asked Goosby to confirm the last four digits of his social security number to verify that he had the right customer. Goosby yelled at him, "I don't know" and that the police "can't make me tell you nothing." [ECF No. 71, p. 4].

The police arrested Goosby at approximately 4:15 p.m. for disorderly conduct and placed him in the police car as they awaited the results of the Bank's continued investigation of the check's validity.

While Goosby was in the police car, Sanchez repeated Zike's procedure of pulling the signature card. She too saw that Ms. McKenzie was not listed as an authorized signor. But she later was able to reach a person in the bankruptcy department (which had not issued the check), and that person was able to confirm with the department which had issued the check that it was, in fact, valid and had been mailed to Goosby.

At about 5:11 p.m., after receiving this confirmation, Sanchez advised Officer

Pineda and indicated that the Bank wanted to cash the check for Goosby but wanted the police to remain while they cashed the check to maintain the peace.

Sanchez indicated that she had called the police in the first place because Goosby had refused to move from the teller window. The police declined to permit Goosby to cash the check at that time because he had already been arrested for disorderly conduct and was in custody. The police never charged Goosby with uttering a fraudulent check and did not arrest him because of the check.

Officer Wilkinson informed Goosby that the check had been confirmed as valid but that Goosby was still going to jail for disorderly conduct based on his behavior, which the police witnessed in Sanchez's office. When Goosby asked why he had to go to jail, Wilkinson responded that it was "because of what you did in there," but then **suggested that Goosby sue the Bank.** [ECF No. 71, p. 4].

Following this exchange, but before leaving the branch, Officer Wilkinson made statements to Sanchez and Gallego, leading them to conclude that Goosby intended to sue the Bank, Sanchez, and Gallego as a result of the incident. [ECF No. 55-2, ¶ 6]. Similarly, Sanchez testified that an officer said: "basically to expect litigation or him suing us." [ECF No. 71-1, p. 3].

On the morning of the next business day, Monday, March 6, 2017, Sanchez and Gallego met in Sanchez's office to discuss and then prepare the SIR, which took several hours. [ECF No. 55-2, ¶ 8]. Before they started drafting, Gallego and Sanchez first

recounted to each other their respective recollections of the events. [ECF No. 55-2, ¶ 9]. In doing so and in preparing the SIR, they were both influenced by their knowledge that Goosby intended to sue on account of the incident. [ECF No. 55-2, ¶ 9]. They both felt it important to include as much detail as they could recall so that they would have a contemporaneous record of the events if Goosby later sued. [ECF No. 55-2, ¶ 9].

A short time after they had started to fill out the SIR form, Goosby entered the branch and approached the teller area, and Sanchez and Gallego stopped working on the SIR form. [ECF No. 55-2, ¶ 10]. Sanchez then left his office to assist the teller with Mr. Goosby's transaction requests. [ECF No. 55-2, ¶ 10]. Gallego remained in Sanchez's office because she did not feel comfortable dealing with Goosby in light of the incident. [ECF No. 55-2, ¶ 10].

Goosby presented the $3,700 check for cash, Sanchez approved the transaction, and the teller gave Goosby the cash. [ECF No. 55-2, ¶ 11]. Then, at Sanchez's request, Gallego left his office and attended to other matters in the branch. [ECF No. 55-2, ¶ 12]. Sanchez met with Goosby for a short time in Sanchez's office. [ECF No. 55-2, ¶ 13].

After Goosby left the branch, Gallego returned to Sanchez's office to complete the SIR form with Sanchez. [ECF No. 55-2, ¶ 14]. Sanchez recounted what Goosby had said and certain of his actions, which fortified their conclusion the previous Friday that Goosby intended to sue them and the Bank. [ECF No. 55-2, ¶ 14]. With this in mind, they continued to work on the SIR, which included further detailed descriptions of the

events that occurred on Friday and that Monday morning during Goosby's return visit. [ECF No. 55-2, ¶ 15].

