Page 1

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                           MIAMI DIVISION
3          CASE NO.: 1:17-cv-23419-Altonaga/Goodman
4
     JAMES GOOSBY,
5
             Plaintiff,
6
             vs.
7
     BRANCH BANKING & TRUST COMPANY,
8    a foreign corporation, and
     successor by merger to
9    BankAtlantic,
10           Defendant.
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
11
12                   VIDEOTAPED DEPOSITION OF
13                      DR. DELVENA THOMAS
14             TAKEN ON BEHALF OF THE DEFENDANT
15
                        Thursday, May 10, 2018
16                      6:24 p.m. - 11:56 p.m.
17
18           Offices of Garbett Allen & Roza, P.A.
              80 Southwest 8th Street, Suite 3100
19                       Miami, Florida
20
21
22
23                      Chloe Leroux, FPR
24
25      Job No. CS2914952

Page 2

1      A P P E A R A N C E S
2
    On behalf of the Plaintiff:
3
    JERMAINE A. LEE, ESQUIRE
4   WALLEN, HERNANDEZ, LEE, MARTINEZ, LLP
    306 Alcazar Avenue
5   Suite 301
    Coral Gables, Florida 33134
6   jlee@whlmlegal.com
7
    On behalf of the Defendant:
8
    DAVID S. GARBETT, ESQUIRE
9   BRIAN P. YATES, ESQUIRE
    GARBETT, ALLEN & ROZA, P.A.
10  Brickell City Tower, Suite 3100
    80 Southwest 8th Street
11  Miami, Florida 33130
    (305) 536-8861
12  dgarbett@gsarlaw.com
    byates@gsarlaw.com
13
    MARKENZY LAPOINTE, ESQUIRE
14  SHANI RIVAUX, ESQUIRE
    PILLSBURY WINTHROP SHAW PITTMAN LLP
15  600 Brickell Avenue
    Suite 3100
16  Miami, Florida 33131
    markenzy.lapointe@pillsburylaw.com
17  shani.rivaux@pillsburylaw.com
18
    On Behalf of the Deponent:
19
    FRANZ C. JOBSON, ESQUIRE
20  500 Southwest 3rd Avenue
    Fort Lauderdale, Florida 33315
21  fcjlaw@yahoo.com
    Fcjobson@jwtflaw.com
22
23  Also Present:
24      Videographer Michael Abarca
25          - - -

Page 3

1         I N D E X
2
3   Witness:                    Page:
4   DR. DELVENA THOMAS
5   DIRECT EXAMINATION MS. RIVAUX          5
    CROSS-EXAMINATION MR. LEE           169
6   REDIRECT EXAMINATION             174
    RECROSS-EXAMINATION              179
7
    CERTIFICATE OF OATH ...........................181
8   CERTIFICATE OF DEPOSITION TRANSCRIPT ............182
    ERRATA SHEET ....................................183
9   NOTIFICATION LETTER ............................184
10          - - -
11
12      E X H I B I T S
13

        Description:        Page:

14
15  Exhibit No. 44    James Goosby's Initial       7
                Disclosures
16
    Exhibit No. 45    Medical Evaluation        44
17      08/09/17
18  Exhibit No. 46    Medical Evaluation        46
        10/25/17
19
    Exhibit No. 47    Medical Evaluation        46
20      01/24/18
21          - - -
22
23
24
25

Page 4

1      Videotaped Deposition of Dr. Delvena Thomas
2          May 10, 2018
3
4      THE VIDEOGRAPHER:  We're now on the record.
5   The time is 6:24 p.m., on May 10, 2018.
6      This is Media Unit 1 of the video-recorded
7   deposition of Delvena Thomas, M.D., taken by
8   counsel for the defendant, in the matter of Goosby
9   vs. Branch Banking & Trust Company, filed in the
10  United Stated District Court, Southern District of
11  Florida, Miami Division.
12      This deposition is being held at Garbett Allen
13  & Roza.
14      Counsel and all attending will now state your
15  appearances and affiliations for the record.
16      MS. RIVAUX:  Shani Rivaux, with the law firm
17  of Pillsbury Winthrop Shaw Pittman, on behalf of
18  the defendant.
19      MR. LAPOINTE:  Markenzy Lapointe, same law
20  firm, on behalf of the defendant.
21      MR. GARBETT:  David Garbett, Garbett Allen &
22  Roza, on behalf of the defendant.
23      MR. YATES:  Brian Yates, on behalf of BB&T.
24      MR. LEE:  Jermaine Lee, on behalf of Plaintiff
25  James Goosby.

Page 5

1      MR. JOBSON:  Franz Jobson, for the witness,
2   Dr. Thomas.
3      THE WITNESS:  Delvena Thomas, psychiatrist,
4   treating psychiatrist.
5   THEREUPON,
6          DR. DELVENA THOMAS,
7   having been first duly sworn or affirmed, was examined
8   and testified as follows:
9      THE WITNESS:  Yes, I do.
10         DIRECT EXAMINATION
11  BY MS. RIVAUX:
12      Q.  Good evening, Dr. Thomas.  State your full
13  name for the record.
14      A.  First name is Delvena, D-e-l-v-e-n-a, Renee,
15  R-e-n-e-e, last name Thomas, T-h-o-m-a-s.
16      Q.  What is your current home address?
17      A.  2941 Hidden Harbour Street, H-i-d-d-e-n
18  H-a-r-b-o-u-r, Fort Lauderdale, Florida 33312.
19      Q.  Have you ever had your deposition taken
20  before?
21      A.  Yes.
22      Q.  When was that?
23      A.  Approximately the fall of 2016, regarding a
24  patient, also several times during the time period of
25  2007 until 2014.

2 (Pages 2 - 5)

Page 6

1     Q.  So I'm just going to refresh some of the
2  ground rules before we begin.  One thing that is very
3  important is that we don't talk over each other, because
4  we do have a court reporter here.  She cannot take both
5  of us at the same time, both of us talking, so just let
6  me finish my question, and I'll let you finish your
7  answer, and this way, she can record everything
8  accurately.
9     A.  Okay.  I understand.
10     Q.  Make sure that, when you're answering
11  questions, you respond with a yes or no, because it's
12  very hard for the court reporter to take down a head nod
13  or a shaking of your head, so just verbal responses.
14     A.  Understood.
15     Q.  Thank you.  And, also, if you don't understand
16  a question that I may ask you, just let me know.  I can
17  rephrase it.  But, otherwise, I'm going to assume that
18  you understood my question.  Okay?
19     A.  Okay.
20     Q.  And, lastly, this is not a marathon.  If you
21  need a break, at any time, just let me know, and I'll be
22  happy to take a break.
23     A.  Okay.
24     Q.  Thank you.  So, Dr. Thomas, do you understand
25  what your role is in this case?

Page 7

1     A.  No.
2     Q.  No?  No one has reached out to you to explain
3  to you your role?
4     A.  No.
5     Q.  Okay.  What I'm going to mark, as Exhibit 44,
6  are the initial disclosures by Plaintiff James Goosby.
7  I'm going to hand the witness a copy.
8        (Defendant's Exhibit No. 44, James Goosby's
9        Initial Disclosures, was marked for
10        identification.)
11  BY MS. RIVAUX:
12     Q.  And I'm going to ask you to turn to the second
13  page, under Subsection G, where it says:
14        DRT Behavioral Services, PLLC, 2699 Stirling
15  Road, Unit C407, Fort Lauderdale, Florida 33312.
16        DRT has information and knowledge about
17  Mr. Goosby's mental evaluation and treatment as a
18  result of his arrest at BB&T and subsequent
19  imprisonment.
20        Have you seen this document before?
21     A.  Perhaps.  I'm not -- I believe I have,
22  perhaps.
23     Q.  You have?
24     A.  Yes.
25     Q.  And when you saw this document, did it have

Page 8

1  the Subsection G, describing DRT Behavioral Services in
2  this matter?
3     A.  I don't recall.
4     Q.  Does it seem accurate, based on your
5  recollection?
6     A.  Does what seem accurate?
7     Q.  The description in Subsection G?
8     A.  The description of the what, the address?
9     Q.  No, in terms of the information -- well, the
10  address first, is that accurate?
11     A.  Yes.
12     Q.  And the information and knowledge that DRT
13  Behavioral Services has about Mr. Goosby's mental
14  evaluation?
15     A.  Yes.
16     Q.  That's correct as well?
17     A.  Yes.
18     Q.  So Subsection G is accurate?
19     A.  Yes.
20     Q.  Okay.  And so you understand that this is what
21  you're here to testify about?
22     A.  Pardon me.  Subsection G, I'm familiar with,
23  except for the last part, subsequent imprisonment.
24  That, I'm not familiar with.
25     Q.  Okay, all right.  So you don't remember

Page 9

1  reviewing that particular statement of subsequent
2  imprisonment?
3     A.  Is that in association with the reason he came
4  into my office, or is that separate?
5     Q.  Well, it's more for you to answer whether this
6  to you seems accurate, and from what I understand,
7  you're saying that --
8     A.  It does.
9     Q.  -- that it's accurate, with the exception of
10  the subsequent imprisonment, because that does not --
11  you do not remember that?
12     A.  I recant.  It is accurate.
13     Q.  It is accurate?
14     A.  That is correct.
15     Q.  Okay.  All right.  Did anyone approach you
16  about being a witness in this lawsuit?
17     A.  No.
18     Q.  When did you receive Exhibit 44, the initial
19  disclosures?
20     A.  I would have to see if I have the information.
21  I recall maybe in March 2018, 2 months ago, receiving
22  information, maybe as far back as January, where a court
23  order -- yeah.  January 16, 2018, I received a subpoena,
24  pardon me.
25     Q.  So that was your first indication that you may

3 (Pages 6 - 9)

1　be a witness in this case?
2　　A.　Yes.
3　　Q.　Okay.  And you said that you did review the
4　initial disclosures.  Do you remember who sent you a
5　copy of the initial disclosures?
6　　A.　No.
7　　Q.　Do you remember if you spoke to anybody about
8　the initial disclosures?
9　　A.　No, I don't remember.
10　　Q.　You don't remember speaking to anybody?
11　　A.　No.
12　　Q.　Okay.  Are you -- let me ask you about DRT
13　Behavioral Services.  What is DRT Behavioral Services?
14　　A.　It's a mental health private practice.
15　　Q.　Is that your company?
16　　A.　Yes.
17　　Q.　Do you own it?
18　　A.　Yes.
19　　Q.　And how long has that practice -- have you had
20　that practice?
21　　A.　A little less than 5 years.
22　　Q.　And how many employees do you have?
23　　A.　13.
24　　Q.　And how many mental health providers do you
25　have?

1　　A.　Six.
2　　Q.　Are there any other psychiatrists, other than
3　you?
4　　A.　No.
5　　Q.　How would you describe your patient
6　population?  Who is the universe of patients that come
7　to see you?
8　　A.　In terms of occupation, lawyers, nurses,
9　higher-functioning patients, teachers, educators, in
10　terms of race ethnicity, islanders, African-American,
11　Hispanics, and we see a lot of Jewish patients, I would
12　say probably maybe 60 percent female, 40 percent male,
13　adults only, youngest age would be 18, and there's no
14　max.  We see geriatric patients also.
15　　Q.　Is there a breakdown in the types of mental
16　health services that people come to DRT for?
17　　A.　Mainly depression, anxiety, those are probably
18　the top two, also ADD, ADHD, difficulty concentrating,
19　sleep disturbances, sometimes relationship problems,
20　stress.
21　　Q.　And how many patients are you currently
22　seeing?
23　　A.　Could you be more specific?  Do you mean total
24　patients that we have in our office or on a weekly
25　basis?  Daily basis.

1　　Q.　Currently that your office has.
2　　A.　Managing?
3　　Q.　Managing first.
4　　A.　Maybe 500 active patients.
5　　Q.　And on a daily basis?
6　　A.　I would say it averages 20 patients.
7　　Q.　And do you see all 20 patients yourself?
8　　A.　It depends on the day, because, on certain
9　days, it's only the therapists are there, and those are
10　for cash-paying patients.
11　　　　On Wednesdays and Thursdays, the load is
12　heavier, so maybe it's 30 patients.  And Wednesdays and
13　Thursdays, those patients are med management, which
14　means that I would see those cases, I would supervise
15　those cases, and review those cases.
16　　　　On Fridays, it's a lighter day, more like 10
17　patients.
18　　Q.　So in the role of when it's a therapist that's
19　seeing a patient, what is your involvement in the
20　patient's care?
21　　A.　For psychotherapy, I'm not involved.  Those
22　are the psychotherapist cases, and so those are managed
23　by them.
24　　Q.　And in med -- in med --
25　　A.　-- management.

1　　Q.　Medication management?
2　　A.　Yes.
3　　Q.　Okay.  And so what is your role there?
4　　A.　Sometimes I'm the primary provider.  Other
5　times, I am managing the case along with the mid-level
6　providers, so that could be a physician's assistant, a
7　PA, or a nurse practitioner, an ARNP, who are training
8　in psychiatry.
9　　　　For those cases, the patient might start out
10　with the mid-level provider and give them their history,
11　and then, towards the end of their visit, I go in, to
12　review the information that was ascertained and review
13　the treatments and the patient.
14　　Q.　Okay.  So let me just get an understanding
15　between when it's the primary and when you're in
16　management.  Explain to me what you do when you're the
17　primary for the patient.
18　　A.　Well, I don't mean supervisor, so that would
19　mean I'm the only one seeing the patient.
20　　Q.　So in those situations, you don't have the
21　physician assistant or nurse practitioner with you in
22　the session?
23　　A.　Correct.
24　　Q.　And what types of a treatment do you usually
25　provide when you're the primary?  What does that type of

Page 14

1  session look like?
2     A.  It's the same.  It's medication management and
3  some brief psychotherapy.  So all of the sessions,
4  regardless of if it's just me or if it's the mid-level
5  provider and myself, they're all -- unless the person is
6  not on medication, for whatever reason, but they all
7  consist of medication discussion and also brief
8  psychotherapy.
9        So brief psychotherapy entails that they don't
10  have a full hour of psychotherapy, as they would if they
11  were seeing a psychotherapist solely?
12     Q.  Okay.  So how long does that kind of session,
13  when you're the primary, how long does that session
14  usually last?
15     A.  It varies.  It could be half an hour to an
16  hour.
17     Q.  Will that, the length of time, depend if it's
18  just medication management or whether it also includes
19  some brief psychotherapy?
20     A.  Correct, and also the complexity of the
21  problem or lack of.  If it's a simple issue or concern,
22  it's faster.
23     Q.  And so you started to explain in terms of when
24  it's the medication management and so you have the
25  physician assistant or a nurse practitioner.  Are they

Page 15

1  giving psychotherapy, in their session, or what is it,
2  when you're managing?
3     A.  It's medication management mainly, and at
4  times, there's brief psychotherapy, as I previously
5  stated, so different modalities in helping the patient
6  to recover or tools, so to speak, for them to use at
7  home, when they're dealing with stress or sadness or
8  anxiety.
9     Q.  So coping mechanisms, things like that?
10     A.  Right.
11     Q.  And in those types of sessions, how is the
12  division of time between the time spent with the
13  therapists -- which I'm including the physician's
14  assistant and nurse practitioner.  I'm assuming those
15  are the two categories of therapists you have, or are
16  there other categories?
17     A.  No, they're not therapists.
18     Q.  Oh, I'm sorry.
19     A.  As I was explaining earlier, the
20  psychotherapists are therapists.  They are mid-level
21  providers.  They are PAs and nurse practitioners.
22     Q.  Okay.  I'm sorry.  Maybe I misunderstood that.
23  Is the nurse practitioner and the PA, are they also
24  psychotherapists?
25     A.  No.

Page 16

1     Q.  Okay.
2     A.  They're providers.  They're clinical providers
3  who prescribe medication under my supervision.
4     Q.  The psychotherapists?
5     A.  No, the ones you just asked me about, the PAs
6  and the nurse practitioner.  You asked me about the PA
7  and nurse practitioner.
8        They are prescribers.  They're not
9  psychotherapists.  They prescribe medication under my
10  supervision.  And when it's indicated, they also provide
11  brief psychotherapy, under my supervision.
12     Q.  Okay.  And what does that mean?  Are you in
13  the session?
14     A.  It means, as I said before, I'm in the session
15  towards the end of the session.  They collect the
16  history, the information, and I review the case with
17  them, with the patient, make a treatment plan, and then
18  I review the note again, later, and apply a signature.
19        And sometimes the patient comes back to see me
20  solely, without seeing the nurse practitioner.  It just
21  depends on the case.
22     Q.  How long do you usually spend in the session,
23  as opposed to --
24     A.  It varies.  It could be the entire session,
25  because sometimes the mid-level provider knows, from the

Page 17

1  beginning, that it's a case of concern, so I might be
2  there from the beginning of the session.
3        It could be, usually, at least 20 minutes,
4  towards the end, after they've already been in the
5  session for probably 40 minutes, 45 minutes.
6     Q.  So the entire session is usually about an
7  hour?
8     A.  It could be, depending on the complexity.  It
9  varies.
10     Q.  Okay.  So you mentioned the physician's
11  assistant and the nurse practitioner.  What kind of --
12  starting with the physician's assistant, what kind of
13  training do you have?
14     A.  An undergraduate, a 2-year's master's, and
15  depending on the specialist or the PA, they may have
16  additional certifications and additional training, but
17  at least a minimum 6 years, 4 years of undergraduate and
18  2 years of graduate training.
19     Q.  Do they need specific training in mental
20  health?
21     A.  They don't need, no.  No, they don't need
22  special training in mental health.
23     Q.  And turning to the nurse practitioner, the
24  nurse practitioner, what sort of training do they
25  receive?

5 (Pages 14 - 17)

Page 18

1    A.   It's the same as the PA.  They're 4 years
2  undergraduate and a 2-year graduate degree.
3    Q.   Do they need training specific to mental
4  health?
5    A.   No, because they can, just like a PA, they can
6  train in different specialties.
7    Q.   So how many PAs do you have?
8    A.   One.
9    Q.   One PA.  And how many nurse practitioners do
10  you have?
11    A.   Two.
12    Q.   The PA that you have, does that PA have any
13  training in mental health?
14    A.   Yes.
15    Q.   And what is that?
16    A.   US Army.
17    Q.   And what specific in the U.S. Army, do you
18  know?
19    A.   Yeah, a mental health subset training.
20    Q.   And that's the PA?
21    A.   Yeah, and also training that she completed
22  with me, when she joined the practice.
23    Q.   And the mental health subset training from the
24  U.S. Army, what does that consist of?
25    A.   It's several weeks or some months of

Page 19

1  concentrated reading and clinicals and mental health,
2  basically.  The same patients are -- pardon me, soldiers
3  work mental health pathology, as opposed to just
4  physical health problems.
5    Q.   Do you know how many clinical hours they need?
6    A.   It's not, in the military, it's not necessary.
7  It's just something that they can do, so there's no
8  requirement.  There's no need, so to speak.
9    Q.   So there's no requirement for mental health
10  training specifically?
11    A.   No.  They can just volunteer to shadow or to
12  do additional rotations in that specialty, but there's
13  no requirement or a certain amount of hours that they
14  need.
15    Q.   And you said training with you.  What was the
16  training with you?  Can you elaborate on that, please?
17    A.   Shadowing me in the hospital, shadowing in the
18  skilled nursing facilities, shadowing in the office
19  before they were -- before, this one PA, before she was
20  allowed to see patients, to gather history on her own,
21  without me being there to gather the history.
22    Q.   And how long -- it's a woman?
23    A.   Mm-hmm.
24    Q.   How long did she do that training, the shadow
25  training with you?

Page 20

1    A.   Six months.
2    Q.   And the nurse practitioner, can you describe
3  for me what the training is for a nurse practitioner?
4    A.   The nurse practitioner is a psychiatry nurse
5  practitioner, so he's specifically trained in psychiatry
6  at a graduate level.  So all of his clinicals are mental
7  health and psychiatry clinicals, during graduate school,
8  and clinicals in the hospital, outpatient.
9    Q.   And how many years is that usually?
10    A.   It's 2 years, graduate level, in addition to
11  their undergrad years.
12    Q.   And the PA, what is your PA's name?
13    A.   Jacqueline, J-a-c-q-u-e-l-i-n-e, last name
14  Small.
15    Q.   Okay.  And for your nurse practitioners, what
16  are their names?
17    A.   Adrian Mesa, M-e-s-a, and the other nurse
18  practitioner is new.  Her name is Yolande, Y-o-l-a-n-d-e
19  McCray, M-c-C-r-a-y.
20    Q.   And Jacqueline Small and Adrian Mesa, how long
21  have that been with you?
22    A.   Jacqueline almost 2 years, and Adrian, a
23  little over a year.
24    Q.   When was it that Jacqueline started, just
25  about?

Page 21

1    A.   2016, probably summer 2016, yeah, somewhere in
2  the summer 2016.
3    Q.   And Adrian, you said about a year?
4    A.   Yeah, he started maybe December '16 or
5  January 2017, something like that.  He was after, he
6  started after Jacqueline.
7    Q.   And where was he working before?
8    A.   He's a professor at the University of Miami
9  and the school of nursing and the nurse practitioner
10  program, so he teaches the psychiatry nurse practitioner
11  program to other nurse practitioners, who aspire to be
12  psych nurse practitioners.
13    Q.   Let's go through your background.  Can we talk
14  a little bit about your background?
15    A.   Sure.
16    Q.   Can you walk me through your educational
17  history?
18    A.   I attended College of Notre Dame, which is
19  considered a university now, in Baltimore, Maryland, an
20  all-girls Catholic school, majored in biology.  I earned
21  a BA in biology in May of 1988.  I attended one year at
22  the University of Baltimore, to acquire a master's in
23  health administration.  But, in '99, I was accepted into
24  medical school.
25        So in August 1999, I matriculated and began

6 (Pages 18 - 21)

Page 22

1 medical school in Philadelphia, at the Philadelphia
2 College of Medicine, and graduated from there in
3 May 2003.
4        And that summer, 2003, I started my psychiatry
5 and neurology residency at the university of Maryland in
6 Baltimore, Maryland, and trained in psychology and
7 neurology for 4 years, to complete a residency,
8 graduated in July 2007.
9        During that time I acquired a master's in
10 public health, from Morgan State University, and
11 graduated from that program in December 2006.
12    Q.   During your education, did you have any
13 specializations?
14    A.   What do you mean?
15    Q.   Well, let's start with your master's in public
16 health.  Was it specialized in any particular area?
17    A.   Forensics, criminal, health care of inmates.
18    Q.   And then what did you do after you graduated,
19 and you had your master's and your medical degree?
20    A.   I did my psychiatry residency in 2003, to
21 2007.  That's what I did after I got my medical degree.
22    Q.   And where did you do your residency?
23    A.   As I stated, the University of Maryland, in
24 Baltimore, from 2003 until 2007.
25    Q.   Did you have any specialization in the

Page 23

1 residency of psychiatry?
2    A.   No, just adult psychiatry.
3    Q.   Where did you work after you completed your
4 residency?
5    A.   I took a job with the Department of Justice
6 Federal Bureau of Prisons, and I came to Miami in the
7 Federal Detention Center, in downtown Miami, 33
8 Northeast 4th Street.  I was the chief psychiatrist
9 here, in Miami, and Puerto Rico and Georgia.
10    Q.   And what was your role there?
11    A.   Medication management, forensic evaluations,
12 trauma assessments, mental health care of inmates, and
13 then I became the clinical director in 2012, so I
14 managed the medical unit.  I supervised PAs, nurse
15 practitioners, two other physicians, and some of the
16 psychologists.
17    Q.   How long did you do that for?
18    A.   As clinical director, 2 years.  I worked for
19 the bureau overall for 7 years.
20    Q.   And what was your role the other 5 years?
21    A.   The chief psychiatrist.
22    Q.   Okay.  Well, you had said the clinical
23 director so I --
24    A.   No, I said the chief psychiatrist first, when
25 I initially started there, and then I became the

Page 24

1 clinical director in 2012.
2    Q.   Is there a board certification in psychiatry?
3    A.   Yes.
4    Q.   Are you board certified in psychiatry?
5    A.   Yes, and neurology.
6    Q.   Let me ask you, do you publish any
7 peer-reviewed studies?
8    A.   Yes.
9    Q.   Where do you publish?
10    A.   I did publish.  It was the American Journal of
11 Chemical Warfare.  That was as an undergraduate, in
12 college, the effects of mustard gas on skin.
13    Q.   Any other publications?
14    A.   No.
15    Q.   Do you serve on any editorial boards for any
16 journals?
17    A.   No.
18    Q.   Have you served on any editorial boards for
19 any journals?
20    A.   No.
21    Q.   Do you currently conduct any research,
22 peer-reviewed research?
23    A.   No.
24    Q.   So, in the legal field, we have a requirement
25 that we do continuing legal education.  Do you have the

Page 25

1 same type of continuing medical education requirements?
2    A.   Yes.
3    Q.   What does that usually entail?
4    A.   What do you mean, what does it entail?
5    Q.   So, for example, in the legal field, we have
6 to take 30 hours of courses, in the course of 3 years,
7 and we can pick any topics to study.  There's nothing
8 specific that's required.
9        So I don't know if it's any different in the
10 medical field, and so I'm kind of focusing on what are
11 the requirements, and do you -- how is it that you meet
12 those requirements?
13    A.   The state of Florida, I believe, requires a
14 minimum 40 hours of CMEs every 2 years.  I believe
15 that's the minimum.  I don't know, because I don't
16 usually shoot for the minimum, but I'm not sure about
17 that.  But you do have to have a certain amount of hours
18 every 2 years, so that you can renew your license, and
19 you can achieve that, basically, in any type of
20 conference.  It's your choice.  You can choose.
21    Q.   And so what topics do you usually choose?
22    A.   Psychiatry and addictions, mental
23 health-related topics, but also I do primary care, as
24 well, because some of our patients have coexisting
25 disorders, like diabetes and high blood pressure.

7 (Pages 22 - 25)

Page 26

```
 1        So the last conference I attended was the
 2   Institute of Psychopharm, out in Nevada, and also the
 3   Florida Medical Association's primary care conference.
 4        Q.   Have you ever met Mr. Lee, Mr. Goosby's
 5   attorney, before?
 6        A.   No.
 7        Q.   Have you ever spoken to him on the phone?
 8        A.   I believe once, when I received the initial
 9   subpoena.
10        Q.   And how long was that conversation?
11        A.   Less than 5 minutes.
12        Q.   What did you talk about?
13        A.   I called him to advise that I received a
14   subpoena for his client's records.
15        Q.   Okay.  What was the discussion?
16        A.   I advised him that I received a subpoena for
17   his client's records.
18        Q.   And what did he respond?
19        A.   He said okay.  He told me to comply.
20        Q.   And did you produce all of your records?
21        A.   Yes.
22        Q.   Have you spoken to any of Mr. Goosby's other
23   lawyers?
24        A.   No.
25        Q.   When did you first meet Mr. Goosby?
```

Page 27

```
 1        A.   August 9, 2017.
 2        Q.   Had you known him before, in any way?
 3        A.   No.
 4        Q.   Do you know how Mr. Goosby came to your
 5   office, whether he was referred to you?
 6        A.   He was referred by his psychotherapist,
 7   Mr. Wiggins.
 8        Q.   Do you know Mr. Wiggins?
 9        A.   I do.
10        Q.   How do you know Mr. Wiggins?
11        A.   Professionally, I used to -- my previous
12   office was in the same building that Mr. Wiggins works
13   in, and at the time, we shared a lot of cases, and we
14   still refer to one another.
15        Q.   How many cases does he usually refer to you?
16        A.   I moved my office to Fort Lauderdale now, so
17   it's a lot less, because most of the people he treats
18   are in Miami.  I would say, on average, maybe a case per
19   month, if that.
20        Q.   And how many cases do you usually refer to
21   him?
22        A.   Two per year maybe.
23        Q.   And before you moved your office, how many
24   cases was he referring to you?
25        A.   Maybe more so, like four cases a month, three
```

Page 28

```
 1   or four cases a month.
 2        Q.   And how about you?  How many cases were you
 3   referring to him, before you moved your office?
 4        A.   At the time I didn't have a psychotherapist,
 5   so it may have been at least one case per month.
 6        Q.   Have you ever worked on a case together with
 7   him?
 8        A.   What do you mean by that?
 9        Q.   Did you ever work together in an office
10   together or work on any cases specifically together?
11        A.   No.
12        Q.   Is your relationship with Mr. Wiggins strictly
13   professional, or are you friends outside of the
14   professional workplace?
15        A.   Professional, but we've been to certain
16   educational things at the same time.  I would say more
17   professional, but friendly.
18        Q.   Do you ever go out socially, to dinner or
19   anything like that?
20        A.   No.
21        Q.   Your patients that come to see you, how much
22   do you charge your patients typically for a session?
23        A.   That varies, so initial could be anywhere
24   between $150 to $800, for an initial session.
25        Q.   $800?
```

Page 29

```
 1        A.   Correct.
 2        Q.   And is $800 for a one-hour session, or is that
 3   a longer session?
 4        A.   That's a longer session.  That's more like
 5   90 minutes, maybe 2 hours.  Those cases are identified
 6   as complicated before they come into the office.
 7        Q.   And do you accept insurance?
 8        A.   Yes.
 9        Q.   Do you know how much you charged Mr. Goosby
10   for his sessions?
11        A.   I would have to look, but I believe $150 for
12   each of the sessions.  If I recall, he was uninsured at
13   the time.
14        Q.   Did you do anything to prepare for this
15   deposition?
16        A.   No.
17        Q.   You didn't review any documents, before you
18   came to the deposition?
19        A.   When I sat down, I pulled up his chart, to
20   ensure that you had all of the notes.  I recall talking
21   to -- Mr. Garbett?  Mr. Yates, pardon me, Brian Yates,
22   because one of the notes was missing about a month or
23   over a month ago.  We e-mailed it, but I saw that it
24   wasn't here on the table, so I just confirmed that there
25   was actually a third visit or a third note.
```

8 (Pages 26 - 29)

Page 30

1    Q.   Okay, but before you got here, to the office,
2  for your deposition, you hadn't reviewed any of the
3  materials?
4    A.   No.
5    Q.   And for the sessions that are -- are all the
6  sessions covered by insurance?
7    A.   No, not all sessions are covered.  Some
8  insurance plans won't cover psychotherapy with the
9  psychotherapist, which is why the psychotherapist, a
10  times, a lot of times, have private-pay patients,
11  because insurance may not cover that, but most plans
12  will cover medication management.
13    Q.   And do you find, for, you mentioned your
14  complicated cases, those tend to be about $800 an hour,
15  do insurance cover those sessions?
16    A.   No.  Those rates are self-pay rate.  So that
17  has nothing to do with insurance.  Insurance, every
18  panel is different.  They negotiate their own rates.
19    Q.   And for the insurance -- I guess you're saying
20  there are different rates, depending upon the insurance
21  company?
22    A.   Right, and depending upon what service is
23  rendered.
24    Q.   Other than psychotherapy and medication
25  management, at DRT Behavioral Services, do you provide

Page 31

1  any other services to your patients?
2    A.   Yes.
3    Q.   What are the other services?
4    A.   Massage therapy, facials, Botox, fillers,
5  weight loss, we have a weight-loss program, laser hair
6  treatment removal, and next week, we start with
7  acupuncture.
8    Q.   And how many -- is that when you were talking
9  about the patients, you see about 20 a day, does that
10  include for the other services, or is that separate?
11    A.   No, that's separate.
12    Q.   And how many patients do you usually have for
13  those other services?
14    A.   That's a new addition to our office, so that
15  might be, I'd say, between five and ten cases per week.
16    Q.   You mentioned before that you gave a
17  deposition in 2016.  What was that relating to?
18    A.   An elderly patient, with children who were
19  basically fighting over her estate.
20    Q.   What was your role?
21    A.   I was her treating psychiatrist.
22    Q.   And did you testify at trial there?
23    A.   No.
24    Q.   Have you testified at trial before?
25    A.   Yes.

Page 32

1    Q.   You had mentioned you had testified in
2  deposition for some period of time.  I think you said --
3        MR. GARBETT:  '07 to '14.
4        MS. RIVAUX:  Correct, thank you.
5        THE WITNESS:  Yeah.
6  BY MS. RIVAUX:
7    Q.   And, in that time, how many times did you
8  testify in deposition?
9    A.   More than 10, I don't remember.  I can't
10  recall, several depositions.  And maybe at least
11  five cases, I had to testify as a witness on behalf of
12  the federal government.
13    Q.   And in all of these cases, were you also
14  testifying as the treating physician?
15    A.   No.  A few of the cases, I was the clinical
16  director, supervising the treatment of the patient.
17    Q.   In your current practice, you certainly keep
18  records of the sessions you have with your patients,
19  correct?
20    A.   Yes.
21    Q.   And what is the significance of the records
22  that you make?
23    A.   The significance?  Well, you have to have
24  documentation to show justification for certain
25  prescriptions or a treating plan.  And in cases where

Page 33

1  someone is not using insurance, you don't have to keep
2  any documentation.
3        But we keep documentation on all of our
4  patients, so that, if someone needs records, because
5  they go to a different doctor or they're going to see
6  their primary care doctor, the session is recorded or
7  documented.
8    Q.   And do you yourself take the notes, in your
9  sessions?
10    A.   Well, it depends on who's seeing the patient.
11  So it could be a combination of myself and the mid-level
12  provider.  It could just be myself, if I'm the only one
13  who saw the patient.
14    Q.   When you're taking down the notes, when you're
15  the only one seeing the patient, what type of
16  information do you include?
17    A.   If it's their first time coming in, the first
18  two sessions, we spend collecting their history, like
19  their past psychiatric history, any substance abuse
20  problems, their past medical history, so like physical
21  health problems, if they have any allergies, allergies,
22  if they're prescribed any other medications, their
23  social history, which could include where they were
24  born, where they grew up, any history of trauma, their
25  educational level, any military experience, their job

9 (Pages 30 - 33)

Page 34

1  experience, their current relationship status or issues,
2  if any, as well, of course, the presenting problem that
3  brought them into the office.
4      But an extensive history, such as that, would
5  be during the first two sessions.  And, thereafter, it's
6  mainly focused on symptoms, their response to treatment,
7  if they have any problems with the medication.
8      Q.  Would it be fair to say that what you're
9  recording in the records are the things that are most
10  significant that's coming out of the session?
11      A.  That would be fair to say, yes.
12      Q.  And do you include everything that you believe
13  helps you make your diagnosis?
14      A.  Yes.
15      Q.  And do you provide any training to the PA or
16  to the nurse practitioner in how to take the notes?
17      A.  Every day, every day that we work, they're
18  given feedback and training.
19      Q.  And what kind of training is that?  What kind
20  of feedback is it that you're giving them?
21      A.  A different way to present information, a
22  different way to organize their information, always
23  discussing the diagnosis and ensuring that they have
24  justification for the diagnosis that they provide,
25  discussing the treatment plan, ensuring that they

Page 35

1  understand the treatment plan that we create for the
2  patients.
3      So we have team meeting at the beginning of
4  the day, to review cases that are coming in, to review
5  cases, that might have been problematic, from the day
6  before.  And at the end of the evening, we also have
7  team again.  That's when I review the notes of all the
8  patients.
9      I've been in their sessions, but then, I have
10  to review the notes, so that I can sign and go over the
11  information that they provided verbatim.
12      Q.  Okay.  So, at the end of the day, that's when
13  you go through the notes, that the PA may have taken,
14  and then -- or that the nurse practitioner may have
15  taken, and then you sign off on them?
16      A.  Yes.
17      Q.  And so you mentioned that you include patient
18  history, and is the patient history based on
19  self-report?
20      A.  It is.
21      Q.  Is there anything else that you look at for
22  patient history?
23      A.  If they're referred by their primary care
24  doctor, if applicable, we'll request records from the
25  primary care, if the referral came from their PCP, but

Page 36

1  if it's a self-referral, typically, it's the patient's
2  report and any collateral that he or she may bring in.
3  Sometimes people bring old records or, you know, recent
4  records, from other doctors.
5      Q.  But it's not a practice of yours to go and ask
6  for the medical records of the patients, if they don't
7  bring them or they're not brought in from their PCP?
8      A.  It depends on the case.
9      Q.  Okay.  Do you have a process of when it is
10  that you seek those records?
11      A.  It depends on the case.  It depends on their
12  pathology, what they're presenting with.
13      Q.  Can you give me an example of a situation
14  where you would be requesting the records from the PCP
15  or any other records that they may have?
16      A.  A patient with other ailments and they might
17  be on multiple medications, maybe someone who's HIV
18  positive, and I need the blood work, also their current
19  regimen for their HIV, so we can check medication
20  interactions, things like that.
21      Q.  So would it be fair to say that that it's when
22  you're concerned that there may be contraindications
23  with the patient's medication?
24      A.  Yes.
25      Q.  Are there any other circumstances where you

Page 37

1  may request the records, beyond the patient's
2  self-report?
3      A.  Certain medications, like if they say I've
4  been on Xanax for 10 years, I'm not a Xanax prescriber
5  typically, definitely not over long term, so at times I
6  have to verify, if they're saying they're getting a
7  controlled substance, I'll verify if they've had that
8  previously.  We prescribe it for certain cases, but,
9  like, not for a long-term thing.
10      So when they come in and they're on long-term
11  medications like that, we'll request records.
12      Q.  And what, for you, is considered long-term on
13  Xanax?
14      A.  Over a year.
15      THE WITNESS:  Is there any way to adjust the
16  temperature in here?  It's freezing.
17      (A discussion was held off the record.)
18      MR. LAPOINTE:  We can take it off the record.
19      THE VIDEOGRAPHER:  We're going off the record,
20  at 7:15 p.m.
21      (Off the record.)
22      THE VIDEOGRAPHER:  We're back on the record.
23  The time is 7:23 p.m.
24  BY MS. RIVAUX:
25      Q.  Thank you, Dr. Thomas.  We were talking about

10 (Pages 34 - 37)

Page 38

1  your medical records.  And you mentioned that part of
2  your records includes the history that you take of the
3  patient, based on the self-report, correct?
4      A.  Correct.
5      Q.  And part of it may include records from other
6  providers that they may have, in some cases?
7      A.  That would be correct.
8      Q.  And when you get records from providers on
9  certain cases that you may -- either the patient brings
10 them in or you request the records yourself, do you keep
11 those records as part of the file?
12     A.  We do.  They're uploaded into their electronic
13 chart.
14     Q.  Okay.  And when you keep that electronic
15 chart, do all the records always travel together?
16     A.  Yes.
17     Q.  In addition to you including the self-report,
18 do you include also your personal observations of the
19 patient when they come to see you?
20     A.  Absolutely, yes.
21     Q.  And then you mentioned that you have patients
22 that are prescribed controlled substances, correct?
23     A.  Yes.
24     Q.  And you're licensed to prescribe controlled
25 substances to your patients?

