UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:17-cv-23419-Altonaga/Goodman

JAMES GOOSBY,

      Plaintiff,

vs.

BRANCH BANKING & TRUST COMPANY,
a foreign corporation, and successor by merger
to BankAtlantic,

      Defendant.

_____/

## DECLARATION OF MICHAEL J. HERKOV, Ph.D., ABPP, ABN

    I, Michael J. Herkov, Ph.D., ABPP, ABN, am over 18 years old and am competent to testify.   I make the following declaration:

    1.    I have been asked by the Defendant in this case to serve as an expert and have submitted a report of my examination of James T. Goosby Sr. ("Mr. Goosby"), a copy of which is attached hereto as Exhibit A.   I hereby affirm under penalty of perjury that the statements in the report are to the best of my knowledge true and correct. My qualifications and background are described in detail in an attachment to that report.   In summary, I am a board certified clinical psychologist by the American Board of Professional Psychology and a board certified neuropsychologist by the American Board of Professional Neuropsychology.   I am a licensed psychologist in the state of Florida.

    2.    The primary purpose of this declaration is to comment on the methodology and analysis used by Mr. Goosby's treating psychiatrist, Dr. Delvena Thomas, and her diagnosis of Posttraumatic Stress Disorder (PTSD), as described in her medical records and deposition.   This declaration is not intended to be exhaustive, and it should be read in conjunction with the attached report.

## DR. THOMAS FAILED TO APPLY THE THRESHOLD DSM-5 CRITERION A TO PTSD

1

3.      As Dr. Thomas testified, the Diagnostic and Statistical Manual, Fifth Edition ("DSM-5") is the evaluative tool used by clinicians in the field of mental health to diagnose patients.   Strict adherence to its criteria is essential to a proper diagnosis.   A copy of the pertinent parts of DSM-5 for PTSD is attached hereto as Exhibit B.

4.       DSM-5 imposes a hierarchical analysis in the diagnosis of PTSD, that is, the patient must meet the first criterion before the health care professional may consider additional criteria.   The first criterion, known as Criterion A, provides:

> Criterion A (one required):   The person was exposed to: death, threatened death, actual or threatened serious injury, or actual or threatened sexual violence, in the following way(s):
>
> > 1.      Direct exposure
> > 2.      Witnessing the trauma
> > 3.      Learning that a relative or close friend was exposed to a trauma
> > 4.      Indirect exposure to aversive details of the trauma, usually in the course of professional duties (e.g., first responders, medics).

DSM-5 at 271.

5.      If a patient does not meet Criterion A, a professional may not proceed and a PTSD diagnosis cannot occur.

6.      DSM-5 provides specific examples of the types of events that could give rise to PTSD. While these examples are not exhaustive, they are designed to illustrate the types of events or stressors needed to establish Criterion A.   The specific examples listed in DSM-5 are

> exposure to war as a combatant or a civilian, threatened or actual physical assault (e.g., physical attack, robbery, mugging, childhood physical abuse), threatened or actual sexual violence (e.g., forced sexual penetration, alcohol drug-facilitated sexual penetration, abusive sexual contact, noncontact sexual abuse, sexual trafficking), being kidnapped, being taken hostage, terrorist attack, torture incarceration as a prisoner of war, natural or human-made disasters, and severe motor vehicle accidents ….

*Id*. at 274.

7.      DSM-5 makes clear that ordinary events or stressors do not serve as the basis for PTSD.

Rather, DSM-5 uses specific language to limit the types of events that could apply. As shown above, the criteria require "direct exposure to death, threatened death, actual or threatened serious injury or actual or threatened sexual violence." By her own admission Dr. Thomas acknowledged that Mr. Goosby was not exposed to any actual or threatened death or serious bodily injury.

8.     When assessing the DSM-5 Criterion A the harm must be actual or threatened, and be seen as reasonably likely to reach this threshold. While the perceptions of the person experiencing the event are important and must be taken into account, the person's subjective experience of the event cannot serve as the sole basis for meeting this criterion, especially in situations where a responsible person would not objectively view the event/experience as threating life or serious injury, measured in an objective manner. In her deposition, Dr. Thomas testifies that meeting of Criterion A is solely related to the person's perception of the event and not the objective or reasonable likelihood or risk of the danger described in the DSM-5. For example, Dr. Thomas testified "trauma is my understanding of a certain type of event." Thomas Tr. at 98:21. Under Dr. Thomas' interpretation of DSM-5, any event, no matter how insignificant or ordinary, could qualify for a PTSD diagnosis.[1] Thus, a person who was rebuffed when asking someone out on a date, terminated from a job, or bumped into while walking on a crowded street could be seen as having experienced a Criterion A event if that person subjectively felt he/she were at risk of death or serious injury. Clearly those events would not remotely approach Criterion A for PTSD.

9.     Employing such a subjective threshold for meeting Criterion A clearly violates the PTSD diagnostic criteria of DSM-5. That is most clearly illustrated in examining the specific diagnostic category in which PTSD is described.

10.     PTSD is listed in a section of the DSM-5 entitled "Trauma- and Stressor-Related

---

[1]   I note that Dr. Thomas excluded eating ice cream, but did not specify any other exclusions. Thomas Tr. at 98:5-11.

Disorders." This section of the DSM-5 acknowledges that an individual can experience emotional distress from experiencing stressful events.   In fact, this diagnostic category includes the diagnosis of "Adjustment Disorder."   Criterion A for this diagnosis requires "The development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within 3 months of the onset of the stressor(s)."   Note that this diagnosis does not describe or require the level of stressor/event that the DSM-5 imposes for the diagnosis of PTSD.   In fact, the DSM-5, in providing information for making a differential diagnoses between PTSD and an Adjustment Disorder states: "In adjustment disorders the stressor can be of any severity rather than the severity and type required by Criterion A of acute stress disorder and posttraumatic stress disorder." (p. 288).   This provides the most clear evidence that the types of events listed in Criterion A for PTSD are unique and that their presence is required for the diagnosis.

11.    To my knowledge, the American Psychiatric Association, the publisher of the DSM-5, has not published any guidelines supporting the position that any event can meet Criterion A for PTSD as long as the person experiencing the event believes it to be traumatic.

12.    In the case of Mr. Goosby, the direct exposure must be to "death, threatened death, [or] actual or threatened serious injury …."[2]   Dr. Thomas acknowledged that according to Mr. Goosby's self-report, he did not have direct exposure to death, threatened death, or actual or threatened serious injury during the incident, including the time he spent in jail (about 22 hours, according to Mr. Goosby). Dr. Thomas specifically testified that for Mr. Goosby, there was nothing about the behavior of the officers prior to his arrest, his arrest, the handcuffing, the back of the police car or the time spent in jail that was life threatening or threatening of serious bodily harm.   Instead, Dr. Thomas relied entirely on the fact that the arrest, based on Mr. Goosby's perception, was unjustified or "false" in order to justify

_____

[2]    There was no sexual violence involved in the March 3, 2017 incident.

her conclusion of a traumatic event qualifying under Criterion A.   Mr. Goosby's perception of the event as "traumatic" or a "trauma" is not relevant to a proper analysis of Criterion A and certainly does not meet the threshold triggering event under Criterion A for PTSD.

13.     Dr. Thomas' employment of the standard that virtually any event can meet Criterion A of the PTSD if the person perceives the event as traumatic represents an inappropriate application of DSM-5 and thus fails to employ the methodical rigor necessary for a proper diagnosis.   That is, before assessing the presented symptoms, the mental health professional must first determine that the triggering event qualifies under Criterion A.   However, when Dr. Thomas was asked the basis of her opinion that the triggering event met Criterion A for PTSD, she recited the symptomology that Mr. Goosby self-reported.   This, however, improperly conflates the triggering event with the resulting symptoms. This is reflected in the Diagnostic Features of DSM-5 as it provides that the "Emotional reactions to the traumatic event (e.g., fear, helplessness, horror) are no longer part of Criterion A.   That is, the qualifying event must be first established and then the mental health practitioner may consider whether the characteristic symptoms have resulted from the event.

## DR. THOMAS FAILED TO PROPERLY EXCLUDE MALINGERING

14.     During his initial meeting with Dr. Thomas, Mr. Goosby told her about the incident claiming the arrest to be unjustified requiring two attorneys.   At a minimum, this should have raised questions for Dr. Thomas about the potential that Mr. Goosby may have been involved in some type of litigation.

15.     Presentation of clinical symptoms by a person who has a concomitant legal action can lead to an exaggeration of symptoms related to secondary gain associated with the outcome of the case.

16.      It is well known and documented that patients in litigation often exaggerate or fabricate claimed symptoms and descriptions of adverse reactions to events in order to obtain financial benefits from the defendant(s) or to avoid negative consequences.

17.     DSM-5 uses the concept of malingering to address the phenomenon.   DSM-5 lists the essential feature of malingering as "the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs. "

18.     DSM-5 further provides that "[m]alingering should be strongly suspected if any combination of the following is noted: 1. Medicolegal context of presentation (e.g. the individual is referred by an attorney to the clinician for evaluation, or the individual self-refers while litigation or criminal charges are pending). 2. Marked discrepancy between the individual's claimed stress or disability and the objective findings and observations. 3. Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regime. 4. Presence of antisocial personality disorder.

19.     Dr. Thomas should have been reasonably aware of the litigation aspect of Mr. Goosby's presentation as noted above.   Dr. Thomas should have but did not ask Mr. Goosby whether he was contemplating or involved in litigation.   When she learned in January 2018 that he was involved in this action, she did not ask any questions about the litigation.

20.     The issue of a marked discrepancy between the individual's claimed stress and the objective findings or observations or assessing lack of cooperation with the evaluation requires some knowledge of the person's circumstances and history. Inaccuracies in these areas could serve as the basis for establishing these criteria.   As noted below, Mr. Goosby provided Dr. Thomas with false information (e.g., he had not been previously arrested) and did not inform her of other stressful/traumatic events in his life that predated the bank incident (e.g., financial problems, family problems).

21.     Thus, to evaluate potential malingering, the clinician must have sufficient historical and collateral data to address the criteria noted above.   Dr. Thomas' assertion that she was able to exclude

6

malingering by simply "eyeballing" Mr. Goosby does not take into account the guidelines in DSM-5 for addressing this issue.

22.     Dr. Thomas recognized certain marked discrepancies when she conceded that Mr. Goosby did not inform her of many critical factors.

23.     Dr. Thomas also conceded that Mr. Goosby did not inform her of many critical factors, which reflect a marked discrepancy from his self-report and her observations.   Such factors call into question her diagnosis and render it unreliable and speculative at best.

24.     For example, Mr. Goosby informed Dr. Thomas that he had never been arrested before March 3, 2017.   However, he had been arrested four previous times, including two arrests for disorderly conduct, one in December 2015 and one in 2001.   This information would have provided Dr. Thomas with an opportunity to probe further and question the facts surrounding the arrests and whether the symptoms Mr. Goosby self-reported in August 2017 could even be tied to the incident.

25.     Dr. Thomas acknowledged at her deposition that it would have been significant to her PTSD diagnosis to learn that Mr. Goosby had history of alcoholic or controlled substances use or abuse. Thomas Tr. at 163:20-164:07.   In fact, a witness testified that Mr. Goosby at one point would drink a bottle of liquor per day with her, a fact not considered by Dr. Thomas because she did not inquire of Mr. Goosby of his alcoholic use nor did Mr. Goosby volunteer that information.   *Id.*   The same also applies to Mr. Goosby's marijuana use, which she neither asked Mr. Goosby about nor did he volunteer. Yet she agreed such use would have been significant to her diagnosis if it had not been a habit in the distant past.   *Id.* at 164:9-14.   This is especially true of her diagnosis of PTSD in that Criterion H precludes diagnosis of PTSD if the individual's symptoms are related to substance use.   For example, Criterion H states: "The disturbance is not attributable to the physiological effects of a substance (e.g., medication, alcohol) or another medical condition."   Thus, knowledge of Mr. Goosby's substance use would be required before a diagnosis of PTSD could be made according to DSM-5 criteria.

26.     Similarly, Mr. Goosby failed to inform Dr. Thomas of his pre-existing financial distress, including his four foreclosure actions (including a foreclosure initiated by BB&T one month prior to the incident) and multiple evictions of his tenants that he himself files, all of which pre-dated the incident. Such failures in disclosures to Dr. Thomas prevented her from having sufficient data to make an informed conclusion (albeit the underlying methodology still fails to support a qualifying event for Criterion A).

27.     Mr. Goosby also failed to notify Dr. Thomas when he initiated this lawsuit, a fact that under the generally accepted procedures should have alerted Dr. Thomas to the possibility of malingering and would have required it to be ruled out.

28.     Mr. Goosby also did not share with Dr. Thomas of the unexpected death of his friend Dexter or his sister.

29.     Mr. Goosby also never shared with Dr. Thomas that the officers who arrested him told Mr. Goosby that: (1) he was not being arrested for a fraudulent check; and that (2) he was being arrested for disorderly conduct for his behavior at the bank after the police arrived.

30.     As Dr. Thomas conceded, all of this information was significant and could have impacted her opinions had she had the opportunity to consider them.   However, as Mr. Goosby failed to provide Dr. Thomas with accurate, verifiable information to the questions posed to him, her opinions regarding Mr. Goosby's PTSD are inherently unreliable.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:   May 15, 2018

_____

Michael J. Herkov, Ph.D., ABPP, ABN

8



NORTH FLORIDA
CLINICAL PSYCHOLOGY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:17-cv-23419-Altonaga/Goodman

JAMES GOOSBY,

Plaintiff,

vs.

BRANCH BANKING AND TRUST COMPANY,

Defendant.