They completed the vast majority of the SIR after Goosby's visit on Monday morning. [ECF No. 55-2, ¶ 15]. Also, and as described in the SIR, Sanchez contacted Daniel Mendez, who was then the area operations officer who oversaw the branch operations, described Goosby's visit that morning, his statements and actions, and requested that his branch privileges be revoked. [ECF No. 55-2, ¶ 16]. In the early afternoon, Gallego and Sanchez completed the SIR and submitted it to Mendez for review and further transmittal. [ECF No. 55-2, ¶ 16].[2]

At or about this time, Goosby retained counsel, who sent a demand letter dated March 7, 2017, demanding turnover and preservation of the Bank surveillance video. [ECF No. 71-2].[3]

<u>Goosby's View of the Facts</u>

Based on submissions to date, it does not appear that Goosby is challenging much of the factual history outlined above. Instead, he argues that the Bank is *omitting* certain facts, especially concerning the check, the experience (or lack of experience) of

---

[2] The Undersigned would typically not provide this type of detail about a document filed under seal, but the bank, which itself filed the SIR under seal, made this disclosure in a public filing. The Undersigned therefore deems it appropriate to include these references in an unsealed Order.

[3] The attorney who sent the demand letter is not the attorney who filed Goosby's lawsuit.

the Bank employees who examined it, and his repeated requests for copies of the check the Bank had incorrectly claimed (at least for a time) was fraudulent.[4]

He also stresses that Sanchez's deposition testimony admitted that SIRs (and the UFO forms that replaced them) are prepared to ensure that the Bank complies with banking laws. [ECF No. 89-1]. And he highlights the facts that the SIRs are "a prelude to the potential submission of a [sic] SAR required by federal law and regulations" and are "prepared solely to help the bank determine 'whether or not financial observations should be reported externally to the Financial Crimes Enforcement Network (FinCen)." [ECF No. 89, p. 2].

Goosby does not deny that a police officer suggested that he file a lawsuit; that he threatened litigation; that the officer made certain statements suggesting that litigation was likely; that he returned to the Bank on March 6, 2018, before the SIR was completed; and that he made comments which reinforced the bankers' assessment that he was going to file a lawsuit.

**Procedural Background**

United States District Judge Cecilia M. Altonaga issued a Trial Scheduling Order that referred all discovery matters to the Undersigned. [ECF No. 13]. The most-

---

[4] Although not included in the memoranda challenging the Bank's work product claim or the Undersigned's initial ruling, Goosby emphasized that Bank employees who were belatedly contacted on March 2, 2017, were able to recognize the check as a legitimate bank check either immediately or within less than ten minutes of being asked. [ECF No. 96, p. 2, n. 2].

important element highlighted in that Order and my later-filed Discovery Procedures Order is: no written discovery motions should be filed unless specifically directed. [ECF Nos. 13, p. 3; 14, p. 2].

The Discovery Procedures Order provides detailed instructions on my discovery dispute protocol. The Order prohibits the parties from submitting legal memoranda on discovery disputes unless specifically authorized. [ECF No. 14, p. 2]. It also permits the parties to include an explanation of a discovery dispute that needs "specialized attention." [ECF No. 14, p. 3]. The Order also allows the parties to submit a "notice of authorities." [ECF No. 14, p. 3]. And it authorizes the parties to submit a motion for leave to file a discovery motion or memoranda for "particularly complex" discovery disputes. [ECF No. 14, pp. 3–4].

To provide the parties and their counsel with guidance on what types of disputes usually are not rare enough to justify a motion for leave to file a submission, the Order listed 14 illustrations of discovery disputes that would typically not warrant a motion. [ECF No. 14, p. 4].

Dueling theories about whether the "primary purpose" or "dual purpose" test (or even some other test) should control a work product claim evaluation is not one of the 14 examples of garden-variety discovery disputes that typically would not need specialized attention (and that would therefore not warrant a legal memorandum).