Page 39

1      A.  Yes.
2      Q.  And you're familiar with the different
3  schedules of classifications for controlled substances?
4      A.  Yes.
5      Q.  Could you explain your understanding of the
6  classification?
7      A.  Well, the classifications are based,
8  basically, on legality and also, as well, addictive or
9  addiction potential.
10        And certain schedules -- the schedules, pretty
11 much, limit certain people from prescribing, for
12 instance, there might be schedules that can only be
13 prescribed by a dentist or a certain type of surgeon,
14 such as when cocaine is used for certain medical
15 reasons.
16        And so the schedules themselves are used by
17 pharmacists to, basically, limit what's going in and out
18 of the pharmacy and who's prescribing what and, also, to
19 protect patients, so that people who are not trained in
20 prescribing those certain schedules are not prescribing
21 those particular drugs or medications.
22     Q.  And do you keep internal policies to ensure
23 that you're following the requirements and procedures
24 for controlled substances?
25     A.  We do, yes.

Page 40

1      Q.  And under that procedure, is there a time
2  frame or a certain amount of visits that you need to
3  have with a particular patient, before you can start
4  prescribing a controlled substance?
5      A.  No.  And it all depends on the presentation
6  and the symptoms.  There's no time frame.
7      Q.  I just want to turn now to Mr. Goosby,
8  specifically.  You said the first time you met him was
9  on August 9, 2017?
10     A.  That would be correct.
11     Q.  And do you know how many times you met with
12 him?
13     A.  Three times.
14     Q.  And do you know how long each session was?
15     A.  The first two sessions, the first session was
16 about an hour, and the second session was 45 to
17 50 minutes.  And the third session was more like
18 30 minutes.
19     Q.  And when you were in the sessions, was there
20 anyone else in the sessions with you?
21     A.  The first two sessions included PA Jacqueline
22 Small, and the third session, he was seen by Psychiatric
23 Nurse Practitioner Adrian Mesa.
24     Q.  So, in his sessions, was it as you described
25 earlier, where they took his personal history

Page 41

1  information first, and then you came in for the
2  medical -- the medication management?
3      A.  Actually, Mr. Goosby was -- is an outlier.  I
4  was in his first session most of the session, because of
5  what he was presenting with, because of the case, so I
6  was there.
7         He started with PA Small, and 10 minutes or
8  15 minutes into the session, I went in, and so I was
9  part of the history-taking, the presentation of current
10 symptoms, when he shared his past psych, substance
11 abuse, past medical, those things that I described
12 earlier.
13        So with this case, I was there more so at the
14 beginning than at the end.
15     Q.  And that was for the first session.  How about
16 for the second and third session?  Let's start with the
17 second session.
18     A.  The second session, I would say I went in
19 probably halfway into the visit, 20 minutes in.  And the
20 third visit, I went into the session for the last
21 15 minutes.
22     Q.  And in the second and third session, was your
23 focus more on the medication management?
24     A.  No.  It's never just on the medication
25 management.

11 (Pages 38 - 41)

Page 42

1    Let me clarify.  When I go in, at the end of
2  the session, on any case, I start from the beginning,
3  but because I'm a psychiatrist, I'm faster than the
4  mid-level providers at being able to acquire the
5  information quickly and summarize and then create a plan
6  with the patient, along with the mid-level.
7    So, with any case, I always start from the
8  beginning, when I come in, and I recap the history that
9  they've provided, because the computer is there, and I
10  also ask them, how are things going?  How are you
11  responding to the medication?  What symptoms are you
12  noticing, any side effects?
13    So it's not that I go in and say, oh, yeah, we
14  did this, this is the prescription you get, here it is,
15  bye.
16    So I come in and I do more of -- it's a faster
17  way of doing the entire session, again, to ensure that
18  the PA or the nurse practitioner provided accurate
19  information in the presenting complaint, with those
20  accompanying symptoms, so that we make an accurate plan.
21    Q.  So, wait, so, in the sessions, you're coming
22  in after the PA or the nurse practitioner, and it's
23  faster for you, given your experience, correct?
24    A.  It doesn't take as long, correct, to go
25  over -- they've already given all of the details, all of

Page 43

1  the specifics, over that amount of time that they've
2  already been there with the nurse practitioner or the
3  PA, and then I come and still review the information
4  with the patient and ask if they have any additional
5  information to add, in the event that we did not record
6  or they did not record what the patient felt were their
7  main points or their main concerns.
8    So I touch on everything, their symptoms,
9  their response, the medication, and then we build a
10  plan.
11    Q.  You mentioned that there were three sessions
12  with Mr. Goosby.  Do you do any Skype sessions or phone
13  sessions?
14    A.  No.
15    Q.  And do you record any of your sessions?
16    A.  No.
17    Q.  And is Mr. Goosby currently still under your
18  care?
19    A.  He has not been discharged from the office, so
20  yes, he's still under our care.
21    Q.  And when was the last time you saw him?
22    A.  January 2018, so about 4 months ago,
23  January 24, 2018.
24    Q.  You say January 24th?
25    A.  Yes.

Page 44

1    Q.  Was the last time you saw him?
2    A.  Yes.
3    Q.  I'm going to show you what we'll mark as
4  Exhibit 45.
5    MS. RIVAUX:  I'll mark this as 45.
6    (Defendant's Exhibit No. 45, Medical
7  Evaluation 08/09/17, was marked for
8  identification.)
9  BY MS. RIVAUX:
10    Q.  Dr. Thomas, do you recognize this document?
11    A.  Yes.
12    Q.  And can you tell us what that document is?
13    A.  This is a new medical evaluation performed at
14  DRT Behavioral Services, authored by PA Jacqueline Small
15  and Delvena Thomas.
16    Q.  And if you could just look at the top, where
17  it says Seen By, is that where you identify who it is
18  that is the initial person doing the intake?
19    A.  Yes.
20    Q.  And then, at the end of the document, do you
21  see where it says, patient -- and this is on page two,
22  patient assessed, where it says PT, I'm assuming that's
23  patient, assessed and managed by Dr. Thomas, including
24  PA Small?
25    A.  Yes.

Page 45

1    Q.  That means that you were in the session?
2    A.  Yes.
3    Q.  And do you always include that, if you are in
4  the session?
5    A.  No, it's different terminology.
6    Q.  Okay.  And so what does that reference
7  specifically?
8    A.  What does what reference?
9    Q.  The reference when you put in patient assessed
10  and managed by Dr. Thomas, including PA Small.
11    A.  That the patient assessment is by Dr. Thomas,
12  by myself, and also the PA.
13    Q.  And are there times -- and you're saying there
14  are times that you don't include it?
15    A.  I didn't say that.  I said there are times
16  when we use different terms to describe that the patient
17  was assessed and managed by me.
18    Q.  Okay.
19    A.  So it's not always verbatim, patient assessed
20  and managed, so it could be a different way.
21    Q.  And if you don't include that at the bottom,
22  does that reference then, that you were not in the
23  session?
24    A.  No.  It could mean that I forgot to enter it.
25    Q.  Okay.

12 (Pages 42 - 45)

1    MS. RIVAUX:  I'm going to, then, mark
2  Exhibit 46.
3    (Defendant's Exhibit No. 46, Medical
4  Evaluation 10/25/17, was marked for
5  identification.)
6  BY MS. RIVAUX:
7    Q.  Do you recognize this document?
8    A.  Yes.
9    Q.  And what is this document?
10   A.  It's the initial psychiatric assessment
11 completed on October 25, 2017.
12   Q.  And here, Mr. Goosby -- and this is
13 Mr. Goosby's record?
14   A.  Yes.
15   MS. RIVAUX:  And we're going to mark this as
16 Exhibit 47.
17   MR. LEE:  That's the one from today?
18   MS. RIVAUX:  Yes.
19   MR. LEE:  That's fine.  I have a copy.
20   MS. RIVAUX:  Exhibit 47.
21   (Defendant's Exhibit No. 47, Medical
22 Evaluation 01/24/18, was marked for
23 identification.)
24 BY MS. RIVAUX:
25   Q.  And do you recognize this document?

1    A.  Yes.
2    Q.  And what is this document?
3    A.  A progress note or a followup note completed
4  January 24, 2018.
5    Q.  Also for Mr. Goosby?
6    A.  Yes.
7    Q.  Okay.  Do Exhibits 45, 46, and 47, is that the
8  entirety of your records for Mr. Goosby?
9    A.  Yes.
10   Q.  Okay.  And just for clarification, for the
11 record, you had previously provided Exhibits 45 and 46,
12 pursuant to the subpoena, and you've provided Exhibit 47
13 today, when you realized that it had not been produced?
14   A.  I provided it a month ago, by e-mail,
15 Exhibit 47, when, after I spoke to Mr. Yates, and he
16 said -- I told him, over the phone, the dates that
17 Mr. Goosby had been seen by us.
18     And he said he did not have the January
19 encounter, and he asked why hadn't we sent it.  And I
20 told him the initial subpoena requested records through
21 September 2017, I believe it was, and I explained to
22 him -- or maybe it was November 2017.  And I explained
23 to him that I can't release records if I don't have the
24 dates included on the subpoena.
25     So he sent a new subpoena, and we e-mailed to

1  him the January 24, 2018, encounter.  And when I came
2  today, I didn't see it, and that's when we resent it.
3    Q.  I see.  Thank you for the explanation.
4    A.  Sure.
5    Q.  When a patient comes to you, who is making the
6  diagnosis?  Is it the PA or the nurse practitioner, in
7  the cases where you have the -- where you're involved in
8  the medication management, as opposed to the primary,
9  who is involved in making the diagnosis?  Do they make
10 the diagnosis, and then you confirm it, or are you the
11 only one making the diagnosis?
12   MR. LEE:  Form.
13   A.  Ultimately, I make the diagnosis.  When I go
14 into the room, and they present the case, and I talk to
15 the patient.  The PA and nurse practitioner will, at
16 times, give their differential, based on the symptoms,
17 and then I make the diagnosis.
18   Q.  Okay.  And is it fair to say, that you want an
19 accurate assessment, in order to properly treat your
20 patient?
21   A.  Yes.
22   Q.  And is it also fair to say, that you want to
23 have all the data necessary to reach a proper diagnosis?
24   A.  Yes.
25   Q.  And you want your diagnosis to have a degree

1  of reliability and confidence, based on all of the data
2  that is available, correct?
3    A.  Correct.
4    Q.  Is it fair to say, the more information you
5  have about the patient, the more accurate your
6  assessment is going to be?
7    A.  Yes.
8    Q.  What is the -- what is the methodology that
9  you use for diagnosing your patients?
10   A.  Well, the first thing that initiates it is
11 self-report, what the patient presents with, what they
12 describe, so we call that subjective, our own assessment
13 of the patient and how they appear while we're talking
14 with them and gathering information.  If there's
15 collateral available, collateral records can be useful,
16 sometimes.
17   Q.  Okay.
18   A.  And experience, intuition.
19   Q.  Do you use the Diagnostic and Statistical
20 Manual, the DSM?
21   A.  Yes.  Our diagnoses are governed by the DSM–5
22 and have to be based on the DSM–5.
23   Q.  And how do you personally use the DSM–5?
24   A.  I don't know what you mean.
25   Q.  Sure, let me clarify.  Do you have a copy of

13 (Pages 46 - 49)

Page 50

1 it in the office, when you see your patients?
2      A.  I do.
3      Q.   And do you refer to it when you're making your
4 diagnosis?
5      A.  From time to time, depending, but this is why
6 I did a 4-year residency, so I could remember certain
7 things, while I'm seeing a patient, and not have to
8 refer to a manual or a computer.
9      Q.   So you feel very comfortable that you know it,
10 the DSM–5, but sometimes you may have to refer to it?
11      A.  Correct.
12      Q.   And you said you use the DSM–5.  Is that
13 authoritative in your field?
14      A.  It is.
15      Q.   Would you call it the Bible of your field?
16      A.  No, I would not.
17      Q.   What is the Bible of your field?
18           MR. LEE:  Form.
19      A.  I don't call anything the Bible.
20           MR. LEE:  That's just for us.
21      Q.   How long would you say it usually takes you to
22 take a full, complete clinical history of a patient?
23      A.  It varies.  It could be in as little as
24 15 minutes.  It could be as long as 40 minutes,
25 45 minutes.  It varies.

Page 51

1      Q.   Is the DSM-4 authoritative as well?
2      A.  The DSM-4 is very outdated.  We haven't used
3 that in 100 years maybe.
4      Q.   How important is it for you to know if a
5 patient has any preexisting mental health conditions?
6      A.  It's very important.  It's essential to the
7 assessment.  We always ask about previous psychiatric
8 history.
9      Q.   Is it fair to say, you mentioned you rely on
10 the self-report, is it fair to say, that, if the
11 self-report is inaccurate, then your diagnosis may be
12 inaccurate?
13      A.  That's fair.
14      Q.   So, on some level, you really have to rely on
15 the accuracy and reliability of your patient, to give
16 you information, in order for you to make your
17 assessment, correct?
18      A.  Correct.
19      Q.   Is it important for your patient to be
20 truthful with you, for you to make a proper assessment?
21      A.  Yes.
22      Q.   And you mentioned that the self-report on the
23 records is under the subheading Subjective, is that
24 because any self-report is subjective?
25      A.  Repeat the question.

Page 52

1      Q.   Sure.  That was a poorly-worded question.  Let
2 me rephrase.
3           Is a self-report subjective?
4      A.  Yes.
5      Q.   Do you use any psychological testing in
6 assessing your patients?
7      A.  At times.
8      Q.   And what are the types of psychological tests
9 that you use?
10      A.  We have rating scales, GAD 7.  There's a PTSD
11 VA rating scale that we use.  Veterans Affairs has
12 confirmed that it's sensitive and reliable.  So we use
13 that for PTSD.
14           And the other main rating scale is what's
15 called a Hamilton and a GAD 7, for anxiety illnesses,
16 and, at times, we refer out to a psychologist for an
17 MNPI, if there's any question or hesitation regarding
18 someone's diagnosis or if we're kind of on the fence.
19      Q.   Any other ones that you use?
20      A.  No.
21      Q.   And the VA PTSD rating scale, is that the name
22 of it, or does it have another name?
23      A.  I believe that is the name.
24      Q.   Do you ever use a structured clinical
25 interview?

Page 53

1      A.  Every time we see a patient.
2      Q.   And do you keep records of the questions that
3 are asked in the structured interviews?
4      A.  It's the information that's entered in the
5 record and their note.
6      Q.   Do you use the same set of questions each
7 time?
8      A.  No.
9      Q.   So you mentioned it's the information that's
10 in the record.  That's the -- is it fair to say that's
11 the information that the patient provided to you in
12 response to the questions, correct?
13      A.  Some of it, yes.
14      Q.   And for the structured interview, is there,
15 you said, is there a specific assessment?  For example,
16 do you use the SCID?
17      A.  The SCID is not for my population, so no.
18      Q.   Okay.  Do you use the SCID's PTSD module?
19      A.  No, not typically.
20      Q.   And when you say it's not for your patient
21 population, why is that?
22      A.  Typically, they're more high functioning, and
23 they can give a thorough review of systems.  And we
24 spend a lot of time talking with them, acquiring their
25 information.

14 (Pages 50 - 53)

Page 54

1    Sometimes, questionnaires like that, you see
2  them used in places where there's not a lot of
3  one-on-one interaction with the patient and the
4  provider, so they sit in a room and answer questions,
5  and then a provider regurgitates what they answer them
6  in their questionnaire, in their note.
7    Q.  So for the structured -- you said, what you
8  do, you call it a structured interview.  Is it based on
9  any specific peer-review study, the specific questions
10  that you ask?
11    A.  No.
12    Q.  Are these questions that you've developed?
13    A.  No, I wouldn't say that.  It's a combination
14  of training, from residency, work experience in the
15  prison, in the prison system, experience in community
16  mental health systems, and just defining the best way to
17  acquire information from patients.
18    Q.  And that's based on your personal experience?
19    A.  Yes, and training.
20    Q.  Do you know, is there a validity -- what the
21  validity is of a structured interview, based on personal
22  experience and training, as opposed to the structured
23  clinical interviews that are -- that have been tested?
24    MR. LEE:  Form.
25    A.  No, I don't know.

Page 55

1    Q.  Let me rephrase that.  Are you aware of the
2  validity of the testing -- I'm sorry.  Let me rephrase.
3    Are you aware of the validity of the
4  structured interviews that you've used in your practice?
5    A.  They are valid, yes, I'm aware.  They are
6  valid.
7    Q.  What is that validity based on?
8    A.  My interpretation of the information I acquire
9  from my patients and my practice.
10    Q.  Is there any peer-reviewed study, that you are
11  familiar with, that ranks, as valid, the types of -- the
12  structured interview that you use?
13    A.  No.
14    Q.  Do you know the error rate of the structured
15  interview that you use?
16    A.  No.
17    Q.  You've mentioned the VA PTSD rating scale.
18  Can you describe that a little bit?
19    A.  It's a scale or a questionnaire, that presents
20  a variety of questions, and the person answers whether
21  or not those things or those symptoms apply to them, and
22  if so, they can rate the severity.
23    Q.  They rate the severity of the symptoms?
24    A.  Right, or the -- the severity and, also, like
25  the frequency that the symptoms occur, if it's never,

Page 56

1  rare, sometimes, often.
2    Q.  And how often would you say that you use that?
3    A.  It varies.
4    Q.  And is it a questionnaire, that has to be
5  filled out?
6    A.  Yes, or we just present the questions verbally
7  without giving them a questionnaire.  Sometimes, when
8  you give someone a questionnaire, and someone is trying
9  to trick the systems, they might answer the
10  questionnaire a certain way.
11    So oftentimes I'll verbally ask questions and
12  sort of mix the questions into the assessment, so that
13  they're not just -- they're not just asked all of the
14  questions all at one time.
15    It's an indirect way of acquiring the
16  information, without them knowing that they're actually
17  doing a questionnaire.
18    Q.  And when you do that, do you keep a record of
19  their answers to the specific questions on the
20  questionnaire?
21    A.  It depends on the -- it depend on the case.
22    Q.  Now, you mentioned that it has a rating scale.
23  How do you achieve the rating, in the times when you are
24  not writing down their specific answers?
25    A.  Because to make the diagnosis, you don't

Page 57

1  necessarily need to know the frequency, the rate.  Those
2  scales are just sort of supportive information, if you
3  will, when people are on the fence regarding someone's
4  diagnosis.
5    As long as it's present, it doesn't matter if
6  it's once a week or twice a week or every day.  If it's
7  present, that's the only thing that's required.
8    Q.  So it's your understanding that, as long as
9  you have the symptoms at the day when you're presenting,
10  that's sufficient to meet the criteria?
11    A.  That's not what I said.
12    Q.  I'm sorry.  If you could explain what you
13  meant.
14    A.  It's not based on the day.  It's based on the
15  time leading up to the day that they come into the
16  appointment.
17    Q.  So would that mean, if the symptom was present
18  at some point before they came to the appointment, and
19  then they report about that symptom, then it is -- then
20  that is what would be sufficient to meet the criteria?
21    A.  Well, it's not that simple, but somewhat, yes,
22  but not as simplified at that.
23    Q.  Well, how would you explain it?
24    A.  I wouldn't, because it's really, it's very
25  lengthy.  It's not just I have this, and so you have

15 (Pages 54 - 57)

Page 58

1 this diagnosis.  There are specific criteria, and there
2 are specific timelines.
3      Q.  Do you know the validity of the VA PTSD rating
4 scale?
5      A.  No.
6      Q.  Is it helpful in making your diagnosis, or you
7 mentioned that it's helpful in patients when the
8 diagnosis is on the fence.  Is it -- could it be
9 supportive or corroborative of a diagnosis that you've
10 made?
11     A.  Yes.
12     Q.  Is, the VA PTSD rating scale, is that
13 different from the PTSD symptoms scale interview, the
14 PSSI?
15     A.  Different, yes.
16     Q.  What is the PSSI?
17     A.  What do you mean what is it?
18     Q.  What is the PTSD symptoms scale interview?
19     A.  It's a scale that queries for symptoms of
20 PTSD.
21     Q.  Do you use that?
22     A.  No.
23     Q.  Well, do you find that they're objective
24 tests?
25     A.  I think, based on being in Iraq and

Page 59

1 Afghanistan and Kuwait, I don't need anybody's scale, to
2 diagnosis when someone has PTSD.  So I pretty much rely
3 on my experience from the military.  It's not too often
4 that I have to defer to a rating scale, when I'm talking
5 to a patient.
6      Q.  But is it useful?  You mentioned that it can
7 assess severity, so could it impact and assist you in
8 assessing the proper treatment plan for a particular
9 patient?
10         MR. LEE:  Form.
11     A.  No.
12     Q.  You mentioned you were in Iraq and
13 Afghanistan?
14     A.  Yes.
15     Q.  Can you describe for me what some examples of
16 the patients that you've had that came in with PTSD?
17     A.  Rollovers, IEDs, explosions, the DFAC, which
18 is the dining-room facility being blown up, while I was
19 there on base, and medical providers getting killed,
20 having to go and perform first aid on the troops that
21 you serve with and having people who were going home the
22 next day, after being on the deployment, killed, and
23 having to contact their family and telling them they
24 weren't coming home, so stuff like that.
25     Q.  So very severe situations, that soldiers have

Page 60

1 to go through during war?
2      A.  Yeah.
3      Q.  I imagine that, being in a war zone, IEDs,
4 rollovers, a lot of the very sensitive information that
5 you were telling us about, is very traumatic for the
6 patients that you must have seen, correct?
7      A.  Yes.
8      Q.  In making your assessments, also, is it
9 important to understand your patients, what other
10 stressors they have in their lives, other than the
11 specific presenting symptoms that they're coming to you
12 with?
13     A.  Yes.
14     Q.  Is it fair to say that you want to exclude
15 those other symptoms, in order to make sure that -- I'm
16 sorry.  Let me rephrase.
17         Is it fair to say that you want to exclude
18 those other stressors, that may be in their life, to
19 ensure that the symptoms that they're coming to you are
20 the ones that need to be treated?
21     A.  In psychiatry and mental health, you don't
22 exclude other stressors.  They're part of their clinical
23 picture.  So not correct.
24     Q.  But you do need to know what those other
25 stressors are, to make a proper diagnosis?

Page 61

1      A.  Yes.
2      Q.  Just going back for a minute, in terms of
3 having other stressors, though, would you want to have a
4 sense of, if a particular stressor is causing a
5 particular symptom, you'd have to exclude other
6 stressors, to identify whether they're causing a
7 particular symptom?
8      A.  Yes.
9      Q.  And is part -- let me clarify.  Is part of
10 what you do also a differential diagnosis?
11     A.  Yes.
12     Q.  What is a differential diagnosis?
13     A.  Possibilities of what the elements or the
14 pathology could be that's causing a presentation.
15     Q.  And does that require you to look at different
16 conditions and exclude different conditions, to identify
17 the condition that's causing the symptoms or whether
18 it's multiple conditions causing the symptoms?
19     A.  That could be a part of it.
20     Q.  What other parts are there to the differential
21 diagnosis?
22     A.  Basically, the presentation of the symptoms.
23     Q.  And, to clarify it, I think you said this
24 earlier, just to clarify, that includes the -- an
25 important part of that is to include a complete history

16 (Pages 58 - 61)

1 of the patient, correct?

2   A.   Correct.

3   Q.   I want to turn to Mr. Goosby.  When he came to

4 see you, you said it was August 9, 2017, was the first

5 session?

6   A.   Yes.

7   Q.   And what symptoms did Mr. Goosby have, when he

8 came to see you?

9   A.   Anxiety, inner tension, sleeping difficulty,

10 anger.

11   Q.   Anything else?

12   A.   I can refer to the exhibit, correct?

13   Q.   Yes, of course.

14   A.   Okay.  Embarrassment, not sleeping, weight

15 loss, sadness, anxiety, anger, restlessness, anger,

16 ruminating thoughts about what happened to him, kind of

17 reflecting back on the situation that occurred, having

18 intrusive thoughts about the situation that occurred in

19 the bank, loss of interest in things.

20   Q.   So the symptoms that you identified for us,

21 those were all based on self-report?

22   A.   Yes.

23   Q.   And, with Mr. Goosby, did you use the

24 structured interview that you mentioned earlier, that's

25 based on your personal experience?

1   A.   Yes.

2   Q.   And did have a -- did you keep the list of

3 questions that you asked Mr. Goosby during that session?

4   A.   No.

5   Q.   Can you just refer me to the section -- you

6 mentioned intrusive thoughts, if you could just identify

7 for me where, just what part of the record you -- how

8 you listed that symptom.

9   A.   It may not be there, necessarily, verbatim.  I

10 know, all of the patients who come to my practice, I

11 know their stories and their symptoms, so some

12 information is on paper and some information is memory.

13   Q.   Okay.

14   A.   Based on what I recall, from their

15 presentation.

16   Q.   So you're saying you recall that he had

17 intrusive thoughts, but you didn't put it down?

18   A.   I can look again to see if that word, exactly,

19 is in the notes.  There are different ways of describing

20 intrusive.  Like rumination, which is there, ruminating

21 thoughts, that could be intrusive.  So intrusive is the

22 word that I selected to use now, but it's described

23 there as ruminating thoughts.

24   Q.   Yeah, I just wanted to clarify it, because

25 when I asked you about the symptoms, you used both

1 "ruminating" and "intrusive," and I wanted to know if

2 there's a distinction, since you used both of them?

3   A.   Not necessarily, no.

4   Q.   Can a thought be ruminating but not intrusive?

5   A.   It can be.

6   Q.   So what leads you to believe here that the

7 thought was ruminating but also intrusive?

8   A.   He was very restless when he came in, during

9 the first session, restless, very anxious, just

10 visibly -- presented as visibly disturbed with the

11 memories of what happened to him, when discussing them.

12   Q.   And you mentioned earlier that you write down

13 what's most significant in your records and that you

14 want your records to be complete?

15   A.   Mm-hmm.

16   Q.   Having left out the intrusive thoughts piece,

17 is the record complete here?

18   A.   I think that you're not -- I didn't say that I

19 only do that for completion of record.  I didn't say

20 that.  So there's more than one way to know your

21 patient.  You don't have to write everything in that

22 person's chart.  Some things are just memory.

23       I've been practicing medicine for over

24 15 years.  So some things you just remember, based on

25 the patient.  If I had to put everything in someone's

1 notes, I would never finish my workday.

2   Q.   You understand that it's very important for

3 your records to be complete, correct?

4   A.   Yes.

5   Q.   And other people may have relied on those

6 records, is that right?

7   A.   That's correct, yes.

8   Q.   And other practitioners may rely on those

9 records?

10   A.   I've said that already, yes.

11   Q.   So when you leave things out, that's a

12 significant omission from your records, correct?

13   A.   There's nothing left out.  It states here that

14 he was restless, irritability, pacing, so everything I

15 just described here, described to you verbally, is in

16 the record, utilizing different adjectives and utilizing

17 different symptoms.  There's more than one way to

18 describe something.

19   Q.   So anything that's not specifically in your

20 record is not something that you -- that is not part of

21 the complete record?  Let me rephrase that.

22       Anything that, any symptom that you left off

23 is not a symptom that you included in your diagnosis,

24 correct?

25   A.   Rephrase the question.

17 (Pages 62 - 65)

Page 66

1    Q.   Any symptom that is not identified in the
2   medical record is not a symptom that you relied upon in
3   making your diagnosis, correct?
4    A.   That's not correct.
5    Q.   Okay.  Can you clarify then?
6    A.   As I said, there's different adjectives and
7   ways of describing a patient's symptom, so if I say one
8   word verbally, in describing the case as I recall it, it
9   doesn't mean that because that particular word isn't
10  here.  There's probably a million ways to say anxiety.
11  Because I didn't say it here, if I expressed it
12  verbally, it does not mean that it's not captured in the
13  note.
14   Q.   That's fine.  So there are two aspects.  The
15  first, you mentioned that it was something that you
16  remembered, but didn't include, because these are things
17  you just remember about your patients?
18       MR. LEE:  Form.
19   A.   Maybe that was the intrusive part, when I
20  mentioned intrusive.
21   Q.   Okay.  So you had remembered intrusive, even
22  though you didn't write down intrusive specifically?
23   A.   Correct.
24   Q.   And you've mentioned you have 500 patients?
25   A.   Correct.

Page 67

1    Q.   And how often is it that you leave out certain
2   aspects of the patient report, that you then have to
3   remember for the patient?
4        MR. LEE:  Form.
5    A.   Probably every day I see a patient.  I'm not a
6   robot.
7    Q.   But you do commit it all to memory?
8    A.   Nothing is ever all or always, no.
9    Q.   So it's possible then, that maybe you're
10  recalling incorrectly that he had intrusive thoughts?
11       MR. LEE:  Form.
12   A.   No, it's not possible.
13       MR. LAPOINTE:  I'm sorry, I didn't hear.
14       THE WITNESS:  I said no, it's not possible.
15       MR. LEE:  I withdraw my objection, given the
16  answer.
17       MR. LAPOINTE:  I thought you might.
18  BY MS. RIVAUX:
19   Q.   Now, you mentioned that you were using other
20  adjectives, so is restlessness and ruminating thoughts
21  the same as intrusive thoughts?
22   A.   They're suggestive of intrusive thoughts, but
23  certainly --
24   Q.   But it's not the same thing?
25   A.   It can be.  In this case, it is.

Page 68

1    Q.   So when you write restlessness in your record,
2   you meant intrusive thoughts?
3    A.   Restlessness, and I also wrote pacing and
4   ruminating thoughts, so the fact that it's combined with
5   other symptoms also helps to trigger or recall other
6   information regarding the dates.
7    Q.   And how long was Mr. Goosby having -- how long
8   was Mr. Goosby having the intrusive thoughts?
9    A.   He said since the arrest, since the situation
10  occurred, so it had been several weeks, some months.
11   Q.   Did he tell you how often he was having the
12  intrusive thoughts?
13   A.   On most days.
14   Q.   Can you point me to where it says that he was
15  having intrusive thoughts on most days?
16   A.   No, because "on most days" is not there.
17   Q.   Is that something, also, that you committed to
18  memory?
19   A.   I rendered a diagnosis of acute PTSD, so to
20  render that diagnosis, it would have to be on most days.
21   Q.   But it's not something that you included in
22  your record?
23   A.   I don't -- no, I didn't.  It wasn't necessary.
24   Q.   So you didn't include specifically the fact
25  that it was intrusive thoughts, and you also didn't

Page 69

1   specifically include that it was occurring on most days,
2   correct?
3    A.   Correct.
4    Q.   And you're saying that you believe that it was
5   on most days, because of the diagnosis that you gave?
6    A.   Yes, to meet criteria for certain diagnoses,
7   the symptoms have to occur on most days than not, and
8   they have to occur for a certain amount of time,
9   depending on the diagnosis.  For PTSD, for acute, it
10  could be less than 30 days.  It becomes chronic when
11  it's over 30 days.
12       But when they have acute symptoms such as what
13  he described, then it's considered acute still.  So it
14  depends on the case.
15       So this, actually, once you render the
16  diagnosis for another professional in the same
17  specialty, they understand that it was on most days.  It
18  doesn't have to be written.  There's an understanding in
19  the medical community.
20   Q.   So you understand that you don't need to put
21  in all of the information that the patient is telling
22  you and reporting, in order to render your diagnosis?
23       MR. LEE:  Form.
24   A.   You don't have to put in all of the
25  information.  You don't have to do anything, no, you

18 (Pages 66 - 69)

Page 70

1  don't have to, no.
2      Q.  And you also don't need to -- it's your
3  position that you don't need to put in all of the
4  information, for your record to be complete?
5      A.  I put in the information -- some of the
6  information, and some of the information is based on
7  professional judgment.  But the record is complete,
8  based on a combination of what they report, what we
9  report, and when we render the diagnosis.  So it's a
10  combination.
11      Q.  Is it fair to say that the ones that you're
12  reporting are the important ones?
13      A.  Not fair to say, because there could be some
14  information there that's not necessarily important,
15  depending on that's subjective.  What's important to
16  you, may not be important to me.  So I wouldn't say that
17  either.
18          There's a combination of -- there's a variety
19  of information, of information that's included.
20      Q.  And do you put in all of the information
21  that's important to you, in the record?
22      A.  No, I don't put in all of the information
23  that's important.  There's no way to put in all of the
24  information.
25      Q.  So it's fair to say that you leave out some

Page 71

1  important information?
2      MR. LEE:  Form.
3      A.  No.  It's captured in a different way.  You
4  may not see it, explicitly see it, in these objectives,
5  but it's captured either in the objective, or it's
6  captured in the diagnosis, so it's not left out, and
7  it's captured in another part of the assessment.
8      Q.  So everything that's important is, you're
9  saying, is in the record?
10      A.  Everything that's important, no.
11      MR. LEE:  Form.
12      A.  Everything may not be in the record.
13      Q.  And in this case, is everything that's
14  important not in the record?
15      A.  No, that wouldn't be true either.  Most things
16  that are important are in the record.  Everything that's
17  needed to render the diagnosis is in the record, to
18  justify the diagnosis.
19      Q.  Okay.
20      A.  Or it's -- it's used to diagnose, to render
21  the diagnosis.  So it may not be explicitly stated, but
22  it's used to render the diagnosis, so it's used in some
23  form or fashion, whether it's written or applied to the
24  decision, when considering the differential diagnosis or
25  making the diagnosis, if there's no differential.  So

Page 72

1  the capacity depends.  There's not one way to report the
2  information.
3      Q.  I just want to get a clarification.  In some
4  form, is every information that you consider important
5  reflected in the record?
6      A.  Yes.
7      Q.  Okay.  And one of the things you mentioned is
8  that everything that -- and I just want to make sure
9  that I understood you correctly, because I don't know if
10  I understood you correctly.  I thought you said that
11  everything that is important to justify the diagnosis is
12  recorded in the record.  Is that accurate?
13      A.  It is recorded in some way in the record, yes.
14      Q.  And if someone wanted to verify the diagnosis,
15  do they have the complete information in the record in
16  order to verify the diagnosis?
17      A.  Yes.
18      Q.  So you mentioned, though, for an acute PTSD,
19  one of the things would be that intrusive thoughts need
20  to be present on most days?
21      A.  Mm-hmm.
22      Q.  And you also mentioned that -- is that
23  correct?
24      A.  Yes.
25      Q.  And then you mentioned that the reference to

Page 73

1  intrusive thoughts is not in the record, correct?
2      A.  No, I didn't say that.  I said it's described
3  in a different way.  In the chart, but described
4  using other symptoms and adjectives and adverbs.
5      Q.  But, specifically, intrusive is not in the
6  record, correct?
7      A.  Correct, not in this, not in this note, no.
8      Q.  Correct, and you also mentioned that the
9  reference to most days is not in the record, correct?
10      A.  It is.  It's contained in the diagnosis.
11      Q.  Right, and I think we're just getting
12  circular, because --
13      A.  We are.
14      Q.  Because my understanding -- because it's my
15  understanding, you said that everything -- if someone
16  wanted to verify the diagnosis, where could they verify
17  that there was a report that Mr. Goosby was having
18  intrusive thoughts on most days?
19      A.  The fact that the diagnosis rendered was PTSD
20  itself tells you he had symptoms on most days.
21      Q.  But where specifically is that in the report?
22      A.  Again, the fact that the diagnosis was
23  rendered tells them that it was on most days.  No one is
24  going to render a diagnosis of PTSD if it's not most
25  days.

19 (Pages 70 - 73)

Page 74

1    Q.   Are you suggesting that practitioners and
2  clinicians never make mistakes?
3        MR. LAPOINTE:  Form.
4    A.  I didn't say that.
5    Q.   Well, you did mention that no one is going to
6  return a diagnosis of PTSD or acute PTSD without that
7  information, correct?
8        MR. LEE:  Form.
9    A.  Correct.
10   Q.   And how is it for someone coming, if another
11 practitioner comes and wants to be able to verify the
12 diagnosis of acute PTSD, based on your records, how are
13 they able to do that, if the reference specifically to
14 intrusive thoughts occurring on most days is absent from
15 the record?
16   A.  Because it's understood from the diagnosis.
17 You cannot make a diagnosis of certain pathologies
18 without the symptoms occurring on most days.  So if, in
19 your scenario, if a clinician is viewing the records,
20 and they see a diagnosis, it's understood that the
21 person met the criteria for the diagnosis.
22   Q.   So the clinician has to make an assumption
23 that the prior -- that the prior -- let me clarify.
24        So the clinician that wants to verify the
25 diagnosis has to make an assumption that the clinician

Page 75

1  who made the diagnosis didn't make a mistake?
2        MR. LEE:  Form.
3    A.  I don't understand the question.
4    Q.   All right.  Let me try to break it down for
5  you.  The question is, I want to understand how someone
6  who's looking at this record, that has a diagnosis of an
7  acute PTSD, someone who was not in the session with you
8  or with Mr. Goosby, can verify that the diagnosis is
9  accurate.
10       MR. LEE:  Form.
11   Q.   So just -- so when we want to -- let me
12 rephrase the question.
13       MS. RIVAUX:  Can you read back the question,
14 please.
15       (The requested portion of the record was read
16 by the court reporter.)
17       MR. LEE:  Form.
18 BY MS. RIVAUX:
19   Q.   You can answer.
20   A.  The diagnosis itself tells you that it was on
21 most days.  You cannot, again, you can't render a
22 diagnosis without needing criteria.  So knowing that I'm
23 a psychiatrist, it's inherent that that diagnosis is
24 rendered, because someone met the criteria, and to meet
25 the criteria, you have to have symptoms on most days,

Page 76

1  and that's with most diagnoses of mental health.
2    Q.   So the person who wants to verify the
3  diagnosis has to rely on your diagnosis of acute PTSD?
4    A.  That would be why they're looking at the
5  chart, because they're relying on what I wrote, so yes.
6    Q.   And they're relying simply on your conclusion
7  without the specific facts to support it, correct?
8        MR. LAPOINTE:  Form.
9    A.  There are some facts already in this
10 subjective.  So no, that's not correct.  They see the
11 facts that are present in the HPI.
12   Q.   So, just to clarify, they're seeing some of
13 the facts, but not all of the facts, that support your
14 conclusion, correct?
15       MR. LEE:  Form.
16   A.  They're seeing enough facts to support the
17 conclusion.
18   Q.   But there are some facts they are not seeing,
19 that support your conclusion?
20       MR. LEE:  Form.
21   A.  No.  The diagnosis, the fact of the diagnosis
22 suggests that the symptoms were on most days.  You
23 cannot render the diagnosis.  It's already understood,
24 when you diagnosis someone, that their symptoms are on
25 most days.