---

FORENSIC PSYCHOLOGICAL EVALUATION
AND EXPERT WITNESS REPORT

OF

MICHAEL J. HERKOV, Ph.D., ABPP, ABN

March 20, 2018

**EXHIBIT A**

## Forensic Psychological Evaluation and Expert Witness Report

**Name:** James T. Goosby, Sr.
**Date of Evaluation:** March 7, 2018

**Referral Information:** Mr. Goosby is a 51-year-old, separated, African-American, real estate investor/property manager, referred for psychological evaluation by David Garbett, Esq., attorney for the defendant, for information regarding his current level of psychological functioning. The specific referral question involves whether Mr. Goosby manifests any psychopathology, cognitive impairment, or behavioral aberration, and if so, whether this is related to an incident that took place on March 3, 2017 at a BB&T bank office.

Mr. Goosby was informed of the limited confidentiality of the present evaluation, and that the evaluation would form the basis of a report which would be sent to the referral source and whomever else he released the information. Mr. Goosby was given and read the Informed Consent form but declined to sign the document.

**Compensation:** This psychologist's fee schedule in the present case is $400 an hour for all activities except travel, which is billed at $200 an hour and testimony, at deposition or trial, which is billed at $500 an hour. The fee is earned without regard to the case.

**Testimony Case List:** Attached as Exhibit A. is a list of cases in which this expert has testified at deposition or trial in civil or criminal proceedings in the last four years.

**Qualifications of the Expert:** Attached as Exhibit B is this expert's curriculum vita which outlines his educational and occupational history, scholarly work, and qualifications.

**Basis of the Evaluation:** The information contained, and the opinions offered in this report were based on the following data sources:

1. Clinical interview and mental status examination of Mr. Goosby
2. Psychological testing consisting of the Minnesota Multiphasic Personality Inventory-2
3. Review of records including:
   a. Complaint
   b. Plaintiff's initial disclosures
   c. BB&T motions to strike jury demand, supporting documents and request for judicial notice (DE 23-25)
   d. Plaintiff's response to defendant's request for production
   e. Plaintiff's response to Defendant's first set of interrogatories
   f. BB&T answer to complaint
   g. Body camera videos from Officers Wilkinson, Pineda and Farinas
   h. Audio and PDF transcript of 911 call by BB&T on March 3, 2017
   i. Audio and PDF transcripts of two 911 calls by Mr. Goosby on March 3, 2017
   j. BB&T office surveillance video on March 3 and March 6, 2017
   k. Carter Wiggins and Associates
   l. Arrest affidavit dated December 3, 2015
   m. Appearance of bond dated March 3, 2017

Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN
Page 3

n. Arrest affidavit dated March 3, 2017
o. DRT Behavioral Services
p. Photos and property assessment information on Mr. Goosby's home
q. Miami/Dade County Criminal docket dated March 22, 2000
r. Miami/Dade County Criminal docket dated October 12, 2001
s. Miami/Dade County Criminal docket dated October 12, 2010
t. Miami/Dade County Criminal docket dated December 9, 2015
u. US Bank v  Goosby Complaint dated April 26, 2016
v. TD Bank v Goosby Complaint dated October 21, 2016
w. State of Florida Division of Corporations Top Title, Inc status
x. Bank of New York v Goosby Complaint dated November 3, 2016
y. Florida Office of Financial Regulation Mortgage Broker License Records
z. Jailbase.com mugshots and charge listing for Mr. Goosby from the December 4, 2015 and March 3, 2017 arrests for Disorderly Conduct

**History of the Presenting Problem:** Mr. Goosby stated that on March 3, 2017, after having lunch with his girlfriend, he went to the BB&T bank to cash a check they had sent to him as refund for partial payment he had made on a loan/line of credit they had acquired when they bought BankAtlantic. Mr. Goosby went on to describe how he had had problems with BB&T regarding this loan and that this ultimately resulted in the loan wrongfully being placed into foreclosure.

Mr. Goosby stated that after leaving lunch with his girlfriend, he took the check of $3700 through the bank drive through to be cashed. He indicated that he had dealt with BB&T in the past but had never been to this particular branch. After presenting his check and ID to the teller, he stated that she informed him that the check was fraudulent. After waiting several minutes, she informed him through the intercom that he had come into the bank to verify the check. He parked his vehicle and subsequently went into the branch.

Mr. Goosby stated that the teller in the drive-through was the same woman who waited on him inside the branch. After she again told him that the check was not valid, he explained to her that in fact it was legitimate. When she was not persuaded that the check was valid, he stated that he asked for his check and identification back so that he could go someplace else to have it cashed; however, he stated that the teller said she could not give him back the check or his ID.

Mr. Goosby stated that he then asked to talk to the branch manager but was informed that he was unavailable and on a conference call. He then asked where the manager's office was and indicated that the teller left the window, with his ID and check on the counter, and went to the manager's office and closed the door.

Mr. Goosby stated that he then called 911 to inform them of the incident.  Mr. Goosby stated that when police had not arrived after approximately 15 minutes, he made a second call to 911. After his first 911 call, bank surveillance video indicated that Mr. Goosby went to the window of another teller.  This teller reported that Mr. Goosby told her that she was beautiful.

Mr. Goosby indicated that a police officer then entered the branch and, believing that he was responding to his 911 call, Mr. Goosby flagged him down and told him of his story. He

reported that the officer did not know of his call to 911 but in fact had been responding to a call from the bank. He indicated that the officer told him to remain by the teller window and that he then went into the manager's office. While in the office Mr. Goosby stated that he could hear the officer say, "What do you want me to do?"

Mr. Goosby stated that the officer then came out of the office and asked him to come into the manager's office. He was somewhat hesitant to do so because of his size and the fact that the manager and female teller look scared. He also said that the officer was of small stature but that he had a "big gun." Mr. Goosby complied with the officer's request and entered into the manager's office.

While in the manager's office Mr. Goosby reported that he felt like he was being interrogated. When the officer told him to listen to what the bank employees were saying he asked "Why?" since the check was legitimate and the bank was wrongly accusing him. He was then told that the bank had verified that the check was fraudulent. At this point Mr. Goosby indicated that a second officer, the one that was responding to his 911 call, entered the room.

Mr. Goosby reported the following: He felt "demoralized" and that he was being treated like a "criminal." He indicated that the police officer told him to calm down, but Mr. Goosby felt that he was being calm and that he was not causing a scene. At this point, Mr. Goosby stated that he intended to sue the bank if they had in fact given him a fraudulent check and that he asked the manager to simply give him a written statement that the check was fraudulent, a copy of the check, and his ID, and that he would leave. Mr. Goosby informed this examiner that while he did not know this at the time of the event, he now he realizes that you could not leave the scene if you were accused of providing a fraudulent check.

Mr. Goosby reported that he felt intimidated by the bank manager, who was standing over him pointing his finger at him. He also felt uncomfortable in that one the police officers had his hand on his weapon. He became concerned for his safety stating that he knew what could happen in these types of situations and that he could be shot and killed and not be there to tell his side of the story.

Mr. Goosby indicated that the police then told him they were going to arrest him for passing a forged instrument, even though he assured them that it was legitimate. At this point he became "really aggravated" and fearful that the officers would shoot him stating that he did not want to see himself on "Channel 7 news" as part of a story of "another big black guy on the news." He indicated that he then told the police that he would rather go to jail than be shot. While the police officer told him to calm down, he stated to them that he was calm.

At this point, Mr. Goosby reported hearing one of the police officers say "disorderly" and that because of his fear of being shot and his hearing the police officer say he was going to be arrested, that he stood and had the officers handcuff him. He said he was then instructed by officers to sit down but he asked them why did he have to remain there if he was going to be arrested and then he was taken out to the patrol car.

Mr. Goosby reported that he was placed in the backseat of the patrol car that was not air-conditioned. He believed that officers were trying to "provoke" him and that because of the

heat, he had a difficult time breathing. The officers came to the car and informed him that the air-conditioning did not work but they did crack one of the windows in the car.

While in the patrol car, Mr. Goosby stated that he was embarrassed in that he saw many people who knew him and had worked for him. At one point he indicated that police pulled him out of the car by his feet, causing his face to drag on the seat where people had been sitting, to loosen his handcuffs.

After being in the car for approximately an hour, Mr. Goosby indicated the police came and told him that they had both "good news and bad news." The good news was that the check was in fact legitimate. The bad news was that he was being taken to jail on a charge of a misdemeanor (disorderly conduct).

At this point Mr. Goosby stated that he became "mad" and all that he could do was hit his head against the window. He felt as if he was being treated as a slave. At one point, after informing officers that he was thirsty, he indicated that an officer opened the bottle of water and poured it into his mouth from above, causing it to splash on his face, and making Mr. Goosby feel as if he was being treated like a dog. While in the car he indicated that the officers sympathized with his predicament but told him that he was being arrested for disorderly conduct on account of his size and intimidating behavior. He was subsequently transported to jail.

Mr. Goosby indicated that he remained in jail all night and that the experience was terrible and that he was placed with a number of ill people. He indicated that he was able to bond out at approximately 1:00 PM the next day. Following his arrest, he had to obtain a private attorney and indicated that the state dropped the charges against him.

Mr. Goosby indicated that his primary emotions during the above incident were that of fear and embarrassment. As noted above, he was fearful of his safety and his life because of the police officer having his hand on his weapon. He felt as if he were being belittled and that his character was being demoralized, reminding him of how he might've been treated in this country 100 years ago. He knew that the check was legitimate and was taken aback by the people in charge not believing him based on the words of a single woman. While he states that he knew such injustices are perpetrated against African-Americans, he was still taken aback in that such an event had never happened to him.

**Current Reported Symptoms:** Mr. Goosby reports that he has been continually depressed since the March 2017 event. He feels depressed every day but, on some days, it is worse than others. He described his depression as a "4" on a scale of 1 to 10 where one represents the most depressed mood. He reports general anhedonia and decreased interest and pleasure in virtually all activities. He has had a significant loss in libido and reports a drop in sexual activity from several times a week before the incident to only four times since the event.

Mr. Goosby indicated that he is more isolative and withdrawn, wanting to avoid going out on account of his fear of being around people. This fear stems from several factors including his embarrassment surrounding his arrest. He indicated that he was a respected person in the community who had a good reputation. In fact, he indicated that people referred to him as "Rev" because of his encouraging people to go to church. Following his arrest his picture was

placed on the Internet, causing others to know of event and change their opinion of him.  For example, he indicated that people are avoiding him and that one tenant moved out after seeing Mr. Goosby's picture on the jail website. He also indicated his arrest has hurt his business in that people now think that his businesses are "shady" and no longer want to work for him.  He indicated this has also harmed him in his personal life and described an incident where a woman at church saw his booking picture on the Internet and informed the pastor of their church that he needed to avoid Mr. Goosby. Mr. Goosby, who served as a security associate for the pastor, found this to be particularly troubling although he indicated that he was accepted by the pastor after he was able to view the video of the event.

Mr. Goosby also avoids people because of his fear of his physical stature and that it will be intimidating to others. In fact, he said that being "big is a curse" and that this was the reason he was arrested and went to jail. He is also afraid of what women might say about him because of how the female teller responded to him which he believes is due to his size. Finally, he is embarrassed regarding his emotional displays (e.g., crying in public) and does not want to have to explain to others why he is upset.

Mr. Goosby reports a significant decrease in appetite indicating he has lost significant weight, going from 290 pounds at the time of the event to a current weight of 255 pounds. He no longer works out because of decreased energy as well as his desire to reduce his physical size so that he is not intimidating.

Mr. Goosby reports significant sleep impairment indicating that he will be "up all night." Prior to falling asleep he is troubled by images of being in the room at the bank with the manager pointing at him, the police officer holding his gun, and feeling as if he was going to be shot. He also ruminates on his being thirsty in the car and how the officer poured water down on him, causing him to catch it like a dog. After he will fall asleep he is frequently awoken by unpleasant dreams (see below).

Mr. Goosby reports feelings of worthlessness and decreased self-esteem indicating a significant decline from where he was prior to the event. He also experiences guilt about being "so big." He is reporting decreased attention and concentration abilities. He also indicated having suicidal  thoughts in the past but that he did not share this with his mental health providers. He denied any current suicidal intent or plan.

Mr. Goosby stated that he was in fear for his life at the time of the event because of the officer having his hand on his weapon and his general knowledge of African-American men being victims of inappropriate police actions. He indicates continued intrusive recollections of the event that involve him seeing images of the manager standing over him and pointing, the teller waving the check and telling him it was fraudulent, police pouring water all over his face like a dog, etc. While he tries to resist these images, he is unable. These images can be triggered by a number of factors including driving past the bank, seeing women who resemble the teller or hearing the word "intimidate." At other times these intrusive recollections often emerge without any precipitating event. He also has nightmares where he is under water, shackled, and having difficulty breathing. He also has dreams of the teller "flapping the check" in front of him and the manager pointing at him.

Mr. Goosby reported experiencing both psychological and physiological responses to these images that involve sadness, anxiety, crying, and body tension. He attempts to avoid situations that remind him of the event. For example, he stated that he has never been back to that particular branch and that he will even avoid driving by the facility.

As a result of this experience, Mr. Goosby stated that his view of the world has changed. He realizes now that life is unfair and that detrimental things can happen to you simply by the right person saying something, even if it is not true. He is less trustful of the world. There is also a part of him that attributes blame for the event to him simply because of his size and is feeling that if he were "smaller" the arrest would not have happened.

As noted above, Mr. Goosby reports significant shame regarding the event secondary to its negative impact on his reputation in the community and his social and occupational pursuits. He feels more detached from others and does not feel as close to his girlfriend. He has a difficult time experiencing happiness and indicates that the feeling of happiness is not the same.