Plaintiff submitted a Notice of Discovery Hearing, scheduling a discovery

hearing for February 23, 2018. [ECF No. 53]. The notice explained that "[t]he parties could not resolve BB&T's work product objection" and noted that the Bank would produce the withheld documents for my *in camera* review at the hearing. [ECF No. 53, p. 1].

Neither party filed a motion for leave to submit a discovery motion nor a memorandum of law, and neither party filed a notice of authorities before the hearing.

At the hearing, the Bank presented copies of the Merly Gallego and Jackie Orrizzi declarations. I also reviewed the Bank's privilege log and excerpts from the Bank's "Teller Survival Guide," which says, among things, under the "Reporting" category: "***Your job is to report any suspicious activity to your Teller Supervisor***. Your supervisor will work with other bank personnel to determine if a **Suspicious Incident Report (SIR)** needs to be completed, which may lead to a **Suspicious Activity Report (SAR)** being filed with the government." [ECF No. 61-2, p. 2].

In addition to reviewing these materials at the hearing, the Undersigned also reviewed *in camera* the SIR and relevant portions of documents concerning the SIR at issue.

Neither side advanced (or even mentioned) the "primary purpose" or "dual purpose" test (or any alternate test) for evaluating work product claims at the hearing.

The Undersigned ruled from the bench, determining that the SIR was subject to work product protection. I also directed the Bank to file on the public record the two

declarations and the amended privilege log, which it did. [ECF No. 55]. In addition, I directed the Bank to file the SIR and other documents under seal. The Bank complied and filed under seal the SIR, a draft SIR, and several emails exchanged on the same day the SIR was completed (March 6, 2017), and one email sent the day after. [ECF No. 56].

I later memorialized the from-the-bench ruling (and rulings on other discovery disputes resolved that day) in a two-and-a-half page "Post-Hearing Discovery Order," which contained a one-sentence summary of the SIR-related ruling made at the February 23, 2018 hearing. [ECF No. 57].

On March 12, 2018, Plaintiff filed an objection to the ruling on the SIR. [ECF No. 62]. It included a memorandum of law that discussed the "primary motivating purpose test" and contended that the ruling was clearly erroneous, contrary to law, and subject to reversal because the SIR was a required document prepared in the ordinary course of Bank business and to comply with governmental regulations.

In support of his objection, Plaintiff also filed, under seal, the branch coordinator checklist, an excerpt from the Teller Survival Guide (for Suspicious Activity), another Teller Survival Guide excerpt (discussing the completion process for an SIR) and the Suspicious Incident Report guideline. [ECF No. 61].

In response to Plaintiff's formal objection and memorandum, the Bank filed a 13-page memorandum of law, opposing the objection to the Discovery Order concerning the SIR. [ECF No. 71]. It discussed both the "primary purpose" and "dual purpose"

tests and noted that there is no binding authority in our Circuit. In the response, the Bank argued that "the authors were influenced in preparing it by Goosby's threats to sue BB&T and provided more detail in the report specifically in anticipation of and for use in litigation." [ECF No. 71, p. 1]. The memorandum also noted that the two employees completed the SIR

> one business day after Goosby advised them that he intended to sue the bank and one of the police officers made the same prediction to them, and following Goosby's return visit to the branch, where Goosby's conduct and statements clearly reflected that he had **done research over the weekend to identify personal information of the branch manager and intended to sue BB&T.**

[ECF No. 71, p. 1 (emphasis added)].

Judge Altonaga scheduled a hearing on Goosby's objection but denied the objection for reasons stated in Court during the hearing. [ECF No. 73]. The Order noted that the parties could return to me for further proceedings concerning the SIR. Counsel advised me that the reasons stated in Court concerned their failure to address with me the legal arguments they later raised for the first time in the objection and the response. The parties did, in fact, return to me to further discuss the SIR, and I authorized further, albeit not mandatory, briefing. [ECF No. 82]. The parties each submitted an additional memorandum. [ECF Nos. 89; 97].