Page 77

1        You cannot -- it's elementary to state in your
2  HPI that on most days.  We know that.  It's understood.
3  That's with any provider.  It's understood already, or
4  you cannot render the diagnosis.
5    Q.   Is the diagnosis an opinion or a fact?
6    A.  A diagnosis is a diagnosis.  It's based on the
7  information that's presented.  So, I guess, if you want
8  to split hairs over what's a fact and what's not
9  considered a fact, the diagnosis would be considered
10 that person's diagnosis.
11        It's a fact, in regard to the information
12 that's presented there in the subjective.  It's factual
13 for what I appreciate, from that patient.
14   Q.   So, for you, a diagnosis is factual, based on
15 what the patient told you, but is not your opinion?
16       MR. LEE:  Form.
17   A.  It's not an opinion, no.
18   Q.   Okay.  Let me go back.  You said on most days.
19 Can you clarify what you mean by most days?
20   A.  Five out of seven days of the week, maybe 25,
21 26 days out of the month, it depends on the time period
22 that you're using.  If we're looking at a month, over
23 half the month, the person had symptoms.
24   Q.   And do you remember how many days,
25 specifically, Mr. Goosby told you he had the intrusive

20 (Pages 74 - 77)

Page 78

1  thoughts?
2      A.  No, I don't remember exactly.
3      Q.  So did he tell you?
4      A.  Yes.
5      Q.  But you didn't write it down?
6      A.  No.
7      Q.  Okay.
8          (A discussion was held off the record.)
9  BY MS. RIVAUX:
10     Q.  So you mentioned several symptoms that
11 Mr. Goosby identified for you in his self-report.  For
12 any of the symptoms that you identified, did you include
13 how long he was having those symptoms?
14     A.  Yes.
15     Q.  And can you identify where in the record
16 you -- where you include how often Mr. Goosby was --
17     A.  You weren't specific, when you said --
18     Q.  -- identifying the different symptoms that you
19 identified?
20     A.  Your first question wasn't specific.  You
21 said, did I include?  When I rendered the diagnosis, I
22 included the amount of dates.  Not if you mean include
23 on the paper, we just went through that.  It's not
24 there, because it's understood from the diagnosis.
25         So yes, I included it when I made the

Page 79

1  diagnosis.
2      Q.  Well, for example, you said that he was
3  feeling angry.  Do you know how often he was feeling
4  angry?
5      A.  On most days.
6      Q.  So every symptom was on most days?
7      A.  Yes.
8      Q.  And for any of the symptoms, do you remember
9  what most days meant for Mr. Goosby?
10     A.  A patient doesn't know what most days means,
11 but I do, so I know what it meant for me.  And as I said
12 before, most days mean depending on the time period out
13 of a month, out of a week, out of a quarter, so it
14 depends.
15     Q.  It was my understanding that you had
16 specifically asked him how long he was having the
17 particular symptoms.  Do you remember the answers to any
18 of those questions?
19     A.  There were times he said every day.  Like for
20 anger, he felt angry every day.
21     Q.  And that's not something that you included in
22 the record, correct?
23     A.  I stated that he said he felt angry.
24     Q.  But not that he felt angry every day?
25     A.  It's included in the record, based on the

Page 80

1  diagnosis.
2      Q.  And how about sleep difficulty?
3      A.  Most nights.
4      Q.  And most nights, what did he mention
5  specifically, regarding most nights, how many nights?
6      A.  What do you mean?  How many nights?
7      Q.  Correct.  When you say most --
8      A.  I don't know.  I don't remember.
9      Q.  Is it fair to say, then, it's very important
10 to put down the information you get from the patient on
11 this self-report, so that, when there are questions
12 about the specifics, you'd be able to answer them,
13 correct?
14     A.  I can answer them based on what I recall, so
15 no, that's not correct.  I don't have to put everything
16 in the chart or on paper.  That's my prerogative as the
17 provider.  We don't put everything on paper, nor is
18 there any requirement to.
19         So it's based on a combination of things, as I
20 stated previously.
21     Q.  Okay.  So you mentioned -- did Mr. Goosby tell
22 you what the intensity of any of the symptoms that he
23 had?
24     A.  He did.  Intrusive to his ability to work,
25 disrupting his relationships with family members, so

Page 81

1  that was how he seemed to describe the intensity or how
2  it affected him, the consequences on everyday
3  functioning in his relationships.
4      Q.  Can you show me where, in the record, you
5  write down that it was intrusive to the point that it
6  interfered with his family relationships?
7      A.  So we've already discovered intrusive is not
8  in the chart, so no, there's no word "intrusive" in this
9  part of the record.
10         Let's see.  There's a decline in business, so
11 that was one factor that he described and how it has
12 affected him, the intensity of his symptoms.
13         There's the statement:  He is not able to
14 sleep well due to replaying of the incident and
15 embarrassment of being arrested, which has harmed his
16 standing in his community.  So that's pretty intense.
17 So that was one way he used to describe the intensity.
18         And that it caused financial distress, that's
19 another way he described the intensity in which the
20 symptoms have affected him.
21         The patient lost 40 pounds since the arrest,
22 so that's another way that he described the intensity of
23 his symptoms.  He lost 40 pounds.
24         Needing help with anxiety, depression, and
25 anger, that's another descriptor of the intensity.

21 (Pages 78 - 81)

Page 82

1    Q.   And you mentioned that he had trouble with
2  family members.  Which family members was he having
3  trouble with?
4    A.   His girlfriend, mainly his girlfriend, his
5  significant other.
6    Q.   And did you include that here?
7    A.   I think -- let's see.  I don't know if it's in
8  this note or a different note, if it was included.
9  Yeah, so in January when he came in, there's a comment
10 about his quality of life.  That was one of the times
11 when he discussed his relationships.
12   Q.   But in the first visit, focusing on the first
13 visit.
14   A.   Oh, pardon.  In the first visit, I think that
15 was more so something that came out at subsequent
16 visits.
17   Q.   So he --
18   A.   More so like work, his clients, co-workers,
19 those types of relationships.
20   Q.   And when you write a decline in his business
21 due to people seeing him get arrested, did you look at
22 anything to see if you could corroborate that
23 information?
24   A.   No.
25   Q.   Did you ask him any followup questions, as to

Page 83

1  how many people saw him get arrested?
2    A.   We did.  He said it was a bank full of people.
3  He said it was during the day, and it was very busy and
4  a lot of people there.
5    Q.   And did he explain how the bank full of people
6  impacted a decline in his business?
7    A.   He claimed that some of the people in the bank
8  were current clients, but I didn't ask him, you know,
9  how many or what percentage of the people that were in
10 the bank were his clients.
11   Q.   And so you also don't know what the percentage
12 of decline in his business would have been, correct?
13   A.   No, no.
14   Q.   So as you sit here, you say that it's
15 intrusive and it caused a decline in his business, but
16 you don't know how much of a decline, correct?
17   A.   Correct, enough to where he said he had
18 financial distress, so he seemed to describe, at least
19 qualitatively, that there was an impact, because he had
20 financial difficulties because of it.  But
21 quantitatively wasn't something that we needed to know.
22   Q.   Did you ask him whether any of the financial
23 distress was preexisting prior to the arrest?
24   A.   He suggested, on his own, that he didn't have
25 any financial problems until this happened.  So we

Page 84

1  didn't have to ask him for that.  He, actually,
2  spontaneously reported it.
3    Q.   So he didn't have any financial problems
4  before, correct?
5    A.   Yes.
6    Q.   So if Mr. Goosby did have financial problems
7  before the incident, is it fair to say that he didn't
8  give you full and accurate information?
9    A.   I'm not answering that.  That's speculation.
10 I'm not answering that question.
11   Q.   Well, you said that he suggested to you that
12 he had no financial problems before the arrest?
13   A.   Yes.
14   Q.   Correct?
15   A.   Yes.
16   Q.   If, in fact, Mr. Goosby had financial problems
17 before the arrest, is that information that would be
18 important for you to know?
19   A.   No, no.  Financial problems and having
20 worsened problems, I don't understand the connection
21 you're making.
22   Q.   Well, how could you identify whether the
23 problems are worsened, if you're unaware of the problems
24 that existed before?
25   A.   I don't have to be aware of the problems.  If

Page 85

1  someone told me that their financials, their financial
2  situation, worsened, then it worsened.
3        There's no -- it's not useful information for
4  me to dig and ask, well, what were your previous
5  problems?  In what way has this been different? or
6  whatever.  It's a matter of if there's financial
7  distress or not.
8    Q.   So you have to accept what he told you is
9  true, right?
10   A.   Yes, that is correct.
11   Q.   So if it's not true, however, that would be
12 significant for you, correct?
13   A.   If it's not true that wasn't the case.  So
14 again, I don't answer hypothetical stuff.  No, I'm not
15 going to answer that question.  Word it a different way.
16   Q.   Sure.  You did say that wasn't the case, in
17 terms of him not having financial problems previously?
18   A.   I said that he said he had financial distress
19 now.  As far as in his lifetime, before this happened, I
20 don't know if he's ever had financial problems.  I don't
21 know.
22   Q.   So it's fair to say, if you don't know he had
23 financial problems immediately before the incident,
24 whether the financial problems were worsening because of
25 they were preexisting or whether it had anything to do

22 (Pages 82 - 85)

Page 86

1  with the arrest, correct?
2      A.  It's fair to say that I don't know if he had
3  financial problems prior to the incident.  That's fair
4  to say.
5      Q.  And if Mr. Goosby was being untruthful with
6  you, would that be something that would be significant
7  to you?
8          MR. LEE:  Form.
9      A.  Yes.
10     Q.  And could it be something that impacts your
11 ultimate conclusions?
12     A.  It could be, yes.
13     Q.  And the other one you mentioned, that he
14 doesn't sleep well, did you question him on whether he
15 had any trouble sleeping before the arrest?
16     A.  Yes.
17     Q.  Yes?  And what did he say?
18     A.  He said he did not.
19     Q.  And that's something you also didn't include
20 here, correct, in the medical record?
21     A.  Possibly not, I don't know, because, as I
22 said, I didn't review anything before I came in.  It may
23 or may not be there somewhere.
24         But we always ask patients who have, in
25 general, if someone has a sleeping issue, we always want

Page 87

1  to know if it's new or if it's been ongoing, which
2  either pinpoint maybe they had problems in their
3  childhood or, you know, they never had any problems, so
4  we always ask if it's new.
5      Q.  So take a look at the record and see if you
6  can identify where you received -- where you write down
7  that this sleeplessness didn't exist before the
8  incident.
9      A.  No, we didn't state explicitly that he did not
10 have problems with sleep prior to the incident.  It's
11 not explicitly stated, no.
12     Q.  Is it implicitly stated?
13         MR. LEE:  Form.
14     A.  Again, there's some information that I know
15 from the questions that we ask in our assessments, and
16 it's applied when we're rendering the diagnosis.
17     Q.  So it's another piece of information that you
18 didn't include specifically in the record, correct?
19     A.  It's included in the diagnosis.
20     Q.  So it's only included in the diagnosis, but
21 not included in --
22     A.  We don't have to verify --
23     Q.  I'm sorry, if I could just finish my question.
24 This is another aspect of the record that Mr. -- let me
25 rephrase.

Page 88

1          It's another fact that you could not include
2  specifically in the record, correct?
3      A.  It's included to render the diagnosis.
4      Q.  And when you say it's included to render the
5  diagnosis, you're saying that it's simply in your
6  conclusion of PTSD, but not specifically identified in
7  the record, correct?
8      A.  It's specifically identifiable to me, so no,
9  that's not correct.  It's identified as sleeplessness.
10 If this were something that was ongoing and not new, we
11 would have indicated that it's not a new issue.
12         There are different ways that we use, when
13 we're charting.  The fact that we did not say that this
14 is not new for him, implies that this is something
15 that's not new -- or that is new, that he did not have
16 it before, that it's something that happened after the
17 incident.
18     Q.  And is that how you always record the record?
19         MR. LEE:  Form.
20     A.  Nothing is ever always.  It depends on the
21 case.
22     Q.  So it's possible, then, when you wrote
23 sleeplessness, it's an aspect that preexisted, right?
24     A.  No, no, that wouldn't be possible.  That would
25 not be possible, no.  In this type of case, we would

Page 89

1  indicate if it was something that was ongoing or
2  preexisting, because it would work against rendering
3  that diagnosis.
4      Q.  But again, you didn't include that specific
5  information, other than in your conclusion, correct?
6      A.  Because it's not new, because it's not --
7  excuse me, it's is not an old symptom.  That is why.  If
8  it were an old symptom, then we would have stated
9  previous, not new, preexisting, something like that.
10         But the fact that he explained that he has
11 sleeplessness and has not been able to sleep well, due
12 to replaying of the incident, that's something to
13 suggest that it was new.
14         The fact that we didn't say sleeplessness, old
15 problem, then that, also, and per my recollection from
16 seeing the patient during that assessment, the sleeping
17 issues were not a problem for him prior to the incident.
18     Q.  Is there any of the symptoms that Mr. Goosby
19 identified -- that is identified in the self-report,
20 that preexisted the incident?
21     A.  That I can recall, no.  He didn't have any
22 past psychiatric history.  Per his report, he did not
23 have any mental health issues or disturbance.  So the
24 anger was something new for him.  The sleeplessness was
25 new.  The ruminating thoughts, the inner tension, he

23 (Pages 86 - 89)

Page 90

1  reported that they were new.
2      Q.  And you relied on his report, correct?
3      A.  Yes, yes.
4      Q.  So, for example, if there's information, that
5  Mr. Goosby didn't share with you, that maybe he had
6  preexisting anger, that would not be something that you
7  would know in making your diagnosis and coming to your
8  conclusion, correct?
9      A.  If you have information I don't, then
10  obviously, I wouldn't know that information then,
11  because I don't have the information, if I understood
12  your question.
13      Q.  Okay.  Do you know if -- when is the last time
14  you said you saw Mr. Goosby?
15      A.  January 24, 2018.
16      Q.  Do you know if he still has any of the
17  symptoms that you identified today?
18      A.  I don't know.
19      Q.  In your practice, how often is a patient like
20  Mr. Goosby supposed to see you?
21      A.  He doesn't have insurance, and he's self-pay.
22  So if someone has limited ability to pay, and they don't
23  have insurance, that pretty much dictates how often they
24  can be seen.  It's based on their affordability.
25          So for a patient like him, with no insurance

Page 91

1  and, for him, financial distress, they can't come every
2  week or every month, so the frequency can be erratic.
3      Q.  Do you know why he doesn't have insurance?
4      A.  No.
5      Q.  Do you know if he doesn't have insurance
6  because of financial distress?
7      A.  No, I don't know why.
8      Q.  Okay.  And you said that Dr. Wiggins -- I'm
9  sorry, Mr. Wiggins referred Mr. Goosby to you, correct?
10      A.  Yes.
11      Q.  Did -- I noticed that, in your records, you do
12  not have Mr. Wiggins' records.  Did you have any of
13  Mr. Wiggins' records?
14      A.  No.
15      Q.  And did you make your diagnosis of Mr. Goosby
16  after your first visit with Mr. Goosby?
17      A.  Yes.
18      Q.  Can you describe the specific incident that
19  Mr. Goosby reported to you?
20      A.  He stated he went into BB&T Bank and was
21  accused of trying to cash a fraudulent check.  That I
22  can recall, he states that it was his check, that the
23  bank actually sent him that check, and that the manager
24  or someone discovered that the check was actually
25  legitimate, but the police arrested him anyway, is what

Page 92

1  I recall.
2      Q.  Did he give you a sense of why the police
3  arrested him?
4      A.  He said that they told him that they still had
5  to take him to jail.
6      Q.  Do you have a sense of why they told him they
7  still had to take him to jail?
8      A.  I don't, no.  I asked him more than once, and
9  he said that he was told that he still had to be taken
10  to jail.
11      Q.  And did he have a sense and understanding of
12  why he was arrested?
13      A.  Repeat the question.
14      Q.  Did Mr. Goosby have an understanding of why he
15  was arrested?
16          MR. LEE:  Form.
17      Q.  That he shared with you?
18      A.  I don't know.  I don't know.
19      Q.  Did you ask him?
20      A.  He said it was because of the fraudulent
21  check, and he said, even when it was verified that that
22  check was legitimate, that the police told him that they
23  still had to take him to jail.  That was the only thing.
24          I don't know anything additional.  He never
25  shared anything additional, that I can recall.

Page 93

1          MS. RIVAUX:  Now is a good time.
2          THE VIDEOGRAPHER:  Going off the record, the
3      time is 8:50 p.m.
4          (Off the record.)
5          THE VIDEOGRAPHER:  We're back on the record.
6      The time is 9:07 p.m.
7  BY MS. RIVAUX:
8      Q.  Dr. Thomas, at the break we were talking about
9  Mr. Goosby's description of the incident to you,
10  correct?
11      A.  Yes.
12      Q.  And you said that it was your understanding
13  that he was arrested because of the fraudulent check?
14          MR. LEE:  Form.
15      A.  That's my understanding.
16      Q.  But you also mentioned that the check was
17  determined to be legitimate, correct?
18      A.  As was told to me, by him, yes.
19      Q.  So did you questioned him how was it that he
20  was arrested for a fraudulent check, if the check was
21  legitimate?
22      A.  Yes.
23      Q.  And what did he say?
24      A.  He said the police said they had to arrest
25  him.

24 (Pages 90 - 93)

Page 94

1    Q.   And did he explain why they said they had to
2  arrest him?
3        MR. LEE:  Form.
4    A.   I don't recall that, no.
5    Q.   Did it seem odd to you that he was arrested
6  for a fraudulent check, when he told you it was
7  legitimate?
8        MR. LEE:  Form.
9    A.   Yes.
10   Q.   Did he tell you who called the police?
11   A.   I don't recall him saying that.
12   Q.   Did you ask him who called the police?
13   A.   No.
14   Q.   Would it be important for you to know the
15 basis of why Mr. Goosby got arrested, in making your
16 assessment?
17   A.   The basis, no.  For him, the presentation was
18 that he was arrested, and that's what led to the
19 symptoms.  That was traumatic to him.  So it was more so
20 the arrest, the experience of the arrest, than anything.
21   Q.   What specifically about the arrest?
22   A.   He said that he was arrested in broad
23 daylight, in front of a bank, and there were a lot of
24 bystanders.  His words were "full of people."  And some
25 of the people in the bank included some of his clients.

Page 95

1    Q.   And is that -- and, in your assessment, what
2  about the arrest was traumatic?
3    A.   The fact that he said he was unfairly
4  arrested, those weren't his words necessarily, but that
5  he was arrested without committing a crime or allegedly
6  attempting to pass a fraudulent check, that wasn't
7  fraudulent.
8    Q.   Okay.
9    A.   So he was arrested; although, it wasn't a
10 fraudulent check.
11   Q.   And was it significant to you whether this was
12 Mr. Goosby's first encounter with law enforcement?
13   A.   No, because the basis of the presentation was
14 I was arrested when I should not have been.  I was
15 accused of something that I didn't do.
16   Q.   So is it significant to you whether Mr. Goosby
17 was ever arrested before?
18   A.   No, not in this presentation, no, not
19 significant.
20   Q.   If there was a different basis, for example,
21 for disorderly conduct, that would make the arrest --
22 would that change your assessment of the -- let me
23 rephrase.
24        If Mr. Goosby was arrested based on disorderly
25 conduct and not on the basis of a fraudulent check,

Page 96

1  would that change your assessment?
2    A.   If he was arrested and had not done anything,
3  it would not change the basis of the assessment.  So the
4  trauma was precipitated by being arrested for something
5  that he didn't do, is how he presented.  So that's the
6  basis for the trauma.
7        So the crime itself, it doesn't matter the
8  type of crime.
9    Q.   So is it the -- is it specifically the
10 accusation, that was traumatic about it, in your
11 assessment?
12   A.   As was presented by Mr. Goosby, it was the
13 trauma of being arrested for something he didn't do.  So
14 that was what he described as the traumatic experience
15 for him, that he was arrested in front of people and
16 people he knew, for something that he did not do.
17   Q.   If Mr. Goosby had been arrested previously,
18 does that impact your opinion at all?
19   A.   No.
20   Q.   Do you know if Mr. Goosby was arrested
21 previously?
22   A.   Based on the information presented, no, he has
23 not been.
24   Q.   If Mr. Goosby invited the police to arrest
25 him, would that change you assessment of the trauma?

Page 97

1    A.   Invited the police to -- can you clarify?
2    Q.   Sure.  If Mr. Goosby asked the police to
3  arrest him, would that change your assessment of --
4  change your assessment of the trauma?
5        MR. LEE:  Form.
6    A.   It would depend.  It would depend on the other
7  circumstances.
8    Q.   Like what?
9    A.   If the element is still there, that he was
10 engaged by the police for something that he did not do,
11 no, that would not change my assessment, if he's still
12 presenting that element, as something traumatic to him,
13 that caused the symptoms that he reported.
14   Q.   Now, you said it's traumatic to him.  Is that
15 a subjective trauma?
16   A.   Yes, trauma is subjective.  It can be
17 subjective.  What's traumatic for me, may not be
18 traumatic for you.
19   Q.   Does the DSM use subjective trauma or
20 objective trauma?
21   A.   It doesn't use either.  It just says a trauma
22 exists, a trauma.  So it's understood to be the trauma
23 for that person.  I can't tell you what a trauma is for
24 you and vice versa.
25   Q.   How does the DSM–5 define the trauma?

Page 98

1    A. It says a traumatic event, is what it states.
2    Q. Does it give a definition for what the
3 traumatic event is?
4    A. No.
5    Q. So anything, it's your understanding, that
6 anything that someone says is traumatic to them could be
7 a basis for PTSD, under the DSM-5?
8    A. Yes, that's correct, if they perceive an event
9 to be a traumatic event. And by reason, licking an ice
10 cream cone, because someone says it's traumatic, would
11 not be deemed traumatic.
12    So there's some, I suppose, some insinuation
13 or some appreciation for what we consider to be
14 traumatic, what causes trauma, what's considered to be
15 types of events that are considered to be traumatic.
16    Q. And what are the types of events that are
17 considered to be traumatic under the DSM–5?
18    MR. LEE: Form.
19    A. Being arrested -- or, pardon. Under the
20 DSM–5, there's no listing of what's considered to be
21 traumatic. A trauma is my understanding of a certain
22 type of event. So it could be a robbery for some
23 people. It could be a rape. It could be hearing a
24 gunshot.
25    It could be watching the tower fall in New

Page 99

1 York, during 911. For some people, watching that on
2 television, that was traumatic for them. It could be
3 delivering a baby. It could be someone walking into a
4 room and grabbing someone, without causing physical
5 harm. That could be interpreted as traumatic for that
6 person.
7    Q. You said delivering a baby, so delivering a
8 baby naturally can be considered traumatic under the
9 DSM–5?
10    A. Depending on what happens during that event,
11 it could be considered a trauma for that person.
12    Q. Could you elaborate on what would be a
13 traumatic event for delivering a baby?
14    A. Near-death experience, watching your baby die
15 during the birth, stuff like that.
16    Q. So not a general delivery of a baby, but
17 something beyond that?
18    A. Right, something that's outside of ordinary
19 circumstances.
20    Q. Now, you mentioned that the trauma that
21 Mr. Goosby experienced, from his report, was,
22 specifically, being arrested for something he believes
23 he didn't do, correct?
24    A. Yes.
25    Q. Was there anything else, any other factors,

Page 100

1 that he stated and reported to you, that are included in
2 that assessment?
3    A. Rephrase the question. I don't understand the
4 question.
5    Q. No problem. You mentioned that Mr. Goosby
6 explained to you that, to him, the trauma of the arrest
7 was the fact that he was not -- I'm sorry, let me
8 restate it.
9    First, did you identify that as a trauma, or
10 is it simply Mr. Goosby identified the incident as a
11 trauma?
12    A. He identified it as a trauma for him.
13    Q. And you stated that, based on his self-report,
14 what he was reporting was that the traumatic aspect was
15 that he was being arrested for something he believes he
16 did not do, correct?
17    A. Yes, correct.
18    Q. And that specific something, that he believes
19 he did not do, was that he was being arrested for trying
20 to pass a fraudulent check?
21    A. That would be correct.
22    Q. Did he give you any other factors, that were
23 significant to you, in making the assessment that it was
24 traumatic?
25    A. The symptoms that he described that followed

Page 101

1 the event, so how he said he was embarrassed, angry that
2 it happened, the restlessness, the inner tension.
3    Q. But was there anything else about the incident
4 that he told you was traumatic?
5    A. The people, the bystanders, the onlookers,
6 feeling embarrassed in front of people, strangers and
7 people he knew, that was traumatic for him. He said
8 that there were people in the bank who he knew from
9 business, clients.
10    Q. And it's your understanding, that, because
11 he felt being embarrassed was traumatic, that was
12 sufficient to assess it as a trauma?
13    A. No, embarrassment is not enough. It's the way
14 in which he described having to be arrested and placed
15 in a police car, although he felt he had not done
16 anything, the way in which he described it, the symptoms
17 that were present when he recalled what happened to him.
18    Q. So from my understanding, it was -- okay.
19 Anything else? Any other factor, putting aside the
20 symptoms, but focusing only on the specific aspects of
21 the trauma of the arrest, are there any other aspects,
22 that he told you he felt was traumatic to him?
23    A. Being inside the jail cell. They arrested him
24 and took him to jail.
25    Q. But specifically --

26 (Pages 98 - 101)

1    A.  Being handcuffed, waiting in the squad car for
2  over an hour, while they verified the check, and still
3  going to jail, although the check was verified.
4    Q.  Is being handcuffed on its own or being inside
5  a jail, is that traumatic?
6    A.  Yes.
7    Q.  Under the DSM–5, it's considered a trauma?
8    A.  Again there's no listing of examples of what's
9  traumatic.  Trauma is based on the person's
10  interpretation.  And yes, being handcuffed can be
11  traumatic, being in a jail cell can be traumatic.
12    Q.  Does it impact the trauma of whether the
13  person had been in jail before?
14    A.  It really depends case by case.  Everyone does
15  not experience desensitization after certain events, so
16  just because someone's been exposed to it before doesn't
17  mean they won't react to it in a way that's unsettling
18  to them the next time.
19      So it really depends.  And the brain is
20  pretty -- can be random.  You can't forget things like
21  that.
22    Q.  Did you make an assessment of whether -- were
23  you able to exclude desensitization for Mr. Goosby?
24    A.  It's not a factor.  So again, that's why --
25  it's not a factor.

1    Q.  I understand it's not a factor for PTSD, but
2  I'm asking, for you, in your clinical judgment, were you
3  able to exclude desensitization for Mr. Goosby?
4    A.  That's not relevant.
5    Q.  Why is it not relevant?
6    A.  Well, your initial question was based on a
7  hypothetical situation, so I answered your question
8  based on a hypothetical situation.
9    Q.  But you also said it's not relevant.  Why
10  would desensitization, for Mr. Goosby, not be relevant?
11    A.  For the same reasons I just described for any
12  person.  Being exposed to a particular event does not
13  make you less likely to interpret that same type of
14  recurring event as a trauma or not a trauma.
15    Q.  Well, wouldn't you want to know if there was
16  similar traumas before, in order to determine whether
17  there was desensitization?
18    A.  Again, that's not a factor.  You don't have to
19  rule out -- desensitizing is not a factor in making the
20  diagnosis of PTSD.
21    Q.  I understand that.  I understand that it's not
22  a factor, but my question is more specific.  Were you
23  able to rule out desensitization for Mr. Goosby?
24      MR. LEE:  Form.
25    A.  It wasn't considered.

1    Q.  For example, if Mr. Goosby had been arrested
2  previously, would it be significant to consider
3  desensitization in that case?
4      MR. LEE:  Form, asked and answered.
5    A.  I answered that.  No, no.
6    Q.  I'll clarify.  For your clinical judgment, in
7  determining the severity of the trauma, as opposed to
8  diagnosing the PTSD, would it be relevant, to be able to
9  consider desensitization, if Mr. Goosby had been
10  arrested previously?
11      MR. LEE:  Form.
12    A.  No, because the circumstances are usually
13  different.  This is not a trauma because he was
14  arrested.  This is a trauma because he said he was
15  unjustly arrested, that he did not commit the crime.  So
16  the issue here is not being arrested.
17      So, no, previous arrests really don't have a
18  bearing.  Because the issue is not being arrested.  The
19  issue is being arrested for something he did not do.
20  That's the issue.
21    Q.  If he has been previously arrested, and there
22  were some similar circumstances that existed, would that
23  matter to you?
24    A.  I don't know.  That's a hypothetical
25  situation.  That's speculation.  I don't know.  I don't

1  know that this was this or that was that.  It really
2  depends on the circumstances that really existed, and I
3  would need additional information.
4    Q.  And if Mr. Goosby was not truthful with you
5  about his arrests, it would make it -- is it fair to say
6  that it makes it difficult for you to assess whether
7  those circumstances would have been relevant to your
8  opinion?
9      MR. LEE:  Form.
10    A.  If it's regarding anything previous to that
11  circumstance, no, it wouldn't be relevant.  Because,
12  again, the issue was just being arrested.  The issue was
13  that he was arrested for something he didn't do.  So
14  that would have no bearing.
15      If he was arrested 50 times in the past, that
16  would have no bearing on what occurred that day, if, in
17  fact, what he says is the truth and he was arrested for
18  something he didn't do.
19      So again, the circumstance, the situation
20  here, the issue is not that he was arrested, but that he
21  was arrested, according to him, for something he did not
22  do.
23    Q.  So that would be the important factor, is that
24  he was being truthful about why he was arrested,
25  correct?

1      MR. LEE:  Form.
2      A.  Being truthful is always a factor.  You can't
3  make a judgment based on misrepresented information.
4      Q.  Did you rely on the DSM-5 for the diagnosis of
5  Mr. Goosby?
6      A.  No.
7      Q.  Did you rely on any objective evidence, in
8  coming to your diagnosis of Mr. Goosby?
9      A.  Yes.
10     Q.  What was that?
11     A.  Mental status examination.
12     Q.  Can you complain what that is?
13     A.  The entire assessment, you visually assess the
14  person and how they present in terms of their mood,
15  their speech, basically, their presentation, their
16  physical presentation, as they're talking to you.
17     Q.  And what did you notice about Mr. Goosby's
18  physical presentation?
19     A.  Pretty much, overall, it was what we would
20  call within normal limits.  He did say that he felt, on
21  this first day, that it was within normal limits, he
22  felt agitated.  That was his self-report.
23     But, you know, he appeared well developed.
24  His speech was normal.  His affect, how his mood
25  appeared to be, for us, seemed to be appropriate, for

1  the way he described himself.  He was able to speak with
2  direction and answer questions appropriately.  He
3  understood what was being asked.  There wasn't anything
4  bazaar or unusual about him.
5      Q.  And what does the term "within normal limits"
6  refer to, when you used it in this context?
7      A.  There's a range of what's considered accepted
8  presentation, and so someone that falls outside of that
9  range may not be considered normal or within that normal
10  range.
11     So examples would be someone who's very
12  anxious during assessment, nervous, someone who can't
13  answer questions correctly, someone who's disheveled,
14  because it's not normal to walk around disheveled or
15  unclean unkempt.
16     Q.  So you didn't find him to be anxious or
17  nervous during the examination?
18     A.  No.
19     Q.  With Mr. Goosby, did you use any of the
20  clinical assessment tools that you mentioned earlier?
21     A.  No, during the first visit, no.  There were no
22  tools where he had to physically write and circle
23  answers of questions.  It was more so my asking him
24  questions in a way so that he would not realize that I
25  was performing like a rating scale or asking him things

1  specific about PTSD or any other ailment.
2      Q.  And did you include his specific responses and
3  include the rating scale in your notes?
4      A.  Some of his responses are in the notes, and
5  some are implied in the diagnosis.
6      Q.  But, specifically, as to the ratings for the
7  different criteria, did you identify those specifically,
8  in response to the questions that you asked?
9      A.  Some of them are in the note.
10     Q.  But not all of them?
11     A.  Possibly not all.
12     Q.  And where were the questions taken from, that
13  you were asking about?
14     A.  Mental memory bank.
15     Q.  And you don't have a copy of those questions
16  today?
17     A.  Again, some things are just like walking,
18  talking, like we do it so many times, that it becomes
19  routine, in what you need to know to make a diagnosis.
20     Q.  Do you know, in the questions that you asked,
21  do you know the validity of asking questions in that
22  format?
23     A.  No.
24     Q.  Do you know the error rate for asking
25  questions in that format?

1      A.  No.
2      Q.  Are you familiar with any peer-reviewed
3  studies, that support asking questions in that format?
4      A.  As I previously answered, no.
5      Q.  Is the method that you use for diagnosing
6  100 percent accurate?
7      A.  Nothing is 100 percent, so no.
8      Q.  What factors impact the accuracy of the
9  results?
10     A.  If a patient forgets a symptom, if a patient
11  says something that might not be true or something
12  that's not true, mainly.  So it's driven based on
13  self-report, so if they forget something, they leave
14  something out, that they tell you something that's not
15  true.
16     Q.  Anything else?
17     A.  No.
18     Q.  Is there any additional testing or assessment
19  that you could have done to confirm the validity of your
20  diagnosis?
21     A.  No.
22     Q.  But there are other diagnostic tools available
23  for assessing PTSD, correct?
24     A.  There are, yes.  There are additional.
25     Q.  Do you know, you said you didn't have

28 (Pages 106 - 109)

Page 110

1 Mr. Wiggins' notes, when you were coming to your
2 analysis and to your conclusion. Do you have
3 Mr. Wiggins's diagnosis?
4     A.  No. So when providers refer cases to one
5 another, and you can do a sign-out verbally, typically,
6 you'll get a courtesy call, and they'll describe the
7 chief complaint or what their concern is, so ...
8     Q.  And what did Mr. Wiggins describe? I'm sorry.
9 Was it Mr. Wiggins that called you specifically?
10    A.  Yes.
11    Q.  And what did he describe?
12    A.  I may not recall everything, but the gist of
13 what I can recall, is that, he was falsely arrested, and
14 that he's having difficulty since the arrest, he's not
15 sleeping, and he may need medication.
16    Q.  Anything else?
17    A.  Not that I can recall.
18    Q.  And did you take notes on that phone call?
19    A.  No.
20    Q.  Do you think it would be significant to keep
21 that information, that you received from another
22 provider, as part of the complete records that you have
23 for a patient?
24    A.  In some cases, in come cases no, it depends.
25    Q.  And did you think it was significant to

Page 111

1 exclude those notes on your conversation with
2 Mr. Wiggins?
3     A.  No, because the patient came and said the same
4 thing, I'm not sleeping, I was falsely arrested, I need
5 medication.
6     Q.  Did Mr. Wiggins tell you if he performed any
7 tests, of any kind, on Mr. Goosby?
8     A.  I don't think so. I don't think he mentioned
9 that, not that I recall.
10    Q.  Did you conduct a differential diagnosis for
11 Mr. Goosby on your first session with him?
12    A.  For him, the differential wasn't -- there
13 weren't a lot of different diagnoses. It sounded like
14 PTSD. So a differential is not included in every case.
15 When something is unclear, a differential may be
16 discussed or included, but it's not for every case.
17    Q.  So for Mr. Goosby you did not conduct a
18 differential diagnosis, correct?
19        MR. LEE:  Form.
20    A.  What do you mean by conduct? I think you have
21 a misunderstanding of what a differential actually is.
22 A differential is a list of possible diagnoses.
23        So whenever you see a patient, mentally, you
24 consider what the possibilities could be. If that's
25 your question, then yes, on every case I consider all

Page 112

1 the possibilities -- as many possibilities, with regard
2 to their symptoms and diagnosing them.
3     Q.  So Mr. Goosby, understanding your explanation
4 of differential diagnoses, what were the potential
5 diagnoses that you considered?
6     A.  PTSD and PTSD and PTSD.
7     Q.  So other than PTSD, you would not consider any
8 other diagnoses?
9     A.  No.
10    Q.  You mentioned that sometimes you discussed the
11 potential different diagnoses with the PA or the nurse
12 practitioner that's in the session with you. Here, was
13 it simply you, on your own, or did the PA or nurse
14 practitioner have any assessment of their own?
15    A.  It was me. When you say, did they have an
16 assessment of their own? No. They didn't suggest that
17 maybe it's something else, no. I rendered the
18 diagnosis, as I typically do in most cases.
19    Q.  Are you aware of -- -- strike that.
20        Are you aware of the error rate for a PTSD
21 diagnosis, if you do not do a differential and consider
22 the other diagnoses?
23    A.  No, I'm not aware of the error rate.
24    Q.  Are you aware of any scientific peer-reviewed
25 studies, that support the conclusion that no

Page 113

1 differential diagnosis is necessary?
2     A.  Scientific journal, no, I'm not aware.
3     Q.  Is it possible that Mr. Goosby was suffering
4 from any preexisting depression?
5        MR. LEE:  Form.
6     A.  I guess it could be possible.
7     Q.  But that's not something that you considered?
8     A.  Pardon?
9     Q.  It's not something that you considered?
10       MR. LEE:  Form.
11    A.  He didn't report symptoms consistent with
12 previous episodes of depression, so no, it wasn't
13 considered.
14    Q.  Do you know if Mr. Goosby was ever diagnosed
15 with bipolar disorder?
16    A.  Per him, no, he said he did not have any psych
17 history. He denied.
18    Q.  Did you consider any other possible stressors,
19 that Mr. Goosby might have in his life, that could
20 impact a PTSD diagnosis?
21    A.  Yes. We --
22    Q.  What other stressors did you consider?
23    A.  We asked about any stress that they may have
24 in the home or on the job or, in general, in
25 relationships. That's typically a part of the

29 (Pages 110 - 113)

Page 114

1 history-taking.
2    Q.   Did Mr. Goosby share with you any stress that
3 he had in the home prior to March 3, 2017?
4    A.   No, I don't recall him sharing anything.
5 Maybe -- I have that he's been separated from his
6 significant other, so that suggested that's probably a
7 relationship stress, because he's not with his
8 significant other, so he did mention that.
9    Q.   Do you have a sense of how impactful that
10 stress was, on his separation from his wife?
11    A.   I had a sense that it wasn't impacting him in
12 any significant way when he presented to us, because he
13 said it was 4 years ago, and he reported that his
14 symptoms were from the situation that occurred in the
15 bank, so based on the information he shared, it did not
16 have an impact on his presentation or his reported
17 symptoms, on the day he was seen.
18    Q.   What about stressors from family?  Did he
19 identify any stressors from his family, prior to
20 March 3, 2017?
21    A.   Not that I recall.
22    Q.   Did he mention any concerns or stressors
23 related to his daughters?
24    A.   No, not that I recall.
25    Q.   Did he mention any stressors related to his

Page 115

1 job, prior to March 3, 2017?
2    A.   No.
3    Q.   What about other relationships?  Did he
4 mention other stressors, from other relationships, that
5 he may have had, prior to March 3, 2017?
6    A.   Not that I'm recalling.
7    Q.   What other stressors did you ask about?
8    A.   We usually ask the family, relationship, and
9 work.  Those are the three main relationship stressors
10 we ask about.  So it's just the three I described
11 previously.
12    Q.   So no other ones, to see if there were any
13 other potential stressors?
14    A.   No, unless they volunteered information or
15 that it's something that's significant to them and they
16 share it in their assessment.
17    Q.   So, for instance, you don't ask an open-ended
18 question of, tell me about the stressors that you
19 believe you have in their life?
20    A.   I didn't say that.  We do ask that question,
21 and when they say no, then sometimes we have to direct
22 them a little and be more specific, and that's when we
23 ask about work relationships, as in personal, love, and
24 intimacy relationships at home.
25    Q.   And you said that you do ask those questions.