Mr. Goosby indicated that he has increased anger and irritability since the event, indicating that he is always "mad or sad." This is a significant departure from his previous personality. He denied any physical aggression. He denied any self-destructive behavior. However, he reports being much more hypervigilant, especially when in an enclosed room like the one in which the evaluation took place (see below). In fact, being in such an environment can serve as a cue for intrusive recollections of the event. He denied an exaggerated startle response.

Mr. Goosby denied any symptoms of mania such as discrete periods of expansive mood, grandiosity, or decreased need for sleep. This is somewhat inconsistent with what he has reported to other mental health professionals. He indicated he is always been "active" but denied any blatantly manic or hypomanic symptoms. He did report experiencing approximately four panic attacks since the event where he became extremely anxious and nervous, had difficulty breathing, and felt as if he might be dying. He is unable to identify a specific trigger to these events although he indicates they will sometimes occur after a dream.

Mr. Goosby has sought treatment for his symptoms beginning on June 30, 2017 when he went for evaluation with Mr. Wiggins. These notes were handwritten and difficult to read. However, they seem to indicate that Mr. Goosby reported a number of psychological symptoms similar to that being reported at the present time. While Mr. Goosby indicated attending approximately seven sessions with Mr. Wiggins, this examiner was only able to identify three contacts occurring on June 30, July 20, and August 10, 2017. In a December 14, 2017 letter to Jermaine Lee, Esq., Mr. Goosby's attorney, Mr. Wiggins indicates that Mr. Goosby has been treated for PTSD and Major Depressive Disorder.

Mr. Goosby also sought treatment from Dr. Thomas. An August 9, 2017 note indicates that he had been referred by Mr. Wiggins. He was diagnosed with PTSD and given a prescription for Xanax and Remeron and recommended to continue in psychotherapy. It was recommended that he return to the office in four weeks. The next note from Dr. Thomas occurs October 25, 2017. This note indicates that the Xanax is helpful in his anxiety and that he has never taken the Remeron medication. This note indicates that they will start him on Remeron and add Trazodone to his medication regime. No other notes from Dr. Thomas were provided.

**Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN**
**Page 8**

**Psychosocial History:** Mr. Goosby was born on December 2, 1966 in Lakeland Florida. His parents were married at the time of his birth and remained so until his father died of cancer when Mr. Goosby was nine years old. His mother did not remarry and raised him and his 11 siblings alone. His mother died in 2012. He denied any history of physical, emotional, or sexual abuse.

**Educational/Occupational History:** Mr. Goosby described himself as doing well in school and denied any grade failures or special education classes. He denied any significant behavior problems and got along well with teachers and peers. He was involved in extra-curricular activities such as sports and graduated from high school in 1984.

After graduating high school Mr. Goosby matriculated to Florida Memorial University in Miami where he again did well. He stated that he received his bachelor's degree in business management and administration. He also holds certifications as a mortgage broker business, mortgage broker licensee, and title company licensee.

Mr. Goosby worked in medical billing for approximately 10 years. He then began his own property management business that involves investing and rehabilitating properties. He was involved in this line of work at the time of the incident and is still self-employed in this area. However, as noted above, he indicated that his business has suffered significantly because of his arrest. In fact, he indicated that he has not done any new deals since the incident and that he had to file for bankruptcy recently to save his home. As noted above, Mr. Goosby was involved in some type of financial dispute with BB&T prior to the event regarding his payment on a previously obtained line of credit.

However, review of records indicates that Mr. Goosby's financial difficulties preceded the March 2017 event. Records also indicate that in addition to his loan issues with BB&T, several other banks also filed complaints against him. For example, complaints for foreclosure were filed against Mr. Goosby and his various business interests by TD Bank, US Bank and Bank of New York in 2016 for his failure to repay various mortgages. In addition, documents from the State of Florida indicate that his mortgage broker license has been expired since August 2009. Additionally, his title company, Top Title, Inc., appears to have been dissolved since September 2010.

**Relationship History:** Mr. Goosby has been married since 1992. He described the relationship as an "8-10" on a scale of 1 to 10 where 10 represents the best possible relationship. However, when there was some confusion regarding his discussion of his present girlfriend, he indicated that he and his wife have actually had been separated for three or four years but that they have not divorced. He indicated that he still maintains a good relationship with her and went to the movies with her just the other day. His wife and three children do not live with him.

Mr. Goosby has been in his current relationship for over a year. He described the relationship as a "10" prior to the incident. However, he stated that since then it has fallen to a 3-4. He attributes this to his agitation, communication difficulties and his avoidance of being around others. As noted above, he noted a significant decline in both their physical and emotional intimacy. In fact, he stated that he would not be bothered if he never saw her.

Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN
Page 9

**Past Medical History:** Mr. Goosby described himself as being in good physical health prior to the incident. He denied any serious medical illnesses, accidents, diseases, or other conditions. As noted above, he has stopped working out because of his concern about his size and his relationship to people perceiving him as intimidating. He also indicated that he has been unable to go back to his gym because a woman at the counter resembles the bank teller. He denied any significant medical issues since the incident.

**Past Mental Health History:** Mr. Goosby denied any mental health treatment prior to the above incident. He also denied any mental health treatment from other healthcare professionals or need for mental health intervention. He has been seeing Mr. Wiggins and Dr. Thomas since the event and has been diagnosed with Major Depressive Disorder and Posttraumatic Stress Disorder. He indicated Dr. Thomas has placed him on Xanax for anxiety and two other medications that he was unable to recall, one for sleeping and the other is to help him stay calm.

**Substance Use History:** Mr. Goosby described himself as a rare user of alcohol, consuming several drinks a month usually with a meal. He denied any history of alcohol abuse or alcohol-related problems. Mr. Goosby indicated that he may have smoked marijuana once or twice as a teenager but indicated that he has not used marijuana in more than 20 years. He denied any use or experimentation with any other illicit drugs. He denied any concerns about abuse of prescription medications.

**Past Arrest History:** Mr. Goosby indicated one instance of previous law enforcement contact. He described a situation where someone had stolen his property and he reported this to police. The individual was apprehended and a trial was scheduled. Mr. Goosby stated that decided to let the matter drop but that a warrant was filed on him for not "taking the guy to court." Mr. Goosby was unaware of this warrant until four years later when he was pulled over by police a traffic issue, informed of the outstanding warrant, and taken to jail. He indicated that he was in jail for several hours and was then released. While the warrant involved a felony charge, he stated that it was later dropped.

Mr. Goosby's description of his past legal history is inconsistent with the records reviewed by this examiner. For example, records indicate that Mr. Goosby was arrested on December 3, 2015 and charged with disorderly conduct. According to the police report, Mr. Goosby became verbally aggressive towards his wife in a restaurant parking lot. When police made contact with him he was asked to lower his voice but refused and was noted to be very loud and yelling obscenities in the area which resulted in disruption of the business and forming of a crowd. He was subsequently taken into custody and transported to a police substation.

Mr. Goosby was also charged with disorderly conduct from an event taking place on October 12, 2001. The examiner was not able to find a narrative of this event. However, court records indicate that some type of judgment was entered in that Mr. Goosby received a fine. Mr. Goosby was also arrested in March 2000 on charges of petty larceny, theft, and sanitary nuisance. He was subsequently placed on probation. Again, no narrative of the details of this charge were available for review.

Mr. Goosby was also arrested for possession of cannabis on October 12, 2010. No narrative was available regarding the details of this charge. Records reviewed indicate that adjudication was withheld but that Mr. Goosby received a fine and court costs.

**Behavior Observations and Mental Status Examination:** Mr. Goosby arrived for his appointment approximately 10 minutes late. The evaluation included both an interview and psychological testing and began at 10:10 AM and concluded at 4:35 PM. At 12:25 PM Mr. Goosby asked to take an approximate 30-minute lunch break, which was granted. However, he did not return to the examination room until 1:50 PM, indicating that he had fallen asleep in his car. Mr. Goosby was appropriately dressed in a black polo shirt and pants. He indicated that he specifically wears black because it makes him look smaller so that he does not appear intimidating to others. In fact, during the evaluation, Mr. Goosby asked this examiner if I felt intimidated by him. Mr. Goosby was generally cooperative with the examiner and a good working rapport was established.

Mr. Goosby was appropriately oriented. His reality testing abilities were intact with no evidence of any hallucinations, delusions, obsessions, compulsions, flight of ideas, or loosening of associations. When he first came into the examination room, he was noted to be deliberately looking from side to side and behind him as if he were suspicious or hypervigilant. When asked by the examiner if he was okay, Mr. Goosby responded that he does not like being in enclosed spaces since the event and that such situations remind him of his experiences that day. Is important to note, however, that Mr. Goosby ceased this behavior within the first 15 minutes of the evaluation. In fact, during the psychological testing later in the afternoon, Mr. Goosby, who had his back to the door, did not even raise his head when the examiner would reenter the room and come up behind him.

Mr. Goosby's affect was mildly varied throughout the evaluation. He was noted to become teary-eyed many times, such as when discussing his treatment at the bank and with police, current symptoms, changes in his life, and financial distress/bankruptcy which he attributes to the event. He was noted to place his head in his hands numerous times and was asked by the examiner on several occasions if he felt he could continue, to which he replied he did.

Mr. Goosby's attention, concentration and memory abilities were generally intact and sufficient for him to participate in the evaluation. He was able to give a detailed account of events at the time of the incident as well as his pre-and post-incident history. There were significant discrepancies between the record and Mr. Goosby's self-report. These involved the incident, his past arrest and substance use history, subsequent visit to the bank, etc. However, these were viewed as not being representative of an underlying cognitive deficit, but rather an intentional effort at impression management. His language abilities were within normal limits both in terms of production and comprehension. His speech was appropriate in terms of content and rate.

**Psychological Test Results and Interpretations:** Mr. Goosby responded to psychological test items in a consistent manner, similar to that of most individuals, with no evidence of any confusion, error, omissions, or random responding that would invalidate testing. While not leaving any items blank, his responses to several items were somewhat equivocal, resulting in them not being scored.

**Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN**
**Page 11**

There was indication of symptom exaggeration noted on both test validity and clinical scales. For example, Mr. Goosby achieved significant elevation on eight of 10 clinical scales. In some cases, his scores were over five standard deviations above the mean, indicating an extremely elevated score, even for someone in an inpatient psychiatric setting. The levels of psychopathology indicated on the test would be seen as inconsistent with Mr. Goosby's observed behavior during the evaluation and his current adaptive functioning in his life. Persons with this profile would be expected to display overwhelming depressive symptoms to the point of likely being unable to function in their life. They would also display a level of paranoia and persecutory ideation that would be consistent with a disturbance in reality testing abilities to the level of psychosis. As noted above, these types of descriptors would be inconsistent with Mr. Goosby's observed behavior and adaptive functioning. Because of this overreporting, further analysis of test scales is not warranted.

**Opinions and Recommendations:** Mr. Goosby is a 51-year-old, separated, African-American, real estate investor/manager who reports numerous physical, cognitive, and psychological symptoms since an event at a BB&T bank office where a dispute regarding the legitimacy of the presented check ultimately resulted in him being arrested for disorderly conduct.

Based on the results of the present evaluation, is my professional opinion, within reasonable degree of psychological probability, that Mr. Goosby does not currently exhibit symptoms that would suggest lingering psychological sequela from that event or support a diagnosis of PTSD. This opinion is supported by the following:

1. There are concerns regarding Mr. Goosby's reliability as an informant. This opinion is supported by the following:
    a. Results in the present evaluation indicate that Mr. Goosby is likely exaggerating and/or fabricating many symptoms.
        i. As noted above, psychological test results indicate the presence of symptom exaggeration, especially when viewed in context with Mr. Goosby's behavior observations and recent history.
        ii. Mr. Goosby was not forthright in his self-reported history to this examiner specifically involving the incident, his past legal history, possible substance use, and reported symptoms.
        iii. Mr. Goosby's observed behavior of paranoia/hypervigilance, a symptom of PTSD, appeared to be contrived and was not consistent with such symptoms seen in patients with a legitimate PTSD diagnosis.
    b. Mr. Goosby is currently involved in litigation where his recovery will be based, in part, on the nature, range, and scope of his psychological distress. The DSM-5 indicates that such a situation can result in symptom exaggeration/fabrication, a condition described as Malingering, especially in situations where the evaluation takes place in a medical legal context and there is noted inconsistency between reported and observed symptoms/behaviors.
2. Events from March 3, 2017 do not meet DSM-5 criteria for diagnosis of PTSD. This is supported by the following:

Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN
Page 12

    a.  DSM-5 is a hierarchical diagnosis the first requires the person to be exposed to a situation that involves "actual or threatened death, serious injury, or sexual violence."

    b.  While Mr. Goosby's interaction with bank employees was no doubt frustrating, there is no indication of any behavior on their part that would even remotely approximate this criterion. This is supported by the following:

        i.  Review of surveillance video and police body cameras do not indicate any hostile, aggressive, or threatening behavior by bank employees. In fact, behavior by the bank employees was noted to be calm and courteous. They were not noted to raise their voice or threaten Mr. Goosby in any way, let alone engage in behavior that would meet the above criterion for PTSD.

        ii.  Mr. Goosby's contention that the bank manager stood over him and aggressively pointed his finger at him is not consistent with the video record. While the bank manager was noted to stand up on one occasion, the type of intimidating pointing described by Mr. Goosby was not observed. However, even if such behavior did occur, it would not rise to the level of a PTSD stressor.

    c.  Mr. Goosby reports that he experienced this level of trauma because of the behavior of the police. He supports this through his contention of historic police inappropriate behavior towards African-American males, officers telling him to calm down when he perceived himself as being calm, and one officer having his hand on his weapon. Mr. Goosby's account of events is, however, inconsistent with the video record observed by this examiner. This opinion is supported by the following:

        i.  Because the video provided is from police officer body cameras, it is impossible to validate or contradict Mr. Goosby's contention that the officer rested his hand upon his weapon. However, an officer being present with his weapon or even having his hand on a holstered or secured weapon would not, in my professional opinion, meet this criterion for PTSD.