In his supplemental memorandum, Goosby mentions, although only in a quick reference, the "because of" test that some courts use (instead of the primary purpose or dual purpose test). [ECF No. 89, p. 5].

In its supplemental memorandum, the Bank argued that its work product claim over the SIR should prevail under both the primary purpose and dual-purpose test. The Bank contends that the SIR was prepared in anticipation of litigation "because the manner of its preparation was litigation-based and threatened litigation permeated its contents." [ECF No. 97, p. 1].

**The SIR at Issue (and its Comparison to Other Bank-issued SIRs)**

The Court will describe, in general, the SIR at issue [ECF No. 56-1] without disclosing the substantive contents that the Bank contends is subject to work product protection.

The factual summary is single-spaced. It contains approximately 1,800 words. It begins with Goosy entering the Cutler Bay branch at approximately 3:50 p.m. on Friday, March 3, 2017, and ends with him leaving the same branch late morning on Monday, March 6, 2017. It provides extensive detail about the events, including specifics about conversations with Goosby. It identifies every person involved in the incident, including Bank staffers who provided information by telephone. The narrative also mentions the specific facts that caused the Bank to conclude that Goosby was going to file a lawsuit.

The Bank takes the position that the SIR is entitled to work product protection *regardless* of whether the primary purpose or dual-purpose test is used. It says protection is appropriate "because the **manner in which it was completed** was

informed by the threat of litigation, and the authors **included more details than usual for litigation purposes**." [ECF No. 71, p. 2 (emphasis added)].

Given this dynamic, the Undersigned required the Bank to submit ten representative SIRs, to gauge whether the SIR here is unusually detailed and substantially more litigation-focused than a more-routine SIR. The Bank submitted the other SIRS, along with a declaration from Daniel Mendez, confirming that they are fair and representative samples. [ECF No. 99].

Mendez was the Area Operations-Consultant for seven branches, including the Cutler Bay branch at issue, from January 2015 to August 2017, which includes the March 2017 incident with Goosby. Mendez's declaration explains that he searched for SIRs involving a suspected fraudulent check (because the Goosby incident involved this scenario). Seven of the ten samples submitted involve suspected fraudulent checks, and three involve other topics. Several involve the Cutler Bay branch and include narratives prepared by Merly Gallego (listed as Merly L. Vivanco) and Sanchez, the branch manager at the time.

These ten reports are significantly different than the SIR prepared on the Goosby incident. They are considerably shorter. In some cases, they are only a few sentences. For the most part, they are comparatively conclusory. They do not provide substantial detail.

These garden-variety SIR reports are significantly and substantively different

than the SIR at issue here. I cannot disclose specifics because the SIR has been filed under seal and (as outlined below) the Undersigned finds that the SIR is protected work product. Nevertheless, even a cursory comparison of the SIR and the garden-variety SIRs leads to a clear-cut conclusion that this report is "not equal to" the other reports. The SIR at issue here is different than the routine SIRs. It reflects an intent to discuss matters relevant to likely litigation, and it is quite apparent that the SIR, though prepared in the ordinary course of business as a required report, was significantly influenced by concern over threatened litigation.

But, as Goosby emphasizes, the SIR is in fact a document prepared in the ordinary course of business, according to the Bank's internal procedures and designed to comply with federal law. Therefore, Goosby argues, there should be no need for additional analysis. According to Goosby, the SIR's status as a required form prepared in the ordinary course of business should be dispositive.

**The Parties' Specific Contentions**

The parties discuss the primary purpose and dual-purpose tests. Neither side discusses in detail any other test or approach. Both sides acknowledge that the Eleventh Circuit has not adopted a precise test or methodology.

More specifically, the Bank argues that the SIR is entitled to work product protection under *both* the primary purpose and dual-purpose tests. Its main point is that "the manner of its preparation was litigation-based and threatened litigation permeated

its contents." [ECF No. 97, p. 1].