Page 116

1 Did you ask that specific question with Mr. Goosby?
2    A.   Yes.
3    Q.   And you remember asking that question?
4    A.   Yes.
5    Q.   And what was Mr. Goosby's answer?
6    A.   He said that there wasn't anything
7 significant.  That's when he mentioned that he's been
8 separated for 4 years.  And, from what I can recall,
9 that was pretty much the gist of those other aspects in
10 his life.
11    Q.   If there were other stressors in his life,
12 that he didn't tell you about, it's fair to say you
13 couldn't consider them, correct?
14    A.   Correct.
15    Q.   And if you didn't consider them, is it fair to
16 say they could have had an impact on your assessment?
17    A.   No, it's not fair to say.  So just because
18 someone has a stressor does not mean that it would
19 change their presenting symptoms and how you render the
20 diagnosis.  It just really depends on what they're
21 describing or what's happening in their life.
22    Q.   But it is fair to say that it could impact
23 your assessment, correct?
24    A.   Oh, correct, yes.
25    Q.   And in the sense that it could impact your

Page 117

1 assessment, it could impact your ultimate diagnosis of
2 PTSD, as well, correct?
3        MR. LEE:  Form.
4    A.   No.  PTSD is not based on stressors in
5 someone's life.  It's based on the traumatic event they
6 described and the symptoms they present with.  It has
7 nothing to do with social stressors.
8    Q.   Well, let me ask you, if someone comes in
9 identifying certain symptoms and they believe that it's
10 from what they subjectively understand to be a traumatic
11 event, but there are other stressors in their life,
12 could the symptoms be related to those stressors and not
13 the traumatic event?
14        MR. LEE:  Form.
15    A.   That's why you have to tease it out during the
16 clinical assessment.  You ask the questions that have to
17 be asked, so that you can decipher between what's
18 causing the symptoms.
19        When they're clearly telling you the symptoms
20 started after the trauma, then it's safe to say, more
21 than likely, the other outliers are not contributing to
22 their symptoms, especially if those things were in
23 existence already, but they didn't have the symptoms
24 they've presented to you, the new symptoms that they're
25 presenting.

30 (Pages 114 - 117)

Page 118

1    Now, it's different if they had ongoing
2  symptoms and it's the same symptoms, the same quality of
3  symptoms, and there's a trauma. Then it's hard to say
4  what's causing the issue.
5    But when it's something new that they're
6  presenting with, then you can say that those new
7  symptoms are likely due to the trauma, if they've
8  already had those ongoing issues in the past.
9    Q.  I'm sorry, I'm not sure I follow. So if
10  someone has ongoing symptoms, can you necessarily
11  attribute those symptoms to the traumatic event, if they
12  had some of those symptoms before the traumatic event?
13    A.  There are very specific criteria in rendering
14  a diagnosis. Having one or two symptoms is not
15  sufficient in many of the illnesses. If they present
16  with a certain set of symptoms, and there's a lot of
17  different ones, and they present over a certain amount
18  of time, then you can render the diagnosis, regardless
19  of whatever else is occurring in their life.
20    Q.  So you don't need to -- it's your
21  understanding, you don't need to exclude those other
22  symptoms, coming from another stressor?
23    A.  PTSD is not a diagnosis based on stress. It's
24  a diagnosis based on the trauma. That's the first thing
25  that has to be present.

Page 119

1    Q.  Let me clarify then. If the symptoms are
2  occurring because of preexisting stressors, but the
3  patient tells you they believe that they are coming from
4  what they perceive to be the traumatic event, it's
5  impossible for you to know whether the symptom is
6  actually coming from the stressor or the traumatic
7  event?
8    MR. LEE:  Form.
9    A.  I wouldn't say impossible. Typically a
10  conversation takes place with them, that we cannot
11  necessarily say that their symptoms are because of, you
12  know, whatever specific circumstance they already had,
13  the other symptoms, or the other circumstances in place.
14    So it does make it a little more difficult to
15  sort of tease out what's coming from -- what's causing
16  what, when they're presenting symptoms prior to the
17  trauma.
18    Q.  All right, thank you. Okay.
19    Now, you said earlier that the definition of
20  trauma, in the DSM-5, is a traumatic event? Let me ask
21  you again. What is the definition of trauma, under the
22  DSM-5?
23    MR. LEE:  Form.
24    A.  It's an unsettling -- well, verbatim, from the
25  DSM-5, I cannot recall how it's listed in the DSM-5

Page 120

1  verbatim.
2    A traumatic event is something that's
3  unsettling for a patient, that they perceive to be a
4  traumatic experience for them, something that's out of
5  the ordinary or unusual for them and causes social
6  dysfunction and other changes in their presentation or
7  how they feel and their mood.
8    Q.  And that's your understanding of the
9  definition for the criteria -- is that your definition
10  for Criteria A of PTSD?
11    MR. LEE:  Form.
12    A.  No, it's not. I answered the first question
13  you asked me, which was, how does the DSM-5 define
14  trauma. You didn't ask me about criteria in A.
15    Q.  Okay. How do you define criteria in A, under
16  the DSM-5? I'm sorry, let me rephrase.
17    How does the DSM-5 define the criteria in A?
18    A.  There are three sets of --
19    MR. LEE:  Going from memory? Do you have it?
20  I mean, do you want her to define terms in the
21  manual from memory?
22    MR. YATES:  She's about ready to do that.
23    MS. RIVAUX:  I want to understand what her
24  understanding is.
25    A.  So the three different subsets are categories

Page 121

1  of symptoms, and they're classified as numbing,
2  hypervigilance, or hyper-startle, and, also, changes in
3  mood, or reliving experiences. And under each of those
4  categories, there's very specific types of symptoms or
5  ways that they can present.
6    So you have to have so many in each category,
7  over a certain amount of time, for you to meet the
8  actual criteria as having PTSD or posttraumatic stress,
9  in addition to trauma being present.
10  BY MS. RIVAUX:
11    Q.  Okay. I want to focus, then, just on the
12  first criteria, in Criteria A, okay?
13    A.  Mm-hmm.
14    Q.  And so in Criteria A, what is specifically,
15  under the DSM-5, sufficient to meet Criteria A?
16    A.  It's at least three symptoms out of
17  Criteria A. So it's a total of at least five symptoms,
18  but at least so many have to come from each category.
19    Q.  Okay. All right. Let's step back for a
20  moment. When a patient is coming to you and describing
21  a traumatic event, is it important for the patient to
22  tell you about all the traumatic events in their life?
23    A.  No, no. No, but it is important to ask about
24  certain traumas. We always ask about sexual trauma,
25  child-rearing, if there was any trauma in the home, like

31 (Pages 118 - 121)

Page 122

1 physical abuse, things like that, and that's typically a
2 part of the assessment at some point.
3 Sometimes, because of time and how a person
4 engages the assessment, you may not be able to ask all
5 of the questions that you want, during the first or the
6 second time, and you continue to collect information or
7 data over subsequent visits.
8 Q. Okay. But you made your diagnosis based on
9 the information in the first visit, correct?
10 A. Yes. Yes, the information presented in his
11 first visit was sufficient, based on his reports, to
12 render the diagnosis.
13 Q. Do you do a trauma screen for your patients?
14 A. No.
15 Q. What is a trauma screen?
16 A. So there's different types. If you're
17 referring to a specific -- there's rating scales for
18 everything. So what I understood from you is you're
19 referring to a specific trauma screen, and we don't do
20 that. We verbally ask about traumas, and that is our
21 trauma screen. So we do a trauma screen, but not a
22 specific trauma rating scale.
23 Q. When you say -- kind of did quotations around
24 trauma screen, and you said it is our, quote/unquote,
25 trauma screen?

Page 123

1 A. Mm-hmm.
2 Q. And why do you call it "our trauma screen"?
3 A. Well, because it's what we have determined to
4 be helpful for us in our practice and how we assess
5 patients.
6 Q. And when you say we, you mean --
7 A. -- practitioners.
8 Q. -- you and the members of DRT Behavioral
9 Services?
10 A. Correct, the other providers and practitioners
11 in the office.
12 Q. Are you familiar with the error rate for your
13 company's trauma screen?
14 A. No.
15 Q. Are you aware of the validity of your
16 company's trauma screen?
17 A. No.
18 Q. Are you aware of any peer-reviewed literature,
19 that would support your trauma screen?
20 A. No.
21 MS. RIVAUX: I'm going to mark as Exhibit 48.
22 THE WITNESS: I have to return a call. That's
23 the hospital calling. It will take about
24 5 minutes.
25 (A discussion was held off the record.)

Page 124

1 THE VIDEOGRAPHER: We're off the record.
2 (Off the record.)
3 THE VIDEOGRAPHER: We're back on the record.
4 The time is 10:17.
5 BY MS. RIVAUX:
6 Q. Dr. Thomas, we were talking about the DSM-5,
7 and we were talking about the Criteria A. What is the
8 Criteria A in the DSM-5 for diagnosing PTSD?
9 A. That there's an exposure of some type. As
10 we've been discussing, this whole definition of trauma,
11 that there's a traumatic event. But also, depending on
12 the source that you reference, it could be a stressful
13 event. Some sources also say stressful. And I would
14 like to say the DSM-5 may actually state the same. So
15 it's defined as traumatic or stressful event.
16 Q. You said you think it's -- the fact that an
17 exposure can be a stressful event, you mention that's in
18 the DSM-5?
19 A. Yes. There's been a lot of changes with PTSD.
20 It's one of those things, that, with the DSM-5, they had
21 to, sort of, I guess, revise the criteria. So it
22 depends on -- some references will say just trauma, and
23 then others, it's trauma or a stressful event. And I'm
24 pretty sure the DSM-5 says or stressful event.
25 Q. What's the difference between a trauma and a

Page 125

1 stressful event, as you understand it?
2 A. Well, so a trauma could be anything that
3 places the person in danger or they feel threatens their
4 life. A stressful event could be something that's
5 unsettling for a person, so in the sense it provides
6 more range to describe the event.
7 Q. So it broadens your understanding of what the
8 triggering event could be, under PTSD?
9 A. Yes.
10 Q. And for Mr. Goosby, did you identify it as a
11 trauma or a stressful event?
12 A. Both, a trauma as well as distressing for him,
13 was a stressful event for him.
14 Q. And when you say that you described it, in
15 part, as a trauma, is because he subjectively understood
16 it to be a trauma?
17 A. To be a traumatic event, correct.
18 Q. Is it your understanding that a "stressful
19 event" is a word that's used in the DSM-5?
20 A. I can't really recall exactly, because there's
21 been so many changes and back and forth, with the
22 definition of the precipitating event that resulted in
23 someone's PTSD. I would say definitely "trauma" is
24 there, and perhaps the word "stressful" that the words
25 "stressful event," are also there in the DSM-5.

32 (Pages 122 - 125)

1      In fact, it's categorized now as trauma or
2   stress illness.  It's no longer classified under anxiety
3   illnesses.  So the fact that they classify it as trauma
4   or stress, that they need to say that, yes, in the
5   DSM–5, it's considered a trauma or stressful event.
6       Q.   Are you familiar with any peer-reviewed
7   literature that supports that a stressful event could be
8   a trigger or Criteria A?
9       A.   It exists.  Am I familiar to the cite at this
10  time?  No, I can't recall the authors.  But I know that
11  there are peer-reviewed double-blind, but I don't recall
12  the authors and the names of the studies.
13      Q.   Do you remember what journals they're in?
14      A.   American Psychiatric Association, the Journal
15  of Internal Medicine, American Psychological
16  Association, there are several studies, in several
17  journals.
18      Q.   And Mr. Goosby's event, if you have to put it
19  on a scale, was it more traumatic or more stressful?
20      A.   I can't answer that question.  Actually, I
21  answered it.  It was both, perceived as being both for
22  him.  To say it was this or that, it was both.
23      Q.   And when you defined trauma and gave the
24  example of life-threatening, was there anything
25  life-threatening for Mr. Goosby, or is there some other

1   definition of trauma that you're --
2       A.   I think I said life-threatening or threatening
3   one's safety, is what I also said.  So he thought his
4   safety was threatened.
5       Q.   So it's your understanding that it's because
6   he felt his safety was threatened?
7       A.   It's not my understanding.  It's how it's
8   defined in the DSM-5 and the DSM-4TR and the DSM-4 and
9   the DSM-3.
10      Q.   And what specifically did he tell you, that he
11  felt, that, his life, that he felt threatened?
12      A.   The activity of being arrested, being placed
13  in a squad car and left there for over an hour.
14      Q.   Anything else?
15      A.   The jail cell.
16      Q.   Does it matter to you, in your assessment of
17  Mr. Goosby's PTSD, if he was arrested for a charge that
18  was different than a fraudulent check?
19      MR. LEE:  Form.
20      A.   It would matter to me.
21      Q.   Would it impact your opinion?
22      A.   Possibly.
23      Q.   Did Mr. Goosby tell you about any other
24  traumatic events that he felt that he had in his life?
25      A.   No.  He said there weren't any.  When we asked

1   him about sexual traumas, he denied that.  Physical
2   abuse, he denied that.  So he denied that he had other
3   traumas.
4       Q.   Did he deny specifically all other traumas or
5   specifically sexual and physical abuse?
6       MR. LEE:  Form.
7       A.   We asked him, have you had any other traumatic
8   experiences?  His answer was no.  And then I led him and
9   asked, what about any event that he wasn't perceiving
10  certain things to be traumatic?
11      Sometimes people who grow up in certain homes
12  don't perceive physical rearing to be traumatic for
13  them.  So when you ask the question, sometimes they
14  elaborate, and in fact, it was maybe a traumatic
15  experience.
16      So the next thing you typically ask, when
17  someone says no, we asked about sexual trauma, physical
18  trauma, abuses like emotional, verbal abuse, growing up
19  in the home, and he said no too, to those things.
20      Q.   Okay.  I want to refer you to Exhibit 45,
21  which is the August 9, 2017, record.  Under trauma, you
22  reference, the March 3, 2017, arrested for disorderly
23  "conducted" -- I think that's "conduct"?
24      A.   Right.
25      Q.   -- as described in HPI.  That's the reference

1   above, the description, is that correct?
2       A.   Yes.
3       Q.   And then you write "check incident."  Is that
4   because you wanted to verify what the arrest was for?
5       A.   No.  It refers to the filing of the check.
6       Q.   I see.
7       A.   Right, check incident, as in the fraudulent --
8   the check that he claimed -- pardon me.  The check that,
9   his understanding, was said to be fraudulent, that he
10  said was not fraudulent.  So it was referring to that
11  circumstance.
12      Q.   And does it refresh your recollection at all,
13  that, under trama, you write that he was arrested for
14  disorderly -- you write conducted, and not for the
15  fraudulent check?
16      A.   So under that, we wrote arrest, disorderly
17  conduct and charges dropped, so it was considered to be
18  one and the same, because, per him, the disorderly
19  conduct was because of the check issue; that he was, I
20  guess, opposing or not being cooperative during the
21  arrest process.
22      So he was charged with disorderly conduct,
23  instead of the fraudulent check, is how it was
24  described.
25      Q.   So it's your understanding that the disorderly

33 (Pages 126 - 129)

Page 130

1 meant, during the arrest, for the fraudulent check, he
2 was not cooperating?
3     A.  Yes, ma'am.
4     Q.  So the disorderly arrest took place after he
5 was already told that he was under arrest?
6         MR. LEE:  Form.
7     A.  It was something during that process.  I don't
8 know if it was after the cuffs were on.  It was
9 something associated with that same situation, that they
10 were one and the same, that they weren't two separate
11 things.
12     Q.  Okay.  So let me see if we can just break that
13 down.  So it was that he was not cooperating during the
14 arrest, and that's why he was charged with the
15 disorderly conduct, is that your understanding?
16         MR. LEE:  Form.
17     A.  That's my understanding.
18     Q.  Okay, so can you give me what the categories you
19 understand -- you gave me Criteria A, from the DSM, was
20 the event, right?
21     A.  Yes, correct.
22     Q.  What is Category B?
23     A.  Intrusive thoughts about that event, from
24 criteria on A.  There's some type of intrusive stuff,
25 whether it's nightmares, flashbacks, reliving.

Page 131

1     Q.  In your first session, where you made the
2 diagnosis of Mr. Goosby, did he complain of nightmares?
3     A.  I don't recall specifically hearing
4 nightmares.  He couldn't sleep because of -- couldn't
5 sleep.  He was waking up a lot.
6         But nightmares, specifically, I would have to
7 defer to Exhibit 45, to see if he specifically stated
8 that.
9         What I recall is that it was more so his
10 having reliving the event, recurring thoughts about what
11 happened.
12     Q.  Do you have a sense of whether it was
13 something that he was intentionally thinking about?
14     A.  I don't understand the question.
15     Q.  You said that one of symptoms that you
16 identified, during your first session with Mr. Goosby,
17 was that he was having recurring thoughts about the
18 incident.  Is it your understanding whether his thoughts
19 and his thinking about the incident, whether they were
20 intentional, thinking specifically about the event?
21         MR. LEE:  Form.
22     A.  It was my sense that they weren't intentional,
23 that's why it was unsettling for him, because he could
24 not keep himself from thinking about the event.
25     Q.  But you don't write here that the thoughts

Page 132

1 were unwanted, correct?
2         MR. LEE:  Form.
3     A.  No.  It states here:  Patient states he's not
4 able to sleep well due to the replaying of the incident.
5 So that's why he couldn't sleep, because of thinking of
6 it over and is over in his head.
7     Q.  And then you mentioned flashbacks.  Does he
8 identify any flashbacks?
9     A.  I didn't appreciate specifically flashbacks,
10 no.
11     Q.  I want to just go back for a minute to the
12 trauma.  You mentioned that -- you explained the
13 perceived trauma of the arrest, and then you also
14 mentioned being in the jail and being handcuffed.
15         What specifically, let's start first, what
16 specifically about being handcuffed was perceived as
17 being traumatic for Mr. Goosby?
18         MR. LEE:  Form.
19     A.  That he felt he was innocent and hadn't done
20 anything wrong.
21     Q.  And the same question, what did Mr. Goosby
22 perceive to be traumatic in being in jail?
23     A.  That he was innocent and had not done anything
24 wrong, with regard to a fraudulent check.
25     Q.  If his perceived trauma is based solely on his

Page 133

1 perceived -- let me rephrase that.
2         If Mr. Goosby's perceived trauma is based on
3 perceiving that he was wrongly arrested, would that be a
4 traumatic event?
5         MR. LEE:  Form.
6     A.  Say that again.
7     Q.  Sure.  Mr. Goosby, you said, perceived a
8 trauma when he was arrested, correct?
9     A.  Correct.
10     Q.  And part of the -- and the traumatic aspect of
11 that was that he perceived that he was wrongly arrested,
12 correct?
13     A.  That he was accused of doing something he
14 didn't do, and that was trying to cash a fraudulent
15 check.  So it's very specific.  He says that he was
16 not -- that the check was legitimate, and he was not
17 trying to cash a fraudulent check.
18     Q.  Now, if he was perceived to be arrested for a
19 fraudulent check, but he was actually arrested for
20 something else, would that still be a trigger as a
21 traumatic event?
22         MR. LEE:  Form, asked and answered.
23     A.  I don't know.
24     Q.  For Criteria B, was there anything else that
25 you felt met the criteria for Criteria B?

34 (Pages 130 - 133)

Page 134

1    A.  No, no.  I think it was mainly the reliving
2  the intrusive thoughts over and over, that he noticed.
3    Q.  And what is Criteria C?
4    A.  Negative mood symptoms, so affects on the
5  person's mood, sadness, loss of interest in things, we
6  call that anhedonia, melancholy, isolation, different
7  things that denote that the person is -- that their mood
8  has not been the same, they have worsened mood or sad
9  mood or low mood, sadness, basically.
10    Q.  Did you find that Mr. Goosby met this
11  criteria?
12    A.  Yes.  He had loss of interest in things.  He
13  said he was embarrassed, so shame is also something
14  that's in that criteria.  He felt embarrassed, I think
15  is how he described it in his notes.  Yeah, patient
16  states he has not been able to sleep due to the incident
17  and the embarrassment of being arrested.
18    So, yeah, he has shame.  He presented with
19  shame, which has harmed his standing in the community,
20  so he had shame, anhedonia, loss of interest, sadness.
21    Q.  When you say loss of interest, did Mr. Goosby
22  explain to you specifically what the loss of interest
23  was?
24    A.  Sort of isolating himself, not doing things
25  for fun, not working the same in his business.  I

Page 135

1  believe he's self-employed, so there was a change with
2  that.
3    Q.  And you said that he was isolating.  Where do
4  you identify that he was isolating, in your record?
5    A.  It's what I recall from when I saw him.
6    Q.  So that part is not in the record?
7    A.  No.
8    Q.  Okay.  And you also said not doing things for
9  fun.  Where is that in the record?
10    A.  No, I think what I was describing was
11  anhedonia.  He had loss of interest in things, and the
12  example I gave was not working the same as he did
13  before, not working with the same passion as before.
14    Q.  Do you identify anywhere, and I'm going to
15  probably butcher the word, that he had anhedonia?
16    A.  Anhedonia is loss of interest, and that's what
17  I recall from the assessment of him, that he had loss of
18  interest.
19    Q.  But none that you specifically identify in the
20  record?
21    A.  Again, I identified it when I spoke to him,
22  and I used it and applied that information to my
23  diagnosis, is what I recall.
24    Q.  But, specifically, the anhedonia is a symptom
25  that you recall, but you didn't identify specifically in

Page 136

1  the record, correct?
2    A.  Again, it's specifically identified, because
3  the diagnosis was rendered.
4    Q.  Did he meet any of the other criteria for the
5  negative mood?
6    A.  There are several different ones.  Perhaps he
7  did, but he met three that he needed to meet, criteria.
8    Q.  What is the next criteria?
9    A.  Hypervigilance.  So in hypervigilance, someone
10  expresses anger, irritability.  They could express
11  impulsivity.  They can express restlessness, psychomotor
12  agitation, as not being able to sit still, pacing all
13  the time.
14    So again, there are several symptoms under
15  that criteria as well, and he met at least three of
16  those.
17    Q.  And which ones did he meet?
18    A.  The pacing, the restlessness, the
19  irritability, the inner tension, and the anger.
20    Q.  Okay.
21    A.  And I just, from the document, whenever he
22  sees the police, he gets angry, and it intensifies, so
23  that's kind of like reliving the situation, which is
24  back to the previous criteria you were asking me about.
25    So he was having the recurring thoughts,

Page 137

1  intrusive thoughts or, kind of, thinking about it,
2  interrupting his sleep.
3    And then, also, when he saw the police, they
4  were a reminder, so that's also considered an intrusive
5  thought or intrusive-type symptom.
6    Q.  And what is the next criteria?
7    A.  Social dysfunction, changing how someone is
8  managing their life.
9    Q.  And what's the next one?
10    A.  That's -- let's see.  We've done A, B, C, D,
11  E, that the diagnosis is not explained by another
12  illness, that they don't meet criteria, that their
13  symptoms do not meet criteria for another pathology or
14  mental health illness.
15    And the last criteria is that there's no
16  substance abuse or medical issues that could be causing
17  the symptoms.  So that's your eight criteria.
18    Q.  So it's your understanding that he had no
19  substance abuse issues?
20    A.  My understanding is that, on the day he
21  presented to my office and on the day that -- on the day
22  that he presented to my office and during the time
23  period, there were -- there wasn't any use of, active
24  use, of drugs or illicit substances, that could cause
25  the symptoms he was presenting with.

35 (Pages 134 - 137)

Page 138

1    Q.   Would alcohol be one of the factors you would
2  need to exclude?
3    A.   I mean, any substance could be something that
4  you have to exclude, but that criteria is defined and
5  listed in all mental health modalities.
6    Q.   And did you exclude whether alcohol was
7  impacting the symptoms?
8    A.   Yes.  And the way we do that, though, is
9  asking about their use of substances, whether or not
10  they're using any street dugs, like marijuana, cocaine,
11  heroin, popping pills, overusing prescription pills,
12  alcohol, overuse or dependence or addiction.  Tobacco is
13  also.  We asked him about cigarettes and tobacco as
14  well.
15    Q.   And did Mr. Goosby deny those?
16    A.   He did.
17    Q.   One criteria that I believe is also
18  referenced, I'm just going to try to refresh your
19  recollection, is avoidance?
20    A.   Mm-hmm.
21    Q.   Using avoidance as a stimuli?
22    A.   Yes.
23    Q.   Now, what is that?  What does that refer to?
24    A.   So someone doesn't like being in an
25  environment that reminds them of where their trauma

Page 139

1  occurred, or they may not want to be around a person who
2  reminds them of a perpetrator from a traumatic event,
3  not wanting to be around or not being -- not wanting to
4  be around people or environments or circumstances that
5  remind them of the trauma or the stress.
6    Q.   Okay.  So, for example, in Mr. Goosby's
7  situation, since the incident happened at the bank, you
8  would expect that he would try to avoid the bank?
9    A.   No, no, that's not necessarily the case.
10  Maybe he would avoid -- I mean, there's a lot of
11  possibilities.  But because the bank is somewhere people
12  can't avoid, it's just like the grocery store, that
13  people can't, in circumstances, avoid the grocery store
14  or certain things that are kind of associated with
15  regular living, where people will go to those places,
16  but then have stress or feel unsettled or uneasy when
17  they go.
18       But, in some cases, yes, people would avoid
19  the environment.  So, in his situation, it's a
20  possibility he would avoid going to a bank, a bank or
21  that particular bank.
22    Q.   Okay.  And is there anything specific, that
23  Mr. Goosby told you, that met the criteria for
24  avoidance?
25    A.   No, not that I recall.  I think it's the

Page 140

1  police.  The thing that was the most unsettling for him
2  was being around the police.  So he avoided being around
3  police, because he was so angry because of being
4  arrested unjustly or for not doing -- not trying to pass
5  a fraudulent check.  So I would say the avoidance part
6  was because of the police, not necessarily the actual
7  location.
8       So he described staying away from police, not
9  wanting to see them, because they evoked anger in him
10  and reminded him of the situation.  They kind of made
11  him think about, again, about what happened to him.
12    Q.   Did he specifically tell that you he was
13  avoiding the police?
14    A.   He said he doesn't go around them.  If he sees
15  them, he goes another way.  He can't stand to be around
16  them.
17    Q.   And that's not something you, also, included
18  specifically, in the medical record, on the day you made
19  the diagnosis, correct?
20    A.   Yeah, I included that he gets angry when he
21  sees the police, but the additional information is
22  something that he told me, that I recall, that he told
23  the PA and me.
24    Q.   Okay.  Are you familiar with the term in the
25  DSM for PTSD called "delayed expression"?

Page 141

1    A.   I can't say "delayed," because it has
2  different terms, but yes, delayed expression, I am
3  familiar.
4    Q.   And what's your understanding of delayed
5  expression?
6    A.   Manifestation of symptoms well after the event
7  occurred, so some people don't present with symptoms
8  soon after the trauma or not even within a month or a
9  few months.  Some people don't present until years
10  later, with symptoms from that trauma.
11    Q.   Is it possible Mr. Goosby had prior trauma,
12  that had a delayed expression?
13       MR. LEE:   Form.
14    A.   It's possible.
15    Q.   If I could turn your attention to I think what
16  we marked as Exhibit 46, and that's going to be your
17  October 25, 2017, medical record.
18    A.   Yes.
19    Q.   And in this session, Ms. Small was in the
20  session with you as well?
21    A.   Yes.
22    Q.   Okay.  And correct me if I'm wrong, but it
23  seems that much of the information that is in this
24  record, from October 25th, is taken directly from the
25  August 9th record, is that correct?

36 (Pages 138 - 141)

Page 142

1    A.  That's correct.
2    Q.  One thing that is different is the first
3  paragraph under the Subjective, is that correct?
4    A.  That's correct.
5    Q.  And during that session, Mr. Goosby told you
6  that things were so far so good?
7    A.  He did, yes.
8    Q.  Did you understand that to mean that he was
9  improving?
10    A.  Yes.
11    Q.  Did you receive any additional information,
12  during this session, about Mr. Goosby's symptoms?
13    A.  No, just that they had improved so much that
14  he stopped one of the medications, and he was only using
15  the alprazolam as needed.  So he stopped one of the
16  medications and was just taking the Xanax, which is
17  alprazolam.
18    Q.  And let me just clarify.  You said he stopped
19  taking the other medication.  Which other medication are
20  you referring to?
21    A.  Remeron, R-e-m-e-r-o-n.
22    Q.  And if I can refer you to the third sentence,
23  it says, PT, patient, did fill the Remeron, but has
24  never used the medication?
25    A.  Oh, yeah, that's true.

Page 143

1    Q.  Does that refresh your recollection, that he
2  never used Remeron?
3    A.  Possibly.  Yeah, I don't really remember too
4  much, but if that's there, he told us that he didn't
5  comply with it.  So never used it, he didn't comply with
6  that, and just continued to take the Xanax.
7    Q.  Okay.  What is your course of treatment for
8  Mr. Goosby?
9    A.  His has been based on when he could afford it.
10  So it's based on when he could come in to see us.  It
11  wasn't what we -- the way we recommended.
12       For instance, when he was seen August 9th, he
13  was told to come back in 4 weeks; which is, pretty much,
14  the typical followup, depending.  Sometimes people are
15  told to come back in 2 weeks, 4 weeks.
16       So he was told to come back in 4 weeks, and he
17  didn't come back until October 25th.
18    Q.  And I think earlier you said you didn't know
19  his financial situation, correct?
20    A.  I said I did not know his specific financial
21  situation in the past, preceding the arrest.
22    Q.  What basis do you have that he wasn't coming
23  to the sessions, as you prescribed in your treatment
24  plan, based on his inability to pay?
25    A.  Because he told us.  So when someone

Page 144

1  doesn't -- we made the appointment.  When they don't
2  show, I call or the PA or the nurse practitioner calls
3  and says we missed you.
4       It starts with the admin office.  They call
5  and say you missed your appointment, and then a
6  clinician also calls to ensure that they're safe, that
7  they're okay.  And with Mr. Goosby, he said he couldn't
8  afford it.
9    Q.  And did you record that in any of your
10  records?
11    A.  That's not meant to be in a medical chart.
12  Someone's affordability for their sessions, that's not
13  appropriate in the medical record.
14    Q.  Do you keep a log of the phone calls that you
15  make for your patient?
16    A.  It depends on the circumstances.  If it's
17  something to do with suicidal ideation, homicidal
18  ideation, yes.  But if it's something to do with
19  finances, no.  That's inappropriate to be in the record.
20    Q.  And why is that inappropriate to be in the
21  record?
22    A.  It's not information regarding their medical
23  status.  Someone's not being able to afford an
24  appointment is not something you have to enter into the
25  chart.

Page 145

1    Q.  Did he tell you, specifically, that he can't
2  afford it?
3    A.  Yes, he did.
4    Q.  So you were the one who made that phone call
5  to him?
6    A.  Yes.
7    Q.  And when was it that you made the phone call
8  to him?
9    A.  Sometime in September, so he was seen August
10  9th, and he was told to be come back in 4 weeks, so it
11  would have been early September, that he was due back.
12    Q.  What else is part of your treatment plan for
13  Mr. Goosby?
14    A.  We referred him back to Mr. Wiggins, the
15  clinician who referred him to the office to begin with,
16  so that he could continue in psychotherapy, with
17  Mr. Wiggins.
18    Q.  In your first session with Mr. Goosby, did you
19  ask him whether he was going to file a lawsuit?
20    A.  No.
21    Q.  Did you ask him whether he was considering
22  filing a lawsuit?
23    A.  No.
24    Q.  Did he suggest to you whether he was
25  considering filing a lawsuit?

37 (Pages 142 - 145)

Page 146

1    A.  I don't think so.  I don't recall that being a
2  part of his session.
3    Q.  Okay.  So did Mr. Goosby ever tell you that he
4  was involved --
5    A.  Wait.  I recall he did mention attorneys.  He
6  did mention he got an attorney, because he was falsely
7  arrested or accused, in the first session.
8    Q.  Did he mention whether that was for a civil
9  case or for his criminal case?
10   A.  No.
11   Q.  Did you have any understanding whether it was
12 civil or criminal?
13   A.  No.
14   Q.  Would it matter to you, in assessing your
15 patient for PTSD, whether they were intending to file a
16 civil lawsuit?
17   A.  It would matter, because it suggests that they
18 feel that they have pain and suffering, that they feel
19 their symptoms are so severe that they needed to hire an
20 attorney to advocate for them.
21      So, you know, when a patient comes in, we're
22 not skeptical of their intentions, because they're our
23 patient, so it's a patient/doctor relationship.  If
24 someone mentions hiring an attorney, it suggests that
25 they feel their symptoms or -- their symptoms or their

Page 147

1  reaction to the circumstances were just that severe,
2  where they feel they have to hire counsel.
3    Q.  Were there any other reasons whether
4  Mr. Goosby or any patient, for that matter, is going to
5  file the lawsuit, for you to have that information?
6      MR. LEE:  Form.
7    A.  Is there any reason?
8    Q.  Any other reason?
9    A.  No, not that I can think of, no.
10   Q.  Do you know if the DSM-5 has any
11 consideration, for a clinician to look at, when a
12 patient suggests that they are involved in civil
13 litigation?
14   A.  You consider things like secondary gain and
15 malingering.
16   Q.  And when did you find out, specifically, that
17 Mr. Goosby was filing a lawsuit?
18   A.  So I knew he had attorneys.  I believe that
19 was the first visit, if I can refer to the notes.  Yeah,
20 he said that he had attorneys, but I don't recall him
21 saying that he was filing a lawsuit.
22      I think I did not learn until I was served
23 January 16, 2018, and then, regarding the attorneys, he
24 said that he paid for two lawyers, because of being in
25 jail.  So I don't even know if that was because of

Page 148

1  wanting to file a lawsuit.  So the attorneys were
2  because of his being held in jail for 22 hours,
3  according to him.
4    Q.  And you didn't follow up the question of
5  whether there was a civil lawsuit that he was
6  considering, correct?
7    A.  That's not a typical question we would ask
8  during an assessment.  Are you filing a lawsuit?  No, I
9  didn't ask that.  When he said he got attorneys, he said
10 it was because he was held in jail for 22 hours, and I
11 took his word for it.
12   Q.  Right, and I understand that, typically, you
13 wouldn't ask that question.  But in this particular
14 situation, when Mr. Goosby told you that he was hiring
15 attorneys, did you ask the followup question of whether
16 he was intending to file a civil lawsuit?
17   A.  No, no, because he said that the attorneys
18 were because of his being held in jail for 22 hours.  So I
19 just made the connection that he had to get attorneys to
20 get out of jail, that he could not get out of jail, and,
21 to get out of jail, he'd have to get these attorneys.
22   Q.  So is that an assumption that you made?
23   A.  It is, because I did not ask him specifically
24 if he was filing a civil suit.
25   Q.  Now, did you have any indication, prior to

Page 149

1  January 16, 2018, that Mr. Goosby had filed a lawsuit?
2    A.  I don't recall having any indication, no.
3    Q.  If I could, when we first started the
4  deposition, you mentioned you had reviewed the initial
5  disclosures?
6    A.  Mm-hmm.
7    Q.  Do you know when you saw those initial
8  disclosures?
9    A.  No.  I get so much paperwork from the courts
10 regarding different stuff.  I don't remember.
11   Q.  Do you know if it was before you received the
12 subpoena?
13   A.  I don't recall.  I don't know what came first.
14 And sometimes documents go to my other office.  I don't
15 know.
16   Q.  Okay.  So at a minimum, though, by January 16,
17 2018, you were aware that Mr. Goosby had filed a civil
18 lawsuit, correct?
19   A.  I thought so, yes, based on the subpoena.  It
20 says James Goosby vs. Branch Banking & Trust Company.
21   Q.  And you had another session with Mr. Goosby,
22 following the receipt of this subpoena?
23   A.  That is correct.
24   Q.  And at that time, did you ask him about the
25 lawsuit?

38 (Pages 146 - 149)

Page 150

1    A.   No.
2    Q.   You didn't ask him about the lawsuit?
3    A.   No.
4    Q.   At that time, once you had found out about the
5    civil lawsuit, did you consider whether you needed to
6    exclude malingering?
7    A.   So at his session on January 24th, it was more
8    so about symptoms and medication, but on the day that I
9    received the subpoena, I would like to say it may have
10   been, actually, the next day, that I called him and to
11   advise him that I received the subpoena, that, by
12   law, I had to release the records, because I had a
13   subpoena.
14        At that time he gave me the phone number for
15   his attorney, and I contacted his attorney also.  So
16   that was when the discussion took place about the
17   subpoena, but I didn't ask a question about, are you
18   filing a lawsuit?
19        For me, this a subpoena, and this does not
20   automatically assume that there's a lawsuit in place,
21   nor do I want to know, because the less I know, the
22   better for me, so that it doesn't cloud clinical
23   judgment.  So I did not ask him about the lawsuit.
24   Q.   So you didn't want to know any specifics about
25   the lawsuit, correct?

Page 151

1    A.   No.
2    Q.   And you didn't even want to know if there was
3    a lawsuit, correct?
4    A.   Correct.
5    Q.   And so, is it fair to say, you didn't consider
6    malingering, at all, for Mr. Goosby?
7    A.   No, that's not fair to say.  I always consider
8    it, you know, during every session, with every patient,
9    so for him, including during the first session, the
10   second session.  Whenever something as subjective as
11   someone reporting symptoms that you don't see in the
12   moment, you would have to consider malingering.
13        So as I said, his mental status exam was
14   normal, for the most part, except for what he said about
15   feeling agitated.  So that was a consideration, because
16   he talked about the symptoms.  The mental status exam
17   was normal.
18        And then, from working in the prison system, I
19   know that people can malinger for secondary gain.
20   Q.   And so what did you do for Mr. Goosby, to
21   exclude malingering?
22   A.   Just continued clinical assessment, being in
23   the sessions when he came in, as opposed to, for
24   instance, after we were served, when he came in
25   January 24th.

Page 152

1        The psychiatric nurse practitioner could have
2    seen him on his own, because the psychiatric nurse
3    practitioner has the experience to do that, at a
4    followup appointment.
5        But I went in to see him, so that way, I
6    eyeball him, so it's clinical assessment and assessing
7    his mental status.
8    Q.   During that session, did he seem normal to
9    you?
10   A.   In January?
11   Q.   Yes.
12   A.   No.  This time he said that he had symptoms.
13   So when he came in October, he was pretty much
14   asymptomatic.
15        But when he came back January 24th, he said
16   that he was having, quote, I thought all of this would
17   go away, but I have flashbacks of the incident, and it's
18   just been hard.  I am waking up, with thinking about the
19   incident, sweating, with my heart pounding, closed
20   quote.
21        So when he came in January, it seemed like he
22   was symptomatic again.
23   Q.   Given that now you were aware of the lawsuit
24   and Mr. Goosby's symptoms seemed to come back, did it
25   suggest to you that you should seriously consider

Page 153

1    malingering?
2    A.   Again, no, malingering is -- malingering is
3    something that you don't render lightly.  You can be
4    sued for that.  We practice offensive medicine.  You
5    don't render malingering lightly, based on, well, he's
6    suing, so he might be misrepresenting.  You have to have
7    additional information, and that's in any setting when
8    you're seeing a patient.  You don't just easily say
9    someone is malingering.
10        And as his treating physician, it is not my
11   burden to rule out malingering either.  So it's my
12   patient.  We have a patient/doctor relationship
13   established.
14        And so, unless someone is demonstrating very
15   specific actions or behaviors suggestive of malingering,
16   that's the only time, in the private setting, that I'm
17   going to go after ruling that in or ruling that out.
18   Q.   So if I understood you correctly, it's your
19   understanding that you don't have the burden to rule out
20   malingering with a patient, correct?
21   A.   I said if there aren't any specific behaviors,
22   I don't have that burden.  He did not do anything that
23   suggested that he could be malingering.
24   Q.   And what other information would you look to,
25   to determine if a patient was malingering?