        ii.  While no video of the officer's hand on his weapon is available, there is no indication from the observed video that would indicate that officers were threatening or attempting to intimidate Mr. Goosby. In fact, officers are noted to be calm, courteous, and attempting to resolve the matter in a professional way.

        iii.  In fact, Mr. Goosby's emotional escalation and inappropriate behavior are not responded to in-kind by police.

        iv.  Mr. Goosby's reported fear that he would be shot and killed by police appears to be inconsistent with his observed behavior. For example, his yelling at police, use of profanity towards them, and erratic behavior does not appear to be consistent with his report of asking to be arrested because of his desire to minimize any harm that might come to him.

    d.  Mr. Goosby's account of events, including his behavior, is inconsistent with the video record, and indicates either a lack of insight into his behavior and its impact on others or a deliberate attempt to minimize his actions. This opinion is supported by the following:

    i. Mr. Goosby, in his frustration, clearly becomes agitated and emotionally erratic during interactions in the bank manager's office.

    ii. At times, Mr. Goosby's escalation appears to represent almost a deliberate attempt to have officers arrest him.

    iii. Mr. Goosby's emotional and behavioral escalation is evidenced not only in the bank but in the police cruiser where he can be heard screaming and at one point banging his head against the patrol car plexiglass between the front and rear seat.

    iv. Mr. Goosby appears to infer persecutory or aggressive behavior by the officers where none exists. His continual referral to his being mistreated or being treated as a dog appears to reflect his projection of his feelings onto the situation rather than a response to officer behavior.

    v. Mr. Goosby maintains that the police poured water from above onto his face and mouth, treating him like a dog. However, review of the video clearly indicates the police officer holding the water to Mr. Goosby's lips and interacting with him in a respectful manner, with Mr. Goosby expressing his gratitude to them.

  e. Mr. Goosby's emotional response to events that took place on March 3, 2017 appear to be more reflective of his underlying personality structure/emotional dyscontrol rather than a response to bank employee or officer behavior. This opinion is supported by the following:

    i. Mr. Goosby has a history of engaging in disorderly conduct as evidenced by two past arrests on the charge. In fact, he was most recently arrested only 15 months before the March 2017 incident on the exact same charge.

    ii. Review of Mr. Goosby's December 2015 arrest for disorderly conduct suggests similar emotional dyscontrol in a public venue (i.e., loud and disruptive behavior interfering with business operation) as well as his inability/refusal to comply with police requests to de-escalate and calm down.

3. Mr. Goosby maintains that he has also experienced shame, humiliation, decreased self-esteem, and disruption of his business because of his arrest. However, this assertion is difficult to understand given his documented history. This opinion is supported by the following:

  a. Mr. Goosby maintains that he was embarrassed and humiliated by police "parading" him to the patrol car in that he was seen by numerous people whom he knew. While Mr. Goosby may have encountered people he knew while being escorted to the patrol car, this event was precipitated by his emotional dyscontrol and erratic behavior in the bank.

  b. During his walk to the patrol car and after being placed in the patrol car, Mr. Goosby engaged in loud and erratic behavior that would call attention to himself.

  c. Mr. Goosby maintains that much of this trauma is related to this being his first experience with being in this situation, specifically being handcuffed and placed in a patrol car. However, this is inconsistent with the available records that suggest that an almost identical scenario would have occurred less than 15 months before because of his arrest for disorderly conduct in the restaurant

parking lot. Thus, rather than being a unique or previously unexperienced event, Mr. Goosby's experiences on March 3, 2017 likely would have occurred numerous times in his past.

    d. Mr. Goosby maintains that he suffers significant emotional distress and shame because of his humiliation within the community and the negative response by customers, employees, and friends because of his arrest. He specifically cites his mug shot being displayed on the Internet as the basis for their reactions and his distress. However, this contention is difficult to understand given his arrest on an identical charge only 15 months before. This arrest also occurred in a public place, presumably resulted in him being handcuffed, placed in a police car and taken to jail, and most importantly resulted in his booking picture being placed on the Internet.

4. There also appears to be an incongruity between Mr. Goosby's reported symptoms, distress, life disruption, and seeking of therapeutic services. This opinion is supported by the following:

    a. One of the diagnostic categories for trauma disorders such as PTSD involves the person avoiding stimuli associated with the traumatic event. Indeed, Mr. Goosby reports anxiety when driving past the bank parking lot and avoidance of that area. In fact, he stated he has not gone back to the bank since the March 3rd event. However, this self-report is inconsistent with bank surveillance video which indicates that he returned to the same bank three days later on March 6, 2017 to cash the original check. Given the number of BB&T branches within the area, it is highly unusual that an individual with such psychological trauma and avoidance behavior would return to the same bank to deal with the same people to cash the check.

    b. Despite the severity, chronicity, and disruption of life associated with Mr. Goosby's reported symptoms from the event, review of the provided medical records indicates that he did not seek treatment until June 30, 2017. Since that time, he has attended what appears to be three counseling sessions and two psychiatric appointments. It is surprising that someone in such distress would receive such limited intervention. While Mr. Goosby maintains that he is having to pay for the sessions "out-of-pocket", is important to note that there are a number of services available within the community that provide free or sliding scale services to individuals with limited financial resources.

It is possible that Mr. Goosby may be experiencing some legitimate underlying emotional distress that is unrelated to the bank incident. For example, while he maintains that his business has suffered as a result of the incident and that he has incurred significant financial loss as a result, review of the provided records indicates that his business and financial problems clearly predate the March 2017 event. As noted above, State of Florida records indicate dissolution of his title company, expiration of his mortgage brokers license and several complaints of mortgage foreclosure that all occurred prior to the BB&T event. Thus, while he filed for bankruptcy in the summer of 2017, provided documentation indicates a significant and long-standing financial problems independent from the BB&T event. It would not be unusual for an individual in such circumstances to experience depressive and anxiety symptoms. While one might argue that his failure to seek treatment prior to March 2017 suggests a lack of emotional distress associated with these stressors, it is important to note that he did not seek treatment for

**Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN**
**Page 15**

events stemming from the BB&T event until almost four months following his interaction with bank employees and police.  However, as indicated above, Mr. Goosby's current reported PTSD symptoms and depression, in my professional opinion, represent an exaggeration/fabrication of psychological distress, are not causally related to the March 2017 event and would be most consistent with a diagnosis of Malingering.


Michel J. Herkov, Ph.D., ABPP, ABN
Diplomate in Clinical Psychology
Diplomate in Neuropsychology
Licensed Psychologist

Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN
Page 16

Exhibit A

Michael J. Herkov, Ph.D.
Testimony Case List
January 2014-Present

Civil Cases

| Plaintiff | Plaintiff Or Defense | Referring Attorney | Attorney City |
|---|---|---|---|
| **2014** | | | |
| Christine Grimmett | D | J. Menello | Orlando |
| Dawn Moser | D | C. McKeon | Tampa |
| Dana King | P | L. Tygart | Jacksonville |
| Barbara Lourie | P | R. Cabaniss | Orlando |
| Cleston Wilcox | P | J. Gustafson | Tallahassee |
| Debra Natis | D | J. Menello | Orlando |
| Charles Hall | D | E. Sage | Fort Lauderdale |
| Maria Bucheli | P | G. Fox | Miami |
| Perry Poteat | D. | C. Coleman | Ocala |
| **2015** | | | |
| Robert Merritt | D | J. D'Andrea | Jacksonville |
| Peter Bennett | P | S. Andrews | Tallahassee |
| Naomi Williams | P | J. Cunningham | Seattle, WA |
| Evelyn Alston | D | B. Flanagan | Orlando |
| Tamar Jones | P | S. Andrews | Tallahassee |
| Merlonda Jones | P | S. Andrews | Tallahassee |
| George Gionet | D | W. Fox | Atlanta |
| Travis Allen | D | C. Skar | Fargo, ND |
| Max Price | P | A. Abel | Ft. Myers |
| Courtney Potts | D | B. Cole | Jacksonville |
| Kevin Armstrong | D | A. Salem | Jacksonville |
| Jerry Davis | D | L. Starrett | Jacksonville |
| Larry Johnson | P | L. Clark | Tampa |
| Green, Tammi | D | E. Wood | St. Petersburg |
| **2016** | | | |
| Joel Kun | P | N. Panagakis | Orlando |
| Donald Pearson | P | Eric Roslansky | Tampa |
| Max Price | P | Andrew Able | Ft. Myers |

Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN
Page 17

| Valton Sheffield | P | Melvin Wright | Orlando |
|---|---|---|---|
| Heidi Fortson | D | Chris Killer | Orlando |
| Dorothy McCabe | P | L. Clark | Tampa |
| Max Price | P | R. Spivey | Ft. Myers |
| Green, Tammi | D | E. Wood | St. Petersburg |
| Dudek, Richard | D | E. Sage | Weston |
| Astaphan, Jennifer | P | S. Ratzan | Miami |
| Flaherty, Jordan | P | L. Franklin | Louisville, KY |
| Cuscione, Joseph | D | D. Dore | Jacksonville |
| Chessher, Jason | D | P. Martin | Tallahassee |
| Theis, Edward | P | H. Bass | Miami |
| Joki, James | P | J. Cunningham | Seattle, WA |
| Price, John | P | G. Prysock | Jacksonville |
| Kloppenburg, Patricia | P | L. Briggs | Miami |
| Brown, Arthur | P. | G. Pryock | Jacksonville |
| Ribkee, Karen | D | E. Wood | St. Petersburg |
| Schecter, Linda | P | H. Bass | West Palm Beach |
| Shadd, Ralph | P | K. Hyman | Miami |
| Gloger, Irene | P | E. Zebersky | Ft. Lauderdale |
| Knapstein, Nichole | D | D. Dore | Jacksonville |

| | | 2017 | |
|---|---|---|---|
| Ilex McGill | D | L. Starrett | Jacksonville |
| Daniel Moore | D | T. Unice | Tampa |
| Faulkner, Anastasis | D | S. Adamsky | Weston |
| Gloger, Irene | P | E. Zebersky | Ft. Lauderdale |
| Shadd, Ralph | P | K. Hyman | Miami |
| Carrico, Diane | P | A Luciano | Jacksonville |
| Reding, Jack | D | J. Goldis | St. Petersburg |
| Williams, Mickel | P | J. Roth | Miami |
| Nunez, Bryanna | D | S. Mendlestein | Miami |
| Holcomb, Terry | D | J. Knight | Jacksonville |
| Maloney, Carolyn | P | C. Stevens | Ft. Myers |
| Hodges, Delmar | P | H. Bass | West Palm Beach |
| Heirs, Carolyn | P | H. Bass | West Palm Beach |
| Pearson, Donald | P | E. Roslansky | St. Petersburg |
| Mobley, Leonard | P | T. Luciano | Jacksonville |
| Baxter, Jacqueline | P | L. Briggs | Miami |
| Engleman, Gregory | P | T. Thompson | Louisville, KY |
| Williams, Annie | P | K. Massa | Jacksonville |
| | | | |
| 2018 | | | |

**Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN**
**Page 18**

| Neitzel, Matthew | D | R. Santos | Orlando |
| Ricks-Ngwayah, Elias | P | K. Conway | Chicago, IL |
| Gornick, Kimaya | D | J. Watson | Jacksonville |
| Malady, Bethany | D | B. Kennedy | Tampa |

## Criminal Cases

| Plaintiff | State Or Defense | Referring Attorney | Attorney City |
|---|---|---|---|
| **2014** | | | |
| V. Babichev | D | Gonzales Andux | Jacksonville |
| J. McMillian | D | Ann Finnell | Jacksonville |
| A Wilson | D | Andrew Thomas | Tallahassee |
| E. McDonald | D | Alice Copek | Tallahassee |
| **2015** | | | |
| Jamie James | D | A. Finnell | Jacksonville |
| Michael Sayles | D | G. Andux | Jacksonville |
| Michael Crowder | D | S. Andrews | Tallahassee |
| Devonte Harrison | D | R. Weeden | Orlando |
| Christopher Serna | S | D. Scuderi | Naples |
| Correnia Bice | C | Judge Manalich | Ft. Myers |
| Thesia Lipka | D | B. Hutson | Gainesville |
| Hicks, Edward | D | V. Jackson | Jacksonville |
| **2016** | | | |
| Crystalus, Donald | D | K. Bedell | Jacksonville |
| Troemner, Lisa | S | J. Brown | Naples |
| **2017** | | | |
| Grantley, Derrick | C | Judge Richards | Punta Gorda |
| McCrae, Victor | S | D. Butler | Ft. Myers |
| **2018** | | | |
| Troemner, Lisa | S | J. Brown | Naples |
| Santiago, Angel | S | H. Jones | Gainesville |

Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN
Page 19

## Exhibit B

## Curriculum Vitae

| | |
|---|---|
| **Name:** | Michael John Herkov, Ph.D. |
| | (Formerly Michael J. Hryckowian) |
| | |
| **Updated:** | September 1, 2016 |
| | |
| **Address:** | North Florida Clinical Psychology |
| | 3700 NW 91st Street |
| | Suite B-200 |
| | Gainesville, FL 32606 |
| | |
| **Business Phone:** | 352.678-0010 |
| **Business Fax:** | 352.327-3678 |
| | |
| **Licensure:** | State of Florida |
| | Licensed Psychologist |
| | PY4681 |
| **Board** | |
| **Certifications:** | Diplomate in Clinical Psychology |
| | American Board of Professional Psychology |
| | |
| | Diplomate in Neuropsychology |
| | American Board of Professional Neuropsychology |
| | |
| **Fellow:** | American Academy of Clinical Psychology |
| | American Board of Professional Psychology |
| | |
| **Supervisor** | Qualified Supervisor for Mental Health Counseling |
| **Certification:** | Florida Department of Health |
| | May 2006 |
| | |
| **Pre-Doctoral** | |
| **Education:** | Baldwin-Wallace College |
| | Berea, Ohio |
| | Degree: B.A., Psychology |
| | 1978-1982 |
| | Honors: Summa Cum Laude |
| | |
| | University of Central Florida |
| | Orlando, Florida |
| | Degree: M.S., Clinical Psychology |
| | 1983-1987 |
| | Honors: Magna Cum Laude |

**Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN
Page 20**

Auburn University
Auburn, Alabama
Degree: Ph.D., Clinical Psychology
1985-1990
Honors: Magna Cum Laude

Internship
Eastern Virginia Medical School
Norfolk, Virginia
Psychology Intern
1989-1990

**Post-Doctoral
Education:**

Forensic Psychiatry Training Program
University of Florida
Department of Psychiatry
Forensic Psychiatry Division
1992-1994

Neuropsychological Assessment Training
Without Compensation Employee
Veteran's Administration Hospital
Gainesville, Florida
1993-1994

**Academic
Appointments:**

University of Florida
Department of Psychology
Adjunct Professor
April 2013- May 2016

University of Florida
Department of Psychology
Courtesy Professor
August 2014- Present

Department of Psychiatry
Associate Professor- 2009- March, 2013
Chief, Forensic Addiction Medicine-2010- March, 2013
Director, Forensic and Addiction Psychology- 2009-March 2013
Director, P.O.W.E.R Program- 2010-March 2013

University of Florida
Department of Psychology
Associate Professor
Counseling Psychology Doctoral Program- 2009-March, 2013

**Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN   Page 21**

University of North Florida
Department of Psychology
Associate Professor-2003-2009
Coordinator, MACP Program 2003-2006

University of Florida
College of Medicine
Department of Psychiatry
Assistant Professor-1990-1996
Associate Professor-1996-2003

University of Florida
College of Arts and Sciences
Department of Psychology
Affiliate Assistant Professor- 1995-1996
Affiliate Associate Professor-1996-2003

**Tenure:**

University of Florida
Florida Board of Regents
1996

University of North Florida
Board of Trustees
2003

**Positions Held:**
**Clinical**

North Florida Clinical Psychology, Inc.
Licensed Psychologist
Duties: Psychological and Neuropsychological Assessment and
Treatment of Children and Adults
April, 2013-Present

University of Florida
Department of Psychiatry
Associate Professor
Forensic Institute
Program Director Forensic Psychology
Duties: Psychological and Neuropsychological Assessment
of Children and Adults and Testimony in Civil and Criminal
Matters-
2009-March, 2013

Florida Recovery Center
Program Director Addiction Psychology
Duties: Psychological and Neuropsychological Assessment
of Chemically Dependent Adults and Impaired Professionals-

**Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN   Page 22**

2009-March, 2013

Florida Recovery Center
Program Director UF P.O.W.E.R. Program
Duties: Evaluation and Treatment of Distressed and
Disruptive Professionals- 2010-March, 2013

North Florida Clinical Psychology, Inc.
Licensed Psychologist
Duties: Psychological and Neuropsychological Assessment of
Children and Adults
Psychological and Addictions Treatment of Children and
Adults- 2005-2009

University of Florida
College of Medicine
Department of Psychiatry
Division of Adult Inpatient Psychiatry
Duties: Psychological and Neuropsychological Assessment and
Treatment of Adult Psychiatric Inpatients- 1990-2003

Division of Adult Outpatient Psychiatry
Duties: Individual Psychotherapy of Adults
1990-2003

Division of Forensic Psychiatry
Duties: Psychological and Neuropsychological Assessment
of Children and Adults and Testimony in Civil and Criminal
Matters- 1990-2003

Consultation and Liaison Service
Duties: Psychological Evaluation of Inpatient Medical
Patients- 1994-1999

Employee Assistance Program
Duties: Crisis Intervention, Individual Psychotherapy-
1992-1997

Director of Psychological Services
Division of Addiction Medicine
Director Psychological Testing
Duties: Psychological Assessment and Treatment Planning with
Chemically Dependent Patients
2000-2001

**Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN   Page 23**

University of Florida
College of Medicine Office of the Dean
Division of Continuing Education
Program Director, U.F. Comprehensive Assessment and
Remedial Educational Services (U.F. C.A.R.E.S.)
Duties: Evaluation and Skills Assessment of Physicians
1999-2003

Director of Substance Abuse Education
2002-2003

**Teaching:**  University of Florida
Department of Psychology
Adjunct Professor
April, 2013 to May 2016

Department of Psychiatry
Associate Professor
2009-March, 2013

Forensic Psychiatry Fellowship
2009-March, 2013

Course Director
MEL: 4005- Medicine and the Law
2009-2011

Psychiatry Resident Lecture Series
2009-March, 2013

University of Florida
Department of Psychology
Associate Professor
PCO6316C- Assessment I Cognitive and Intellectual
Assessment
2009-March, 2013

University of Florida
Department of Psychology
Adjunct Professor
PCO6316C- Assessment I Cognitive and Intellectual Assessment
April, 2013-May 2016

University of Florida
Department of Psychology

Adjunct Professor
PCO6317C- Assessment II- Personality Assessment
August 2015- May 2016

University of North Florida
Department of Psychology
Associate Professor
2003-2009
Graduate Classes
Psychological Assessment
2003-2006

Ethics and Legal Issues
2003-2008

Research Design and Program Evaluation
2003-2005

Individual Evaluation and Assessment
2003-2009

Substance Abuse
2008-2009

Graduate Student Clinical Supervision
2003-2007

Undergraduate Classes
Psychology and the Law
2007-2009

Abnormal Psychology
2008-2009

University of Florida
College of Medicine
Assistant Professor
1990-1996

Associate Professor
1996-2003
Course Director
First Year Medical Student
Human Behavior Course
1998-2002

Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN   Page 25

Course Director
First Year Medical Students
Essentials of Patient Care
Communication and Interview Skills Module
1998-2002

Co-Course Director
Psychiatric Residents
Cognitive Behavioral Therapy
1995-1999

Course Director
Psychiatric Residents
Psychological and Neuropsychological Assessment
1999-2003

First Year Medical Student
Didactic Lecture Series
1990-2003

Third Year Medical Student
Psychiatry Clerkship
Didactic Lecture Series
1992-2003

Psychiatric Resident
Didactic Lecture Series
1990-2003

Forensic Fellowship
Didactic Lecture Series
1994-2003

Psychiatric Residents
Clinical Supervisor
1991-2003

Psychology Graduate Student
Clinical Supervisor
1990-2003

Psychology Graduate Student
Lecturer
1990-1998

Physician Assistant Program

**Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN   Page 26**

                               Lecturer
                               1992-2003

College of Medicine
Division of Continuing Medical Education
Founder and Course Director
BMS: 4029 Neurobiology of Addiction
2001-2003

Department of Counselor Education
Co-Course Advisor SDS: 3481 Substance Abuse
1999-2000

**Committee Work:**   University of North Florida
Distance Learning Committee 2005-2009

Parking Appeals Committee 2008-2009

University of North Florida
Department of Psychology
Developmental Psychology Search Committee
Member, 2004

Clinical/Counseling Health Psychology Search Committee
Chair, 2005

Clinical/Counseling Adolescent Psychology Search Committee
Chair, 2005

Clinical/Counseling Psychology Adolescent Search Committee
Chair, 2006

Psychology By-Laws Committee
Member, 2005

Psychology Ph.D. Development Committee
Chair, 2005

Psychology Promotion and Tenure Committee
Member 2006

University of Florida
College of Medicine
Department of Psychiatry

**Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN**
**Page 27**

College of Medicine
Faculty Council Representative 1992-1999

Undergraduate Education Committee Member
1994-1998

University of Florida
Faculty Senate Member
1995-1997

Addiction Medicine Director
Search Committee Chair 1996

Search Committee Member
College of Medicine
Office of the Dean
Educational Specialist
1998

Department of Psychiatry
Addiction Medicine Medical Director
Florida Recovery Center
1998

College of Medicine
Sexual Harassment Committee
Member
1999-2002

College of Medicine
Sexual Harassment Committee
Co-Chairperson
2002-2003

Florida Bar Association
Fourth Judicial Circuit
Grievance Committee
2003-2006

**Hospital**
**Privileges:**          Shands Hospital at the University of Florida
Gainesville, Florida
Clinical Psychology
1992-2003
2012-March, 2013

**Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN**
Page 28

Neuropsychology
2002-2003
2012-March, 2013

Shands at Vista Psychiatric Hospital
Gainesville, Florida
Clinical Psychology
1998-2003
2012-March, 2013

Neuropsychology
2002-2003
2012-March, 2013

**Professional Societies:**

American Psychological Association
Division 12-Clinical Psychology
Division 40-Neuropsychology
Division 41-American Psychology-Law Society

National Academy of Neuropsychology

American Board of Professional Psychology

American Board of Professional Neuropsychology

International Neuropsychological Society

**Offices Held:**

Florida Psychological Association
Psychology and the Law Committee
Chairperson
1996-1998

Board of Directors
Florida Psychological Association
1996- 1998

**Editorial Boards:**

*Assessment*
Editorial Board
Publisher: Psychological Assessment Resources
1995-2002

**Editorial Review:**

*Journal of Personality Assessment*
Ad hoc Reviewer
1991-2000

> *Psychological Assessment*
> Ad hoc Reviewer
> 1995-2003

**Consultant:**     Florida Board of Bar Examiners
Mental Health Consultant
1998-present

Professionals Resource Network
Consultant to the Florida Board of Psychology
2006-present

**Board Examiner:**     American Board of Professional Psychology
Board Certification Examiner
1997-2000

## Grants and Contracts:

Herkov, MJ, & Biernat, M. (1990). *Examination of student reactions to campus violence*. Division of Sponsored Research, University of Florida, Gainesville, FL. $1,000.

Herkov, MJ. (1990). *Community reactions, responses, and needs following serial murder: A guide for law enforcement.* National Institute of Justice, Washington, DC. $15,000.

Evans, DL, Greer, RA, Herkov, MJ, & Bottom, W. (1992). *A placebo-controlled study of pramiracetam in depressed inpatients undergoing electroconvulsive therapy*. Cambridge NeuroScience Incorporated, Research Triangle, NC. $30,000.

Herkov, MJ. (2004). *Adolescent Level II and III Evaluation.* Department of Juvenile Justice/First Coast Management, Jacksonville, FL. $56,000

Herkov, MJ. (2006). *Adolescent Level II and III Evaluation.* Department of Juvenile Justice/First Coast Management, Jacksonville, FL. $56,000

## Publications:

Hryckowian, MJ, & Gynther, MD (1988). MMPI item subtlety: Another look. *Journal of Clinical Psychology*, *44*, 148-152.

Hryckowian, MJ, & Gynther, MD (1989). MMPI item subtlety: Familiar vs. unfamiliar constructs. *Journal of Clinical Psychology*, *45*, 778-781.

Herkov, MJ, Archer, RP & Gordon, RA (1991). MMPI response sets among adolescents: An evaluation of the subtle-obvious scales. *Psychological Assessment: A Journal of Consulting and Clinical Psychology*, *3*, 424-426.

**Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN**
**Page 30**

Greer, RA & Herkov, MJ (1992). Erectile dysfunction in geriatric males. *Family Practice Recertification, 14,* 49-67.

Herkov, MJ, Gordon, RA, Gynther, MD & Greer, RA (1994). Perceptions of MMPI item subtlety: Influences of age and ethnicity. *Journal of Personality Assessment, 62,* 9-16.

Hankins, G, Barnard, G, Vera, M & Herkov MJ (1994). Patient-therapist sexual involvement: A review of clinical and research data. *Bulletin of the American Academy of Psychiatry and the Law, 22,* 109-126.

Greer, RA & Herkov, MJ (1994). Sexuality within a Russian geriatric sample: A pilot study. *Psychological Reports, 74,* 491-494.

Herkov, MJ, Greer, RA, Blau, BI, McGuire, JM & Eaker, D (1994). Bulimia: An empirical analysis of psychodynamic theory. *Psychological Reports, 75,* 51-56.

Biernat, M & Herkov, MJ (1994). Reactions to violence: A campus copes with serial murder. *Journal of Social and Clinical Psychology, 13,* 309-334.

Herkov, MJ, Myers, WC & Burkett, RC (1994). Children's reactions to serial murder. *Behavioral Sciences and the Law, 12,* 251-259.

Herkov, MJ & Blashfield, RK (1995). Clinician diagnoses of personality disorders: Evidence of a hierarchical structure. *Journal of Personality Assessment, 65,* 313-321.

Shaw, T, Herkov MJ & Greer, RA (1995). Examination of treatment completion and predicted outcome among incarcerated sex offenders. *The Bulletin of the American Academy of Psychiatry and the Law, 23,* 35-41.

Herkov, MJ, Gynther, MD, Thomas, S & Myers, WC (1996). MMPI responding among adolescent rapists, sodomists, and sexual abusers. *Journal of Personality Assessment 66,* 81-90.

Blashfield RK & Herkov, MJ (1996). Investigating clinician adherence to diagnosis by criteria: A replication of Morey and Ochoa. *Journal of Personality Disorders, 10,* 219-228.

Herkov, MJ, & Myers, WC (1996). MMPI profiles of depressed adolescents with and without conduct disorder. *Journal of Clinical Psychology, 52,* 1-6.