Moreover, the Bank now asserts another new reason to sustain its work product claim: it says that SAR-prelude reports, like an SIR, are privileged and otherwise not subject to disclosure. [ECF No. 97, pp. 3–4]. However, the Bank asserted this argument for the very first time in a reply memorandum to which Goosby is foreclosed from responding to with another memorandum. Because courts do not typically consider arguments raised for the first time in a reply, the Undersigned will not consider the Bank's new SAR-prelude argument. To do otherwise would unfairly prejudice Goosby, who has not been "afforded an opportunity to respond." *Bentley v. Miami Air Int'l, Inc.*, 262 F. Supp. 3d 1370, 1375 n.8 (S.D. Fla. 2017) (explaining why the court would not consider defendant employer's argument in support of its summary judgment motion in a civil rights employment case); *see also WBY, Inc. v. Dekalb Cty., Ga.*, 695 F. App'x. 486, 491-92 (11th Cir. 2017) ("reply briefs are not a vehicle to present new arguments or theories"); *Herring v. Sec'y Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As [the Eleventh Circuit] repeatedly ha[s] admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (internal quotation and citations omitted).

Goosby's chief argument is that the SIR "was required to be prepared irrespective of litigation." [ECF No. 89, p. 5]. Therefore, he says, the mere fact that Sanchez and Gallego were anticipating litigation and that this anticipation "even

colored how they responded" does nothing to change the reality that the "'primary motivating purpose' of the SIR/UFO was to ensure compliance with banking laws." [ECF No. 89, p. 5].

The Bank, of course, acknowledges that its employees were required to complete the SIR and that the SIR is used to help prepare a Government-required SAR. But it then distinguishes this specific SIR as being worthy of work product protection because the employees' concern over threatened litigation caused them to prepare the form in a specific, detail-filled, litigation-oriented manner.

**Applicable Legal Standards and Legal Analysis**

Federal Rule of Civil Procedure 26(b)(3)(A) provides that "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A).

Determining whether the Bank prepared the SIR "in anticipation of litigation" (leading to work product protection) or "in the ordinary course of business or pursuant to public requirements unrelated to litigation" (which would not generate work product protection if the SIR would have been prepared in the same manner if not for the litigation threat) is the overarching question. Fed. R. Civ. P. 26 (comments to subdivision (b)(3)).

The law is well settled that the "party claiming a privilege has the burden of proving its applicability." *Bridgewater v. Carnival Corp.*, 286 F.R.D. 636, 638 (S.D. Fla.

2011) (internal citations omitted). "That burden is not, of course, discharged by mere conclusory or *ipse dixit* assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." *Id*. More significantly, "[t]his burden, to sustain a claim of privilege, is heavy because privileges are 'not lightly created nor expansively construed, for they are in derogation of the search for the truth.'" *Id*. (citing *U.S. v. Nixon*, 418 U.S. 683, 710 (1974)).

Former Chief Magistrate Judge Stephen Brown provided a useful summary of the work product exception:

> The work product doctrine protects otherwise discoverable "documents and tangible things ... prepared in anticipation of litigation or for trial by or for [a] party or by or for that . . . party's representative (including the . . . party's . . . consultant . . .)." Fed. R. Civ. P. 26(b)(3). Such materials, however, are not protected if they are assembled in the ordinary course of business or other non-litigation purposes. *Advisory Committee Notes to Rule 26, 1970 Amendment, Subdivision (b)(3).* Documents are prepared in anticipation of litigation, and consequently protected by the work product doctrine, if "in light of the nature of the document and **the factual situation in the particular case**, the document can fairly be said to have been **prepared or obtained because of the prospect of litigation**." Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 *Federal [P]ractice & Procedure* § 2024, at 343 (1994). "When there is a true independent purpose for creating a document, work product protection is less likely, but when two purposes are profoundly interconnected, the analysis is more complicated." *In re Grand Jury Subpoena,* 357 F.3d 900, 908 (9th Cir. 2004). A document is protected by the work product doctrine if, "taking into account the **facts surrounding their creation**, their litigation purpose so permeates any non-litigation purpose that the two purposes **cannot be discretely separated** from the factual nexus as a whole." *Id.* at 910. **In other words, even if a document has some purpose within the ordinary course of business, the document is protected as work product if it is substantially infused with litigation purpose**. *See id.*

*Developers Sur. & Indem. Co. v. Harding Vill., Ltd.*, No. 06-21267CIV-BROWN, 2007 WL

2021939, at *2 (S.D. Fla. July 11, 2007) (emphasis added).