39 (Pages 150 - 153)

Page 154

1    A.  By some of the things they say, or if you find
2  that they're not filling their medication.  When he did
3  not come in, we checked to see if he had gone to the
4  pharmacy and filled the scripts, and he did, the one
5  script, the Xanax.
6       So you can check with pharmacies, to see if
7  they're taking their medication.  If the person says
8  anything that's kind of suspicious of "I'm just doing
9  this to get paid," and sometimes people say that, and
10  those cases get referred out.  We don't continue to
11  treat them.  So it's kind of limited in the private
12  practice setting.
13    Q.  And do you ever look to see if there's any
14  collateral data, that you could look at, to confirm
15  whether a patient is malingering?
16    A.  So had he not been referred by his therapist,
17  I would have reached out to -- I would have requested a
18  release of information, to reach out to another provider
19  involved in the case.
20       But because his psychotherapist referred him
21  to me, and he didn't have concerns of malingering, so
22  collateral for this case was Mr. Wiggins, because there
23  weren't any other providers involved in the case.
24    Q.  And did you speak to Mr. Wiggins more than
25  just the one time, when he referred Mr. Goosby to you?

Page 155

1    A.  I spoke to him to tell him that he didn't come
2  in for his followup, that, in September, he still hadn't
3  come in, and I asked him if he had seen him.
4    Q.  So do you have any sense of whether the
5  symptoms that Mr. Goosby was identifying to you were
6  different than the ones that he was identifying to
7  Mr. Wiggins?
8    A.  I didn't get that sense, no.
9    Q.  Did you ever ask Mr. Goosby if you could
10  review the videos?
11    A.  No.
12    Q.  Would that be important to you?
13    A.  No, absolutely not, and inappropriate
14  clinically.  I'm not an investigator.  I'm his treating
15  doctor.
16    Q.  You're familiar with the American
17  Psychological Association?
18    A.  Yes.
19    Q.  And are they authoritative in the field of
20  mental health?
21    A.  They and others.
22    Q.  Are you familiar with the peer-reviewed
23  literature, from the American Psychological Association,
24  that finds that there is a lack of reliability in
25  self-reports?

Page 156

1    A.  Yes.
2    Q.  And are you familiar with the peer-reviewed
3  literature, from the American Psychological Association,
4  regarding the lack of clinicians and mental health
5  professionals from detecting when a patient is lying?
6    A.  I'm not familiar with that.
7    Q.  Do you think it's something that you should be
8  aware of?
9    A.  Aware of what, the actual data?  Aware of
10  what?  Be specific, please.
11    Q.  Do you think you should be aware of how --
12  aware that there is difficulty for clinicians to detect
13  when a patient is lying?
14    A.  I'm aware of that.  But I think your former
15  question asked me something more specific, that, I'm not
16  aware of.  But yes, I know patients misrepresent all the
17  time.
18    Q.  But let me clarify.  That it's difficult for
19  clinicians to detect when a patient is lying, are you
20  aware of that?
21    A.  Yes, yes.
22    Q.  Are you aware of any literature, from the
23  American Psychological Association, that states that, in
24  a litigation context, because of the secondary gain that
25  we talked about, that clinicians should not only rely on

Page 157

1  self-reports, but should also consider other
2  post-incident factors?
3    A.  I don't think so, no.
4    Q.  Would it matter to you if there are witnesses
5  in this case that have called Mr. Goosby a liar?
6    A.  I think that would matter, yes.
7       MR. LEE:  Form.
8    Q.  And would it matter to your opinion, that, if
9  there were witnesses in this case that called him a
10  manipulator?
11       MR. LEE:  Form.
12    A.  Yes.
13    Q.  Were you aware of any of those?
14    A.  No.
15    Q.  Have you reviewed any of the deposition
16  transcripts in this case?
17    A.  No.
18    Q.  Are you aware of any of the witnesses that
19  have been deposed in this case?
20    A.  No.
21    Q.  Would it matter to you, in your rendering of
22  an opinion of PTSD, whether Mr. Goosby had anger issues,
23  that were described just by witnesses, including busting
24  the horn of a car, before the incident?
25       MR. LEE:  Form.

40 (Pages 154 - 157)

Page 158

1    A.  It would matter.
2    Q.  How would it matter to you?
3    A.  One of the criteria is to rule out that the
4  symptoms are not due to another illness or another
5  mental health disorder.  So he presented anger as one of
6  his symptoms of his PTSD, so if he had anger because of
7  something else, then we would have to rule in or rule
8  out what could be causing the anger, other than PTSD.
9  Maybe there's some other illness also.
10   Q.  And that's not something that you were able to
11  do, correct?
12   A.  Correct.
13   Q.  If there are witnesses in this case that state
14  that the separation from his wife was continuing to
15  cause him stress, would that be significant to your
16  opinion?
17   A.  Yes.
18   Q.  How would that affect your opinion?
19   A.  It could have a bearing on some of the
20  symptoms that he reported.  If he's having ongoing
21  stress because of a previous relationship, we would have
22  to tease out when he had certain symptoms, if it was
23  because of thinking about the circumstances with his
24  wife, if it was because of a phone call with the
25  ex-wife.  So you have to consider other things as well.

Page 159

1    Q.  And that was not something you were able to do
2  in this case?
3    A.  No.
4    Q.  What about if he has friends, that there are
5  witnesses in this case, that said he had stressors from
6  the estrangement of his two daughters?  Would that be
7  significant to your opinion?
8    A.  Yes.
9    Q.  And is that something that you considered in
10  this case?
11   A.  No, and we weren't aware of it.
12   Q.  And you mentioned earlier that you rely on the
13  self-report of your patients?
14   A.  I did, yes.
15   Q.  And so is this information you would expect
16  your patient to tell you during the self-report?
17   A.  Yes.
18   Q.  And failing to inform you of that information
19  makes it difficult for you to render your opinion,
20  correct?
21   A.  Yes, it could.
22   Q.  And if there are witnesses in this case that
23  state that she was stressed from the unexpected death of
24  a friend, would that stressor be significant for you in
25  your underlying opinion?

Page 160

1    A.  It would be if it was recent or around the
2  time of the incident, yes.
3    Q.  And how would it impact your opinion?
4    A.  Again, we would have to rule out that the
5  symptoms he presented are not due to something else, so
6  that he could meet the criteria.
7    Q.  And it's fair to say you weren't able to do
8  that in this case?
9    A.  Correct.
10   Q.  And if Mr. Goosby did have financial distress
11  prior to March 3, 2017, that he didn't disclose to you,
12  would that be significant for you, in determining your
13  opinion in this case?
14   A.  Yes.
15   Q.  And how did it impact your opinion?
16   A.  Well, one of the criteria that they have to
17  meet is social dysfunction, so finances are part of
18  social dysfunction, and that's one of the things he
19  identified as being dysfunctional after the arrest, that
20  his finances declined, and he had financial distress.
21   Q.  So if he had financial distress before, it
22  would be impossible for you, at this point, to identify
23  where the financial distress, post March 3, 2017,
24  occurred?
25   A.  We would have to ask more questions, to

Page 161

1  determine how exactly this impacted it more so than
2  previous, but yes, it wouldn't be as cut and dry.
3    Q.  So, for example, if, prior to the incident, in
4  the months leading up to the incident, he had four
5  foreclosures, would that be significant for you to know,
6  in rendering your opinion of whether the incident caused
7  any financial distress?
8    A.  Yes.
9    Q.  And does that impact your underlying opinion
10  in this case?
11   A.  Does what impact it, the financial stress?
12   Q.  Does the fact that Mr. Goosby had four
13  bankruptcies prior to -- I'm sorry.  Let me restate.
14  It's getting late.
15       Does the fact that Mr. Goosby had four
16  foreclosures preceding the incident matter to your
17  opinion of whether he had financial distress resulting
18  from the incident?
19   A.  Yes.
20   Q.  And why is that?
21   A.  Well, that, basically, creates the element
22  that there was already financial distress and that
23  wasn't something new, that occurred after the arrest.
24   Q.  And would it be significant to you that, in
25  the month before the incident, that BB&T foreclosed on

41 (Pages 158 - 161)

Page 162

1 Mr. -- had a foreclosure action against Mr. Goosby?
2     A.  You said, would it be relevant?
3     Q.  Yes.
4     A.  No, no, not relevant to the accusation that
5 was made, that he tried to cash a fraudulent check, no.
6     Q.  Would the fact that the foreclosure existed
7 one month before the incident impact your ultimate
8 opinion that he had PTSD?
9     A.  There are so many other symptoms, that's
10 just one element.  So it depends on everything else.  If
11 he did not have the financial distress, that's an
12 example of social dysfunction.  There may have been
13 something else.  According to him, he didn't have as
14 many clients, because they saw him in the bank getting
15 arrested.
16        So I wouldn't say that is true necessarily.
17 It depends on a lot of other things too, because it's
18 established based on so many things, not just that one
19 thing, one element.
20     Q.  But you would expect that he would be able to
21 establish the loss of business from those particular
22 clients, to show the stress, the financial stress?
23        MR. LEE:  Form.
24     A.  I don't understand the question.
25     Q.  I'll move on.  It's getting late.

Page 163

1        And if there were witnesses in this case that
2 testified that Mr. Goosby, prior to March 3, 2017, had
3 stress from collecting money from tenants, would that be
4 significant to your opinion?
5     A.  You said that clients had stress from
6 collecting money from tenants or that he --
7     Q.  Let me restate.
8     A.  Okay.
9     Q.  Would it be significant to your underlying
10 opinion, that there were witnesses that testified in
11 this case, that Mr. Goosby, prior to March 3, 2017, felt
12 stress from collecting money from tenants?
13     A.  Yes.
14     Q.  If Mr. Goosby was untruthful about the
15 customers that saw him either inside the bank or outside
16 the bank, would that change your opinion?
17        MR. LEE:  Form.
18     A.  Possibly, because that's how we established
19 the criteria of shame and embarrassment.
20     Q.  If there were witnesses that testified in this
21 case that Mr. Goosby was drinking a bottle a day of
22 alcohol with a friend, would that be significant to your
23 opinion?
24     A.  Yes.
25     Q.  And how would it impact your opinion?

Page 164

1     A.  A bottle per day can lead to mood changes,
2 cause anxiety, issues with sleep.  So based on the
3 criteria for PTSD, we would have to rule out that the
4 alcohol was not a factor in those presenting symptoms,
5 that he presented with.
6     Q.  And that was not something you were able to
7 rule out?
8     A.  No.
9     Q.  And if there was a witness that testified that
10 Mr. Goosby smoked pot for many years, smoked marijuana
11 for many years, would that impact your opinion in this
12 case?
13     A.  If he was currently using, it would.  If it
14 was something he did in the past and stopped, no.
15        MS. RIVAUX: Can we just go off the record for
16 a moment?  I just want to review my notes.
17        THE VIDEOGRAPHER:  Going off the record, the
18 time is 11:21 p.m.
19        (Off the record.)
20        THE VIDEOGRAPHER:  We're back on the record.
21 The time is 11:31 p.m.
22 BY MS. RIVAUX:
23     Q.  Dr. Thomas, I just have a few more followup
24 questions for you.
25        So one of the things you mentioned earlier,

Page 165

1 was, the triggering event for Mr. Goosby was the arrest,
2 and you said that he expressed that he felt that he
3 was -- his life was being threatened in the jail?  Is
4 that -- am I misunderstanding what you said?
5        MR. LEE:  Form.
6     A.  Yeah, no, not that it was being threatened in
7 the jail, but his safety felt threatened, because he
8 could be arrested for no reason, because he maintained
9 that he was arrested for no reason.
10     Q.  Was there anything specific about the jail
11 itself, that was life-threatening?
12        MR. LEE:  Form.
13     A.  No.
14     Q.  Was there anything specific about being
15 handcuffed that was life-threatening?
16     A.  Just that he didn't do anything or that he
17 didn't pass a fraudulent check, just that part, but no.
18     Q.  Was there anything specific about the arrest
19 that was life-threatening?
20     A.  No.
21     Q.  And is it fair to say that there was -- was
22 there anything in -- let me rephrase.  Is there
23 anything, specifically, about being in jail, that he
24 felt threatened with serious bodily harm?
25     A.  No.

42 (Pages 162 - 165)

Page 166

1    Q.   Was there anything about being handcuffed,
2  that he felt threatened with serious bodily harm?
3    A.   No.
4    Q.   Was there anything sitting in the back of the
5  police car, that he felt threatened with serious bodily
6  harm?
7    A.   No.
8    Q.   Was there anything specific about the arrest,
9  that he felt threatened with specific bodily harm?
10    A.   No.
11    Q.   Dr. Thomas, would it be significant for you to
12  know that the officer specifically told Mr. Goosby that
13  he was being arrested for disorderly conduct?
14       MR. LEE:  Form, asked and answered.
15    A.   Yes.
16    Q.   And what impact would that have on your
17  opinion?
18    A.   Well, he established the basis of the arrest
19  being traumatic, because of being arrested for a
20  fraudulent check, although he hadn't done anything or
21  did not try to cash a fraudulent check.
22    Q.   And would it be significant for you, also,
23  that the officers told Mr. Goosby that he was not being
24  arrested for a fraudulent check?
25       MR. LEE:  Form.

Page 167

1    A.   Yes.
2    Q.   And how would that impact your opinion?
3    A.   I reiterate, he said the stress was because of
4  being arrested for trying to pass a fraudulent check,
5  and that's not what he put -- or that's not what he was
6  doing.
7    Q.   And is it also fair to say that if the
8  officers told him, multiple times, that he was not being
9  arrested for a fraudulent check, that that would impact
10  your opinion?
11       MR. LEE:  Form.
12    A.   Yes.
13    Q.   If the officers told Mr. Goosby that he was
14  not being accused of presenting a fraudulent check,
15  would that be significant to your opinion?
16       MR. LEE:  Form.
17    A.   Yes.
18    Q.   And how would that be significant to your
19  opinion?
20    A.   The experience and the symptoms associated
21  with it are based on the fraudulent check.
22    Q.   And if the officers told him that, not only
23  are they not accusing him, but that nobody at the bank
24  is accusing him of falsifying a fraudulent check, would
25  that be significant to your opinion?

Page 168

1    A.   Yes.
2    Q.   And how would that be significant to your
3  opinion?
4    A.   The basis of his trauma is the fraudulent
5  check.
6    Q.   Would it be significant to you that, during
7  the incident on March 3, 2017, Mr. Goosby told the
8  officers that he wanted to sue the bank?
9    A.   No.
10    Q.   Would it be significant to your opinion that,
11  during the incident on March 3, 2017, that the officers
12  told Mr. Goosby that they thought there could be a
13  mistake or a clerical error, that the bank was trying to
14  confirm?
15    A.   Yeah, he did tell us that.  I remember
16  Mr. Goosby saying, that, while he was under arrest, they
17  were checking on the check, and they came back and said,
18  no, it wasn't fraudulent.  So the answer would be yes,
19  and he did indicate that.
20    Q.   Okay.  Dr. Thomas, thank you so much for your
21  time.  I appreciate it.
22       Just one question, we had asked you several
23  times, and I just want to confirm on the record, whether
24  you wanted to keep going or come back another day, and
25  it's my understanding you wanted to finish the

Page 169

1  deposition tonight, is that correct?
2    A.   Yes.
3    Q.   Okay.  And if you wanted to come back, you
4  understand that we would have made that accommodation?
5    A.   I do.
6       MS. RIVAUX:  Those are all the questions that
7  I have right now, depending on whether Mr. Lee has
8  any kind of questions for you.
9            CROSS-EXAMINATION
10  BY MR. LEE:
11    Q.   Dr. Thomas, I know we talked about your
12  education history.  Can you share with us your work
13  experience after you left medical school?
14    A.   I was in the Army Reserves during my residency
15  training, so I actually joined the U.S. Army Reserves in
16  2003, right after I graduated medical school.  And
17  during residency, while I was training to become a
18  psychiatrist, slash, neurologist, I would do military
19  drills and military training, and I was paid to do so.
20       When I finished my residency in 2007, I was
21  deployed to Baghdad, Iraq, for a 90-day deployment.  I
22  was stationed at Camp Liberty and Camp Victory.
23       Immediately preceding that, I had taken a job
24  with the Federal Bureau of Prisons, as the chief
25  psychiatrist, and while I was deployed, I still remained

43 (Pages 166 - 169)

Page 170

1 in that position, and when I came back, I was in
2 position as the chief psychiatrist and maintained that
3 position until 2012.
4         During that time I had another deployment to
5 Afghanistan, for Operation Enduring Freedom.  I was the
6 officer in charge of a mental health unit.  During that
7 time, we would see soldiers who were, basically,
8 clearing roadways, IEDs and stuff, so they were going
9 out and clearing the roads, so when generals and so
10 forth go through, they didn't have the chance of getting
11 blown up by an IED.
12         So most of what we saw were soldiers, if they
13 got exposed to an explosion or something like that, they
14 would be brought in for stabilization and sent home if
15 they needed it.
16         In 2012 I was promoted to the clinical
17 director with the Federal Bureau of Prisons, and so I
18 managed the health care of the inmates at Federal
19 Detention Center, in Miami, and also, the mental health
20 care, I had a psychiatrist working under me, in that
21 position.
22         I did that for about 2 years, which is when I
23 was deployed again to the Middle East, and that too was
24 a part of Operation Enduring Freedom, and I was
25 deployed, at that time, for 6 months as an officer in

Page 171

1 charge of our behavioral health unit.
2         When I returned, I immediately, preceding that
3 deployment, I, actually, opened my private practice and
4 started part-time seeing patients, and when I returned,
5 that's when I resigned from the Bureau of Prisons and
6 started to do private practice full time.
7    Q.  So you said, since your time with your studies
8 and your time with the Army and the Bureau of Prisons,
9 you've had to evaluate various patients and their
10 medical status, including whether or not they had PTSD
11 or those types of symptoms, correct?
12    A.  Yes.
13    Q.  So you've been doing that, evaluating patients
14 to diagnose whether or not they've got PTSD, for how
15 many years now, would you say?
16    A.  15.
17    Q.  Okay.  So this isn't something you just
18 started a few years ago?  This is something you've been
19 doing for 15 years?
20        MS. RIVAUX:  Form.
21    A.  Yes.
22    Q.  Do you have any privileges with any hospitals?
23    A.  Yes, Broward Health North, Aventura Hospital,
24 Palmetto General Hospital.
25    Q.  Can you share with us when you began your

Page 172

1 privileges with the various hospitals you just described
2 for us?
3    A.  2013, in 2013, I had privileges at North
4 Shore, Aventura, and Palmetto Hospital.  I relinquished
5 privileges at North Shore, because they were
6 disorganized, so I just resigned my privileges there.
7 And Broward Hospital, I gained privileges there in
8 January 2017.
9         Also during this span, I had privileges at
10 Cleveland Clinic in Weston, Florida, so that was about
11 3 years, that I had privileges there.
12    Q.  Do you or any of your staff teach at any
13 universities or in any capacity?
14    A.  From time to time, I teach the residents at
15 Larkin Community Hospital, in Coral Gables, Florida
16 University, and the University of
17 Maryland, my alma mater, for residency.
18    Q.  So you go up to Maryland every now and then,
19 when it's not as cold, I assume?
20    A.  Yes.
21    Q.  Counsel had asked you about if witnesses made
22 certain statements about Mr. Goosby, including if they
23 said he lied and he was aggressive, etc., etc., if those
24 things would impact your diagnosis of Mr. Goosby.
25         Wouldn't you also need to know whether or not

Page 173

1 those witnesses are indeed credible, before you could
2 know whether or not their statements would impact your
3 diagnosis of Mr. Goosby?
4         MS. RIVAUX:  Form.
5    A.  Yes.
6    Q.  Do you know if the witness's counsel is
7 referring to, about what they said, do you know if those
8 witnesses are credible or not?
9         MS. RIVAUX:  Form.
10    A.  No.
11    Q.  Counsel also asked you about if you learned
12 Mr. Goosby had stress in collecting payments from
13 tenants, whether or not that would affect your
14 diagnosis.  Do you remember those questions?
15    A.  Yes.
16    Q.  Wouldn't you need to know the level of stress
17 Mr. Goosby is experiencing before you could make that
18 diagnosis?
19         MS. RIVAUX:  Form.
20    A.  Yes.
21    Q.  Did counsel explain to you whether Mr. Goosby
22 was significantly stressful, just slightly stressful, or
23 was just pissed off, that the tenants hadn't paid him
24 his rent?
25         MS. RIVAUX:  Form.

44 (Pages 170 - 173)

Page 174

1     A.  No, I didn't get into details.
2     Q.  So you would need those details, to really be
3   able to evaluate whether it had any impact?
4     A.  Yes.
5     Q.  And counsel didn't share those with you,
6   correct?
7     A.  Correct.
8     Q.  Did Mr. Goosby, in any of your visits, go
9   through a detailed, point-by-point explanation of what
10   happened at the bank?
11     A.  Yes.
12     Q.  Did he share with you whether or not he felt
13   threatened by the police officers before he was
14   arrested?
15     A.  I don't recall.
16     Q.  As you sit here today, do you recall
17   everything that Mr. Goosby said to you during those
18   visits?
19     A.  No.
20     MR. LEE:  That's all I have, Dr. Thomas.
21           REDIRECT EXAMINATION
22   BY MS. RIVAUX:
23     Q.  Dr. Thomas, just a few followup questions.  At
24   a minimum, you mentioned that you would want to know if
25   the witnesses were credible, right?

Page 175

1     A.  Yes.
2     Q.  And if Mr. Goosby didn't tell you about any of
3   that information, you would have no idea of whether he
4   was credible, right?
5     A.  Repeat the question.
6     Q.  Sure.  If Mr. Goosby didn't tell you about any
7   of the testimony that the witnesses in this case
8   mentioned -- strike that.  Let me rephrase.
9         If there is information that is contradictory
10   to Mr. Goosby's account, in this case, would that be
11   significant for you to know, in rendering your opinion
12   in this case?
13     A.  Yes.
14     Q.  And would it change your opinion in this case
15   if the testimony is contradictory to Mr. Goosby's
16   testimony and description of symptoms to you?
17     A.  It depends on the information.
18     Q.  But that's -- is it fair to say that that
19   information you would need to know, in order to render
20   your opinion?
21     A.  No.  I can still render my opinion based on
22   the information that was provided, but it would be
23   helpful in making considerations to other things.  I
24   don't think I really understood your question.
25     MS. RIVAUX:  Read the question back.

Page 176

1     (The requested portion of the record was read
2   by the court reporter.)
3     A.  I think I answered that question, and said
4   yes, and it was that last question, that doesn't make
5   sense to me.
6   BY MS. RIVAUX:
7     Q.  Okay.  Would you expect that Mr. Goosby gives
8   you full and accurate information in his self-report, in
9   order for you to provide an accurate diagnosis?
10     A.  Yes.
11     Q.  And if there are witnesses that contradict his
12   statements, that would be information that would be
13   important for you, in order to assess the accuracy of
14   your diagnosis, is that correct?
15     MR. LEE:  Form.
16     A.  No.  Because an individual assessment is based
17   on that individual.  We're talking about the business of
18   a private practice office.  So that's a hypothetical.
19   That's speculation.  That's hypothetical, and it's not
20   realistic in a private practice, so that's very
21   difficult for me to answer.
22     Q.  Because I thought we went through all the
23   different testimony of the different witnesses in this
24   case, and those factors, you did mention, would have
25   been significant to your opinion, is that correct?

Page 177

1     A.  You're asking me, very specifically, if those
2   people contradicting what he said, would that be a
3   factor in my decision?  It's not a possibility for those
4   witnesses to be a factor in his assessment, because it's
5   not realistic.  That's a hypothetical situation, that I
6   can't answer.  That calls for speculation.
7         And the other questions you asked me, if you
8   didn't know this, would that impact or would that be a
9   factor?  Those I can answer.
10     But to ask me specifically if a witness tells
11   me information that's very hypothetical, that's
12   unrealistic, I would not go to a witness, from the
13   circumstance to treat a private office patient, it's
14   unrealistic and it's a very hypothetical, and so I can't
15   answer that question.
16     Q.  But would you like to know information from
17   witnesses that may have contradictory evidence and
18   testimony --
19     A.  I can't --
20     Q.  Let me finish my question.
21     Would you want to know about testimony from
22   witnesses that may have contradictory evidence about and
23   testimony about the symptoms and stressors that
24   Mr. Goosby told you about, because it questions the
25   information that he gave you?

45 (Pages 174 - 177)

Page 178

1    A.  Again, I cannot answer that.  That's
2  hypothetical.  That is not a realistic circumstance, not
3  in a private practice office.  You do not have
4  information from witnesses from a situation.
5        That's called a breach of privacy, first of
6  all.  If he doesn't give me a release of information, to
7  speak to anyone, that's a breach of privacy.  So that's
8  hypothetical, and I can't answer the question.  It's
9  unrealistic under this circumstance.
10    Q.  And what about reviewing the deposition
11  testimony of the witnesses and making the assessment for
12  yourself?
13    A.  No, not in a clinical practice.  It's
14  inappropriate.  It's inappropriate.
15    Q.  So you wouldn't want to know if there is
16  credible contradictory evidence and testimony, that
17  contradict the statements that Mr. Goosby told you?
18    A.  Under ordinary circumstances, again, that's a
19  hypothetical situation, so I cannot answer that
20  question.
21    Q.  Well, I'm asking, in this particular
22  situation, would you want to have the testimony of the
23  witnesses, in order to make the assessment for yourself,
24  if what Mr. Goosby is telling you is the truth?
25    A.  And I'm telling you, this is a hypothetical

Page 179

1  circumstance you're presenting, so I cannot answer that
2  question.
3    Q.  I'm asking you specifically, in this
4  situation, would you want to know the credibility of the
5  witnesses, that you said it would be important to you,
6  to be able to assess the credibility of the witnesses,
7  to determine if Mr. Goosby is telling you the truth?
8        MR. LEE:  Objection, asked and answered.
9    A.  Again, it's a hypothetical situation.  I
10  cannot answer that question.
11        MS. RIVAUX:  Can we take a quick break?
12        THE VIDEOGRAPHER:  We're going off the record.
13  The time is 11:52 p.m.
14      (Off the record.)
15        THE VIDEOGRAPHER:  We're back on the record.
16  The time is 11:55 p.m.
17        MS. RIVAUX:  Dr. Thomas, thank you so much.
18  I have no further questions.
19            RECROSS-EXAMINATION
20  BY MR. LEE:
21    Q.  I have one question, Dr. Thomas.  When you
22  evaluate patients, do you have to go out and interview
23  the friends or families of people, to find out if those
24  people are making contradictory statements to what your
25  patients are telling you, in order to do your

Page 180

1  evaluation?
2    A.  No.
3        MR. LEE:  That's all I have, Dr. Thomas.
4        MR. YATES:  Read or waive?
5        THE WITNESS:  I would like to read.
6        THE VIDEOGRAPHER:  We're going off the record.
7  The time is 11:56 p.m.
8      (The videotaped deposition was concluded at
9  11:56 p.m.)
10            - - -

Page 181

1            CERTIFICATE OF OATH
2
3  STATE OF FLORIDA:
4  COUNTY OF MIAMI-DADE:
5
6     I, Chloe Leroux, Notary Public, State of Florida,
7  do hereby certify that Dr. Delvena Thomas personally
8  appeared before me on May 10, 2018, and was duly sworn.
9
10    Signed this 11th day of May, 2018.
11
12
13
14
15      _Chloe Leroux 05/11/18_
       _____
16        Chloe Leroux
        Notary Public - State of Florida
17        My Commission No: FF 63953
        Expires: 10/17/2021
18
19
20
21
22
23
24
25

46 (Pages 178 - 181)

Page 182

CERTIFICATE OF REPORTER

STATE OF FLORIDA:

COUNTY OF MIAMI-DADE:

I, Chloe Leroux, FPR, Notary Public, State of
Florida, certify that I was authorized to and did
stenographically report the deposition of Dr. Delvena
Thomas; that a review of the transcript was requested;
and that the foregoing transcript is a true and accurate
record of my stenographic notes.

I further certify that I am not a relative,
employee, or attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the parties'
attorneys or counsel connected with the action, nor am I
financially interested in the action.

DATED this 11th day of May, 2018.

_____
            Chloe Leroux, FPR

---

Page 183

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES HERE

IN RE:    James Goosby v. BB&T
CASE NO:  1:17-cv-23419-Altonaga/Goodman
DATE:     May 10, 2018
DEPONENT: Dr. Delvena Thomas
JOB NO.:  CS2914952

PAGE NO. LINE NO.  CORRECTION & REASON

7    _____  _____  _____
8    _____  _____  _____
9    _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____

22 Under penalties of perjury, I declare that I have read
   the foregoing document and that the facts stated in it
23 are true.
24

_____
25   DATE          Dr. Delvena Thomas

---

Page 184

Veritext Legal Solutions
290 W. Mt. Pleasant Ave. - Suite 3200
Livingston, New Jersey 07039
Toll Free: 800-227-8440  Fax: 973-629-1287

May 13, 2018

To:  Franz C. Jobson, Esq.

Case Name: Goosby, James v. Branch Banking & Trust Company

Veritext Reference Number: 2914952

Witness: Delvena Thomas       Deposition Date:  5/10/2018

Dear Sir/Madam:

The deposition transcript taken in the above-referenced
matter, with the reading and signing having not been
expressly waived, has been completed and is available
for review and signature.  Please call our office to
make arrangements for a convenient location to
accomplish this or if you prefer a certified transcript
can be purchased, which can be sent to you or the
deponent directly.

If the jurat is not returned within thirty days of your

receipt of this letter, the reading and signing will be

deemed waived.

Sincerely,

Production Department

cc:  Brian P. Yates, Esq.

    Jermaine Andre Lee, Esq.

---

47 (Pages 182 - 184)

**[& - 600]**                                                                                    Page 1

| & |
| --- |
| **&**   1:7,18 2:9 4:9 4:13,21 149:20 183:6 184:6 |

| 0 |
| --- |
| **01/24/18**   3:20 46:22 |
| **07**   32:3 |
| **07039**   184:2 |
| **08/09/17**   3:17 44:7 |

| 1 |
| --- |
| **1**   4:6 |
| **10**   1:15 4:2,5 12:16 32:9 37:4 41:7 181:8 183:4 |
| **10/17/2021**   181:17 |
| **10/25/17**   3:18 46:4 |
| **100**   51:3 109:6,7 |
| **10:17**   124:4 |
| **11:21**   164:18 |
| **11:31**   164:21 |
| **11:52**   179:13 |
| **11:55**   179:16 |
| **11:56**   1:16 180:7,9 |
| **11th**   181:10 182:18 |
| **13**   10:23 184:4 |
| **14**   32:3 |
| **15**   41:8,21 50:24 64:24 171:16,19 |
| **150**   28:24 29:11 |
| **16**   9:23 21:4 147:23 149:1,16 |
| **169**   3:5 |
| **174**   3:6 |
| **179**   3:6 |
| **18**   11:13 |
| **181**   3:7 |
| **182**   3:8 |

| 183   3:8 |
| --- |
| **184**   3:9 |
| **1988**   21:21 |
| **1999**   21:25 |
| **1:17**   1:3 183:3 |

| 2 |
| --- |
| **2**   9:21 17:14,18 18:2 20:10,22 23:18 25:14,18 29:5 143:15 170:22 |
| **20**   12:6,7 17:3 31:9 41:19 |
| **2003**   22:3,4,20,24 169:16 |
| **2006**   22:11 |
| **2007**   5:25 22:8,21 22:24 169:20 |
| **2012**   23:13 24:1 170:3,16 |
| **2013**   172:3,3 |
| **2014**   5:25 |
| **2016**   5:23 21:1,1,2 31:17 |
| **2017**   21:5 27:1 40:9 46:11 47:21 47:22 62:4 114:3 114:20 115:1,5 128:21,22 141:17 160:11,23 163:2 163:11 168:7,11 172:8 |
| **2018**   1:15 4:2,5 9:21,23 43:22,23 47:4 48:1 90:15 147:23 149:1,17 181:8,10 182:18 183:4 184:4 |
| **22**   148:2,10,18 |
| **23419**   1:3 183:3 |

| 24   43:23 47:4 48:1 90:15 |
| --- |
| **24th**   43:24 150:7 151:25 152:15 |
| **25**   46:11 77:20 141:17 |
| **25th**   141:24 143:17 |
| **26**   77:21 |
| **2699**   7:14 |
| **290**   184:1 |
| **2914952**   184:7 |
| **2941**   5:17 |

| 3 |
| --- |
| **3**   25:6 114:3,20 115:1,5 127:9 128:22 160:11,23 163:2,11 168:7,11 172:11 |
| **30**   12:12 25:6 40:18 69:10,11 |
| **301**   2:5 |
| **305**   2:11 |
| **306**   2:4 |
| **3100**   1:18 2:10,15 |
| **3200**   184:1 |
| **33**   23:7 |
| **33130**   2:11 |
| **33131**   2:16 |
| **33134**   2:5 |
| **33312**   5:18 7:15 |
| **33315**   2:20 |
| **3rd**   2:20 |

| 4 |
| --- |
| **4**   17:17 18:1 22:7 43:22 50:6 51:1,2 114:13 116:8 127:8 143:13,15 143:16 145:10 |

| 40   11:12 17:5 25:14 50:24 81:21 81:23 |
| --- |
| **44**   3:15,16 7:5,8 9:18 |
| **45**   3:16 17:5 40:16 44:4,5,6 47:7,11 50:25 128:20 131:7 |
| **46**   3:18,18,19 46:2 46:3 47:7,11 141:16 |
| **47**   3:19 46:16,20 46:21 47:7,12,15 |
| **48**   123:21 |
| **4th**   23:8 |
| **4tr**   127:8 |

| 5 |
| --- |
| **5**   3:5 10:21 23:20 26:11 49:21,22,23 50:10,12 97:25 98:7,17,20 99:9 102:7 106:4 119:20,22,25,25 120:13,16,17 121:15 123:24 124:6,8,14,18,20 124:24 125:19,25 126:5 127:8 147:10 |
| **5/10/2018**   184:8 |
| **50**   40:17 105:15 |
| **500**   2:20 12:4 66:24 |
| **536-8861**   2:11 |

| 6 |
| --- |
| **6**   17:17 170:25 |
| **60**   11:12 |
| **600**   2:15 |

**63953** 181:17
**6:24** 1:16 4:5

**7**

**7** 3:15 23:19 52:10
52:15
**7:15** 37:20
**7:23** 37:23

**8**

**80** 1:18 2:10
**800** 28:24,25 29:2
30:14
**800-227-8440**
184:2
**8:50** 93:3
**8th** 1:18 2:10

**9**

**9** 27:1 40:9 62:4
128:21
**90** 29:5 169:21
**911** 99:1
**973-629-1287**
184:2
**99** 21:23
**9:07** 93:6
**9th** 141:25 143:12
145:10

**a**

**abarca** 2:24
**ability** 80:24 90:22
**able** 42:4 74:11,13
80:12 81:13 89:11
102:23 103:3,23
104:8 107:1 122:4
132:4 134:16
136:12 144:23
158:10 159:1
160:7 162:20
164:6 174:3 179:6

**absent** 74:14
**absolutely** 38:20
155:13
**abuse** 33:19 41:11
122:1 128:2,5,18
137:16,19
**abuses** 128:18
**accept** 29:7 85:8
**accepted** 21:23
107:7
**accommodation**
169:4
**accompanying**
42:20
**accomplish** 184:15
**account** 175:10
**accuracy** 51:15
109:8 176:13
**accurate** 8:4,6,10
8:18 9:6,9,12,13
42:18,20 48:19
49:5 72:12 75:9
84:8 109:6 176:8
176:9 182:10
**accurately** 6:8
**accusation** 96:10
162:4
**accused** 91:21
95:15 133:13
146:7 167:14
**accusing** 167:23
167:24
**achieve** 25:19
56:23
**acquire** 21:22 42:4
54:17 55:8
**acquired** 22:9
**acquiring** 53:24
56:15
**action** 162:1
182:15,16

**actions** 153:15
**active** 12:4 137:23
**activity** 127:12
**actual** 121:8 140:6
156:9
**acupuncture** 31:7
**acute** 68:19 69:9
69:12,13 72:18
74:6,12 75:7 76:3
**add** 11:18 43:5
**addiction** 39:9
138:12
**addictions** 25:22
**addictive** 39:8
**addition** 20:10
31:14 38:17 121:9
**additional** 17:16
17:16 19:12 43:4
92:24,25 105:3
109:18,24 140:21
142:11 153:7
**address** 5:16 8:8
8:10
**adhd** 11:18
**adjectives** 65:16
66:6 67:20 73:4
**adjust** 37:15
**admin** 144:4
**administration**
21:23
**adrian** 20:17,20
20:22 21:3 40:23
**adult** 23:2
**adults** 11:13
**adverbs** 73:4
**advise** 26:13
150:11
**advised** 26:16
**advocate** 146:20
**affairs** 52:11

**affect** 106:24
158:18 173:13
**affiliations** 4:15
**affirmed** 5:7
**afford** 143:9 144:8
144:23 145:2
**affordability**
90:24 144:12
**afghanistan** 59:1
59:13 170:5
**african** 11:10
**age** 11:13
**aggressive** 172:23
**agitated** 106:22
151:15
**agitation** 136:12
**ago** 9:21 29:23
43:22 47:14
114:13 171:18
**aid** 59:20
**ailment** 108:1
**ailments** 36:16
**alcazar** 2:4
**alcohol** 138:1,6,12
163:22 164:4
**allegedly** 95:5
**allen** 1:18 2:9 4:12
4:21
**allergies** 33:21,21
**allowed** 19:20
**alma** 172:17
**alprazolam**
142:15,17
**altonaga** 1:3 183:3
**american** 11:10
24:10 126:14,15
155:16,23 156:3
156:23
**amount** 19:13
25:17 40:2 43:1
69:8 78:22 118:17

121:7
**analysis** 110:2
**andre** 184:25
**anger** 62:10,15
  79:20 81:25 89:24
  90:6 136:10,19
  140:9 157:22
  158:5,6,8
**angry** 79:3,4,20,23
  79:24 101:1
  136:22 140:3,20
**anhedonia** 134:6
  134:20 135:11,15
  135:16,24
**answer** 6:7 9:5
  54:4,5 56:9 67:16
  75:19 80:12,14
  85:14,15 107:2,13
  116:5 126:20
  128:8 168:18
  176:21 177:6,9,15
  178:1,8,19 179:1
  179:10
**answered** 103:7
  104:4,5 109:4
  120:12 126:21
  133:22 166:14
  176:3 179:8
**answering** 6:10
  84:9,10
**answers** 55:20
  56:19,24 79:17
  107:23
**anxiety** 11:17 15:8
  52:15 62:9,15
  66:10 81:24 126:2
  164:2
**anxious** 64:9
  107:12,16
**anybody** 10:7,10

**anybody's** 59:1
**anyway** 91:25
**appear** 49:13
**appearances** 4:15
**appeared** 106:23
  106:25 181:8
**applicable** 35:24
**applied** 71:23
  87:16 135:22
**apply** 16:18 55:21
**appointment**
  57:16,18 144:1,5
  144:24 152:4
**appreciate** 77:13
  132:9 168:21
**appreciation**
  98:13
**approach** 9:15
**appropriate**
  106:25 144:13
**appropriately**
  107:2
**approximately**
  5:23
**area** 22:16
**army** 18:16,17,24
  169:14,15 171:8
**arnp** 13:7
**arrangements**
  184:14
**arrest** 7:18 68:9
  81:21 83:23 84:12
  84:17 86:1,15
  93:24 94:2,20,20
  94:21 95:2,21
  96:24 97:3 100:6
  101:21 110:14
  129:4,16,21 130:1
  130:4,5,14 132:13
  143:21 160:19
  161:23 165:1,18