Herkov, MJ, & Biernat, M (1997). Assessment of PTSD symptoms in a community exposed to serial murder. *Journal of Clinical Psychology. 53, 809-15.*

Herkov, MJ, & Biernat, M (1997). Perceptions of the media in a community exposed to serial murder. *Journal of Clinical Psychology, 53,* 909-15.

Cheong, JA, Silva, SG, Petitto, JM, Herkov, MJ & Evans, DL (1997). Human immunodeficiency virus- related psychopathology and treatment. In *Current Psychiatric Therapy II*. (D.L. Dunner, Ed.) New York: W.B. Saunders.

Gold MS, Herkov MJ. (1998). Tobacco smoking and nicotine dependence; biological basis for pharmacotherapy from nicotine to treatments that prevent relapse. In MS Gold (Ed.) Smoking and Illicit Drug Use. (pp. 7-21). New York, NY: Haworth Medical Press.

Gold, MS & Herkov, MJ. (1998). Tobacco smoking and nicotine dependence: Biological basis for pharmacotherapy from nicotine to treatments that prevent relapse. *Journal of Addictive Diseases*, *17*, 7-22.

Gold, MS & Herkov, MJ (1998). The pharmacology of cocaine, crack and other stimulants. In AW Graham & TK Schultz (eds.) *Principles of Addiction Medicine 2nd Edition.* American Society of Addiction Medicine, Inc. Chevy Chase, MD.

Gold MS, Herkov MJ. (1998). The pharmacology of marijuana. In AW Graham & TK Schultz (Eds*.) Principles of Addiction Medicine, 2nd Edition* (Chapter 2: pp. 1-13) Chevy Chase, MD: American Society of Addiction Medicine.

Gold, MS & Herkov, MJ (1999). Close to home: Moyers on addiction review. *Journal of the American Medical Association, 280:232046-2407.*

Herkov, MJ & Gold, MS (1999)*.* Drugs and Violence. In L. Kurtz, (ed.) Encyclopedia *of Violence, Peace, and Conflict* San Diego: Academic Press.

Gold, MS & Herkov, MJ (1999). The heroin epidemic: Trends and interventions. In F. Flach (ed.) *The Hatherleigh Guide to Psychiatric Disorders, Part II.* The Hatherleigh Company, Ltd.: Long Island City, NY.

Cerda, JJ, VanSusteren, TJ, Hatch, R, & Herkov, MJ (2000). Remedial education: Can this doctor be saved? Transaction of the American Clinical and Climatological Association, 111, 188-95.

Herkov, MJ, Gold, MS, Frost-Pineda, K. (2001) Neuropsychological consequences of MDMA. *Biological Psychiatry*, *49,* 164.

Herkov, MJ & Conger, TW. (2002). Neuropsychological assessment: Psychometric and clinical issues. *Disability Medicine*, *2, 46-51.*

Herkov, MJ (2002) Neuropsychological effects of acute, high dose organophosphate exposure. *Archives of Clinical Neuropsychology,* 17, 752.

Herkov, MJ & Conger, TW. (2002). Neuropsychological assessment: Cognitive

Assessment. *Disability Medicine*, 2, 109-115.

Herkov, MJ (2003). Neuropsychological testing and PET contributions in differentiating
Frontal Lobe Syndrome from Antisocial Personality Disorder in a forensic population.
*Archives of Clinical Neuropsychology,* 18, 790.

Myers, WC, Marreno, L & Herkov, MJ. (2005). Forensic psychiatry and forensic psychology:
Sex offender- type, assessment & management. *Encyclopedia of Forensic and Legal
Medicine (R. Byard, T. Corey C. Henderson and J. Payne-James, Eds.).* Elsevier
Academic Press: pp. 444-451.

Gold, MS, Gold, ST & Herkov, MJ (2007). Drugs and Violence. In L. Kurtz, (ed.)
*Encyclopedia of Violence, Peace, and Conflict* San Diego: Academic Press.

Herkov, MJ & Morais. H. (2008) Neuropsychological Functioning in Serial Murder: A Case
Study of Aileen Wuornos. *Journal of the International Neuropsychological Society, 14,
S1*, p. 140

Herkov, MJ, Morais, J., Smith, A., & Slater, R. (2008) Effects of a video camera on
neuropsychological testing. *Archives of Clinical Neuropsychology, 23,* p. 748

Herkov, MJ, Morais, H. Slater, R., & Smith, A. (2008). The impact of video camera observer
effects on neuropsychological test performance. *Journal of the International
Neuropsychological Society, 14, S2,* p. 17

Herkov, MJ, Morais, H and Schwait, A. (2009). Practice effects in a forensic scenario: impact
of item familiarity versus procedural familiarity. *Archives of Clinical Neuropsychology,
24 (5),* p. 514

Gold MS, Herkov MJ. (2010) Understanding Addiction from Biology to Behavior. A
review of: Pharmacology and Treatment of Substance Abuse: Evidence- and
Outcome – Based Research Perspectives. PsycCRITIQUES, 55(9).

Gold MS, Merlo LJ, Bruijnzeel AW, Roytberg A and Herkov M. (2011). Addiction to Drugs,
Food, Gambling, Sex, and Technology: *Shared Causal Mechanisms?* In L. Cottler (Ed.)
Mental Health in Public Health (pp. 118-148). Oxford University Press: New York, NY.

Herkov MJ and Gold MS (2013). Etiology and Prevention of Stimulants (including cocaine,
amphetamines, misuse of prescription stimulants*. Interventions for Addiction:
Comprehensive Addictive Behaviors and Disorders Volume 3*. (pp. 815-822). Academic
Press/Elsevier: Oxford: UK.

Herkov, MJ (2013). ). Intellectual and Achievement Differences in Delinquent and Sexual
Offending Adolescents. *Journal of the International Neuropsychological Society, 19(2),
p. 17.*

Herkov, MJ (2013). Mental Illness and the Practice of Law. *The Bar Examiner. 82 (1), 42-5.*

Herkov MJ, Nias MF, Gold MS (2014). Addiction and Dependence. In Bruce Jennings (ed.) Encyclopedia of Bioethics – 4th edition. Macmillan Reference: Farmington Hills, MI

**Papers/Poster Presentations:**

Herkov, MJ (March, 1989). Etiology of bulimia nervosa from a psychodynamic perspective. *Southeastern Psychological Association Annual Meeting*: Washington, DC.

Herkov, MJ (April, 1990). Use of the Weiner-Harmon subtle-obvious scales in detecting malingering and defensiveness among adolescents. *Southeastern Psychological Association Annual Meeting*: Atlanta, GA.

Herkov, MJ & Gordon, RA (March 1991). Adolescent MMPI item subtlety: Differences in age and race in a forensic population. *Southeastern Psychological Association Meeting*: New Orleans, LA.

Biernat, MR & Herkov, MJ (August, 1991). Reactions to violence: A community copes with serial murder. *American Psychological Association Annual Meeting*: San Francisco, CA.

Barnard, GW, Herkov, MJ, Vera M & Goetz R. (October, 1991). Patient-therapist sexual contact: The forbidden zone. *American Academy of Psychiatry and the Law Annual Meeting*: Orlando, FL.

Herkov, MJ (December, 1991). Therapist risk factors in patient-therapist sex. *Risk Management Symposium University of Florida*: Gainesville, FL.

Blashfield, RK & Herkov, MJ (March, 1992). Clinical vs. criterion diagnoses of the DSM-III-R personality disorders. *Society for Personality Assessment Midwinter Meeting*: Washington, DC.

Herkov, MJ (April, 1992). Community responses to serial murder: Implications for law enforcement. *Florida Department of Law Enforcement*: Tallahassee, FL.

Herkov, MJ (June, 1992). Development and clinical uses of the MMPI-2. *Florida Psychological Association Annual Meeting*: Sanibel Island, FL.

Herkov, MJ, Biernat, MR & Caron, D (March, 1993). Assessment of PTSD criteria in a community exposed to serial murder. *Southeastern Psychological Association Annual Meeting*: Atlanta, GA.

Greer, RA & Herkov, MJ (May, 1993). Sexual dysfunction in Alzheimer's diseased patients. *American Psychiatric Association Annual Meeting*: San Francisco, CA.

Blashfield, RK & Herkov, MJ (May, 1993). Hierarchy of DSM-III-R personality disorders. *American Psychiatric Association Annual Meeting*: San Francisco, CA.

Herkov, MJ (June, 1993). Development and clinical uses of the MMPI-A. *Florida Psychological Association Annual Meeting*: Sarasota, FL.

Herkov, MJ (June, 1993). Reducing risk of employee violence. *North Central Florida Association of Human Resource Managers*: Gainesville, FL.

Herkov, MJ & Biernat, MR (August, 1993) Effects of media coverage on community reactions to serial murder. *American Psychological Association Annual Meeting*: San Francisco, CA.

Herkov, MJ & Biernat, MR (August, 1993) Effects of police activities on community reactions to serial murder. *American Psychological Association Annual Meeting*: San Francisco, CA.

Herkov, MJ (January 1994; November 1994; October 1995). Assertiveness training. *University of Florida Personnel Development:* Gainesville, FL.

Herkov, MJ, Myers, WC & Burkett, RC (March, 1994). Children's reactions to serial murder. *Southeastern Psychological Association Annual Meeting*: New Orleans, LA.

Herkov, MJ, Barnard, G, Beven, G & Greer RA (March 1994). Personality profiles of physician sex offenders. *American Academy of Psychiatry & the Law Annual Meeting*: Maui

Herkov, MJ, Gynther, MD & Thomas, S (April, 1994). MMPI responding in adolescent sex offenders. *Society for Personality Assessment Midwinter Meeting*: Chicago, IL.

Herkov, MJ (May, 1994). Community reactions to serial murder. *Leading Edge Seminars*: Gainesville, FL.

Herkov, MJ (January, 1995) Neuropsychological consequences of alcohol abuse. *Florida Society for Addiction Medicine*: Orlando, FL

Herkov, MJ (January, 1995). Competency and sanity issues in law. *Public Defender Winter Continuing Legal Education Conference*: Gainesville, FL

Herkov, MJ & Myers WC (March, 1995). Measures of psychopathy in an adolescent inpatient sample. *Southeastern Psychological Association Annual Meeting*: Savanna, GA.

Herkov, MJ & Myers WC (March, 1995). MMPI profiles of depressed adolescents with and without conduct disorder. *Society for Personality Assessment Midwinter Meeting*: Atlanta, GA.

Herkov, MJ (May, 1995). Dealing with the aftermath of serial murder. *Federal Bureau of Investigation Serial Murder Task Force Training Center*: Quantico, VA.

Herkov, MJ (June, 1995). Violence in the workplace. *National Association for Health Care Recruitment Annual Meeting*: Orlando, FL.

Herkov, MJ (March, 1997). Coping with Violence through Assertiveness. *Unmasked: Revealing the Forms and Faces of Campus Violence*. Office of Student Services, Drug and Alcohol Resource Center: Gainesville, FL.

Herkov, MJ (May, 1997). Personality Disorders: Etiology, diagnosis and treatment. *State of Florida Department of Corrections 1997 Psychiatry Conference*: Gainesville, FL.

Herkov, MJ (November, 1997). The role of the forensic psychologist in character and fitness investigations. *Committee of Bar Admission Administrators Fall Meeting.* Oklahoma City, OK

Herkov, MJ (February, 1998). Insanity of addiction? *Southern Coastal Conference: A Medical-Legal Conference on Addiction*: Jekyll Island, GA.

Herkov, MJ (February, 1998). Violence and drugs: Chicken, egg, and insanity. *Southern Coastal Conference: A Medical-Legal Conference on Addiction*: Jekyll Island, GA.

Herkov, MJ (September, 1999) Avoiding the pitfalls of professional practice: Life management. *Florida Veterinary Medical Association*. Orlando, FL.

Herkov, MJ (October, 1998) Disruptive Physician Symposium. *Florida Board of Medicine Quality Assurance Committee*, Orlando, FL

Bradley, K, Herkov, MJ, VanSusteren T & Hatch, R. (October, 1999) Fit for Life. Assessment of physician skills after residency. *Association of American Medical Colleges, 110 Annual Meeting*, Washington, DC.

Pomm, R., Thompson, K., and Herkov, MJ (March, 2000). Substance abuse treatment matching with patient criteria. *AMA International Conference on Physician Health.* Seabrook Island, SC.

Herkov, MJ (April 2000). Ask the experts: Sexual boundary violations. *Federation of State Medical Boards Annual Meeting*. Dallas, TX

Cerda, JJ, VanSusteren TJ, & Herkov, MJ (November 2001) Can you teach an old doc new tricks? Cognitive and remedial education. *Proceeds of the American Clinical and Climatological Association*, San Diego, CA.

Hatch, R., Herkov, MJ, VanSusteren, T. (March, 2001). Post licensure skill assessment: Results of the first 35 evaluations. *American Association of Medical Colleges Southern Group*

*on Educational Affairs:* Little Rock, AR.

Herkov, MJ, Gold, MS & Frost-Pineda, K. (May, 2001) Neuropsychological Consequences of MDMA. *Society of Biological Psychiatry Annual Meeting:* New Orleans.

Herkov, MJ (September 2002). Competency Assessment. *Southeast Region Federation of State Physician Health Programs*, Amelia Island, FL

Herkov, MJ (October, 2002). Neuropsychological effects of acute high dose organophosphate exposure. *National Academy of Neuropsychology Annual Meeting,* Miami, FL.