The Undersigned relied upon *Developers Surety* in *Procaps S.A. v. Patheon Inc.*, No.

12-24356-CIV, 2014 WL 1652047 (S.D. Fla. Apr. 23, 2014), when the Court needed to

"decipher[] the circumstances surrounding the creation" of certain documents, and then

ultimately determined that there was nothing in them that "hint[ed] about a business

purpose to them" and thus found them subject to work product protection. *Procaps*,

2014 WL 1652047, at *3.

The discussion of "purposes" in *Developers Surety* and *Procaps* relates to what is

often known as the primary purpose and dual-purpose test.

Under the primary purpose test, a document is deserving of work product

protection "as long as the primary motivating purpose behind the creation of the

document was to aid in possible future litigation." *United States v. Davis*, 636 F.2d 1028,

1040 (5th Cir. 1981).

Under the dual purpose test, dual-purpose documents are protected from

disclosure "if, 'taking into account the facts surrounding their creation, their litigation

purpose so permeates any non-litigation purpose that the two purposes cannot be

discretely separated from the factual nexus as a whole.'" *Developers Sur. & Indem.*, 2007

WL 2021939, at *2 (quoting *In re Grand Jury Subpoena*, 357 F.3d 900, 908 (9th Cir. 2004)).

Thus, "'dual purpose' documents created because of the prospect of litigation can be

protected even though a non-litigation purpose can also be ascertained." Wright, Miller

& Kane, 8 Fed. Prac. & Proc. § 2024 (3d ed. 2010). While the test is straightforward, "the

analysis is more complicated." *In re Grand Jury Subpoena*, 357 F.3d at 908.

In addition to using the primary purpose and dual-purpose tests, other courts

have sometimes used other tests, such as the "because of" test. Under that test, material

used for business purposes does not lose work product protection if it "was created

because of anticipated litigation, and would not have been prepared in substantially

similar form but for the prospect of that litigation." *United States v. Adlman*, 134 F.3d

1194, 1195, 1199 (2d Cir. 1998) (rejecting primary purpose rule as being "at odds with

the text and policies" of Rule 26 and explaining that "the policies underlying the work-

product doctrine suggest strongly that work-product protection should not be denied to

a document that analyzes expected litigation merely because it is prepared to assist in a

business decision"); *see also U.S. v. Deloitte LLP*, 610 F.3d 129, 138 (D.C. Cir. 2010)

("Under the more lenient 'because of' test, material generated in anticipation of

litigation may **also** be used for **ordinary business purposes** without losing its protected

status.") (emphasis added).

Some courts appear to use a "sole purpose" test, such as the analysis used in

*Judicial Watch, Inc. v. U.S. Department of Homeland Security*, 926 F. Supp. 2d 121 (D.D.C.

2013), where the Court held that the work product proponent "bears the burden of

showing that the documents were prepared for the purpose of assisting an attorney in

preparing for litigation, and **not some other reason**." *Id.* at 138 (emphasis added and internal quotations omitted).

In the Eleventh Circuit, contrary to most circuits (which follow the "because of" test), district courts have mostly either used the primary purpose or dual purpose test.