166:8,18 168:16
**arrested** 81:15
  82:21 83:1 91:25
  92:3,12,15 93:13
  93:20 94:5,15,18
  94:22 95:4,5,9,14
  95:17,24 96:2,4,13
  96:15,17,20 98:19
  99:22 100:15,19
  101:14,23 104:1
  104:10,14,15,16
  104:18,19,21
  105:12,13,15,17
  105:20,21,24
  110:13 111:4
  127:12,17 128:22
  129:13 133:3,8,11
  133:18,19 134:17
  140:4 146:7
  162:15 165:8,9
  166:13,19,24
  167:4,9 174:14
**arrests** 104:17
  105:5
**ascertained** 13:12
**aside** 101:19
**asked** 16:5,6 47:19
  53:3 56:13 63:3
  63:25 79:16 92:8
  97:2 104:4 107:3
  108:8,20 113:23
  117:17 120:13
  127:25 128:7,9,17
  133:22 138:13
  155:3 156:15
  166:14 168:22
  172:21 173:11
  177:7 179:8
**asking** 103:2
  107:23,25 108:13
  108:21,24 109:3

116:3 136:24
  138:9 177:1
  178:21 179:3
**aspect** 87:24 88:23
  100:14 133:10
**aspects** 66:14 67:2
  101:20,21 116:9
**aspire** 21:11
**assess** 59:7 101:12
  105:6 106:13
  123:4 176:13
  179:6
**assessed** 44:22,23
  45:9,17,19
**assessing** 52:6
  59:8 109:23
  146:14 152:6
**assessment** 45:11
  46:10 48:19 49:6
  49:12 51:7,17,20
  53:15 56:12 71:7
  89:16 94:16 95:1
  95:22 96:1,3,11,25
  97:3,4,11 100:2,23
  102:22 106:13
  107:12,20 109:18
  112:14,16 115:16
  116:16,23 117:1
  117:16 122:2,4
  127:16 135:17
  148:8 151:22
  152:6 176:16
  177:4 178:11,23
**assessments** 23:12
  60:8 87:15
**assist** 59:7
**assistant** 13:6,21
  14:25 15:14 17:11
  17:12
**associated** 130:9
  139:14 167:20

**association**  9:3
  126:14,16 155:17
  155:23 156:3,23
**association's**  26:3
**assume**  6:17
  150:20 172:19
**assuming**  15:14
  44:22
**assumption**  74:22
  74:25 148:22
**asymptomatic**
  152:14
**attempting**  95:6
**attended**  21:18,21
  26:1
**attending**  4:14
**attention**  141:15
**attorney**  26:5
  146:6,20,24
  150:15,15 182:13
**attorneys**  146:5
  147:18,20,23
  148:1,9,15,17,19
  148:21 182:15
**attribute**  118:11
**august**  21:25 27:1
  40:9 62:4 128:21
  141:25 143:12
  145:9
**authored**  44:14
**authoritative**
  50:13 51:1 155:19
**authorized**  182:7
**authors**  126:10,12
**automatically**
  150:20
**available**  49:2,15
  109:22 184:12
**ave**  184:1
**aventura**  171:23
  172:4

**avenue**  2:4,15,20
**average**  27:18
**averages**  12:6
**avoid**  139:8,10,12
  139:13,18,20
**avoidance**  138:19
  138:21 139:24
  140:5
**avoided**  140:2
**avoiding**  140:13
**aware**  55:1,3,5
  84:25 112:19,20
  112:23,24 113:2
  123:15,18 149:17
  152:23 156:8,9,9
  156:11,12,14,16
  156:20,22 157:13
  157:18 159:11

## b

**b**  3:12 5:18 130:22
  133:24,25 137:10
**ba**  21:21
**baby**  99:3,7,8,13
  99:14,16
**back**  9:22 16:19
  37:22 61:2 62:17
  75:13 77:18 93:5
  121:19 124:3
  125:21 132:11
  136:24 143:13,15
  143:16,17 145:10
  145:11,14 152:15
  152:24 164:20
  166:4 168:17,24
  169:3 170:1
  175:25 179:15
**background**  21:13
  21:14
**baghdad**  169:21
**baltimore**  21:19
  21:22 22:6,24

**bank**  62:19 83:2,5
  83:7,10 91:20,23
  94:23,25 101:8
  108:14 114:15
  139:7,8,11,20,20
  139:21 162:14
  163:15,16 167:23
  168:8,13 174:10
**bankatlantic**  1:9
**banking**  1:7 4:9
  149:20 184:6
**bankruptcies**
  161:13
**base**  59:19
**based**  8:4 35:18
  38:3 39:7 48:16
  49:1,22 54:8,18,21
  55:7 57:14,14
  58:25 62:21,25
  63:14 64:24 70:6
  70:8 74:12 77:6
  77:14 79:25 80:14
  80:19 90:24 95:24
  96:22 100:13
  102:9 103:6,8
  106:3 109:12
  114:15 117:4,5
  118:23,24 122:8
  122:11 132:25
  133:2 143:9,10,24
  149:19 153:5
  162:18 164:2
  167:21 175:21
  176:16
**basically**  19:2
  25:19 31:19 39:8
  39:17 61:22
  106:15 134:9
  161:21 170:7
**basis**  11:25,25
  12:5 94:15,17

**95:13,20,25 96:3,6
  98:7 143:22
  166:18 168:4
**bazaar**  107:4
**bb&t**  4:23 7:18
  91:20 161:25
  183:3
**bearing**  104:18
  105:14,16 158:19
**began**  21:25
  171:25
**beginning**  17:1,2
  35:3 41:14 42:2,8
**behalf**  1:14 2:2,7
  2:18 4:17,20,22,23
  4:24 32:11
**behavioral**  7:14
  8:1,13 10:13,13
  30:25 44:14 123:8
  171:1
**behaviors**  153:15
  153:21
**believe**  7:21 25:13
  25:14 26:8 29:11
  34:12 47:21 52:23
  64:6 69:4 115:19
  117:9 119:3 135:1
  138:17 147:18
**believes**  99:22
  100:15,18
**best**  54:16
**better**  150:22
**beyond**  37:1 99:17
**bible**  50:15,17,19
**biology**  21:20,21
**bipolar**  113:15
**birth**  99:15
**bit**  21:14 55:18
**blind**  126:11
**blood**  25:25 36:18

**blown** 59:18 170:11
**board** 24:2,4
**boards** 24:15,18
**bodily** 165:24 166:2,5,9
**born** 33:24
**botox** 31:4
**bottle** 163:21 164:1
**bottom** 45:21
**brain** 102:19
**branch** 1:7 4:9 149:20 184:6
**breach** 178:5,7
**break** 6:21,22 75:4 93:8 130:12 179:11
**breakdown** 11:15
**brian** 2:9 4:23 29:21 184:24
**brickell** 2:10,15
**brief** 14:3,7,9,19 15:4 16:11
**bring** 36:2,3,7
**brings** 38:9
**broad** 94:22
**broadens** 125:7
**brought** 34:3 36:7 170:14
**broward** 171:23 172:7
**build** 43:9
**building** 27:12
**burden** 153:11,19 153:22
**bureau** 23:6,19 169:24 170:17 171:5,8
**business** 81:10 82:20 83:6,12,15

101:9 134:25 162:21 176:17
**busting** 157:23
**busy** 83:3
**butcher** 135:15
**byates** 2:12
**bye** 42:15
**bystanders** 94:24 101:5

**c**

**c** 2:1,19 20:13,19 20:19 134:3 137:10 184:5
**c407** 7:15
**call** 49:12 50:15,19 54:8 106:20 110:6 110:18 123:2,22 134:6 144:2,4 145:4,7 158:24 184:13
**called** 26:13 52:15 94:10,12 110:9 140:25 150:10 157:5,9 178:5
**calling** 123:23
**calls** 144:2,6,14 177:6
**camp** 169:22,22
**capacity** 72:1 172:13
**captured** 66:12 71:3,5,6,7
**car** 101:15 102:1 127:13 157:24 166:5
**care** 12:20 22:17 23:12 25:23 26:3 33:6 35:23,25 43:18,20 170:18 170:20

**case** 1:3 6:25 10:1 13:5 16:16,21 17:1 27:18 28:5,6 36:8,11 41:5,13 42:2,7 48:14 56:21 66:8 67:25 69:14 71:13 85:13 85:16 88:21,25 102:14,14 104:3 111:14,16,25 139:9 146:9,9 154:19,22,23 157:5,9,16,19 158:13 159:2,5,10 159:22 160:8,13 161:10 163:1,11 163:21 164:12 175:7,10,12,14 176:24 183:3 184:6
**cases** 12:14,15,15 12:22 13:9 27:13 27:15,20,24,25 28:1,2,10 29:5 30:14 31:15 32:11 32:13,15,25 35:4,5 37:8 38:6,9 48:7 110:4,24,24 112:18 139:18 154:10
**cash** 12:10 91:21 133:14,17 162:5 166:21
**categories** 15:15 15:16 120:25 121:4 130:18
**categorized** 126:1
**category** 121:6,18 130:22
**catholic** 21:20

**cause** 137:24 158:15 164:2
**caused** 81:18 83:15 97:13 161:6
**causes** 98:14 120:5
**causing** 61:4,6,14 61:17,18 99:14 117:18 118:4 119:15 137:16 158:8
**cc** 184:24
**cell** 101:23 102:11 127:15
**center** 23:7 170:19
**certain** 12:8 19:13 25:17 28:15 32:24 37:3,8 38:9 39:10 39:11,13,14,20 40:2 50:6 56:10 67:1 69:6,8 74:17 98:21 102:15 117:9 118:16,17 121:7,24 128:10 128:11 139:14 158:22 172:22
**certainly** 32:17 67:23
**certificate** 3:7,8 181:1 182:1
**certification** 24:2
**certifications** 17:16
**certified** 24:4 184:15
**certify** 181:7 182:7,12
**chance** 170:10
**change** 95:22 96:1 96:3,25 97:3,4,11 116:19 135:1 163:16 175:14

**changes**  120:6
121:2 124:19
125:21 164:1
183:2
**changing**  137:7
**charge**  28:22
127:17 170:6
171:1
**charged**  29:9
129:22 130:14
**charges**  129:17
**chart**  29:19 38:13
38:15 64:22 73:3
76:5 80:16 81:8
144:11,25
**charting**  88:13
**check**  36:19 91:21
91:22,23,24 92:21
92:22 93:13,16,20
93:20 94:6 95:6
95:10,25 100:20
102:2,3 127:18
129:3,5,7,8,8,15
129:19,23 130:1
132:24 133:15,16
133:17,19 140:5
154:6 162:5
165:17 166:20,21
166:24 167:4,9,14
167:21,24 168:5
168:17
**checked**  154:3
**checking**  168:17
**chemical**  24:11
**chief**  23:8,21,24
110:7 169:24
170:2
**child**  121:25
**childhood**  87:3
**children**  31:18

**chloe**  1:23 181:6
181:16 182:6,22
**choice**  25:20
**choose**  25:20,21
**chronic**  69:10
**cigarettes**  138:13
**circle**  107:22
**circular**  73:12
**circumstance**
105:11,19 119:12
129:11 177:13
178:2,9 179:1
**circumstances**
36:25 97:7 99:19
104:12,22 105:2,7
119:13 139:4,13
144:16 147:1
158:23 178:18
**cite**  126:9
**city**  2:10
**civil**  146:8,12,16
147:12 148:5,16
148:24 149:17
150:5
**claimed**  83:7
129:8
**clarification**  47:10
72:3
**clarify**  42:1 49:25
61:9,23,24 63:24
66:5 74:23 76:12
77:19 97:1 104:6
119:1 142:18
156:18
**classification**  39:6
**classifications**
39:3,7
**classified**  121:1
126:2
**classify**  126:3

**clearing**  170:8,9
**clearly**  117:19
**clerical**  168:13
**cleveland**  172:10
**client's**  26:14,17
**clients**  82:18 83:8
83:10 94:25 101:9
162:14,22 163:5
**clinic**  172:10
**clinical**  16:2 19:5
23:13,18,22 24:1
32:15 50:22 52:24
54:23 60:22 103:2
104:6 107:20
117:16 150:22
151:22 152:6
170:16 178:13
**clinically**  155:14
**clinicals**  19:1 20:6
20:7,8
**clinician**  74:19,22
74:24,25 144:6
145:15 147:11
**clinicians**  74:2
156:4,12,19,25
**closed**  152:19
**cloud**  150:22
**cmes**  25:14
**cocaine**  39:14
138:10
**coexisting**  25:24
**cold**  172:19
**collateral**  36:2
49:15,15 154:14
154:22
**collect**  16:15 122:6
**collecting**  33:18
163:3,6,12 173:12
**college**  21:18 22:2
24:12

**combination**
33:11 54:13 70:8
70:10,18 80:19
**combined**  68:4
**come**  11:6,16
28:21 29:6 37:10
38:19 42:8,16
43:3 57:15 63:10
91:1 110:24
121:18 143:10,13
143:15,16,17
145:10 152:24
154:3 155:1,3
168:24 169:3
**comes**  16:19 48:5
74:11 117:8
146:21
**comfortable**  50:9
**coming**  33:17
34:10 35:4 42:21
59:24 60:11,19
74:10 90:7 106:8
110:1 118:22
119:3,6,15 121:20
143:22
**comment**  82:9
**commission**
181:17
**commit**  67:7
104:15
**committed**  68:17
**committing**  95:5
**community**  54:15
69:19 81:16
134:19 172:15
**company**  1:7 4:9
10:15 30:21
149:20 184:6
**company's**  123:13
123:16

**complain** 106:12
131:2
**complaint** 42:19
110:7
**complete** 22:7
50:22 61:25 64:14
64:17 65:3,21
70:4,7 72:15
110:22
**completed** 18:21
23:3 46:11 47:3
184:12
**completion** 64:19
**complexity** 14:20
17:8
**complicated** 29:6
30:14
**comply** 26:19
143:5,5
**computer** 42:9
50:8
**concentrated** 19:1
**concentrating**
11:18
**concern** 14:21
17:1 110:7
**concerned** 36:22
**concerns** 43:7
114:22 154:21
**concluded** 180:8
**conclusion** 76:6,14
76:17,19 88:6
89:5 90:8 110:2
112:25
**conclusions** 86:11
**condition** 61:17
**conditions** 51:5
61:16,16,18
**conduct** 24:21
95:21,25 111:10
111:17,20 128:23

129:17,19,22
130:15 166:13
**conducted** 128:23
129:14
**cone** 98:10
**conference** 25:20
26:1,3
**confidence** 49:1
**confirm** 48:10
109:19 154:14
168:14,23
**confirmed** 29:24
52:12
**connected** 182:15
**connection** 84:20
148:19
**consequences** 81:2
**consider** 72:4
98:13 104:2,9
111:24,25 112:7
112:21 113:18,22
116:13,15 147:14
150:5 151:5,7,12
152:25 157:1
158:25
**consideration**
147:11 151:15
**considerations**
175:23
**considered** 21:19
37:12 69:13 77:9
77:9 98:14,15,17
98:20 99:8,11
102:7 103:25
107:7,9 112:5
113:7,9,13 126:5
129:17 137:4
159:9
**considering** 71:24
145:21,25 148:6

**consist** 14:7 18:24
**consistent** 113:11
**contact** 59:23
**contacted** 150:15
**contained** 73:10
**context** 107:6
156:24
**continue** 122:6
145:16 154:10
**continued** 143:6
151:22
**continuing** 24:25
25:1 158:14
**contradict** 176:11
178:17
**contradicting**
177:2
**contradictory**
175:9,15 177:17
177:22 178:16
179:24
**contraindications**
36:22
**contributing**
117:21
**controlled** 37:7
38:22,24 39:3,24
40:4
**convenient** 184:14
**conversation**
26:10 111:1
119:10
**cooperating** 130:2
130:13
**cooperative**
129:20
**coping** 15:9
**copy** 7:7 10:5
46:19 49:25
108:15

**coral** 2:5 172:15
**corporation** 1:8
**correct** 8:16 9:14
13:23 14:20 29:1
32:4,19 38:3,4,7
38:22 40:10 42:23
42:24 49:2,3
50:11 51:17,18
53:12 60:6,23
62:1,2,12 65:3,7
65:12,24 66:3,4,23
66:25 69:2,3
72:23 73:1,6,7,8,9
74:7,9 76:7,10,14
79:22 80:7,13,15
83:12,16,17 84:4
84:14 85:10,12
86:1,20 87:18
88:2,7,9 89:5 90:2
90:8 91:9 93:10
93:17 98:8 99:23
100:16,17,21
105:25 109:23
111:18 116:13,14
116:23,24 117:2
122:9 123:10
125:17 129:1
130:21 132:1
133:8,9,12 136:1
140:19 141:22,25
142:1,3,4 143:19
148:6 149:18,23
150:25 151:3,4
153:20 158:11,12
159:20 160:9
169:1 171:11
174:6,7 176:14,25
**correction** 183:6
**correctly** 72:9,10
107:13 153:18

corroborate 82:22
corroborative
 58:9
counsel 4:8,14
 147:2 172:21
 173:6,11,21 174:5
 182:13,15
county 181:4
 182:4
course 25:6 34:2
 62:13 143:7
courses 25:6
court 1:1 4:10 6:4
 6:12 9:22 75:16
 176:2
courtesy 110:6
courts 149:9
cover 30:8,11,12
 30:15
covered 30:6,7
cream 98:10
create 35:1 42:5
creates 161:21
credibility 179:4,6
credible 173:1,8
 174:25 175:4
 178:16
crime 95:5 96:7,8
 104:15
criminal 22:17
 146:9,12
criteria 57:10,20
 58:1 69:6 74:21
 75:22,24,25 108:7
 118:13 120:9,10
 120:14,15,17
 121:8,12,12,14,15
 121:17 124:7,8,21
 126:8 130:19,24
 133:24,25,25
 134:3,11,14 136:4

136:7,8,15,24
137:6,12,13,15,17
138:4,17 139:23
158:3 160:6,16
163:19 164:3
cross 3:5 169:9
cs2914952 1:25
 183:5
cuffs 130:8
current 5:16 32:17
 34:1 36:18 41:9
 83:8
currently 11:21
 12:1 24:21 43:17
 164:13
customers 163:15
cut 161:2
cv 1:3 183:3

**d**

d 3:1 5:14,17,17
 20:18 137:10
dade 181:4 182:4
daily 11:25 12:5
dame 21:18
danger 125:3
data 48:23 49:1
 122:7 154:14
 156:9
date 183:4,25
 184:8
dated 182:18
dates 47:16,24
 68:6 78:22
daughters 114:23
 159:6
david 2:8 4:21
day 12:8,16 31:9
 34:17,17 35:4,5,12
 57:6,9,14,15 59:22
 67:5 79:19,20,24
 83:3 105:16

106:21 114:17
137:20,21,21
140:18 150:8,10
163:21 164:1
168:24 169:21
181:10 182:18
daylight 94:23
days 12:9 68:13,15
 68:16,20 69:1,5,7
 69:10,11,17 72:20
 73:9,18,20,23,25
 74:14,18 75:21,25
 76:22,25 77:2,18
 77:19,20,21,24
 79:5,6,9,10,12
 184:18
dealing 15:7
dear 184:9
death 99:14
 159:23
december 21:4
 22:11
decipher 117:17
decision 71:24
 177:3
declare 183:22
decline 81:10
 82:20 83:6,12,15
 83:16
declined 160:20
deemed 98:11
 184:20
defendant 1:10,14
 2:7 4:8,18,20,22
defendant's 7:8
 44:6 46:3,21
defer 59:4 131:7
define 97:25
 120:13,15,17,20
defined 124:15
 126:23 127:8

138:4
defining 54:16
definitely 37:5
 125:23
definition 98:2
 119:19,21 120:9,9
 124:10 125:22
 127:1
degree 18:2 20:11
 22:19,21 48:25
delayed 140:25
 141:1,2,4,12
delivering 99:3,7,7
 99:13
delivery 99:16
delvena 1:13 3:4
 4:1,7 5:3,6,14
 44:15 181:7 182:8
 183:4,25 184:8
demonstrating
 153:14
denied 113:17
 128:1,2,2
denote 134:7
dentist 39:13
deny 128:4 138:15
department 23:5
 184:23
depend 14:17
 56:21 97:6,6
dependence
 138:12
depending 17:8,15
 30:20,22 50:5
 69:9 70:15 79:12
 99:10 124:11
 143:14 169:7
depends 12:8
 16:21 33:10 36:8
 36:11,11 40:5
 56:21 69:14 72:1

77:21 79:14 88:20
102:14,19 105:2
110:24 116:20
124:22 144:16
162:10,17 175:17
**deployed**  169:21
169:25 170:23,25
**deployment**  59:22
169:21 170:4
171:3
**deponent**  2:18
183:4 184:17
**deposed**  157:19
**deposition**  1:12
3:8 4:1,7,12 5:19
29:15,18 30:2
31:17 32:2,8
149:4 157:15
169:1 178:10
180:8 182:8 184:8
184:10
**depositions**  32:10
**depression**  11:17
81:24 113:4,12
**describe**  11:5 20:2
45:16 49:12 55:18
59:15 65:18 81:1
81:17 83:18 91:18
110:6,8,11 125:6
**described**  40:24
41:11 63:22 65:15
65:15 69:13 73:2
73:3 81:11,19,22
96:14 100:25
101:14,16 103:11
107:1 115:10
117:6 125:14
128:25 129:24
134:15 140:8
157:23 172:1

**describing**  8:1
63:19 66:7,8
116:21 121:20
135:10
**description**  3:13
8:7,8 93:9 129:1
175:16
**descriptor**  81:25
**desensitization**
102:15,23 103:3
103:10,17,23
104:3,9
**desensitizing**
103:19
**detailed**  174:9
**details**  42:25
174:1,2
**detect**  156:12,19
**detecting**  156:5
**detention**  23:7
170:19
**determine**  103:16
153:25 161:1
179:7
**determined**  93:17
123:3
**determining**  104:7
160:12
**developed**  54:12
106:23
**dfac**  59:17
**dgarbett**  2:12
**diabetes**  25:25
**diagnose**  71:20
171:14
**diagnosed**  113:14
**diagnoses**  49:21
69:6 76:1 111:13
111:22 112:4,5,8
112:11,22

**diagnosing**  49:9
104:8 109:5 112:2
124:8
**diagnosis**  34:13,23
34:24 48:6,9,10,11
48:13,17,23,25
50:4 51:11 52:18
56:25 57:4 58:1,6
58:8,9 59:2 60:25
61:10,12,21 65:23
66:3 68:19,20
69:5,9,16,22 70:9
71:6,17,18,21,22
71:24,25 72:11,14
72:16 73:10,16,19
73:22,24 74:6,12
74:16,17,20,21,25
75:1,6,8,20,22,23
76:3,3,21,21,23,24
77:4,5,6,6,9,10,14
78:21,24 79:1
80:1 87:16,19,20
88:3,5 89:3 90:7
91:15 103:20
106:4,8 108:5,19
109:20 110:3
111:10,18 112:18
112:21 113:1,20
116:20 117:1
118:14,18,23,24
122:8,12 131:2
135:23 136:3
137:11 140:19
172:24 173:3,14
173:18 176:9,14
**diagnostic**  49:19
109:22
**dictates**  90:23
**die**  99:14
**difference**  124:25

**different**  15:5 18:6
25:9 30:18,20
33:5 34:21,22
39:2 45:5,16,20
58:13,15 61:15,16
63:19 65:16,17
66:6 71:3 73:3
78:18 82:8 85:5
85:15 88:12 95:20
104:13 108:7
111:13 112:11
118:1,17 120:25
122:16 127:18
134:6 136:6 141:2
142:2 149:10
155:6 176:23,23
**differential**  48:16
61:10,12,20 71:24
71:25 111:10,12
111:14,15,18,21
111:22 112:4,21
113:1
**difficult**  105:6
119:14 156:18
159:19 176:21
**difficulties**  83:20
**difficulty**  11:18
62:9 80:2 110:14
156:12
**dig**  85:4
**dining**  59:18
**dinner**  28:18
**direct**  3:5 5:10
115:21
**direction**  107:2
**directly**  141:24
184:17
**director**  23:13,18
23:23 24:1 32:16
170:17

**discharged**  43:19
**disclose**  160:11
**disclosures**  3:15
  7:6,9 9:19 10:4,5
  10:8 149:5,8
**discovered**  81:7
  91:24
**discussed**  82:11
  111:16 112:10
**discussing**  34:23
  34:25 64:11
  124:10
**discussion**  14:7
  26:15 37:17 78:8
  123:25 150:16
**disheveled**  107:13
  107:14
**disorder**  113:15
  158:5
**disorderly**  95:21
  95:24 128:22
  129:14,16,18,22
  129:25 130:4,15
  166:13
**disorders**  25:25
**disorganized**
  172:6
**disrupting**  80:25
**distinction**  64:2
**distress**  81:18
  83:18,23 85:7,18
  91:1,6 160:10,20
  160:21,23 161:7
  161:17,22 162:11
**distressing**  125:12
**district**  1:1,1 4:10
  4:10
**disturbance**  89:23
**disturbances**
  11:19

**disturbed**  64:10
**division**  1:2 4:11
  15:12
**doctor**  33:5,6
  35:24 146:23
  153:12 155:15
**doctors**  36:4
**document**  7:20,25
  44:10,12,20 46:7,9
  46:25 47:2 136:21
  183:22
**documentation**
  32:24 33:2,3
**documented**  33:7
**documents**  29:17
  149:14
**doing**  42:17 44:18
  56:17 133:13
  134:24 135:8
  140:4 154:8 167:6
  171:13,19
**double**  126:11
**downtown**  23:7
**dr**  1:13 3:4 4:1 5:2
  5:6,12 6:24 37:25
  44:10,23 45:10,11
  91:8 93:8 124:6
  164:23 166:11
  168:20 169:11
  174:20,23 179:17
  179:21 180:3
  181:7 182:8 183:4
  183:25
**drills**  169:19
**drinking**  163:21
**driven**  109:12
**dropped**  129:17
**drt**  7:14,16 8:1,12
  10:12,13 11:16
  30:25 44:14 123:8

**drugs**  39:21
  137:24
**dry**  161:2
**dsm**  49:20,21,22
  49:23 50:10,12
  51:1,2 97:19,25
  98:7,17,20 99:9
  102:7 106:4
  119:20,22,25,25
  120:13,16,17
  121:15 124:6,8,14
  124:18,20,24
  125:19,25 126:5
  127:8,8,8,9 130:19
  140:25 147:10
**due**  81:14 82:21
  89:11 118:7 132:4
  134:16 145:11
  158:4 160:5
**dugs**  138:10
**duly**  5:7 181:8
**dysfunction**  120:6
  137:7 160:17,18
  162:12
**dysfunctional**
  160:19

**e**

**e**  2:1,1 3:1,12 5:14
  5:14,15,15,15,17
  20:13,13,17,18
  29:23 47:14,25
  137:11 142:21,21
**earlier**  15:19
  40:25 41:12 61:24
  62:24 64:12
  107:20 119:19
  143:18 159:12
  164:25
**early**  145:11
**earned**  21:20

**easily**  153:8
**east**  170:23
**editorial**  24:15,18
**education**  22:12
  24:25 25:1 169:12
**educational**  21:16
  28:16 33:25
**educators**  11:9
**effects**  24:12 42:12
**eight**  137:17
**either**  38:9 70:17
  71:5,15 87:2
  97:21 153:11
  163:15
**elaborate**  19:16
  99:12 128:14
**elderly**  31:18
**electronic**  38:12
  38:14
**element**  97:9,12
  161:21 162:10,19
**elementary**  77:1
**elements**  61:13
**embarrassed**
  101:1,6,11 134:13
  134:14
**embarrassment**
  62:14 81:15
  101:13 134:17
  163:19
**emotional**  128:18
**employed**  135:1
**employee**  182:13
  182:14
**employees**  10:22
**encounter**  47:19
  48:1 95:12
**ended**  115:17
**enduring**  170:5,24
**enforcement**
  95:12

[engaged - fact]                                                        Page 11

engaged  97:10
engages  122:4
ensure  29:20
  39:22 42:17 60:19
  144:6
ensuring  34:23,25
entail  25:3,4
entails  14:9
enter  45:24 144:24
  183:2
entered  53:4
entire  16:24 17:6
  42:17 106:13
entirety  47:8
environment
  138:25 139:19
environments
  139:4
episodes  113:12
errata  3:8 183:1
erratic  91:2
error  55:14
  108:24 112:20,23
  123:12 168:13
especially  117:22
esq  184:5,24,25
esquire  2:3,8,9,13
  2:14,19
essential  51:6
establish  162:21
established  153:13
  162:18 163:18
  166:18
estate  31:19
estrangement
  159:6
ethnicity  11:10
evaluate  171:9
  174:3 179:22
evaluating  171:13

evaluation  3:16,18
  3:19 7:17 8:14
  44:7,13 46:4,22
  180:1
evaluations  23:11
evening  5:12 35:6
event  43:5 98:1,3
  98:8,9,22 99:10,13
  101:1 103:12,14
  117:5,11,13
  118:11,12 119:4,7
  119:20 120:2
  121:21 124:11,13
  124:15,17,23,24
  125:1,4,6,8,11,13
  125:17,19,22,25
  126:5,7,18 128:9
  130:20,23 131:10
  131:20,24 133:4
  133:21 139:2
  141:6 165:1
events  98:15,16
  102:15 121:22
  127:24
everyday  81:2
evidence  106:7
  177:17,22 178:16
evoked  140:9
ex  158:25
exactly  63:18 78:2
  125:20 161:1
exam  151:13,16
examination  3:5,5
  3:6,6 5:10 106:11
  107:17 169:9
  174:21 179:19
examined  5:7
example  25:5
  36:13 53:15 79:2
  90:4 95:20 104:1
  126:24 135:12

139:6 161:3
  162:12
examples  59:15
  102:8 107:11
exception  9:9
exclude  60:14,17
  60:22 61:5,16
  102:23 103:3
  111:1 118:21
  138:2,4,6 150:6
  151:21
excuse  89:7
exhibit  3:15,16,18
  3:19 7:5,8 9:18
  44:4,6 46:2,3,16
  46:20,21 47:12,15
  62:12 123:21
  128:20 131:7
  141:16
exhibits  47:7,11
exist  87:7
existed  84:24
  104:22 105:2
  162:6
existence  117:23
exists  97:22 126:9
expect  139:8
  159:15 162:20
  176:7
experience  33:25
  34:1 42:23 49:18
  54:14,15,18,22
  59:3 62:25 94:20
  96:14 99:14
  102:15 120:4
  128:15 152:3
  167:20 169:13
experienced  99:21
experiences  121:3
  128:8

experiencing
  173:17
expires  181:17
explain  7:2 13:16
  14:23 39:5 57:12
  57:23 83:5 94:1
  134:22 173:21
explained  47:21
  47:22 89:10 100:6
  132:12 137:11
explaining  15:19
explanation  48:3
  112:3 174:9
explicitly  71:4,21
  87:9,11
explosion  170:13
explosions  59:17
exposed  102:16
  103:12 170:13
exposure  124:9,17
express  136:10,11
expressed  66:11
  165:2
expresses  136:10
expression  140:25
  141:2,5,12
expressly  184:12
extensive  34:4
eyeball  152:6

**f**

facials  31:4
facilities  19:18
facility  59:18
fact  68:4,24 73:19
  73:22 76:21 77:5
  77:8,9,11 84:16
  88:1,13 89:10,14
  95:3 100:7 105:17
  124:16 126:1,3
  128:14 161:12,15
  162:6

**factor** 81:11
101:19 102:24,25
103:1,18,19,22
105:23 106:2
164:4 177:3,4,9
**factors** 99:25
100:22 109:8
138:1 157:2
176:24
**facts** 76:7,9,11,13
76:13,16,18
183:22
**factual** 77:12,14
**failing** 159:18
**fair** 34:8,11 36:21
48:18,22 49:4
51:9,10,13 53:10
60:14,17 70:11,13
70:25 80:9 84:7
85:22 86:2,3
105:5 116:12,15
116:17,22 151:5,7
160:7 165:21
167:7 175:18
**fall** 5:23 98:25
**falls** 107:8
**falsely** 110:13
111:4 146:6
**falsifying** 167:24
**familiar** 8:22,24
39:2 55:11 109:2
123:12 126:6,9
140:24 141:3
155:16,22 156:2,6
**families** 179:23
**family** 59:23 80:25
81:6 82:2,2
114:18,19 115:8
**far** 9:22 85:19
142:6

**fashion** 71:23
**faster** 14:22 42:3
42:16,23
**fax** 184:2
**fcjlaw** 2:21
**fcjobson** 2:21
**federal** 23:6,7
32:12 169:24
170:17,18
**feedback** 34:18,20
**feel** 50:9 120:7
125:3 139:16
146:18,18,25
147:2
**feeling** 79:3,3
101:6 151:15
**felt** 43:6 79:20,23
79:24 101:11,15
101:22 106:20,22
127:6,11,11,24
132:19 133:25
134:14 163:11
165:2,7,24 166:2,5
166:9 174:12
**female** 11:12
**fence** 52:18 57:3
58:8
**ff** 181:17
**field** 24:24 25:5,10
50:13,15,17
155:19
**fighting** 31:19
**file** 38:11 145:19
146:15 147:5
148:1,16
**filed** 4:9 149:1,17
**filing** 129:5 145:22
145:25 147:17,21
148:8,24 150:18
**fill** 142:23

**filled** 56:5 154:4
**fillers** 31:4
**filling** 154:2
**finances** 144:19
160:17,20
**financial** 81:18
83:18,20,22,25
84:3,6,12,16,19
85:1,6,17,18,20,23
85:24 86:3 91:1,6
143:19,20 160:10
160:20,21,23
161:7,11,17,22
162:11,22
**financially** 182:16
**financials** 85:1
**find** 30:13 58:23
107:16 134:10
147:16 154:1
179:23
**finds** 155:24
**fine** 46:19 66:14
**finish** 6:6,6 65:1
87:23 168:25
177:20
**finished** 169:20
**firm** 4:16,20
**first** 5:7,14 8:10
9:25 12:3 23:24
26:25 33:17,17
34:5 40:8,15,15,21
41:1,4,15 49:10
59:20 62:4 64:9
66:15 78:20 82:12
82:12,14 91:16
95:12 100:9
106:21 107:21
111:11 118:24
120:12 121:12
122:5,9,11 131:1
131:16 132:15

142:2 145:18
146:7 147:19
149:3,13 151:9
178:5
**five** 31:15 32:11
77:20 121:17
**flashbacks** 130:25
132:7,8,9 152:17
**florida** 1:1,19 2:5
2:11,16,20 4:11
5:18 7:15 25:13
26:3 172:10,15
181:3,6,16 182:3,7
**focus** 41:23 121:11
**focused** 34:6
**focusing** 25:10
82:12 101:20
**follow** 118:9 148:4
**followed** 100:25
**following** 39:23
149:22
**follows** 5:8
**followup** 47:3
82:25 143:14
148:15 152:4
155:2 164:23
174:23
**foreclosed** 161:25
**foreclosure** 162:1
162:6
**foreclosures** 161:5
161:16
**foregoing** 182:10
183:22
**foreign** 1:8
**forensic** 23:11
**forensics** 22:17
**forget** 102:20
109:13
**forgets** 109:10

forgot 45:24
form 48:12 50:18
54:24 59:10 66:18
67:4,11 69:23
71:2,11,23 72:4
74:3,8 75:2,10,17
76:8,15,20 77:16
86:8 87:13 88:19
92:16 93:14 94:3
94:8 97:5 98:18
103:24 104:4,11
105:9 106:1
111:19 113:5,10
117:3,14 119:8,23
120:11 127:19
128:6 130:6,16
131:21 132:2,18
133:5,22 141:13
147:6 157:7,11,25
162:23 163:17
165:5,12 166:14
166:25 167:11,16
171:20 173:4,9,19
173:25 176:15
format 108:22,25
109:3
former 156:14
fort 2:20 5:18 7:15
27:16
forth 125:21
170:10
found 150:4
four 27:25 28:1
161:4,12,15
fpr 1:23 182:6,22
frame 40:2,6
franz 2:19 5:1
184:5
fraudulent 91:21
92:20 93:13,20
94:6 95:6,7,10,25

100:20 127:18
129:7,9,10,15,23
130:1 132:24
133:14,17,19
140:5 162:5
165:17 166:20,21
166:24 167:4,9,14
167:21,24 168:4
168:18
free 184:2
freedom 170:5,24
freezing 37:16
frequency 55:25
57:1 91:2
fridays 12:16
friend 159:24
163:22
friendly 28:17
friends 28:13
159:4 179:23
front 94:23 96:15
101:6
full 5:12 14:10
50:22 83:2,5 84:8
94:24 171:6 176:8
fun 134:25 135:9
functioning 11:9
53:22 81:3
further 179:18
182:12

**g**

g 7:13 8:1,7,18,22
gables 2:5 172:15
gad 52:10,15
gain 147:14
151:19 156:24
gained 172:7
garbett 1:18 2:8,9
4:12,21,21,21
29:21 32:3

gas 24:12
gather 19:20,21
gathering 49:14
general 86:25
99:16 113:24
171:24
generals 170:9
georgia 23:9
geriatric 11:14
getting 37:6 59:19
73:11 161:14
162:14,25 170:10
girlfriend 82:4,4
girls 21:20
gist 110:12 116:9
give 13:10 36:13
48:16 51:15 53:23
56:8 84:8 92:2
98:2 100:22
130:18 178:6
given 34:18 42:23
42:25 67:15
152:23
gives 176:7
giving 15:1 34:20
56:7
go 13:11 21:13
28:18 33:5 35:10
35:13 36:5 42:1
42:13,24 48:13
59:20 60:1 77:18
132:11 139:15,17
140:14 149:14
152:17 153:17
164:15 170:10
172:18 174:8
177:12 179:22
goes 140:15
going 6:1,17 7:5,7
7:12 33:5 37:19
39:17 42:10 44:3

46:1,15 49:6
59:21 61:2 73:24
74:5 85:15 93:2
102:3 120:19
123:21 135:14
138:18 139:20
141:16 145:19
147:4 153:17
164:17 168:24
170:8 179:12
180:6
good 5:12 93:1
142:6
goodman 1:3
183:3
goosby 1:4 4:8,25
7:6 26:25 27:4
29:9 40:7 41:3
43:12,17 46:12
47:5,8,17 62:3,7
62:23 63:3 68:7,8
73:17 75:8 77:25
78:11,16 79:9
80:21 84:6,16
86:5 89:18 90:5
90:14,20 91:9,15
91:16,19 92:14
94:15 95:16,24
96:12,17,20,24
97:2 99:21 100:5
100:10 102:23
103:3,10,23 104:1
104:9 105:4 106:5
106:8 107:19
111:7,11,17 112:3
113:3,14,19 114:2
116:1 125:10
126:25 127:23
131:2,16 132:17
132:21 133:7
134:10,21 138:15