Herkov, MJ (October, 2003). Neuropsychological testing and PET contributions in differentiating Frontal Lobe Syndrome from Antisocial Personality Disorder in a forensic population. *National Academy of Neuropsychology Annual Meeting:* Dallas, TX

Rhoden, B. Herkov, MJ (November 2005). Sexual activity and paraphilia in adolescent sex offenders. *Florida Psychological Association Adult and Juvenile Sex Offender Treatment Conference.* Largo, FL

Herkov, MJ (November, 2006). When practitioners violate provider/patient boundaries. *Florida Department of Health Impaired Practitioners Program Workshop.* Tallahassee, FL.

Athearn, E & Herkov MJ (February, 2007). MMPI-A responses of adolescent sex offenders and delinquents. *Southeastern Psychological Association Annual Meeting*: New Orleans, LA.

Morais, H & Herkov, MJ (2007) MMPI and Rorschach data of serial killer Aileen Wuornos. *Southeastern Psychological Association Annual Meeting*: New Orleans, LA.

Murray, MR & Herkov, MJ (February, 2007). Paraphilia and sexual dysfunction in adolescent sex offenders. *Southeastern Psychological Association Annual Meeting*: New Orleans, LA.

Morais, H & Herkov, MJ (February 2007) MMPI and Rorschach data of serial killer Aileen Wuornos. *Southeastern Psychological Association Annual Meeting*: New Orleans, LA.

Herkov, M.J. (October 2007). Psychological testing in the assessment of boundary violations. *Professionals Resource Network, Inc. Facilitators and Treatment Providers Meeting.* Amelia Island, FL.

Herkov, M.J. (October 2007). Neuropsychological testing and its relevancy to practice. *Professionals Resource Network, Inc. Facilitators and Treatment Providers Meeting.* Amelia Island, FL.

Herkov, M.J. & Morais, H. (February, 2008) Neuropsychological functioning in serial murder:

A case study of Aileen Wuornos. *International Neuropsychological Society, Annual Meeting,* Waikoloa, HI.

Herkov, MJ, Morais, H. Slater, R. & Smith, A. (July, 2008) The impact of video camera observer effects on neuropsychological test performance. *International Neuropsychological Society, Mid-Year Meeting,* Buenos Aries, Argentina.

Slater, R. (October, 2008) Effects of a video camera on neuropsychological testing. *National Academy of Neuropsychology, Annual Meeting*, New York.

Herkov, MJ & Morais (November, 2009) Practice effects in a forensic scenario: Impact of item familiarity versus procedural familiarity. *National Academy of Neuropsychology, Annual Meeting*, New Orleans, LA.

Herkov, MJ (September 2010) Treatment of Disruptive Physicians. *Professionals Resource Network, Intervention Project for Nurses and Florida Lawyers Assistance Program 2010 Annual Conference*, Amelia Island, FL.

Herkov, MJ (October 2010) Managing key but disruptive professionals. Value Options Webinar

Herkov, MJ (November 2010) Psychological Factors in Character and Fitness Evaluation. *Florida Board of Bar Examiners,* Tallahassee, FL

Herkov, MJ (December 2010).Drug Addiction and Brain Disorders. *Florida Public Defender's Association Annual Meeting, Trial with Style XXV,* Daytona Beach, FL.

Herkov, MJ & Brown, M. (January 2011) Dealing with Disruptive Professionals. *University of Florida Department of Psychiatry Grand Rounds.* Gainesville, FL

Herkov, MJ (January 2011) Dealing with Disruptive Professionals. *University of Florida Department of Neurology Grand Rounds.* Gainesvlle, FL

Herkov, MJ (February 2011) Dealing with Disruptive Professionals. *University of Florida Department of Medicine Grand Rounds.* Gainesville, FL

Herkov, MJ (J 2011) Dealing with Disruptive Professionals. *University of Florida Department of Urology Grand Rounds.* Gainesville, FL

Herkov, MJ & Teitelbaum, SA, Harden, JR (April 2011) Using old tools in innovative ways: Psychological testing and the 12 steps. *Gateway Community Serivces 2011 Spring Conference: Innovations in treatment*, Jacksonville, FL

Herkov, MJ (May 2011) Dealing with Disruptive Professionals. *University of Alabama-Birmingham Department of Psychiatry Grand Rounds.* Birmingham, AL

Herkov, MJ (June 2011) Dealing with Disruptive Professionals. *University of Florida*

*Department of Urology Grand Rounds.* Gainesville, FL

Herkov, MJ (July 2011) Treatment of Disruptive Professionals. *Florida Lawyers Assistance Program, 25th Annual Workshop: A quarter century of help, hope and healing.* Naples, FL

Schwait, A. Herkov, MJ & Simonsen, M (August 2011) MMPI-A responding among adolescent sex offenders and juvenile delinquents. *American Psychological Association 119th Annual Convention,* Washington, D.C.

Herkov, MJ (September 2011). Dealing with Disruptive Attorneys. *American Bar Association 2011 National Conference for Lawyers Assistance Programs: Lawyers Helping Lawyers.* Tampa, FL

Herkov, MJ (October, 2008). Neuropsychological Assessment in Criminal Cases. *Regional Education Conference of the Barbados Association of Psychiatrists and Association of Psychologists.* Bridgetown, Barbados.

Herkov, MJ (October, 2008). Dealing with Disruptive Professionals. *Regional Education Conference of the Barbados Association of Psychiatrists and Association of Psychologists.* Bridgetown, Barbados.

Herkov, MJ (November 2011). Contemporary Issues in Forensic Neuropsychology. *American Psychological Association Clinician's Corner.* Washington, DC

Herkov, MJ, D'Andrea, E., Teitelbaum, S., Simonsen, M., Gold, MS., Schwait, A. & Hammond, C. (February 2012) Psychiatric Comorbidity in Impaired Attorneys in Residential Treatment, *Southeastern Psychological Association 58th Annual Meeting.* New Orleans, LA.

Herkov, MJ. Simonsen, M. Hudson, K. Teitelbaum, S. & Schwait, A. (February, 2012). MMPI-Differences in Substance and Non-Substance Abusing Delinquents. *Southeastern Psychological Association 58th Annual Meeting.* New Orleans, LA.

Hudson, K & Herkov, MJ (March, 2012). MMPI-Differences in Substance and Non-Substance Abusing Delinquents. *National Conference on Undergraduate Research.* Ogden, UT.

Herkov, MJ (April 2012). A Closer Look at Mental Illness: How to Evaluate Fitness and Character. *National Conference of Bar Examiners Annual Meeting.* Savannah, GA.

Herkov, MJ (June, 2012). Neuropsychological Testing as a Tool in Addiction Treatment. *Florida Society of Addiction Medicine-Florida Medical Professionals Group Combined Conference.* Orlando, FL.

**Forensic Psychological Evaluation and Expert Witness Report of Michael J. Herkov, Ph.D., ABPP, ABN**
**Page 39**

Herkov, MJ, Simonsen, M, Palmer, BA. (August 2012). Premorbid Psychiatric Diagnosis and Treatment of Juvenile Delinquents: A Case of Too Little Too Late. *American Psychological Association 120th Annual Convention.* Orlando, FL.

Herkov, MJ, Simonsen, M, Palmer, B, Schwait, A, Teitelbaum, S & Teitelbaum, SA (August, 2012).  Development of a MMPI-A Adolescent Sex Offender Scale. *American Psychological Association 120th Annual Convention.* Orlando, FL.

Herkov, MJ (March 2013). What are the Addictions? *Fifth Annual Mental and Behavioral Health Symposium: Addictions Across the Lifespan, Baptist Health South Continuing Medical Education Program,* Miami, FL.

Herkov, MJ (April 2013). A Closer Look at Mental Illness. 2013 *National Conference of Bar Examiners Annual Conference* Boston, MA

Herkov, MJ (June 2013). Mental Health in Character and Fitness Evaluations with the DSM-5. *Florida Board of Bar Examiners Policy Session.* Pensacola Beach, FL

Herkov, MJ (July, 2013). Intellectual and Achievement Differences in Delinquent and Sexual Offending Adolescents. *International Neuropsychological Society Mid-Year Meeting.* Amsterdam, The Netherlands

Herkov, MJ (March 2014). Pharmacological Responses of Mentally Disordered People. *Florida Association of Criminal Defense Lawyers Death is Different XX Conference,* Orlando, FL

Herkov, MJ & Rizzardi, K (July 2014). Judicial Well-Being. *2014 Annual Educational Program of the Conference of County Court Judges of Florida,* Ponte Vedra Beach, FL.

Herkov, MJ (March, 2015). Keynote Speaker- Professionalism Among Professionals. *Northwest Colorectal Foundation 3rd Annual Ethics Conference.* Salt Lake City, UT.

Ash, P & Herkov, MJ (May 2015). Exploring the Relationship Between Conduct and Diagnosis in Fitness Determinations. *National Conference of Bar Examiners Annual Meeting.* Chicago, IL

# Posttraumatic Stress Disorder

## Diagnostic Criteria                                           309.81 (F43.10)

**Posttraumatic Stress Disorder**

**Note:** The following criteria apply to adults, adolescents, and children older than 6 years. For children 6 years and younger, see corresponding criteria below.

A. Exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways:

   1. Directly experiencing the traumatic event(s).

   2. Witnessing, in person, the event(s) as it occurred to others.

   3. Learning that the traumatic event(s) occurred to a close family member or close friend. In cases of actual or threatened death of a family member or friend, the event(s) must have been violent or accidental.

   4. Experiencing repeated or extreme exposure to aversive details of the traumatic event(s) (e.g., first responders collecting human remains; police officers repeatedly exposed to details of child abuse).

   **Note:** Criterion A4 does not apply to exposure through electronic media, television, movies, or pictures, unless this exposure is work related.

B. Presence of one (or more) of the following intrusion symptoms associated with the traumatic event(s), beginning after the traumatic event(s) occurred:

   1. Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s).

   **Note:** In children older than 6 years, repetitive play may occur in which themes or aspects of the traumatic event(s) are expressed.

   2. Recurrent distressing dreams in which the content and/or affect of the dream are related to the traumatic event(s).

   **Note:** In children, there may be frightening dreams without recognizable content.

   3. Dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the traumatic event(s) were recurring. (Such reactions may occur on a continuum, with the most extreme expression being a complete loss of awareness of present surroundings.)

   **Note:** In children, trauma-specific reenactment may occur in play.

   4. Intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).

   5. Marked physiological reactions to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).

C. Persistent avoidance of stimuli associated with the traumatic event(s), beginning after the traumatic event(s) occurred, as evidenced by one or both of the following:

   1. Avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).

   2. Avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).

D. Negative alterations in cognitions and mood associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:

   1. Inability to remember an important aspect of the traumatic event(s) (typically due to dissociative amnesia and not to other factors such as head injury, alcohol, or drugs).

Trauma- and Stressor-Related Disorders

2. Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world (e.g., "I am bad," "No one can be trusted," "The world is completely dangerous," "My whole nervous system is permanently ruined").
3. Persistent, distorted cognitions about the cause or consequences of the traumatic event(s) that lead the individual to blame himself/herself or others.
4. Persistent negative emotional state (e.g., fear, horror, anger, guilt, or shame).
5. Markedly diminished interest or participation in significant activities.
6. Feelings of detachment or estrangement from others.
7. Persistent inability to experience positive emotions (e.g., inability to experience happiness, satisfaction, or loving feelings).

E. Marked alterations in arousal and reactivity associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:

1. Irritable behavior and angry outbursts (with little or no provocation) typically expressed as verbal or physical aggression toward people or objects.
2. Reckless or self-destructive behavior.
3. Hypervigilance.
4. Exaggerated startle response.
5. Problems with concentration.
6. Sleep disturbance (e.g., difficulty falling or staying asleep or restless sleep).

F. Duration of the disturbance (Criteria B, C, D, and E) is more than 1 month.
G. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.
H. The disturbance is not attributable to the physiological effects of a substance (e.g., medication, alcohol) or another medical condition.

**Specify** whether:

**With dissociative symptoms:** The individual's symptoms meet the criteria for posttraumatic stress disorder, and in addition, in response to the stressor, the individual experiences persistent or recurrent symptoms of either of the following:

1. **Depersonalization:** Persistent or recurrent experiences of feeling detached from, and as if one were an outside observer of, one's mental processes or body (e.g., feeling as though one were in a dream; feeling a sense of unreality of self or body or of time moving slowly).
2. **Derealization:** Persistent or recurrent experiences of unreality of surroundings (e.g., the world around the individual is experienced as unreal, dreamlike, distant, or distorted).

**Note:** To use this subtype, the dissociative symptoms must not be attributable to the physiological effects of a substance (e.g., blackouts, behavior during alcohol intoxication) or another medical condition (e.g., complex partial seizures).

**Specify** if:

**With delayed expression:** If the full diagnostic criteria are not met until at least 6 months after the event (although the onset and expression of some symptoms may be immediate).

## Posttraumatic Stress Disorder for Children 6 Years and Younger

A. In children 6 years and younger, exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways:

1. Directly experiencing the traumatic event(s).
2. Witnessing, in person, the event(s) as it occurred to others, especially primary caregivers.

F. The disturbance causes clinically significant distress or impairment in relationships with parents, siblings, peers, or other caregivers or with school behavior.

G. The disturbance is not attributable to the physiological effects of a substance (e.g., medication or alcohol) or another medical condition.

*Specify* whether:

**With dissociative symptoms:** The individual's symptoms meet the criteria for post-traumatic stress disorder, and the individual experiences persistent or recurrent symptoms of either of the following:

1. **Depersonalization:** Persistent or recurrent experiences of feeling detached from, and as if one were an outside observer of, one's mental processes or body (e.g., feeling as though one were in a dream; feeling a sense of unreality of self or body or of time moving slowly).

2. **Derealization:** Persistent or recurrent experiences of unreality of surroundings (e.g., the world around the individual is experienced as unreal, dreamlike, distant, or distorted).