Either way, the Eleventh Circuit has not established a definitive test for courts to follow. *Regions Fin. Corp. v. U.S.*, No. 2:06-CV-00895-RDP, 2008 WL 2139008, at *3 (N.D. Ala. May 8, 2008) ("no binding Fifth or Eleventh Circuit decision clearly adopts the 'primary motivating purpose' test"); *see also In re Blue Cross Blue Shield Antitrust Litig. (MDL No.: 2406)*, No. 2:13-CV-20000-RDP, 2015 WL 10891632, at *6 (N.D. Ala. Nov. 4, 2015) ("In fact, it appears the Eleventh Circuit has never formally adopted *any* test for assessing the scope of the work product privilege."); *Cooper v. Old River Supply, Inc.*, No. 3:10-CV-01495-JEO, 2012 WL 13027261, at *3 (N.D. Ala. May 18, 2012) ("The Eleventh Circuit has not addressed the standard to apply when determining whether a document was prepared in anticipation of litigation."); *c.f. Tillman v. C.R. Bard, Inc.*, No. 3:13-CV-222-J-34JBT, 2015 WL 1062182, at *3 (M.D. Fla. Mar. 11, 2015) (observing that "some district courts within the Eleventh Circuit have moved away from applying the 'primary purpose' test" but then noting that "[n]onetheless, the Eleventh Circuit Court of Appeals has not considered the issue"); *Colardo-Keen v. Rockdale Cty., Georgia*, No. 1:14-CV-489-MHC, 2017 WL 4422349, at *1 (N.D. Ga. May 16, 2017) ("The Eleventh Circuit has not decided which test applies [i.e., the "primary purpose" test or the

"because of" test], and district courts within this Circuit have applied both tests.").

Rendering the analysis more complicated, courts have not always been uniform in the terminology they have used. For example, some courts use the terms "because of" and "dual purpose" interchangeably. *See Spirit Master Funding, LLC v. Pike Nurseries Acquisition, LLC*, 287 F.R.D. 680, 685 (N.D. Ga. 2012) ("it is now well recognized that documents that serve a dual purpose are covered by the work product protection if they were produced with the motivating purpose for or because of anticipated litigation.") (internal quotations omitted).

And, to add yet another factor into the equation, some district courts in our Circuit have adopted a variation on the "primary purpose" test and authorize work product protection when "'**at least one** of the principal purposes for generating' the materials was to aid in possible future litigation." *Dewit v. UPS Ground Freight, Inc.*, No. 1:16CV36-MW/GRJ, 2017 WL 3000029, at *1 (N.D. Fla. May 30, 2017) (quoting *Eisenberg v. Carnival Corp.*, No. 07-22058-CIV, 2008 WL 2946029, at *2 (S.D. Fla. July 7, 2008)).

Moreover, the evaluation of a work product claim is rendered more problematic by the Official Committee Notes to Rule 26(b)(3) (concerning the 1970 Amendment), which provide that materials prepared "in the ordinary course of business or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes," are not protected.

Some courts in our Circuit seem to hold that a document prepared in the

ordinary course of business can **never** be entitled to work product protection. *Holbourn v. NCL (Bahamas) Ltd.*, 305 F.R.D. 685, 687 (S.D. Fla. 2014) ("materials or documents drafted or created in the ordinary course of business are not protected"). Other courts do not take such an all-or-nothing approach. *See, e.g., Adams v. City of Montgomery*, 282 F.R.D. 627, 634 (M.D. Ala. 2012) (holding that documents were protected work product because they "had a dual purpose: They were prepared pursuant to the city's policy of investigation, but also, specifically, with an eye to this anticipated litigation.").

And other courts, including out-of-circuit appellate courts, have upheld the protection of documents that might be deemed to have been prepared in the ordinary course of business. Thus, in *United States v. Adlman*, the Court interpreted the ordinary-course-of-business exception to indicate that a document is eligible for work product protection if it "would not have been prepared in **substantially similar form** but for the prospect of that litigation." 134 F.3d at 1195 (emphasis added).[5]

So the task of determining which test to apply here is challenging.

First, as noted, there is no binding Eleventh Circuit (or U.S. Supreme Court) case on point.