139:23 141:11
142:5 143:8 144:7
145:13,18 146:3
147:4,17 148:14
149:1,17,20,21
151:6,20 154:25
155:5,9 157:5,22
160:10 161:12,15
162:1 163:2,11,14
163:21 164:10
165:1 166:12,23
167:13 168:7,12
168:16 172:22,24
173:3,12,17,21
174:8,17 175:2,6
176:7 177:24
178:17,24 179:7
183:3 184:6
**goosby's** 3:15 7:8
7:17 8:13 26:4,22
46:13 93:9 95:12
106:17 116:5
126:18 127:17
133:2 139:6
142:12 152:24
175:10,15
**governed** 49:21
**government** 32:12
**grabbing** 99:4
**graduate** 17:18
18:2 20:6,7,10
**graduated** 22:2,8
22:11,18 169:16
**grew** 33:24
**grocery** 139:12,13
**ground** 6:2
**grow** 128:11
**growing** 128:18
**gsarlaw.com** 2:12
2:12

**guess** 30:19 77:7
113:6 124:21
129:20
**gunshot** 98:24

**h**

**h** 3:12 5:15,17,18
**hair** 31:5
**hairs** 77:8
**half** 14:15 77:23
**halfway** 41:19
**hamilton** 52:15
**hand** 7:7
**handcuffed** 102:1
102:4,10 132:14
132:16 165:15
166:1
**happened** 62:16
64:11 83:25 85:19
88:16 101:2,17
131:11 139:7
140:11 174:10
**happening** 116:21
**happens** 99:10
**happy** 6:22
**harbour** 5:17
**hard** 6:12 118:3
152:18
**harm** 99:5 165:24
166:2,6,9
**harmed** 81:15
134:19
**head** 6:12,13
132:6
**health** 10:14,24
11:16 17:20,22
18:4,13,19,23 19:1
19:3,4,9 20:7
21:23 22:10,16,17
23:12 25:23 33:21
51:5 54:16 60:21
76:1 89:23 137:14

138:5 155:20
156:4 158:5 170:6
170:18,19 171:1
171:23
**hear** 67:13
**hearing** 98:23
131:3
**heart** 152:19
**heavier** 12:12
**held** 4:12 37:17
78:8 123:25 148:2
148:10
**help** 81:24
**helpful** 58:6,7
123:4 175:23
**helping** 15:5
**helps** 34:13 68:5
**hernandez** 2:4
**heroin** 138:11
**hesitation** 52:17
**hidden** 5:17
**high** 25:25 53:22
**higher** 11:9
**hire** 146:19 147:2
**hiring** 146:24
148:14
**hispanics** 11:11
**history** 13:10
16:16 19:20,21
21:17 33:18,19,20
33:23,24 34:4
35:18,18,22 38:2
40:25 41:9 42:8
50:22 51:8 61:25
89:22 113:17
114:1 169:12
**hiv** 36:17,19
**hmm** 19:23 64:15
72:21 121:13
123:1 138:20
149:6

**home** 5:16 15:7
59:21,24 113:24
114:3 115:24
121:25 128:19
170:14
**homes** 128:11
**homicidal** 144:17
**horn** 157:24
**hospital** 19:17
20:8 123:23
171:23,24 172:4,7
172:15
**hospitals** 171:22
172:1
**hour** 14:10,15,16
17:7 29:2 30:14
40:16 102:2
127:13
**hours** 19:5,13 25:6
25:14,17 29:5
148:2,10,18
**hpi** 76:11 77:2
128:25
**hyper** 121:2
**hypervigilance**
121:2 136:9,9
**hypothetical**
85:14 103:7,8
104:24 176:18,19
177:5,11,14 178:2
178:8,19,25 179:9

**i**

**ice** 98:9
**idea** 175:3
**ideation** 144:17,18
**identifiable** 88:8
**identification** 7:10
44:8 46:5,23
**identified** 29:5
62:20 66:1 78:11
78:12,19 88:6,9

89:19,19 90:17
100:10,12 131:16
135:21 136:2
160:19
**identify**  44:17
61:6,16 63:6
78:15 84:22 87:6
100:9 108:7
114:19 125:10
132:8 135:4,14,19
135:25 160:22
**identifying**  78:18
117:9 155:5,6
**ied**  170:11
**ieds**  59:17 60:3
170:8
**illicit**  137:24
**illness**  126:2
137:12,14 158:4,9
**illnesses**  52:15
118:15 126:3
**imagine**  60:3
**immediately**  85:23
169:23 171:2
**impact**  59:7 83:19
96:18 102:12
109:8 113:20
114:16 116:16,22
116:25 117:1
127:21 160:3,15
161:9,11 162:7
163:25 164:11
166:16 167:2,9
172:24 173:2
174:3 177:8
**impacted**  83:6
161:1
**impactful**  114:9
**impacting**  114:11
138:7

**impacts**  86:10
**implicitly**  87:12
**implied**  108:5
**implies**  88:14
**important**  6:3
51:4,6,19 60:9
61:25 65:2 70:12
70:14,15,16,21,23
71:1,8,10,14,16
72:4,11 80:9
84:18 94:14
105:23 121:21,23
155:12 176:13
179:5
**impossible**  119:5,9
160:22
**imprisonment**
7:19 8:23 9:2,10
**improved**  142:13
**improving**  142:9
**impulsivity**  136:11
**inability**  143:24
**inaccurate**  51:11
51:12
**inappropriate**
144:19,20 155:13
178:14,14
**incident**  81:14
84:7 85:23 86:3
87:8,10 88:17
89:12,17,20 91:18
93:9 100:10 101:3
129:3,7 131:18,19
132:4 134:16
139:7 152:17,19
157:2,24 160:2
161:3,4,6,16,18,25
162:7 168:7,11
**include**  31:10
33:16,23 34:12
35:17 38:5,18

45:3,14,21 61:25
66:16 68:24 69:1
78:12,16,21,22
82:6 86:19 87:18
88:1 89:4 108:2,3
**included**  40:21
47:24 65:23 68:21
70:19 78:22,25
79:21,25 82:8
87:19,20,21 88:3,4
94:25 100:1
111:14,16 140:17
140:20
**includes**  14:18
38:2 61:24
**including**  15:13
38:17 44:23 45:10
151:9 157:23
171:10 172:22
**incorrectly**  67:10
**indicate**  89:1
168:19
**indicated**  16:10
88:11
**indication**  9:25
148:25 149:2
**indirect**  56:15
**individual**  176:16
176:17
**inform**  159:18
**information**  7:16
8:9,12 9:20,22
13:12 16:16 33:16
34:21,22 35:11
41:1 42:5,19 43:3
43:5 49:4,14
51:16 53:4,9,11,25
54:17 55:8 56:16
57:2 60:4 63:12
63:12 68:6 69:21
69:25 70:4,5,6,6

70:14,19,19,20,22
70:24 71:1 72:2,4
72:15 74:7 77:7
77:11 80:10 82:23
84:8,17 85:3
87:14,17 89:5
90:4,9,10,11 96:22
105:3 106:3
110:21 114:15
115:14 122:6,9,10
135:22 140:21
141:23 142:11
144:22 147:5
153:7,24 154:18
159:15,18 175:3,9
175:17,19,22
176:8,12 177:11
177:16,25 178:4,6
**inherent**  75:23
**initial**  3:15 7:6,9
9:18 10:4,5,8 26:8
28:23,24 44:18
46:10 47:20 103:6
149:4,7
**initially**  23:25
**initiates**  49:10
**inmates**  22:17
23:12 170:18
**inner**  62:9 89:25
101:2 136:19
**innocent**  132:19
132:23
**inside**  101:23
102:4 163:15
**insinuation**  98:12
**instance**  39:12
115:17 143:12
151:24
**institute**  26:2
**insurance**  29:7
30:6,8,11,15,17,17

30:19,20 33:1
90:21,23,25 91:3,5
**intake**  44:18
**intending**  146:15
148:16
**intense**  81:16
**intensifies**  136:22
**intensity**  80:22
81:1,12,17,19,22
81:25
**intentional**  131:20
131:22
**intentionally**
131:21
**intentions**  146:22
**interaction**  54:3
**interactions**  36:20
**interest**  62:19
134:5,12,20,21,22
135:11,16,18
**interested**  182:16
**interfered**  81:6
**internal**  39:22
126:15
**international**
172:16
**interpret**  103:13
**interpretation**
55:8 102:10
**interpreted**  99:5
**interrupting**  137:2
**interview**  52:25
53:14 54:8,21
55:12,15 58:13,18
62:24 179:22
**interviews**  53:3
54:23 55:4
**intimacy**  115:24
**intrusive**  62:18
63:6,17,20,21,21
64:1,4,7,16 66:19

66:20,21,22 67:10
67:21,22 68:2,8,12
68:15,25 72:19
73:1,5,18 74:14
77:25 80:24 81:5
81:7,8 83:15
130:23,24 134:2
137:1,4,5
**intuition**  49:18
**investigator**
155:14
**invited**  96:24 97:1
**involved**  12:21
48:7,9 146:4
147:12 154:19,23
**involvement**  12:19
**iraq**  58:25 59:12
169:21
**irritability**  65:14
136:10,19
**islanders**  11:10
**isolating**  134:24
135:3,4
**isolation**  134:6
**issue**  14:21 86:25
88:11 104:16,18
104:19,20 105:12
105:12,20 118:4
129:19
**issues**  34:1 89:17
89:23 118:8
137:16,19 157:22
164:2

### j

**j**  20:13
**jacqueline**  20:13
20:20,22,24 21:6
40:21 44:14
**jail**  92:5,7,10,23
101:23,24 102:3,5
102:11,13 127:15

132:14,22 147:25
148:2,10,18,20,20
148:21 165:3,7,10
165:23
**james**  1:4 3:15
4:25 7:6,8 149:20
183:3 184:6
**january**  9:22,23
21:5 43:22,23,24
47:4,18 48:1 82:9
90:15 147:23
149:1,16 150:7
151:25 152:10,15
152:21 172:8
**jermaine**  2:3 4:24
184:25
**jersey**  184:2
**jewish**  11:11
**jlee**  2:6
**job**  1:25 23:5
33:25 113:24
115:1 169:23
183:5
**jobson**  2:19 5:1,1
184:5
**joined**  18:22
169:15
**journal**  24:10
113:2 126:14
**journals**  24:16,19
126:13,17
**judgment**  70:7
103:2 104:6 106:3
150:23
**july**  22:8
**jurat**  184:18
**justice**  23:5
**justification**  32:24
34:24
**justify**  71:18 72:11

**jwtflaw.com**  2:21

### k

**keep**  32:17 33:1,3
38:10,14 39:22
53:2 56:18 63:2
110:20 131:24
144:14 168:24
**killed**  59:19,22
**kind**  14:12 17:11
17:12 25:10 34:19
34:19 52:18 62:16
111:7 122:23
136:23 137:1
139:14 140:10
154:8,11 169:8
**knew**  96:16 101:7
101:8 147:18
**know**  6:16,21
18:18 19:5 25:9
25:15 27:4,8,10
29:9 36:3 40:11
40:14 49:24 50:9
51:4 54:20,25
55:14 57:1 58:3
60:24 63:10,11
64:1,20 72:9 77:2
79:3,10,11 80:8
82:7 83:8,11,16,21
84:18 85:20,21,22
86:2,21 87:1,3,14
90:7,10,13,16,18
91:3,5,7 92:18,18
92:24 94:14 96:20
103:15 104:24,25
105:1 106:23
108:19,20,21,24
109:25 113:14
119:5,12 126:10
130:8 133:23
143:18,20 146:21
147:10,25 149:7

149:11,13,15
150:21,21,24
151:2,8,19 156:16
161:5 166:12
169:11 172:25
173:2,6,7,16
174:24 175:11,19
177:8,16,21
178:15 179:4
**knowing** 56:16
75:22
**knowledge** 7:16
8:12
**known** 27:2
**knows** 16:25
**kuwait** 59:1

**l**

**l** 5:14 20:13,18
**lack** 14:21 155:24
156:4
**lapointe** 2:13 4:19
4:19 37:18 67:13
67:17 74:3 76:8
**larkin** 172:15
**laser** 31:5
**lastly** 6:20
**late** 161:14 162:25
**lauderdale** 2:20
5:18 7:15 27:16
**law** 4:16,19 95:12
150:12
**lawsuit** 9:16
145:19,22,25
146:16 147:5,17
147:21 148:1,5,8
148:16 149:1,18
149:25 150:2,5,18
150:20,23,25
151:3 152:23
**lawyers** 11:8
26:23 147:24

**lead** 164:1
**leading** 57:15
161:4
**leads** 64:6
**learn** 147:22
**learned** 173:11
**leave** 65:11 67:1
70:25 109:13
**led** 94:18 128:8
**lee** 2:3,4 3:5 4:24
4:24 26:4 46:17
46:19 48:12 50:18
50:20 54:24 59:10
66:18 67:4,11,15
69:23 71:2,11
74:8 75:2,10,17
76:15,20 77:16
86:8 87:13 88:19
92:16 93:14 94:3
94:8 97:5 98:18
103:24 104:4,11
105:9 106:1
111:19 113:5,10
117:3,14 119:8,23
120:11,19 127:19
128:6 130:6,16
131:21 132:2,18
133:5,22 141:13
147:6 157:7,11,25
162:23 163:17
165:5,12 166:14
166:25 167:11,16
169:7,10 174:20
176:15 179:8,20
180:3 184:25
**left** 64:16 65:13,22
71:6 127:13
169:13
**legal** 24:24,25 25:5
184:1

**legality** 39:8
**legitimate** 91:25
92:22 93:17,21
94:7 133:16
**length** 14:17
**lengthy** 57:25
**leroux** 1:23 181:6
181:16 182:6,22
**letter** 3:9 184:19
**level** 13:5,10 14:4
15:20 16:25 20:6
20:10 33:11,25
42:4,6 51:14
173:16
**liar** 157:5
**liberty** 169:22
**license** 25:18
**licensed** 38:24
**licking** 98:9
**lied** 172:23
**life** 60:18 82:10
113:19 115:19
116:10,11,21
117:5,11 118:19
121:22 125:4
126:24,25 127:2
127:11,24 137:8
165:3,11,15,19
**lifetime** 85:19
**lighter** 12:16
**lightly** 153:3,5
**limit** 39:11,17
**limited** 90:22
154:11
**limits** 106:20,21
107:5
**line** 183:6
**list** 63:2 111:22
**listed** 63:8 119:25
138:5

**listing** 98:20 102:8
**literature** 123:18
126:7 155:23
156:3,22
**litigation** 147:13
156:24
**little** 10:21 20:23
21:14 50:23 55:18
115:22 119:14
**lives** 60:10
**living** 139:15
**livingston** 184:2
**llp** 2:4,14
**load** 12:11
**location** 140:7
184:14
**log** 144:14
**long** 10:19 14:12
14:13 16:22 19:22
19:24 20:20 23:17
26:10 37:5,9,10,12
40:14 42:24 50:21
50:24 57:5,8 68:7
68:7 78:13 79:16
**longer** 29:3,4
126:2
**look** 14:1 29:11
35:21 44:16 61:15
63:18 82:21 87:5
147:11 153:24
154:13,14
**looking** 75:6 76:4
77:22
**loss** 31:5,5 62:15
62:19 134:5,12,20
134:21,22 135:11
135:16,17 162:21
**lost** 81:21,23
**lot** 11:11 27:13,17
30:10 53:24 54:2
60:4 83:4 94:23

111:13 118:16
124:19 131:5
139:10 162:17
**love**   115:23
**low**   134:9
**lying**   156:5,13,19

**m**

**m**   5:15 20:17,19
142:21
**m.d.**   4:7
**ma'am**   130:3
**madam**   184:9
**mail**   47:14
**mailed**   29:23
47:25
**main**   43:7,7 52:14
115:9
**maintained**   165:8
170:2
**majored**   21:20
**making**   48:5,9,11
50:3 58:6 60:8
66:3 71:25 84:21
90:7 94:15 100:23
103:19 175:23
178:11 179:24
**male**   11:12
**malinger**   151:19
**malingering**
147:15 150:6
151:6,12,21 153:1
153:2,2,5,9,11,15
153:20,23,25
154:15,21
**managed**   12:22
23:14 44:23 45:10
45:17,20 170:18
**management**
12:13,25 13:1,16
14:2,18,24 15:3
23:11 30:12,25

41:2,23,25 48:8
**manager**   91:23
**managing**   12:2,3
13:5 15:2 137:8
**manifestation**
141:6
**manipulator**
157:10
**manual**   49:20 50:8
120:21
**marathon**   6:20
**march**   9:21 114:3
114:20 115:1,5
128:22 160:11,23
163:2,11 168:7,11
**marijuana**   138:10
164:10
**mark**   7:5 44:3,5
46:1,15 123:21
**marked**   7:9 44:7
46:4,22 141:16
**markenzy**   2:13
4:19
**markenzy.lapointe**
2:16
**martinez**   2:4
**maryland**   21:19
22:5,6,23 172:17
172:18
**massage**   31:4
**master's**   17:14
21:22 22:9,15,19
**mater**   172:17
**materials**   30:3
**matriculated**
21:25
**matter**   4:8 8:2
57:5 85:6 96:7
104:23 127:16,20
146:14,17 147:4
157:4,6,8,21 158:1

158:2 161:16
184:11
**max**   11:14
**mccray**   20:19
**mean**   11:23 13:18
13:19 16:12 22:14
25:4 28:8 45:24
49:24 57:17 58:17
66:9,12 77:19
78:22 79:12 80:6
102:17 111:20
116:18 120:20
123:6 138:3
139:10 142:8
**means**   12:14 16:14
45:1 79:10
**meant**   57:13 68:2
79:9,11 130:1
144:11
**mechanisms**   15:9
**med**   12:13,24,24
**media**   4:6
**medical**   3:16,18
3:19 21:24 22:1
22:19,21 23:14
25:1,10 26:3
33:20 36:6 38:1
39:14 41:2,11
44:6,13 46:3,21
59:19 66:2 69:19
86:20 137:16
140:18 141:17
144:11,13,22
169:13,16 171:10
**medication**   13:1
14:2,6,7,18,24
15:3 16:3,9 23:11
30:12,24 34:7
36:19,23 41:2,23
41:24 42:11 43:9
48:8 110:15 111:5

142:19,19,24
150:8 154:2,7
**medications**   33:22
36:17 37:3,11
39:21 142:14,16
**medicine**   22:2
64:23 126:15
153:4
**meet**   25:11 26:25
57:10,20 69:6
75:24 121:7,15
136:4,7,17 137:12
137:13 160:6,17
**meeting**   35:3
**melancholy**   134:6
**members**   80:25
82:2,2 123:8
**memories**   64:11
**memory**   63:12
64:22 67:7 68:18
108:14 120:19,21
**mental**   7:17 8:13
10:14,24 11:15
17:19,22 18:3,13
18:19,23 19:1,3,9
20:6 23:12 25:22
51:5 54:16 60:21
76:1 89:23 106:11
108:14 137:14
138:5 151:13,16
152:7 155:20
156:4 158:5 170:6
170:19
**mentally**   111:23
**mention**   74:5 80:4
114:8,22,25 115:4
124:17 146:5,6,8
176:24
**mentioned**   17:10
30:13 31:16 32:1
35:17 38:1,21

43:11 51:9,22
53:9 55:17 56:22
58:7 59:6,12
62:24 63:6 64:12
66:15,20,24 67:19
72:7,18,22,25 73:8
78:10 80:21 82:1
86:13 93:16 99:20
100:5 107:20
111:8 112:10
116:7 132:7,12,14
149:4 159:12
164:25 174:24
175:8
**mentions**  146:24
**merger**  1:8
**mesa**  20:17,20
40:23
**met**  26:4 40:8,11
74:21 75:24
133:25 134:10
136:7,15 139:23
**method**  109:5
**methodology**  49:8
**miami**  1:2,19 2:11
2:16 4:11 21:8
23:6,7,9 27:18
170:19 181:4
182:4
**michael**  2:24
**mid**  13:5,10 14:4
15:20 16:25 33:11
42:4,6
**middle**  170:23
**military**  19:6
33:25 59:3 169:18
169:19
**million**  66:10
**minimum**  17:17
25:14,15,16
149:16 174:24

**minute**  61:2
132:11
**minutes**  17:3,5,5
26:11 29:5 40:17
40:18 41:7,8,19,21
50:24,24,25
123:24
**misrepresent**
156:16
**misrepresented**
106:3
**misrepresenting**
153:6
**missed**  144:3,5
**missing**  29:22
**mistake**  75:1
168:13
**mistakes**  74:2
**misunderstanding**
111:21 165:4
**misunderstood**
15:22
**mix**  56:12
**mm**  19:23 64:15
72:21 121:13
123:1 138:20
149:6
**mnpi**  52:17
**modalities**  15:5
138:5
**module**  53:18
**moment**  121:20
151:12 164:16
**money**  163:3,6,12
**month**  27:19,25
28:1,5 29:22,23
47:14 77:21,22,23
79:13 91:2 141:8
161:25 162:7
**months**  9:21 18:25
20:1 43:22 68:10

141:9 161:4
170:25
**mood**  106:14,24
120:7 121:3 134:4
134:5,7,8,9,9
136:5 164:1
**morgan**  22:10
**move**  162:25
**moved**  27:16,23
28:3
**mt**  184:1
**multiple**  36:17
61:18 167:8
**mustard**  24:12

---

**n**

**n**  2:1 3:1 5:14,15
5:17 20:13,18
142:21
**name**  5:13,14,15
20:12,13,18 52:21
52:22,23 184:6
**names**  20:16
126:12
**naturally**  99:8
**near**  99:14
**necessarily**  57:1
63:9 64:3 70:14
95:4 118:10
119:11 139:9
140:6 162:16
**necessary**  19:6
48:23 68:23 113:1
**need**  6:21 17:19,21
17:21 18:3 19:5,8
19:14 36:18 40:2
57:1 59:1 60:20
60:24 69:20 70:2
70:3 72:19 105:3
108:19 110:15
111:4 118:20,21
126:4 138:2

172:25 173:16
174:2 175:19
**needed**  71:17
83:21 136:7
142:15 146:19
150:5 170:15
**needing**  75:22
81:24
**needs**  33:4
**negative**  134:4
136:5
**negotiate**  30:18
**nervous**  107:12,17
**neurologist**  169:18
**neurology**  22:5,7
24:5
**nevada**  26:2
**never**  41:24 55:25
65:1 74:2 87:3
92:24 142:24
143:2,5
**new**  20:18 31:14
44:13 47:25 87:1
87:4 88:10,11,14
88:15,15 89:6,9,13
89:24,25 90:1
98:25 117:24
118:5,6 161:23
184:2
**nightmares**
130:25 131:2,4,6
**nights**  80:3,4,5,5,6
**nod**  6:12
**normal**  106:20,21
106:24 107:5,9,9
107:14 151:14,17
152:8
**north**  171:23
172:3,5
**northeast**  23:8

**notary** 181:6,16
182:6
**note** 16:18 29:25
47:3,3 53:5 54:6
66:13 73:7 82:8,8
108:9
**notes** 29:20,22
33:8,14 34:16
35:7,10,13 63:19
65:1 108:3,4
110:1,18 111:1
134:15 147:19
164:16 182:11
**notice** 106:17
**noticed** 91:11
134:2
**noticing** 42:12
**notification** 3:9
**notre** 21:18
**november** 47:22
**number** 150:14
184:7
**numbing** 121:1
**nurse** 13:7,21
14:25 15:14,21,23
16:6,7,20 17:11,23
17:24 18:9 20:2,3
20:4,4,15,17 21:9
21:10,11,12 23:14
34:16 35:14 40:23
42:18,22 43:2
48:6,15 112:11,13
144:2 152:1,2
**nurses** 11:8
**nursing** 19:18
21:9

**o**

**o** 5:15,18 20:18
142:21
**oath** 3:7 181:1

**objection** 67:15
179:8
**objective** 58:23
71:5 97:20 106:7
**objectives** 71:4
**observations**
38:18
**obviously** 90:10
**occupation** 11:8
**occur** 55:25 69:7,8
**occurred** 62:17,18
68:10 105:16
114:14 139:1
141:7 160:24
161:23
**occurring** 69:1
74:14,18 118:19
119:2
**october** 46:11
141:17,24 143:17
152:13
**odd** 94:5
**offensive** 153:4
**office** 9:4 11:24
12:1 19:18 27:5
27:12,16,23 28:3,9
29:6 30:1 31:14
34:3 43:19 50:1
123:11 137:21,22
144:4 145:15
149:14 176:18
177:13 178:3
184:13
**officer** 166:12
170:6,25
**officers** 166:23
167:8,13,22 168:8
168:11 174:13
**offices** 1:18
**oftentimes** 56:11

**oh** 15:18 42:13
82:14 116:24
142:25
**okay** 6:9,18,19,23
7:5 8:20,25 9:15
10:3,12 13:3,14
14:12 15:22 16:1
16:12 17:10 20:15
23:22 26:15,19
30:1 35:12 36:9
38:14 45:6,18,25
47:7,10 48:18
49:17 53:18 62:14
63:13 66:5,21
71:19 72:7 77:18
78:7 80:21 90:13
91:8 95:8 101:18
119:18 120:15
121:11,12,19
122:8 128:20
130:12 135:8
136:20 139:6,22
140:24 141:22
143:7 144:7 146:3
149:16 163:8
168:20 169:3
171:17 176:7
**old** 36:3 89:7,8,14
**omission** 65:12
**once** 26:8 57:6
69:15 92:8 150:4
**one's** 127:3
**ones** 16:5 52:19
60:20 70:11,12
115:12 118:17
136:6,17 155:6
**ongoing** 87:1
88:10 89:1 118:1
118:8,10 158:20
**onlookers** 101:5

**open** 115:17
**opened** 171:3
**operation** 170:5
170:24
**opinion** 77:5,15,17
96:18 105:8
127:21 157:8,22
158:16,18 159:7
159:19,25 160:3
160:13,15 161:6,9
161:17 162:8
163:4,10,16,23,25
164:11 166:17
167:2,10,15,19,25
168:3,10 175:11
175:14,20,21
176:25
**opposed** 16:23
19:3 48:8 54:22
104:7 151:23
**opposing** 129:20
**order** 9:23 48:19
51:16 60:15 69:22
72:16 103:16
175:19 176:9,13
178:23 179:25
**ordinary** 99:18
120:5 178:18
**organize** 34:22
**outdated** 51:2
**outlier** 41:3
**outliers** 117:21
**outpatient** 20:8
**outside** 28:13
99:18 107:8
163:15
**overall** 23:19
106:19
**overuse** 138:12
**overusing** 138:11

**p**

p   2:1,1,9 184:24
p.a.   1:18 2:9
p.m.   1:16,16 4:5
  37:20,23 93:3,6
  164:18,21 179:13
  179:16 180:7,9
pa   13:7 15:23 16:6
  17:15 18:1,5,9,12
  18:12,20 19:19
  20:12 34:15 35:13
  40:21 41:7 42:18
  42:22 43:3 44:14
  44:24 45:10,12
  48:6,15 112:11,13
  140:23 144:2
pa's   20:12
pacing   62:15
  65:14 68:3 136:12
  136:18
page   3:3,13 7:13
  44:21 183:6
paid   147:24 154:9
  169:19 173:23
pain   146:18
palmetto   171:24
  172:4
panel   30:18
paper   63:12 78:23
  80:16,17
paperwork   149:9
paragraph   142:3
pardon   8:22 9:24
  19:2 29:21 82:14
  98:19 113:8 129:8
part   8:23 38:1,5
  38:11 41:9 60:22
  61:9,9,19,25 63:7
  65:20 66:19 71:7
  81:9 110:22
  113:25 122:2

125:15 133:10
  135:6 140:5
  145:12 146:2
  151:14 160:17
  165:17 170:24
  171:4
particular   9:1
  22:16 39:21 40:3
  59:8 61:4,5,7 66:9
  79:17 103:12
  139:21 148:13
  162:21 178:21
parties   182:13,14
parts   61:20
pas   15:21 16:5
  18:7 23:14
pass   95:6 100:20
  140:4 165:17
  167:4
passion   135:13
pathologies   74:17
pathology   19:3
  36:12 61:14
  137:13
patient   5:24 11:5
  12:19 13:9,13,17
  13:19 15:5 16:17
  16:19 31:18 32:16
  33:10,13,15 35:17
  35:18,22 36:16
  38:3,9,19 40:3
  42:6 43:4,6 44:21
  44:22,23 45:9,11
  45:16,19 48:5,15
  48:20 49:5,11,13
  50:7,22 51:5,15,19
  53:1,11,20 54:3
  59:5,9 62:1 64:21
  64:25 67:2,3,5
  69:21 77:13,15
  79:10 80:10 81:21

89:16 90:19,25
  109:10,10 110:23
  111:3,23 119:3
  120:3 121:20,21
  132:3 134:15
  142:23 144:15
  146:15,21,23,23
  147:4,12 151:8
  153:8,12,12,20,25
  154:15 156:5,13
  156:19 159:16
  177:13
patient's   12:20
  36:1,23 37:1 66:7
patients   11:6,9,11
  11:14,21,24 12:4,6
  12:7,10,12,13,17
  19:2,20 25:24
  28:21,22 30:10
  31:1,9,12 32:18
  33:4 35:2,8 36:6
  38:21,25 39:19
  49:9 50:1 52:6
  54:17 55:9 58:7
  59:16 60:6,9
  63:10 66:17,24
  86:24 122:13
  123:5 156:16
  159:13 171:4,9,13
  179:22,25
pay   30:10,16
  90:21,22 143:24
paying   12:10
payments   173:12
pcp   35:25 36:7,14
peer   24:7,22 54:9
  55:10 109:2
  112:24 123:18
  126:6,11 155:22
  156:2

penalties   183:22
people   11:16
  27:17 36:3 39:11
  39:19 57:3 59:21
  65:5 82:21 83:1,2
  83:4,5,7,9 94:24
  94:25 96:15,16
  98:23 99:1 101:5
  101:6,7,8 128:11
  139:4,11,13,15,18
  141:7,9 143:14
  151:19 154:9
  177:2 179:23,24
perceive   98:8
  119:4 120:3
  128:12 132:22
perceived   126:21
  132:13,16,25
  133:1,2,7,11,18
perceiving   128:9
  133:3
percent   11:12,12
  109:6,7
percentage   83:9
  83:11
perform   59:20
performed   44:13
  111:6
performing
  107:25
period   5:24 32:2
  77:21 79:12
  137:23
perjury   183:22
perpetrator   139:2
person   14:5 44:18
  55:20 74:21 76:2
  77:23 97:23 99:6
  99:11 102:13
  103:12 106:14
  122:3 125:3,5

134:7 139:1 154:7
**person's** 64:22
  77:10 102:9 134:5
**personal** 38:18
  40:25 54:18,21
  62:25 115:23
**personally** 49:23
  181:7
**pharmacies** 154:6
**pharmacists** 39:17
**pharmacy** 39:18
  154:4
**philadelphia** 22:1
  22:1
**phone** 26:7 43:12
  47:16 110:18
  144:14 145:4,7
  150:14 158:24
**physical** 19:4
  33:20 99:4 106:16
  106:18 122:1
  128:1,5,12,17
**physically** 107:22
**physician** 13:21
  14:25 32:14
  153:10
**physician's** 13:6
  15:13 17:10,12
**physicians** 23:15
**pick** 25:7
**picture** 60:23
**piece** 64:16 87:17
**pills** 138:11,11
**pillsbury** 2:14
  4:17
**pillsburylaw.com**
  2:16,17
**pinpoint** 87:2
**pissed** 173:23
**pittman** 2:14 4:17

**place** 119:10,13
  130:4 150:16,20
**placed** 101:14
  127:12
**places** 54:2 125:3
  139:15
**plaintiff** 1:5 2:2
  4:24 7:6
**plan** 16:17 32:25
  34:25 35:1 42:5
  42:20 43:10 59:8
  143:24 145:12
**plans** 30:8,11
**pleasant** 184:1
**please** 19:16 75:14
  156:10 184:13
**pllc** 7:14
**point** 57:18 68:14
  81:5 122:2 160:22
  174:9,9
**points** 43:7
**police** 91:25 92:2
  92:22 93:24 94:10
  94:12 96:24 97:1
  97:2,10 101:15
  136:22 137:3
  140:1,2,3,6,8,13
  140:21 166:5
  174:13
**policies** 39:22
**poorly** 52:1
**popping** 138:11
**population** 11:6
  53:17,21
**portion** 75:15
  176:1
**position** 70:3
  170:1,2,3,21
**positive** 36:18
**possibilities** 61:13
  111:24 112:1,1

139:11
**possibility** 139:20
  177:3
**possible** 67:9,12
  67:14 88:22,24,25
  111:22 113:3,6,18
  141:11,14
**possibly** 86:21
  108:11 127:22
  143:3 163:18
**post** 157:2 160:23
**posttraumatic**
  121:8
**pot** 164:10
**potential** 39:9
  112:4,11 115:13
**pounding** 152:19
**pounds** 81:21,23
**practice** 10:14,19
  10:20 18:22 32:17
  36:5 55:4,9 63:10
  90:19 123:4 153:4
  154:12 171:3,6
  176:18,20 178:3
  178:13
**practicing** 64:23
**practitioner** 13:7
  13:21 14:25 15:14
  15:23 16:6,7,20
  17:11,23,24 20:2,3
  20:4,5,18 21:9,10
  34:16 35:14 40:23
  42:18,22 43:2
  48:6,15 74:11
  112:12,14 144:2
  152:1,3
**practitioners**
  15:21 18:9 20:15
  21:11,12 23:15
  65:8 74:1 123:7
  123:10

**preceding** 143:21
  161:16 169:23
  171:2
**precipitated** 96:4
**precipitating**
  125:22
**preexisted** 88:23
  89:20
**preexisting** 51:5
  83:23 85:25 89:2
  89:9 90:6 113:4
  119:2
**prefer** 184:15
**prepare** 29:14
**prerogative** 80:16
**prescribe** 16:3,9
  37:8 38:24
**prescribed** 33:22
  38:22 39:13
  143:23
**prescriber** 37:4
**prescribers** 16:8
**prescribing** 39:11
  39:18,20,20 40:4
**prescription** 42:14
  138:11
**prescriptions**
  32:25
**present** 2:23 34:21
  48:14 56:6 57:5,7
  57:17 72:20
  101:17 106:14
  117:6 118:15,17
  118:25 121:5,9
  141:7,9
**presentation** 40:5
  41:9 61:14,22
  63:15 94:17 95:13
  95:18 106:15,16
  106:18 107:8
  114:16 120:6

**presented** 64:10
76:11 77:7,12
96:5,12,22 114:12
117:24 122:10
134:18 137:21,22
158:5 160:5 164:5
**presenting** 34:2
36:12 41:5 42:19
57:9 60:11 97:12
116:19 117:25
118:6 119:16
137:25 164:4
167:14 179:1
**presents** 49:11
55:19
**pressure** 25:25
**pretty** 39:10 59:2
81:16 90:23
102:20 106:19
116:9 124:24
143:13 152:13
**previous** 27:11
51:7 85:4 89:9
104:17 105:10
113:12 136:24
158:21 161:2
**previously** 15:4
37:8 47:11 80:20
85:17 96:17,21
104:2,10,21 109:4
115:11
**primary** 13:4,15
13:17,25 14:13
25:23 26:3 33:6
35:23,25 48:8
**prior** 74:23,23
83:23 86:3 87:10
89:17 114:3,19
115:1,5 119:16
141:11 148:25
160:11 161:3,13

163:2,11
**prison** 54:15,15
151:18
**prisons** 23:6
169:24 170:17
171:5,8
**privacy** 178:5,7
**private** 10:14
30:10 153:16
154:11 171:3,6
176:18,20 177:13
178:3
**privileges** 171:22
172:1,3,5,6,7,9,11
**probably** 11:12,17
17:5 21:1 41:19
66:10 67:5 114:6
135:15
**problem** 14:21
34:2 89:15,17
100:5
**problematic** 35:5
**problems** 11:19
19:4 33:20,21
34:7 83:25 84:3,6
84:12,16,19,20,23
84:23,25 85:5,17
85:20,23,24 86:3
87:2,3,10
**procedure** 40:1
**procedures** 39:23
**process** 36:9
129:21 130:7
**produce** 26:20
**produced** 47:13
**production** 184:23
**professional** 28:13
28:14,15,17 69:16
70:7
**professionally**
27:11

**professionals**
156:5
**professor** 21:8
**program** 21:10,11
22:11 31:5
**progress** 47:3
**promoted** 170:16
**proper** 48:23
51:20 59:8 60:25
**properly** 48:19
**protect** 39:19
**provide** 13:25
16:10 30:25 34:15
34:24 176:9
**provided** 35:11
42:9,18 47:11,12
47:14 53:11
175:22
**provider** 13:4,10
14:5 16:25 33:12
54:4,5 77:3 80:17
110:22 154:18
**providers** 10:24
13:6 15:21 16:2,2
38:6,8 42:4 59:19
110:4 123:10
154:23
**provides** 125:5
**pssi** 58:14,16
**psych** 21:12 41:10
113:16
**psychiatric** 33:19
40:22 46:10 51:7
89:22 126:14
152:1,2
**psychiatrist** 5:3,4
23:8,21,24 31:21
42:3 75:23 169:18
169:25 170:2,20
**psychiatrists** 11:2

**psychiatry** 13:8
20:4,5,7 21:10
22:4,20 23:1,2
24:2,4 25:22
60:21
**psychological** 52:5
52:8 126:15
155:17,23 156:3
156:23
**psychologist** 52:16
**psychologists**
23:16
**psychology** 22:6
**psychomotor**
136:11
**psychopharm**
26:2
**psychotherapist**
12:22 14:11 27:6
28:4 30:9,9
154:20
**psychotherapists**
15:20,24 16:4,9
**psychotherapy**
12:21 14:3,8,9,10
14:19 15:1,4
16:11 30:8,24
145:16
**pt** 44:22 142:23
**ptsd** 52:10,13,21
53:18 55:17 58:3
58:12,13,18,20
59:2,16 68:19
69:9 72:18 73:19
73:24 74:6,6,12
75:7 76:3 88:6
98:7 103:1,20
104:8 108:1
109:23 111:14
112:6,6,6,7,20
113:20 117:2,4

118:23 120:10
121:8 124:8,19
125:8,23 127:17
140:25 146:15
157:22 158:6,8
162:8 164:3
171:10,14
**public** 22:10,15
181:6,16 182:6
**publications** 24:13
**publish** 24:6,9,10
**puerto** 23:9
**pulled** 29:19
**purchased** 184:16
**pursuant** 47:12
**put** 45:9 63:17
64:25 69:20,24
70:3,5,20,22,23
80:10,15,17
126:18 167:5
**putting** 101:19

**q**

**qualitatively**
83:19
**quality** 82:10
118:2
**quantitatively**
83:21
**quarter** 79:13
**queries** 58:19
**question** 6:6,16,18
51:25 52:1,17
65:25 75:3,5,12,13
78:20 84:10 85:15
86:14 87:23 90:12
92:13 100:3,4
103:6,7,22 111:25
115:18,20 116:1,3
120:12 126:20
128:13 131:14
132:21 148:4,7,13