**Note:** To use this subtype, the dissociative symptoms must not be attributable to the physiological effects of a substance (e.g., blackouts) or another medical condition (e.g., complex partial seizures).

*Specify* if:

**With delayed expression:** If the full diagnostic criteria are not met until at least 6 months after the event (although the onset and expression of some symptoms may be immediate).

## Diagnostic Features

The essential feature of posttraumatic stress disorder (PTSD) is the development of characteristic symptoms following exposure to one or more traumatic events. Emotional reactions to the traumatic event (e.g., fear, helplessness, horror) are no longer a part of Criterion A. The clinical presentation of PTSD varies. In some individuals, fear-based reexperiencing, emotional, and behavioral symptoms may predominate. In others, anhedonic or dysphoric mood states and negative cognitions may be most distressing. In some other individuals, arousal and reactive-externalizing symptoms are prominent, while in others, dissociative symptoms predominate. Finally, some individuals exhibit combinations of these symptom patterns.

The directly experienced traumatic events in Criterion A include, but are not limited to, exposure to war as a combatant or civilian, threatened or actual physical assault (e.g., physical attack, robbery, mugging, childhood physical abuse), threatened or actual sexual violence (e.g., forced sexual penetration, alcohol/drug-facilitated sexual penetration, abusive sexual contact, noncontact sexual abuse, sexual trafficking), being kidnapped, being taken hostage, terrorist attack, torture, incarceration as a prisoner of war, natural or human-made disasters, and severe motor vehicle accidents. For children, sexually violent events may include developmentally inappropriate sexual experiences without physical violence or injury. A life-threatening illness or debilitating medical condition is not necessarily considered a traumatic event. Medical incidents that qualify as traumatic events involve sudden, catastrophic events (e.g., waking during surgery, anaphylactic shock). Witnessed events include, but are not limited to, observing threatened or serious injury, unnatural death, physical or sexual abuse of another person due to violent assault, domestic violence, accident, war or disaster, or a medical catastrophe in one's child (e.g., a life-threatening hemorrhage). Indirect exposure through learning about an event is limited to experiences affecting close relatives or friends and experiences that are violent or accidental (e.g., death due to natural causes does not qualify). Such events include violent per-

sonal assault, suicide, serious accident, and serious injury. The disorder may be especially severe or long-lasting when the stressor is interpersonal and intentional (e.g., torture, sexual violence).

The traumatic event can be reexperienced in various ways. Commonly, the individual has recurrent, involuntary, and intrusive recollections of the event (Criterion B1). Intrusive recollections in PTSD are distinguished from depressive rumination in that they apply only to involuntary and intrusive distressing memories. The emphasis is on recurrent memories of the event that usually include sensory, emotional, or physiological behavioral components. A common reexperiencing symptom is distressing dreams that replay the event itself or that are representative or thematically related to the major threats involved in the traumatic event (Criterion B2). The individual may experience dissociative states that last from a few seconds to several hours or even days, during which components of the event are relived and the individual behaves as if the event were occurring at that moment (Criterion B3). Such events occur on a continuum from brief visual or other sensory intrusions about part of the traumatic event without loss of reality orientation, to complete loss of awareness of present surroundings. These episodes, often referred to as "flashbacks," are typically brief but can be associated with prolonged distress and heightened arousal. For young children, reenactment of events related to trauma may appear in play or in dissociative states. Intense psychological distress (Criterion B4) or physiological reactivity (Criterion B5) often occurs when the individual is exposed to triggering events that resemble or symbolize an aspect of the traumatic event (e.g., windy days after a hurricane; seeing someone who resembles one's perpetrator). The triggering cue could be a physical sensation (e.g., dizziness for survivors of head trauma; rapid heartbeat for a previously traumatized child), particularly for individuals with highly somatic presentations. Stimuli associated with the trauma are persistently (e.g., always or almost always) avoided. The individual commonly makes deliberate efforts to avoid thoughts, memories, feelings, or talking about the traumatic event (e.g., utilizing distraction techniques to avoid internal reminders) (Criterion C1) and to avoid activities, objects, situations, or people who arouse recollections of it (Criterion C2).

Negative alterations in cognitions or mood associated with the event begin or worsen after exposure to the event. These negative alterations can take various forms, including an inability to remember an important aspect of the traumatic event; such amnesia is typically due to dissociative amnesia and is not due to head injury, alcohol, or drugs (Criterion D1). Another form is persistent (i.e., always or almost always) and exaggerated negative expectations regarding important aspects of life applied to oneself, others, or the future (e.g., "I have always had bad judgment"; "People in authority can't be trusted") that may manifest as a negative change in perceived identity since the trauma (e.g., "I can't trust anyone ever again"; Criterion D2). Individuals with PTSD may have persistent erroneous cognitions about the causes of the traumatic event that lead them to blame themselves or others (e.g., "It's all my fault that my uncle abused me") (Criterion D3). A persistent negative mood state (e.g., fear, horror, anger, guilt, shame) either began or worsened after exposure to the event (Criterion D4). The individual may experience markedly diminished interest or participation in previously enjoyed activities (Criterion D5), feeling detached or estranged from other people (Criterion D6), or a persistent inability to feel positive emotions (especially happiness, joy, satisfaction, or emotions associated with intimacy, tenderness, and sexuality) (Criterion D7).

Individuals with PTSD may be quick tempered and may even engage in aggressive verbal and/or physical behavior with little or no provocation (e.g., yelling at people, getting into fights, destroying objects) (Criterion E1). They may also engage in reckless or self-destructive behavior such as dangerous driving, excessive alcohol or drug use, or self-injurious or suicidal behavior (Criterion E2). PTSD is often characterized by a heightened sensitivity to potential threats, including those that are related to the traumatic experience (e.g., following a motor vehicle accident, being especially sensitive to the threat potentially

Frequently, an individual's reaction to a trauma initially meets criteria for acute stress disorder in the immediate aftermath of the trauma. The symptoms of PTSD and the relative predominance of different symptoms may vary over time. Duration of the symptoms also varies, with complete recovery within 3 months occurring in approximately one-half of adults, while some individuals remain symptomatic for longer than 12 months and sometimes for more than 50 years. Symptom recurrence and intensification may occur in response to reminders of the original trauma, ongoing life stressors, or newly experienced traumatic events. For older individuals, declining health, worsening cognitive functioning, and social isolation may exacerbate PTSD symptoms.

The clinical expression of reexperiencing can vary across development. Young children may report new onset of frightening dreams without content specific to the traumatic event. Before age 6 years (see criteria for preschool subtype), young children are more likely to express reexperiencing symptoms through play that refers directly or symbolically to the trauma. They may not manifest fearful reactions at the time of the exposure or during reexperiencing. Parents may report a wide range of emotional or behavioral changes in young children. Children may focus on imagined interventions in their play or storytelling. In addition to avoidance, children may become preoccupied with reminders. Because of young children's limitations in expressing thoughts or labeling emotions, negative alterations in mood or cognition tend to involve primarily mood changes. Children may experience co-occurring traumas (e.g., physical abuse, witnessing domestic violence) and in chronic circumstances may not be able to identify onset of symptomatology. Avoidant behavior may be associated with restricted play or exploratory behavior in young children; reduced participation in new activities in school-age children; or reluctance to pursue developmental opportunities in adolescents (e.g., dating, driving). Older children and adolescents may judge themselves as cowardly. Adolescents may harbor beliefs of being changed in ways that make them socially undesirable and estrange them from peers (e.g., "Now I'll never fit in") and lose aspirations for the future. Irritable or aggressive behavior in children and adolescents can interfere with peer relationships and school behavior. Reckless behavior may lead to accidental injury to self or others, thrill-seeking, or high-risk behaviors. Individuals who continue to experience PTSD into older adulthood may express fewer symptoms of hyperarousal, avoidance, and negative cognitions and mood compared with younger adults with PTSD, although adults exposed to traumatic events during later life may display more avoidance, hyperarousal, sleep problems, and crying spells than do younger adults exposed to the same traumatic events. In older individuals, the disorder is associated with negative health perceptions, primary care utilization, and suicidal ideation.

## Risk and Prognostic Factors

Risk (and protective) factors are generally divided into pretraumatic, peritraumatic, and posttraumatic factors.

### Pretraumatic factors

**Temperamental.**   These include childhood emotional problems by age 6 years (e.g., prior traumatic exposure, externalizing or anxiety problems) and prior mental disorders (e.g., panic disorder, depressive disorder, PTSD, or obsessive-compulsive disorder [OCD]).

**Environmental.**   These include lower socioeconomic status; lower education; exposure to prior trauma (especially during childhood); childhood adversity (e.g., economic deprivation, family dysfunction, parental separation or death); cultural characteristics (e.g., fatalistic or self-blaming coping strategies); lower intelligence; minority racial/ethnic status; and a family psychiatric history. Social support prior to event exposure is protective.

**Genetic and physiological.**   These include female gender and younger age at the time of trauma exposure (for adults). Certain genotypes may either be protective or increase risk of PTSD after exposure to traumatic events.

# Other Circumstances of Personal History

| V15.49 (Z91.49) | Other Personal History of Psychological Trauma |
| V15.59 (Z91.5) | Personal History of Self-Harm |
| V62.22 (Z91.82) | Personal History of Military Deployment |
| V15.89 (Z91.89) | Other Personal Risk Factors |

**V69.9 (Z72.9)   Problem Related to Lifestyle**
This category should be used when a lifestyle problem is a specific focus of treatment or directly affects the course, prognosis, or treatment of a mental or other medical disorder. Examples of lifestyle problems include lack of physical exercise, inappropriate diet, high-risk sexual behavior, and poor sleep hygiene. A problem that is attributable to a symptom of a mental disorder should not be coded unless that problem is a specific focus of treatment or directly affects the course, prognosis, or treatment of the individual. In such cases, both the mental disorder and the lifestyle problem should be coded.

**V71.01 (Z72.811)   Adult Antisocial Behavior**
This category can be used when the focus of clinical attention is adult antisocial behavior that is not due to a mental disorder (e.g., conduct disorder, antisocial personality disorder). Examples include the behavior of some professional thieves, racketeers, or dealers in illegal substances.

**V71.02 (Z72.810)   Child or Adolescent Antisocial Behavior**
This category can be used when the focus of clinical attention is antisocial behavior in a child or adolescent that is not due to a mental disorder (e.g., intermittent explosive disorder, conduct disorder). Examples include isolated antisocial acts by children or adolescents (not a pattern of antisocial behavior).

## Problems Related to Access to Medical and Other Health Care

| V63.9 (Z75.3) | Unavailability or Inaccessibility of Health Care Facilities |
| V63.8 (Z75.4) | Unavailability or Inaccessibility of Other Helping Agencies |

## Nonadherence to Medical Treatment

**V15.81 (Z91.19)   Nonadherence to Medical Treatment**
This category can be used when the focus of clinical attention is nonadherence to an important aspect of treatment for a mental disorder or another medical condition. Reasons for such nonadherence may include discomfort resulting from treatment (e.g., medication side effects), expense of treatment, personal value judgments or religious or cultural beliefs about the proposed treatment, age-related debility, and the presence of a mental disorder (e.g., schizophrenia, personality disorder). This category should be used only when the problem is sufficiently severe to warrant independent clinical attention and does not meet diagnostic criteria for psychological factors affecting other medical conditions.

**278.00 (E66.9)   Overweight or Obesity**
This category may be used when overweight or obesity is a focus of clinical attention.

**V65.2 (Z76.5)   Malingering**
The essential feature of malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs. Under some circumstances, malingering may repre-

Other Conditions That May Be a Focus of Clinical Attention                                      **727**

sent adaptive behavior—for example, feigning illness while a captive of the enemy during wartime. Malingering should be strongly suspected if any combination of the following is noted:

1. Medicolegal context of presentation (e.g., the individual is referred by an attorney to the clinician for examination, or the individual self-refers while litigation or criminal charges are pending).
2. Marked discrepancy between the individual's claimed stress or disability and the objective findings and observations.
3. Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen.
4. The presence of antisocial personality disorder.

Malingering differs from factitious disorder in that the motivation for the symptom production in malingering is an external incentive, whereas in factitious disorder external incentives are absent. Malingering is differentiated from conversion disorder and somatic symptom–related mental disorders by the intentional production of symptoms and by the obvious external incentives associated with it. Definite evidence of feigning (such as clear evidence that loss of function is present during the examination but not at home) would suggest a diagnosis of factitious disorder if the individual's apparent aim is to assume the sick role, or malingering if it is to obtain an incentive, such as money.

### V40.31 (Z91.83)   Wandering Associated With a Mental Disorder

This category is used for individuals with a mental disorder whose desire to walk about leads to significant clinical management or safety concerns. For example, individuals with major neurocognitive or neurodevelopmental disorders may experience a restless urge to wander that places them at risk for falls and causes them to leave supervised settings without needed accompaniment. This category excludes individuals whose intent is to escape an unwanted housing situation (e.g., children who are running away from home, patients who no longer wish to remain in the hospital) or those who walk or pace as a result of medication-induced akathisia.

**Coding note:** First code associated mental disorder (e.g., major neurocognitive disorder, autism spectrum disorder), then code V40.31 (Z91.83) wandering associated with [specific mental disorder].

### V62.89 (R41.83)   Borderline Intellectual Functioning

This category can be used when an individual's borderline intellectual functioning is the focus of clinical attention or has an impact on the individual's treatment or prognosis. Differentiating borderline intellectual functioning and mild intellectual disability (intellectual developmental disorder) requires careful assessment of intellectual and adaptive functions and their discrepancies, particularly in the presence of co-occurring mental disorders that may affect patient compliance with standardized testing procedures (e.g., schizophrenia or attention-deficit/hyperactivity disorder with severe impulsivity).