Second, the absence of appellate authority leaves me with myriad district court opinions, none of which are binding, and out-of-circuit appellate decisions, which are also not binding. Focusing on rulings from district courts in the Eleventh Circuit, even

---

[5]     *Adlman* is the leading case on the "because of" standard for determining a party's motivation when evaluating a work product claim.

my *own* rulings, are not binding on me in this case. *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.").

Third, the use of titles or names to establish a test is potentially risky in scenarios, such as the one here, where courts have not always been clear about the standard being used to evaluate a work product claim.

Fourth, it is best to confine this ruling to the specific facts of this case and to not announce a new test or rule or approach for assessing the "in anticipation of litigation" requirement of Rule 26(b)(3)(A). The facts here are unique, so the ruling here is unlikely to automatically determine a work product analysis in another case.

Therefore, the Undersigned will discuss the factors I will use to assess the work product claim.

The Undersigned will begin by asking a question similar (but not an identical one) to the one the court asked in *Adams*: "What, if anything, then separates the Adams investigation from the routine investigation?" 282 F.R.D. at 634. In *Adams*, the court was grappling with reports prepared with a dual purpose: pursuant to the city's policy of investigation (i.e., in the ordinary course of business) and "specifically, with an eye to this anticipated litigation." *Id.* Thus, the question here is: how is the Goosby SIR different from the garden-variety SIRs, and is that difference legally meaningful when

analyzing the Bank's work product claim?

The Goosby SIR **is** different than the other SIRs. In fact, it is *unquestionably* different. Even a non-lawyer comparing the Goosby SIR with the ten sample SIRs would quickly realize that the one SIR is unlike all of the others. It discusses the threat of litigation. It contains detailed summaries of what the bankers said to Goosby and what he said to them. It discusses comments from a police officer. It was drafted through the filter of likely litigation.

Phrased differently, the SIR, though on a standard form, would not have been prepared in the way it was prepared but for the anticipation of litigation. Thus, a **substantial motivating purpose** for this specific SIR was to prepare for litigation -- which was not merely anticipated in an abstract sense, but which was threatened directly. This substantial motivation is what distinguishes the SIR from the others.

Moreover, the additional information that the Bank employees included in this specific SIR does not seem designed to further the federal law enforcement policies underlying the requirement that a Bank file an SIR under certain circumstances. The additional details do not concern suspected money laundering, unlawful structuring, record-keeping protocols for investigative follow-up, suspected terrorist activities, or other topics relating to the Bank's obligation to prepare an SIR for possible later use in an SAR. To the contrary, all the additional detail is designed to help the Bank address the express litigation threat.

Theoretically, the two branch employees who prepared the SIR could have prepared a routine, summary-type SIR of only a few sentences and then prepared a *second* SIR (or supplemental memorandum) outlining the litigation-related information. But the mere fact that these two employees decided to include all the information in one master report does not alter the reality that the litigation threat substantially influenced how they completed this report and that the form would have been drafted in a different way absent the anticipated litigation.

So regardless of whether this approach is called the dual-purpose approach, substantial-motivating-factor approach, at-least-one-of-the-primary-purposes approach, the because-of approach, or the not-prepared-in-**substantially-similar-form-**but-for-the-prospect-of-litigation exception to the ordinary business document exemption from work product protection, the conclusion is that the work product doctrine protects this document under the special and fact-specific circumstances presented here.

To be sure, a party is still able to discover a work product document if it shows a "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). But Goosby has not advanced that argument, and the Court will therefore not address that theoretical argument.

## Conclusion

For purposes of analyzing the Bank's work product claim, the SIR is, to use the

*Animal Farm* analogy, more equal than the other garden-variety SIRs. Unlike routine SIRs, this one *is* entitled to work product protection. The Undersigned, therefore, sustains the Bank's work product assertion for the Goosby SIR. This ruling has no impact on other SIRs or UFOs prepared by the Bank, which would *ordinarily* not be eligible for work product protection.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on April 17, 2018.

_____
Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>**Copies furnished to:**</u>
The Honorable Cecilia M. Altonaga
All counsel of record