148:15 150:17
156:15 162:24
168:22 175:5,24
175:25 176:3,4
177:15,20 178:8
178:20 179:2,10
179:21
**questioned** 93:19
**questionnaire**
54:6 55:19 56:4,7
56:8,10,17,20
**questionnaires**
54:1
**questions** 6:11
53:2,6,12 54:4,9
54:12 55:20 56:6
56:11,12,14,19
63:3 79:18 80:11
82:25 87:15 107:2
107:13,23,24
108:8,12,15,20,21
108:25 109:3
115:25 117:16
122:5 160:25
164:24 169:6,8
173:14 174:23
177:7,24 179:18
**quick** 179:11
**quickly** 42:5
**quotations** 122:23
**quote** 122:24
152:16,20

**r**

**r** 2:1 5:15,18,18
20:19 142:21,21
**race** 11:10
**random** 102:20
**range** 107:7,9,10
125:6
**ranks** 55:11

**rape** 98:23
**rare** 56:1
**rate** 30:16 55:14
55:22,23 57:1
108:24 112:20,23
123:12
**rates** 30:16,18,20
**rating** 52:10,11,14
52:21 55:17 56:22
56:23 58:3,12
59:4 107:25 108:3
122:17,22
**ratings** 108:6
**reach** 48:23
154:18
**reached** 7:2
154:17
**react** 102:17
**reaction** 147:1
**read** 75:13,15
175:25 176:1
180:4,5 183:22
**reading** 19:1
184:11,19
**ready** 120:22
**realistic** 176:20
177:5 178:2
**realize** 107:24
**realized** 47:13
**really** 51:14 57:24
102:14,19 104:17
105:1,2 116:20
125:20 143:3
174:2 175:24
**rearing** 121:25
128:12
**reason** 9:3 14:6
98:9 147:7,8
165:8,9 183:6
**reasons** 39:15
103:11 147:3

**recall** 8:3 9:21
29:12,20 32:10
63:14,16 66:8
68:5 80:14 89:21
91:22 92:1,25
94:4,11 110:12,13
110:17 111:9
114:4,21,24 116:8
119:25 125:20
126:10,11 131:3,9
135:5,17,23,25
139:25 140:22
146:1,5 147:20
149:2,13 174:15
174:16
**recalled** 101:17
**recalling** 67:10
115:6
**recant** 9:12
**recap** 42:8
**receipt** 149:22
184:19
**receive** 9:18 17:25
142:11
**received** 9:23 26:8
26:13,16 87:6
110:21 149:11
150:9,11
**receiving** 9:21
**recognize** 44:10
46:7,25
**recollection** 8:5
89:15 129:12
138:19 143:1
**recommended**
143:11
**record** 4:4,15 5:13
6:7 37:17,18,19,21
37:22 43:5,6,15
46:13 47:11 53:5
53:10 56:18 63:7

64:17,19 65:16,20
65:21 66:2 68:1
68:22 70:4,7,21
71:9,12,14,16,17
72:5,12,13,15 73:1
73:6,9 74:15 75:6
75:15 78:8,15
79:22,25 81:4,9
86:20 87:5,18,24
88:2,7,18,18 93:2
93:4,5 123:25
124:1,2,3 128:21
135:4,6,9,20 136:1
140:18 141:17,24
141:25 144:9,13
144:19,21 164:15
164:17,19,20
168:23 176:1
179:12,14,15
180:6 182:11
**recorded**   4:6 33:6
72:12,13
**recording**   34:9
**records**   26:14,17
26:20 32:18,21
33:4 34:9 35:24
36:3,4,6,10,14,15
37:1,11 38:1,2,5,8
38:10,11,15 47:8
47:20,23 49:15
51:23 53:2 64:13
64:14 65:3,6,9,12
74:12,19 91:11,12
91:13 110:22
144:10 150:12
**recover**   15:6
**recross**   3:6 179:19
**recurring**   103:14
131:10,17 136:25
**redirect**   3:6
174:21

**refer**   27:14,15,20
50:3,8,10 52:16
62:12 63:5 107:6
110:4 128:20
138:23 142:22
147:19
**reference**   45:6,8,9
45:22 72:25 73:9
74:13 124:12
128:22,25 184:7
**referenced**   138:18
184:10
**references**   124:22
**referral**   35:25
36:1
**referred**   27:5,6
35:23 91:9 145:14
145:15 154:10,16
154:20,25
**referring**   27:24
28:3 122:17,19
129:10 142:20
173:7
**refers**   129:5
**reflected**   72:5
**reflecting**   62:17
**refresh**   6:1 129:12
138:18 143:1
**regard**   77:11
112:1 132:24
**regarding**   5:23
52:17 57:3 68:6
80:5 105:10
144:22 147:23
149:10 156:4
**regardless**   14:4
118:18
**regimen**   36:19
**regular**   139:15
**regurgitates**   54:5

**reiterate**   167:3
**related**   25:23
114:23,25 117:12
**relating**   31:17
**relationship**   11:19
28:12 34:1 114:7
115:8,9 146:23
153:12 158:21
**relationships**
80:25 81:3,6
82:11,19 113:25
115:3,4,23,24
**relative**   182:12,14
**release**   47:23
150:12 154:18
178:6
**relevant**   103:4,5,9
103:10 104:8
105:7,11 162:2,4
**reliability**   49:1
51:15 155:24
**reliable**   52:12
**relied**   65:5 66:2
90:2
**relinquished**
172:4
**reliving**   121:3
130:25 131:10
134:1 136:23
**rely**   51:9,14 59:2
65:8 76:3 106:4,7
156:25 159:12
**relying**   76:5,6
**remained**   169:25
**remember**   8:25
9:11 10:4,7,9,10
32:9 50:6 64:24
66:17 67:3 77:24
78:2 79:8,17 80:8
116:3 126:13
143:3 149:10

168:15 173:14
**remembered**
66:16,21
**remeron**   142:21
142:23 143:2
**remind**   139:5
**reminded**   140:10
**reminder**   137:4
**reminds**   138:25
139:2
**removal**   31:6
**render**   68:20
69:15,22 70:9
71:17,20,22 73:24
75:16 76:23 77:4
88:3,4 116:19
118:18 122:12
153:3,5 159:19
175:19,21
**rendered**   30:23
68:19 73:19,23
75:24 78:21
112:17 136:3
**rendering**   87:16
89:2 118:13
157:21 161:6
175:11
**renee**   5:14
**renew**   25:18
**rent**   173:24
**repeat**   51:25 92:13
175:5
**rephrase**   6:17
52:2 55:1,2 60:16
65:21,25 75:12
87:25 95:23 100:3
120:16 133:1
165:22 175:8
**replaying**   81:14
89:12 132:4

**report**  35:19 36:2
37:2 38:3,17
49:11 51:10,11,22
51:24 52:3 57:19
62:21 67:2 70:8,9
72:1 73:17,21
78:11 80:11 89:19
89:22 90:2 99:21
100:13 106:22
109:13 113:11
159:13,16 176:8
182:8
**reported**  84:2 90:1
91:19 97:13 100:1
114:13,16 158:20
**reporter**  6:4,12
75:16 176:2 182:1
**reporting**  69:22
70:12 100:14
151:11
**reports**  122:11
155:25 157:1
**request**  35:24 37:1
37:11 38:10
**requested**  47:20
75:15 154:17
176:1 182:9
**requesting**  36:14
**require**  61:15
**required**  25:8 57:7
**requirement**  19:8
19:9,13 24:24
80:18
**requirements**  25:1
25:11,12 39:23
**requires**  25:13
**research**  24:21,22
**resent**  48:2
**reserves**  169:14,15
**residency**  22:5,7
22:20,22 23:1,4

50:6 54:14 169:14
169:17,20 172:17
**residents**  172:14
**resigned**  171:5
172:6
**respond**  6:11
26:18
**responding**  42:11
**response**  34:6 43:9
53:12 108:8
**responses**  6:13
108:2,4
**restate**  100:8
161:13 163:7
**restless**  64:8,9
65:14
**restlessness**  62:15
67:20 68:1,3
101:2 136:11,18
**result**  7:18
**resulted**  125:22
**resulting**  161:17
**results**  109:9
**return**  74:6
123:22
**returned**  171:2,4
184:18
**review**  10:3 12:15
13:12,12 16:16,18
29:17 35:4,4,7,10
43:3 53:23 54:9
86:22 155:10
164:16 182:9
184:13
**reviewed**  24:7,22
30:2 55:10 109:2
112:24 123:18
126:6,11 149:4
155:22 156:2
157:15

**reviewing**  9:1
178:10
**revise**  124:21
**rico**  23:9
**right**  8:25 9:15
15:10 30:22 55:24
65:6 73:11 75:4
85:9 88:23 99:18
119:18 121:19
128:24 129:7
130:20 148:12
169:7,16 174:25
175:4
**rivaux**  2:14 3:5
4:16,16 5:11 7:11
32:4,6 37:24 44:5
44:9 46:1,6,15,18
46:20,24 67:18
75:13,18 78:9
93:1,7 120:23
121:10 123:21
124:5 164:15,22
169:6 171:20
173:4,9,19,25
174:22 175:25
176:6 179:11,17
**road**  7:15
**roads**  170:9
**roadways**  170:8
**robbery**  98:22
**robot**  67:6
**role**  6:25 7:3 12:18
13:3 23:10,20
31:20
**rollovers**  59:17
60:4
**room**  48:14 54:4
59:18 99:4
**rotations**  19:12
**routine**  108:19

**roza**  1:18 2:9 4:13
4:22
**rule**  103:19,23
153:11,19 158:3,7
158:7 160:4 164:3
164:7
**rules**  6:2
**ruling**  153:17,17
**ruminating**  62:16
63:20,23 64:1,4,7
67:20 68:4 89:25
**rumination**  63:20

**s**

**s**  2:1,8 3:12 5:15
20:17
**sad**  134:8
**sadness**  15:7 62:15
134:5,9,20
**safe**  117:20 144:6
**safety**  127:3,4,6
165:7
**sat**  29:19
**saw**  7:25 29:23
33:13 43:21 44:1
83:1 90:14 135:5
137:3 149:7
162:14 163:15
170:12
**saying**  9:7 30:19
37:6 45:13 63:16
69:4 71:9 88:5
94:11 147:21
168:16
**says**  7:13 44:17,21
44:22 68:14 97:21
98:1,6,10 105:17
109:11 124:24
128:17 133:15
142:23 144:3
149:20 154:7

[scale - signature] Page 27

**scale** 52:11,14,21
55:17,19 56:22
58:4,12,13,18,19
59:1,4 107:25
108:3 122:22
126:19
**scales** 52:10 57:2
122:17
**scenario** 74:19
**schedules** 39:3,10
39:10,12,16,20
**school** 20:7 21:9
21:20,24 22:1
169:13,16
**scid** 53:16,17
**scid's** 53:18
**scientific** 112:24
113:2
**screen** 122:13,15
122:19,21,21,24
122:25 123:2,13
123:16,19
**script** 154:5
**scripts** 154:4
**second** 7:12 40:16
41:16,17,18,22
122:6 151:10
**secondary** 147:14
151:19 156:24
**section** 63:5
**see** 9:20 11:7,11
11:14 12:7,14
16:19 19:20 28:21
31:9 33:5 38:19
44:21 48:2,3 50:1
53:1 54:1 62:4,8
63:18 67:5 71:4,4
74:20 76:10 81:10
82:7,22 87:5
90:20 111:23
115:12 129:6

130:12 131:7
137:10 140:9
143:10 151:11
152:5 154:3,6,13
170:7
**seeing** 11:22 12:19
13:19 14:11 16:20
33:10,15 50:7
76:12,16,18 82:21
89:16 153:8 171:4
**seek** 36:10
**seen** 7:20 40:22
44:17 47:17 60:6
90:24 114:17
143:12 145:9
152:2 155:3
**sees** 136:22 140:14
140:21
**selected** 63:22
**self** 30:16 35:19
36:1 37:2 38:3,17
49:11 51:10,11,22
51:24 52:3 62:21
78:11 80:11 89:19
90:21 100:13
106:22 109:13
135:1 155:25
157:1 159:13,16
176:8
**sense** 61:4 92:2,6
92:11 114:9,11
116:25 125:5
131:12,22 155:4,8
176:5
**sensitive** 52:12
60:4
**sent** 10:4 47:19,25
91:23 170:14
184:16
**sentence** 142:22

**separate** 9:4 31:10
31:11 130:10
**separated** 114:5
116:8
**separation** 114:10
158:14
**september** 47:21
145:9,11 155:2
**serious** 165:24
166:2,5
**seriously** 152:25
**serve** 24:15 59:21
**served** 24:18
147:22 151:24
**service** 30:22
**services** 7:14 8:1
8:13 10:13,13
11:16 30:25 31:1
31:3,10,13 44:14
123:9
**session** 13:22 14:1
14:12,13 15:1
16:13,14,15,22,24
17:2,5,6 28:22,24
29:2,3,4 33:6
34:10 40:14,15,16
40:17,22 41:4,4,8
41:15,16,17,18,20
41:22 42:2,17
45:1,4,23 62:5
63:3 64:9 75:7
111:11 112:12
131:1,16 141:19
141:20 142:5,12
145:18 146:2,7
149:21 150:7
151:8,9,10 152:8
**sessions** 14:3
15:11 29:10,12
30:5,6,7,15 32:18
33:9,18 34:5 35:9

40:15,19,20,21,24
42:21 43:11,12,13
43:15 143:23
144:12 151:23
**set** 53:6 118:16
**sets** 120:18
**setting** 153:7,16
154:12
**seven** 77:20
**severe** 59:25
146:19 147:1
**severity** 55:22,23
55:24 59:7 104:7
**sexual** 121:24
128:1,5,17
**shadow** 19:11,24
**shadowing** 19:17
19:17,18
**shaking** 6:13
**shame** 134:13,18
134:19,20 163:19
**shani** 2:14 4:16
**shani.rivaux** 2:17
**share** 90:5 114:2
115:16 169:12
171:25 174:5,12
**shared** 27:13
41:10 92:17,25
114:15
**sharing** 114:4
**shaw** 2:14 4:17
**sheet** 3:8 183:1
**shoot** 25:16
**shore** 172:4,5
**show** 32:24 44:3
81:4 144:2 162:22
**side** 42:12
**sign** 35:10,15
110:5
**signature** 16:18
181:15 182:21

184:13
**signed**  181:10
**significance**  32:21
  32:23
**significant**  34:10
  64:13 65:12 82:5
  85:12 86:6 95:11
  95:16,19 100:23
  104:2 110:20,25
  114:6,8,12 115:15
  116:7 158:15
  159:7,24 160:12
  161:5,24 163:4,9
  163:22 166:11,22
  167:15,18,25
  168:2,6,10 175:11
  176:25
**significantly**
  173:22
**signing**  184:11,19
**similar**  103:16
  104:22
**simple**  14:21
  57:21
**simplified**  57:22
**simply**  76:6 88:5
  100:10 112:13
**sincerely**  184:22
**sir**  184:9
**sit**  54:4 83:14
  136:12 174:16
**sitting**  166:4
**situation**  36:13
  62:17,18 68:9
  85:2 103:7,8
  104:25 105:19
  114:14 130:9
  136:23 139:7,19
  140:10 143:19,21
  148:14 177:5
  178:4,19,22 179:4

179:9
**situations**  13:20
  59:25
**six**  11:1 20:1
**skeptical**  146:22
**skilled**  19:18
**skin**  24:12
**skype**  43:12
**slash**  169:18
**sleep**  11:19 80:2
  81:14 86:14 87:10
  89:11 131:4,5
  132:4,5 134:16
  137:2 164:2
**sleeping**  62:9,14
  86:15,25 89:16
  110:15 111:4
**sleeplessness**  87:7
  88:9,23 89:11,14
  89:24
**slightly**  173:22
**small**  20:14,20
  40:22 41:7 44:14
  44:24 45:10
  141:19
**smoked**  164:10,10
**social**  33:23 117:7
  120:5 137:7
  160:17,18 162:12
**socially**  28:18
**soldiers**  19:2
  59:25 170:7,12
**solely**  14:11 16:20
  132:25
**solutions**  184:1
**someone's**  52:18
  57:3 64:25 102:16
  117:5 125:23
  144:12,23
**somewhat**  57:21

**soon**  141:8
**sorry**  15:18,22
  55:2 57:12 60:16
  67:13 87:23 91:9
  100:7 110:8 118:9
  120:16 161:13
**sort**  17:24 56:12
  57:2 119:15
  124:21 134:24
**sounded**  111:13
**source**  124:12
**sources**  124:13
**southern**  1:1 4:10
**southwest**  1:18
  2:10,20
**span**  172:9
**speak**  15:6 19:8
  107:1 154:24
  178:7
**speaking**  10:10
**special**  17:22
**specialist**  17:15
**specialization**
  22:25
**specializations**
  22:13
**specialized**  22:16
**specialties**  18:6
**specialty**  19:12
  69:17
**specific**  11:23
  17:19 18:3,17
  25:8 53:15 54:9,9
  56:19,24 58:1,2
  60:11 76:7 78:17
  78:20 89:4 91:18
  100:18 101:20
  103:22 108:1,2
  115:22 116:1
  118:13 119:12
  121:4 122:17,19

122:22 133:15
  139:22 143:20
  153:15,21 156:10
  156:15 165:10,14
  165:18 166:8,9
**specifically**  19:10
  20:5 28:10 40:8
  45:7 65:19 66:22
  68:24 69:1 73:5
  73:21 74:13 77:25
  79:16 80:5 87:18
  88:2,6,8 94:21
  96:9 99:22 101:25
  108:6,7 110:9
  121:14 127:10
  128:4,5 131:3,6,7
  131:20 132:9,15
  132:16 134:22
  135:19,24,25
  136:2 140:12,18
  145:1 147:16
  148:23 165:23
  166:12 177:1,10
  179:3
**specifics**  43:1
  80:12 150:24
**speculation**  84:9
  104:25 176:19
  177:6
**speech**  106:15,24
**spend**  16:22 33:18
  53:24
**spent**  15:12
**split**  77:8
**spoke**  10:7 47:15
  135:21 155:1
**spoken**  26:7,22
**spontaneously**
  84:2
**squad**  102:1
  127:13

stabilization
  170:14
staff  172:12
stand  140:15
standing  81:16
  134:19
start  13:9 22:15
  31:6 40:3 41:16
  42:2,7 132:15
started  14:23
  20:24 21:4,6 22:4
  23:25 41:7 117:20
  149:3 171:4,6,18
starting  17:12
startle  121:2
starts  144:4
state  4:14 5:12
  22:10 25:13 77:1
  87:9 124:14
  158:13 159:23
  181:3,6,16 182:3,6
stated  4:10 15:5
  22:23 71:21 79:23
  80:20 87:11,12
  89:8 91:20 100:1
  100:13 131:7
  183:22
statement  9:1
  81:13
statements  172:22
  173:2 176:12
  178:17 179:24
states  1:1 65:13
  91:22 98:1 132:3
  132:3 134:16
  156:23
stationed  169:22
statistical  49:19
status  34:1 106:11
  144:23 151:13,16
  152:7 171:10

staying  140:8
stenographic
  182:11
stenographically
  182:8
step  121:19
stimuli  138:21
stirling  7:14
stopped  142:14,15
  142:18 164:14
store  139:12,13
stories  63:11
strangers  101:6
street  1:2 10:8
  5:17 23:8 138:10
stress  11:20 15:7
  113:23 114:2,7,10
  118:23 121:8
  126:2,4 139:5,16
  158:15,21 161:11
  162:22,22 163:3,5
  163:12 167:3
  173:12,16
stressed  159:23
stressful  124:12
  124:13,15,17,23
  124:24 125:1,4,11
  125:13,18,24,25
  126:5,7,19 173:22
  173:22
stressor  61:4
  116:18 118:22
  119:6 159:24
stressors  60:10,18
  60:22,25 61:3,6
  113:18,22 114:18
  114:19,22,25
  115:4,7,9,13,18
  116:11 117:4,7,11
  117:12 119:2
  159:5 177:23

strictly  28:12
strike  112:19
  175:8
structured  52:24
  53:3,14 54:7,8,21
  54:22 55:4,12,14
  62:24
studies  24:7 109:3
  112:25 126:12,16
  171:7
study  25:7 54:9
  55:10
stuff  59:24 85:14
  99:15 130:24
  149:10 170:8
subheading  51:23
subjective  49:12
  51:23,24 52:3
  70:15 76:10 77:12
  97:15,16,17,19
  142:3 151:10
subjectively
  117:10 125:15
subpoena  9:23
  26:9,14,16 47:12
  47:20,24,25
  149:12,19,22
  150:9,11,13,17,19
subsection  7:13
  8:1,7,18,22
subsequent  7:18
  8:23 9:1,10 82:15
  122:7
subset  18:19,23
subsets  120:25
substance  33:19
  37:7 40:4 41:10
  137:16,19 138:3
substances  38:22
  38:25 39:3,24
  137:24 138:9

successor  1:8
sue  168:8
sued  153:4
suffering  113:3
  146:18
sufficient  57:10,20
  101:12 118:15
  121:15 122:11
suggest  89:13
  112:16 145:24
  152:25
suggested  83:24
  84:11 114:6
  153:23
suggesting  74:1
suggestive  67:22
  153:15
suggests  76:22
  146:17,24 147:12
suicidal  144:17
suing  153:6
suit  148:24
suite  1:18 2:5,10
  2:15 184:1
summarize  42:5
summer  21:1,2
  22:4
supervise  12:14
supervised  23:14
supervising  32:16
supervision  16:3
  16:10,11
supervisor  13:18
support  76:7,13
  76:16,19 109:3
  112:25 123:19
supportive  57:2
  58:9
supports  126:7
suppose  98:12

**supposed** 90:20
**sure** 6:10 21:15
  25:16 48:4 49:25
  52:1 60:15 72:8
  85:16 97:2 118:9
  124:24 133:7
  175:6
**surgeon** 39:13
**suspicious** 154:8
**sweating** 152:19
**sworn** 5:7 181:8
**symptom** 57:17,19
  61:5,7 63:8 65:22
  65:23 66:1,2,7
  79:6 89:7,8
  109:10 119:5
  135:24 137:5
**symptomatic**
  152:22
**symptoms** 34:6
  40:6 41:10 42:11
  42:20 43:8 48:16
  55:21,23,25 57:9
  58:13,18,19 60:11
  60:15,19 61:17,18
  61:22 62:7,20
  63:11,25 65:17
  68:5 69:7,12 73:4
  73:20 74:18 75:25
  76:22,24 77:23
  78:10,12,13,18
  79:8,17 80:22
  81:12,20,23 89:18
  90:17 94:19 97:13
  100:25 101:16,20
  112:2 113:11
  114:14,17 116:19
  117:6,9,12,18,19
  117:22,23,24
  118:2,2,3,7,10,11
  118:12,14,16,22

  119:1,11,13,16
  121:1,4,16,17
  131:15 134:4
  136:14 137:13,17
  137:25 138:7
  141:6,7,10 142:12
  146:19,25,25
  150:8 151:11,16
  152:12,24 155:5
  158:4,6,20,22
  160:5 162:9 164:4
  167:20 171:11
  175:16 177:23
**system** 54:15
  151:18
**systems** 53:23
  54:16 56:9

**t**

**t** 3:12 5:15
**table** 29:24
**take** 6:4,12,22
  25:6 33:8 34:16
  37:18 38:2 42:24
  50:22 87:5 92:5,7
  92:23 110:18
  123:23 143:6
  179:11
**taken** 1:14 4:7
  5:19 35:13,15
  92:9 108:12
  141:24 169:23
  184:10
**takes** 50:21 119:10
**talk** 6:3 21:13
  26:12 48:14
**talked** 151:16
  156:25 169:11
**talking** 6:5 29:20
  31:8 37:25 49:13
  53:24 59:4 93:8
  106:16 108:18

**124:**6,7 176:17
**teach** 172:12,14
**teachers** 11:9
**teaches** 21:10
**team** 35:3,7
**tease** 117:15
  119:15 158:22
**television** 99:2
**tell** 44:12 68:11
  78:3 80:21 94:10
  97:23 109:14
  111:6 115:18
  116:12 121:22
  127:10,23 140:12
  145:1 146:3 155:1
  159:16 168:15
  175:2,6
**telling** 59:23 60:5
  69:21 117:19
  178:24,25 179:7
  179:25
**tells** 73:20,23
  75:20 119:3
  177:10
**temperature**
  37:16
**ten** 31:15
**tenants** 163:3,6,12
  173:13,23
**tend** 30:14
**tension** 62:9 89:25
  101:2 136:19
**term** 37:5,9,10,12
  107:5 140:24
**terminology** 45:5
**terms** 8:9 11:8,10
  14:23 45:16 61:2
  85:17 106:14
  120:20 141:2
**tested** 54:23

**testified** 5:8 31:24
  32:1 163:2,10,20
  164:9
**testify** 8:21 31:22
  32:8,11
**testifying** 32:14
**testimony** 175:7
  175:15,16 176:23
  177:18,21,23
  178:11,16,22
**testing** 52:5 55:2
  109:18
**tests** 52:8 58:24
  111:7
**thank** 6:15,24 32:4
  37:25 48:3 119:18
  168:20 179:17
**therapist** 12:18
  154:16
**therapists** 12:9
  15:13,15,17,20
**therapy** 31:4
**thing** 6:2 37:9
  49:10 57:7 67:24
  92:23 111:4
  118:24 128:16
  140:1 142:2
  162:19
**things** 15:9 28:16
  34:9 36:20 41:11
  42:10 50:7 55:21
  62:19 64:22,24
  65:11 66:16 71:15
  72:7,19 80:19
  102:20 107:25
  108:17 117:22
  122:1 124:20
  128:10,19 130:11
  134:5,7,12,24
  135:8,11 139:14
  142:6 147:14

154:1 158:25
160:18 162:17,18
164:25 172:24
175:23
**think** 32:2 58:25
61:23 64:18 73:11
82:7,14 110:20,25
111:8,8,20 124:16
127:2 128:23
134:1,14 135:10
139:25 140:11
141:15 143:18
146:1 147:9,22
156:7,11,14 157:3
157:6 175:24
176:3
**thinking** 131:13
131:19,20,24
132:5 137:1
152:18 158:23
**third** 29:25,25
40:17,22 41:16,20
41:22 142:22
**thirty** 184:18
**thomas** 1:13 3:4
4:1,7 5:2,3,6,12,15
6:24 37:25 44:10
44:15,23 45:10,11
93:8 124:6 164:23
166:11 168:20
169:11 174:20,23
179:17,21 180:3
181:7 182:9 183:4
183:25 184:8
**thorough** 53:23
**thought** 64:4,7
67:17 72:10 127:3
137:5 149:19
152:16 168:12
176:22

**thoughts** 62:16,18
63:6,17,21,23
64:16 67:10,20,21
67:22 68:2,4,8,12
68:15,25 72:19
73:1,18 74:14
78:1 89:25 130:23
131:10,17,18,25
134:2 136:25
137:1
**threatened** 127:4
127:6,11 165:3,6,7
165:24 166:2,5,9
174:13
**threatening**
126:24,25 127:2,2
165:11,15,19
**threatens** 125:3
**three** 27:25 40:13
43:11 115:9,10
120:18,25 121:16
136:7,15
**thursday** 1:15
**thursdays** 12:11
12:13
**time** 4:5 5:24 6:5
6:21 14:17 15:12
15:12 22:9 27:13
28:4,16 29:13
32:2,7 33:17
37:23 40:1,6,8
43:1,21 44:1 50:5
50:5 53:1,7,24
56:14 57:15 69:8
77:21 79:12 90:13
93:1,3,6 102:18
118:18 121:7
122:3,6 124:4
126:10 136:13
137:22 149:24
150:4,14 152:12

153:16 154:25
156:17 160:2
164:18,21 168:21
170:4,7,25 171:4,6
171:7,8 172:14,14
179:13,16 180:7
**timelines** 58:2
**times** 5:24 13:5
15:4 30:10,10
32:7 37:5 40:11
40:13 45:13,14,15
48:16 52:7,16
56:23 79:19 82:10
105:15 108:18
167:8 168:23
**tobacco** 138:12,13
**today** 46:17 47:13
48:2 90:17 108:16
174:16
**told** 26:19 47:16
47:20 77:15,25
85:1,8 92:4,6,9,22
93:18 94:6 101:4
101:22 130:5
139:23 140:22,22
142:5 143:4,13,15
143:16,25 145:10
148:14 166:12,23
167:8,13,22 168:7
168:12 177:24
178:17
**toll** 184:2
**tonight** 169:1
**tools** 15:6 107:20
107:22 109:22
**top** 11:18 44:16
**topics** 25:7,21,23
**total** 11:23 121:17
**touch** 43:8
**tower** 2:10 98:25

**train** 18:6
**trained** 20:5 22:6
39:19
**training** 13:7
17:13,16,18,19,22
17:24 18:3,13,19
18:21,23 19:10,15
19:16,24,25 20:3
34:15,18,19 54:14
54:19,22 169:15
169:17,19
**trama** 129:13
**transcript** 3:8
182:9,10 183:2
184:10,15
**transcripts** 157:16
**trauma** 23:12
33:24 96:4,6,13,25
97:4,15,16,19,20
97:21,22,22,23,25
98:14,21 99:11,20
100:6,9,11,12
101:12,21 102:7,9
102:12 103:14,14
104:7,13,14
117:20 118:3,7,24
119:17,20,21
120:14 121:9,24
121:25 122:13,15
122:19,21,21,22
122:24,25 123:2
123:13,16,19
124:10,22,23,25
125:2,11,12,15,16
125:23 126:1,3,5
126:23 127:1
128:17,18,21
132:12,13,25
133:2,8 138:25
139:5 141:8,10,11
168:4

**traumas** 103:16
121:24 122:20
128:1,3,4
**traumatic** 60:5
94:19 95:2 96:10
96:14 97:12,14,17
97:18 98:1,3,6,9
98:10,11,14,15,17
98:21 99:2,5,8,13
100:14,24 101:4,7
101:11,22 102:5,9
102:11,11 117:5
117:10,13 118:11
118:12 119:4,6,20
120:2,4 121:21,22
124:11,15 125:17
126:19 127:24
128:7,10,12,14
132:17,22 133:4
133:10,21 139:2
166:19
**travel** 38:15
**treat** 48:19 154:11
177:13
**treated** 60:20
**treating** 5:4 31:21
32:14,25 153:10
155:14
**treatment** 7:17
13:24 16:17 31:6
32:16 34:6,25
35:1 59:8 143:7
143:23 145:12
**treatments** 13:13
**treats** 27:17
**trial** 31:22,24
**trick** 56:9
**tried** 162:5
**trigger** 68:5 126:8
133:20

**triggering** 125:8
165:1
**troops** 59:20
**trouble** 82:1,3
86:15
**true** 71:15 85:9,11
85:13 109:11,12
109:15 142:25
162:16 182:10
183:23
**trust** 1:7 4:9
149:20 184:6
**truth** 105:17
178:24 179:7
**truthful** 51:20
105:4,24 106:2
**try** 75:4 138:18
139:8 166:21
**trying** 56:8 91:21
100:19 133:14,17
140:4 167:4
168:13
**turn** 7:12 40:7
62:3 141:15
**turning** 17:23
**twice** 57:6
**two** 11:18 15:15
18:11 23:15 27:22
33:18 34:5 40:15
40:21 44:21 66:14
118:14 130:10
147:24 159:6
**type** 13:25 25:1,19
33:15 39:13 88:25
96:8 98:22 103:13
124:9 130:24
137:5
**types** 11:15 13:24
15:11 52:8 55:11
82:19 98:15,16
121:4 122:16

171:11
**typical** 143:14
148:7
**typically** 28:22
36:1 37:5 53:19
53:22 110:5
112:18 113:25
119:9 122:1
128:16 148:12

### u

**u** 5:18 20:13
**u.s.** 18:17,24
169:15
**ultimate** 86:11
117:1 162:7
**ultimately** 48:13
**unaware** 84:23
**unclean** 107:15
**unclear** 111:15
**undergrad** 20:11
**undergraduate**
17:14,17 18:2
24:11
**underlying** 159:25
161:9 163:9
**understand** 6:9,15
6:24 8:20 9:6 35:1
60:9 65:2 69:17
69:20 75:3,5
84:20 100:3 103:1
103:21,21 117:10
120:23 125:1
130:19 131:14
142:8 148:12
162:24 169:4
**understanding**
13:14 39:5 57:8
69:18 73:14,15
79:15 92:11,14
93:12,15 98:5,21
101:10,18 112:3

118:21 120:8,24
125:7,18 127:5,7
129:9,25 130:15
130:17 131:18
137:18,20 141:4
146:11 153:19
168:25
**understood** 6:14
6:18 72:9,10
74:16,20 76:23
77:2,3 78:24
90:11 97:22 107:3
122:18 125:15
153:18 175:24
**uneasy** 139:16
**unexpected**
159:23
**unfairly** 95:3
**uninsured** 29:12
**unit** 4:6 7:15 23:14
170:6 171:1
**united** 1:1 4:10
**universe** 11:6
**universities**
172:13
**university** 21:8,19
21:22 22:5,10,23
172:16,16
**unjustly** 104:15
140:4
**unkempt** 107:15
**unquote** 122:24
**unrealistic** 177:12
177:14 178:9
**unsettled** 139:16
**unsettling** 102:17
119:24 120:3
125:5 131:23
140:1
**untruthful** 86:5
163:14

**unusual** 107:4
120:5
**unwanted** 132:1
**uploaded** 38:12
**use** 15:6 45:16
49:9,19,23 50:12
52:5,9,11,12,19,24
53:6,16,18 55:12
55:15 56:2 58:21
62:23 63:22 88:12
97:19,21 107:19
109:5 137:23,24
138:9
**useful** 49:15 59:6
85:3
**usually** 13:24
14:14 16:22 17:3
17:6 20:9 25:3,16
25:21 27:15,20
31:12 50:21
104:12 115:8
**utilizing** 65:16,16

**v**

**v** 5:14 183:3 184:6
**va** 52:11,21 55:17
58:3,12
**valid** 55:5,6,11
**validity** 54:20,21
55:2,3,7 58:3
108:21 109:19
123:15
**varies** 14:15 16:24
17:9 28:23 50:23
50:25 56:3
**variety** 55:20
70:18
**various** 171:9
172:1
**verbal** 6:13 128:18
**verbally** 56:6,11
65:15 66:8,12

110:5 122:20
**verbatim** 35:11
45:19 63:9 119:24
120:1
**verified** 92:21
102:2,3
**verify** 37:6,7
72:14,16 73:16,16
74:11,24 75:8
76:2 87:22 129:4
**veritext** 184:1,7
**versa** 97:24
**veterans** 52:11
**vice** 97:24
**victory** 169:22
**video** 4:6
**videographer** 2:24
4:4 37:19,22 93:2
93:5 124:1,3
164:17,20 179:12
179:15 180:6
**videos** 155:10
**videotaped** 1:12
4:1 180:8
**viewing** 74:19
**visibly** 64:10,10
**visit** 13:11 29:25
41:19,20 82:12,13
82:14 91:16
107:21 122:9,11
147:19
**visits** 40:2 82:16
122:7 174:8,18
**visually** 106:13
**volunteer** 19:11
**volunteered**
115:14
**vs** 1:6 4:9 149:20

**w**

**w** 184:1
**wait** 42:21 146:5
**waiting** 102:1
**waive** 180:4
**waived** 184:12,20
**waking** 131:5
152:18
**walk** 21:16 107:14
**walking** 99:3
108:17
**wallen** 2:4
**want** 40:7 48:18
48:22,25 60:14,17
61:3 62:3 64:14
72:3,8 75:5,11
77:7 86:25 103:15
120:20,23 121:11
122:5 128:20
132:11 139:1
150:21,24 151:2
164:16 168:23
174:24 177:21
178:15,22 179:4
**wanted** 63:24 64:1
72:14 73:16 129:4
168:8,24,25 169:3
**wanting** 139:3,3
140:9 148:1
**wants** 74:11,24
76:2
**war** 60:1,3
**warfare** 24:11
**watching** 98:25
99:1,14
**way** 6:7 27:2
34:21,22 37:15
42:17 45:20 54:16
56:10,15 64:20
65:17 70:23 71:3
72:1,13 73:3

81:17,19,22 85:5
85:15 101:13,16
102:17 107:1,24
114:12 138:8
140:15 143:11
152:5
**ways** 63:19 66:7
66:10 88:12 121:5
**we've** 28:15 81:7
124:10 137:10
**wednesdays** 12:11
12:12
**week** 31:6,15 57:6
57:6 77:20 79:13
91:2
**weekly** 11:24
**weeks** 18:25 68:10
143:13,15,15,16
145:10
**weight** 31:5,5
62:14
**went** 41:8,18,20
78:23 91:20 152:5
176:22
**weston** 172:10
**whlmlegal.com**
2:6
**wife** 114:10
158:14,24,25
**wiggins** 27:7,8,10
27:12 28:12 91:8
91:9,12,13 110:1,8
110:9 111:2,6
145:14,17 154:22
154:24 155:7
**wiggins's** 110:3
**winthrop** 2:14
4:17
**withdraw** 67:15
**witness** 3:3 5:1,3,9
7:7 9:16 10:1 32:5

32:11 37:15 67:14
123:22 164:9
177:10,12 180:5
184:8
**witness's**  173:6
**witnesses**  157:4,9
157:18,23 158:13
159:5,22 163:1,10
163:20 172:21
173:1,8 174:25
175:7 176:11,23
177:4,17,22 178:4
178:11,23 179:5,6
**woman**  19:22
**word**  63:18,22
66:8,9 81:8 85:15
125:19,24 135:15
148:11
**worded**  52:1
**words**  94:24 95:4
125:24
**work**  19:3 23:3
28:9,10 34:17
36:18 54:14 80:24
82:18 89:2 115:9
115:23 169:12
**workday**  65:1
**worked**  23:18 28:6
**workers**  82:18
**working**  21:7
134:25 135:12,13
151:18 170:20
**workplace**  28:14
**works**  27:12
**worsened**  84:20
84:23 85:2,2
134:8
**worsening**  85:24
**write**  64:12,21
66:22 68:1 78:5
81:5 82:20 87:6

107:22 129:3,13
129:14 131:25
183:2
**writing**  56:24
**written**  69:18
71:23
**wrong**  132:20,24
141:22
**wrongly**  133:3,11
**wrote**  68:3 76:5
88:22 129:16

|  x  |
| --- |

**x**  3:1,12
**xanax**  37:4,4,13
142:16 143:6
154:5

|  y  |
| --- |

**y**  20:18,19
**yahoo.com**  2:21
**yates**  2:9 4:23,23
29:21,21 47:15
120:22 180:4
184:24
**yeah**  9:23 18:19
18:21 21:1,4 32:5
42:13 60:2 63:24
82:9 134:15,18
140:20 142:25
143:3 147:19
165:6 168:15
**year**  18:2 20:23
21:3,21 27:22
37:14 50:6
**year's**  17:14
**years**  10:21 17:17
17:17,18 18:1
20:9,10,22 22:7
23:18,19,20 25:6
25:14,18 37:4
51:3 64:24 114:13

116:8 141:9
164:10,11 170:22
171:15,18,19
172:11
**yolande**  20:18
**york**  99:1
**youngest**  11:13

|  z  |
| --- |

**zone**  60:3

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.